**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THURMAN ROSS, by and behalf of himself and all others similarly situated,** | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12 C 276** |
| | ) | |
| **CAREER EDUCATION CORP., GARY E. McCULLOUGH, and MICHAELGRAHAM,** | ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Thurman Ross, on behalf of a proposed class of similarly situated persons, sued Career Education Corporation (CEC), Gary E. McCullough, and Michael J. Graham, alleging securities fraud in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. The Court appointed several entities to act as co-lead plaintiffs, who then filed a consolidated class action complaint. Defendants have moved to dismiss the complaint for failure to state a claim and for failure to plead fraud with sufficient particularity. For the reasons stated below, the Court dismisses the claims against Graham but otherwise denies defendants' motion.

**Background**

The Court draws the following facts from plaintiffs' complaint and accepts them as true for purposes of the motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (*Tellabs II*).

CEC owns and operates for-profit professional schools and colleges. With a focus on offering "career-oriented" disciplines, CEC operates across ninety campuses and serves over 100,000 students. Almost all of CEC's revenue derives from federal financial aid provided to its students under Title IV (Title IV) of the Higher Education Act of 1965. Schools seeking to accept tuition payments from Title IV funding must be accredited by a national accrediting organization certified by the U.S. Department of Education. Meeting the requirements for accreditation is therefore essential for CEC to stay in business.

The two primary accrediting bodies covering CEC's schools are the Accrediting Commission of Career Schools and Colleges (ACCSC) and the Accrediting Counsel for Independent Colleges and Schools (ACICS). To gain accreditation from these organizations and thereby receive access to Title IV funding, a school must show that it complies with certain minimum standards. Compliance is based to a significant extent on the school achieving certain job placement rates for its graduates. These rates are calculated by counting the number of graduates who are gainfully employed in positions that require the degree they received.

Plaintiffs are individual and corporate investors that purchased CEC stock during the proposed class period, February 19, 2009 through November 21, 2011. According to plaintiffs' complaint, prior to the class period, CEC faced a number of lawsuits and

government investigations, as well as scrutiny from accrediting agencies, regarding alleged falsification of job placement rates. In 2007, plaintiffs allege, years of legal and regulatory troubles led to the ouster of CEC's co-founder and the appointment of McCullough as CEO. CEC publicly heralded McCullough's arrival as marking a new era of compliance for the company.

On May 24, 2011, CEC reported that it had received a subpoena from the Attorney General of the State of New York (NYAG) requesting documents pertaining to student employment outcomes and placement rates of graduates. Shortly thereafter, on August 3, 2011, CEC reported on a Form 8-K filed with the Securities and Exchange Commission that in connection with preparing its response to the NYAG subpoena, CEC had found "improper practices . . . relating to the determination of reported placement rates." Compl. ¶ 126. CEC also stated that due to this discovery, CEC engaged the law firm of Dewey & LeBoeuf (Dewey) to conduct an internal investigation of CEC's student placement practices across the country. The price of CEC's stock thereafter declined.

On October 31, 2011, McCullough and three senior vice presidents resigned. The very next day, CEC announced in a press release that the Dewey investigation, which had involved only CEC's 2010-11 placement rates, "confirmed the existence of improper placement determination practices" and found placements that "did not meet applicable placement guidelines established by [CEC]." Compl. ¶ 128. By November 3, 2011, the price of CEC's stock had fallen dramatically. On November 21, 2011, CEC announced receipt of a "show cause" letter from ACICS, threatening suspension of its accreditations of forty-nine CEC schools. Since the time that plaintiffs filed their

complaint, CEC has publicly declined to extend Dewey's investigation of its placement rate practices to time periods before 2010-11.  Compl. ¶ 134.

Plaintiffs allege that defendants violated SEC Rule 10b-5 by knowingly making numerous materially false public statements during the class period about CEC's placement rates, regulatory compliance, and accreditation status.  These misleading statements, plaintiffs allege, artificially inflated CEC's stock value until the truth about its practices became public.  Plaintiffs allege that McCullough and Graham are separately liable under section 20(a) as control persons.  Defendants have moved to dismiss all of plaintiffs' claims.

## Discussion

To prevail on a Rule 10b-5 claim, a plaintiff must prove that the defendant:  (1) made a misstatement or omission of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiff relied; and (5) the plaintiff's reliance was the proximate cause of its injuries.  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  The first three of these elements are subject to "[e]xacting pleading requirements" pursuant to the Private Securities Litigation Reform Act of 1995 (PSLRA).  *Tellabs II*, 551 U.S. at 313; *see also* 15 U.S.C. § 78u-4(a)(1).  This requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [to] state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  With respect to scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2).

The requirement of a "strong" inference means the inference must be cogent, more than plausible, and "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 310.

Under the PSLRA, a court must consider the complaint in its entirety and evaluate the factual allegations as a whole. *Id.* at 322-23. Particular allegations are not assessed in a vacuum. *Id.* Thus, "one or more deficient allegations will not doom [a] complaint if it is otherwise sufficient." *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10 C 7031, 2012 WL 1030474, at *4 (N.D. Ill. Mar. 27, 2012).

Defendants argue that plaintiffs do not sufficiently allege any misleading statements attributable to defendants and have failed to allege scienter and loss causation sufficiently. Defendants also contend there is no basis for control-person liability under section 20(a) with regard to McCullough and Graham.

## 1. Section 10(b) claims

### a. Materially misleading statements

Plaintiffs allege that defendants made a number of false and misleading statements throughout the class period. Plaintiffs categorize the statements in three groups: (1) statements about placement rates; (2) statements about regulatory compliance; and (3) statements about accreditation.

### i. Statements regarding reported placement rates

As noted above, the PSLRA's heightened pleading standard requires plaintiffs to specify the allegedly misleading statements and explain why they were untrue. *See* 15 U.S.C. § 78u–4(b)(1). This means that plaintiffs must allege, with particularity, the factual basis for their allegations. *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d

805, 835 (N.D. Ill. 2008). The relevant question is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) (*Tellabs I*), *rev'd on other grounds*, 551 U.S. 308 (2007).

Plaintiffs contend that during the class period, defendants improperly determined and reported falsified job placements. In the complaint, plaintiffs identify various excerpts from interviews, publications, and public disclosures in which defendants claim the absence of "any significant declines" in their placement rates. Compl. ¶ 143. Plaintiffs also describe statements in which defendants affirmatively represented that CEC's high placement rates pertained to students "who have obtained employment in their field or a related field" when, plaintiffs argue, they had not. *Id.* ¶ 145.

According to defendants, these statements were neither false nor misleading. Defendants contend that because ACICS accreditation criteria provides no specific guidance on what types of employment can be counted as a placement, CEC's reported placement rates cannot have been false. This argument incorrectly suggests that plaintiffs' allegations are dependent on the ACICS guidelines. In fact, they are not.

Plaintiffs cite CEC's November 1, 2011 press release, in which the results of the Dewey investigation into CEC's reporting practices for the 2010-11 period are discussed. In this press release, CEC reported a finding of "improper placement determination practices." Compl. ¶ 128. CEC also specifically stated in the release that the Dewey investigation found that CEC "did not meet applicable placement guidelines *established by [CEC].*" *Id.* (emphasis added). Thus, irrespective of whether ACICS' guidelines were sufficiently clear, plaintiffs allege that CEC misrepresented its

placement rates by comparison to CEC's own standards. Thus, plaintiffs have adequately alleged, through defendants' own statements, facts sufficient to support the belief that CEC's reported job placements were improperly determined, at least for the 2010-11 period.

With respect to alleged misrepresentations for the period preceding 2010-11, plaintiffs rely on a number of interviews with six confidential witnesses (CWs). According to the CWs, who worked for CEC at different schools, defendants artificially inflated placement numbers on a regular basis both before and during the class period. For example, plaintiffs allege that according to CW1, CW5, and CW6, CEC counted as placements short-term jobs at community health fairs – jobs that lasted only one to twelve days, and in some cases as little as a few hours. *Id.* ¶¶ 106-07, 113. Such improper practices, plaintiffs allege, were not limited to health fairs. According to CW1, CEC often misused "waiver status," a classification for graduates who were not looking for jobs due to temporary circumstances such as pregnancy or military service. When the particular circumstance would end, however, CEC would maintain the graduate's waiver status to mask the lack of a placement.. *Id.* ¶ 116. In addition, CW1 and CW4 have informed plaintiffs that it was common practice at CEC to count as placements related to a student's field of study jobs that were actually unrelated to that field. *Id.* ¶ 119. Buttressing these allegations, plaintiffs offer allegations tending to show that CEC itself did not consider such placements to be legitimate. Plaintiffs allege, through the statements of the CWs, that students working in one-day health fairs signed "non-traditional" placement forms stating that CEC would continue to assist them in their job search once their short-term position ended. *Id.* ¶ 120. Plaintiffs allege, and the alleged

statements by their confidential witnesses corroborate, that CEC made no distinction between "traditional" and "non-traditional" placements when reporting, even though such graduates ought not have been considered "placed" by CEC's own definition. *Id.*

Defendants argue that the statements by the CWs should be discounted because "information from anonymous sources is not regarded as compelling." Defs.' Opening Br. at 22 (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007)). As plaintiffs point out, however, this is true only when the complaint lacks enough detail for the Court to determine whether the unnamed witnesses were "in a position to know at first hand the facts to which they are prepared to testify." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008) (*Tellabs III*). So long as plaintiffs describe with particularity the sources of their information, including how the sources were in a position to know the matters alleged, such allegations are sufficient under the PSLRA. *See Taubenfeld v. Career Educ. Corp.*, No. 03 C 8884, 2005 WL 350339, at *8 (N.D. Ill. Feb. 11, 2005) (stating that the particularity requirement applies to allegations based on counsel's interviews with confidential witnesses); *DeVry*, 2012 WL 1030474, at *3 (noting that a securities fraud plaintiff must "'describe [its] sources with sufficient detail to support the probability that a person in the position occupied by the source would possess the information alleged'") (quoting *Tellabs I*, 437 F.3d at 596).

Plaintiffs have described the confidential witnesses with a high degree of specificity. For each CW, plaintiffs provide the witness's title, period of employment, and the state or college in which each witness was employed. *See Tellabs I*, 437 F.3d at 597 (finding plaintiffs' descriptions of confidential witnesses' positions and dates of employment sufficient to show that witnesses were in a position to provide reliable

information in determining whether defendants' statements were misleading).  For

example, plaintiffs describe CW1 as follows:

> Confidential Witness No. 1 ("CW1"), a former Career Services
> Representative at a Sanford-Brown Institute location in New Jersey from
> 2006 to 2009, and then the Director of Career Services in 2009 through
> December 2011, attests that there was tremendous pressure put on
> him/her daily to . . . put CEC[] graduates on "waivers."

Compl. ¶¶ 33-34.

Moreover, plaintiffs clearly identify the source of each particular allegation,

explaining in each paragraph of the complaint exactly which CW reported what

information.  *See DeVry*, 2012 WL 1030474, at *3 (N.D. Ill. Mar. 27, 2012) (emphasizing

need to link anonymous sources with particular allegations).  Plaintiffs also allege that

all of their CWs worked as career services advisors or directors in varying geographic

areas and that the CWs have reported that the practice of manipulating placement rates

came from "all the way up" the corporate ladder.  Compl. ¶ 112.  Given all of these

factors, plaintiffs' allegations regarding false reporting of placement rates meet the

PSLRA's particularity requirements.

To be actionable, an alleged misleading statement must be material.  Materiality

requires "a substantial likelihood" that disclosure of CEC's actual placement rate "would

have been viewed by the reasonable investor as having significantly altered the total

mix of information made available."  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct.

1309, 1312 (2011) (citation omitted).  Plaintiffs contend that had defendants reported

CEC's actual, uninflated placement rates, plaintiffs and others would not have invested

in CEC.  Plaintiffs have alleged a company-wide, routine practice resulting in a

substantial discrepancy between CEC's disclosed and actual placement rates.  *See In*

*re ITT Educ. Services, Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012) (finding for-profit school's alleged misrepresentation regarding employment placement rate immaterial because plaintiff failed to show an "especially egregious discrepancy between [the Company's] disclosed rate and its actual rate"). This, in turn, is substantially likely to have significantly altered the mix of information available to investors. To be more specific, because CEC's business model is based on offering "career-oriented" education, a significant discrepancy in reported vs. actual placement rates of the sort that plaintiffs allege is substantially likely to have had an effect on how a potential investor viewed the company's revenues and prospects. Plaintiffs have thus met the requirements for pleading materiality.

Plaintiffs also allege that the price of CEC's stock quickly diminished once news of CEC's improper placement practices was revealed in public disclosures following the company's receipt of the NYAG subpoena. The market's negative reaction further tends to show that defendants' alleged misstatements were material. *See Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 902 (N.D. Ill. 2001) (even a small market reaction to an alleged misstatement suggests the misstatement was material to reasonable investors). For all of these reasons, plaintiffs have sufficiently alleged a substantial likelihood that disclosure of CEC's actual placement rate would have "significantly altered the reasonable investor's deliberations" during the relevant period. *See Matrixx Initiatives*, 131 S. Ct. at 1312.

### ii.  Statements regarding regulatory compliance

Plaintiffs also allege that during the class period, defendants made misleading statements regarding CEC's compliance with legal and regulatory requirements, particularly with respect to Title IV eligibility.  Plaintiffs point to such statements as:

- McCullough's statement in February 2009 regarding CEC's regulatory past: "[T]he most significant issues are behind us."  Compl. ¶ 180.

- Graham's February 2009 statement regarding past compliance issues: "We've put almost all the legal issues behind us."  *Id.* ¶ 181.

- McCullough's September 2009 statement regarding accreditation issues and lawsuits: "We've eliminated virtually all of those overhangs at this point in time."  *Id.* ¶ 182.

- Graham's June 2010 statement: "[W]e've had a great increase in our culture in terms of compliance and quality."  *Id.* ¶ 185.

- CEC's 2008 10-K: "We are committed to maintaining an industry-leading compliance program."  *Id.* ¶ 190.

- CEC's company spokesman's May 2011 statement regarding a new compliance culture: "[W]e have carefully reviewed and modified our policies and practices for reporting job placement rates, admissions and advertising."  *Id.* ¶ 192.

Defendants contend that the first three statements, and others like them described in the complaint, cannot be misleading because they were true.  Defs.' Opening Br. at 18.  They argue that at the time the statements were made, CEC's major legal and compliance issues had been resolved – prior legal actions against CEC related to compliance had settled, and that Department of Justice and SEC investigations had resulted in no legal action being taken.  *Id.* at 18.  The PSLRA, however, requires a court to consider a complaint in its entirety and not simply assess

individual allegations in isolation. *Tellabs II*, 551 U.S. at 322. It follows that CEC's statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation. *See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp. 2d 858, 878 (N.D. Ill. 2011) ("Even a statement which is literally true, if susceptible to quite another interpretation by a reasonable investor, may properly be considered misleading.").

In a preliminary section of the complaint, plaintiffs outline CEC's long history of compliance troubles prior to the class period. They cite, among other things:

- two lawsuits filed in 2003 that alleged fraudulent practices with respect to CEC's methods of reporting job placement rates and of passing accreditation audit inspections;

- a 2004 securities fraud action alleging falsification of student records to increase graduation rates;

- a probationary period imposed on CEC in 2005 by the Commission on Colleges of the Southern Association of Colleges and Schools for "failure to correct deficiencies of significant non-compliance";

- a 2005 Department of Education ban on approving new school acquisitions or applications for additional branch campuses due to CEC's "history of non-compliance" and misrepresentations about graduate employment rates;

- a 2005 SEC investigation regarding allegations that student records were falsified to maintain access to Title IV funds; and

- a 2006 order from the Department of Education demanding the return of approximately $500,000 in federal financial student aid to resolve claims that students were not eligible for Title IV loans.

Compl. ¶¶ 54-75.

In their complaint, plaintiffs go on to detail how the matters listed above caused CEC's revenue and its stock price to drop, creating concern among various analysts, shareholders, and ultimately CEC's board of directors that the company was in dire need of an overhaul of its compliance regime. Plaintiffs conclude the complaint's historical section on CEC's regulatory past by providing allegations regarding CEC's co-founder's departure, followed by McCullough's recruitment and hiring, which plaintiffs allege CEC touted as ushering in a new era of reform at CEC.

The Court concludes that in light of these allegations, plaintiffs have adequately alleged that defendants' statements to the effect that CEC's "significant" legal issues had been put behind it were materially misleading. CEC made these statements during the class period, shortly after a change in management resulting directly from the company's poor compliance track record. Given that context, the statements reasonably could have been understood to convey the message that CEC had changed its placement-rate practices for which it had come under fire. Given the nature of CEC's tainted past, defendants' statements about the company's current status – that it had eliminated its significant regulatory issues – could have misled a reasonable investor to believe that CEC had remedied the practice that led to those problems – the company's alleged improper reporting of placement rates. *See Tellabs I*, 437 F.3d at 595. Plaintiffs have sufficiently alleged these statements were materially misleading.

Defendants also argue that the statements identified by plaintiffs regarding CEC's "culture of compliance" are mere puffery and too vague to be actionable. Again, as with all statements alleged to be materially misleading, this Court must take into account the context in which the statements were made to determine whether they

amounted only to puffery.  *See FTC  v. Trudeau*, 579 F.3d 754, 766 (7th Cir. 2009) ("In

determining whether a statement is puffery, the context matters.") (citation omitted);

*Casella v. Webb,* 883 F.2d 805, 808 (9th Cir.1989) ("What might be innocuous 'puffery'

or mere statement of opinion standing alone may be actionable as an integral part of a

representation of material fact when used to emphasize and induce reliance upon such

a representation.").

    In support of their argument, defendants rely on *Anderson v. Abbott Laboratories*,

in which the court held that "[v]ague statements about industry leadership and

unquantified growth are classic puffery."  *Anderson*, 140 F. Supp. 2d at 905.  In that

case, the court considered a company's statements that it was "a leader and has grown"

and that it had "listened very closely to the customer to understand what the market

wanted."  *Id*.  The court found that the statements were not only devoid of content, but

more importantly that they were only tangentially related to the plaintiffs' allegations of

regulatory noncompliance.  *Id*. at 905-06.  Absent any reference to regulatory issues,

the court found that no reasonable investor could conclude from the statements that the

company had no regulatory issues.  *Id*.

    In this case, by contrast, defendants' alleged statements were made in a context

relating directly to regulatory compliance.  The statements are not broad,

commendatory, or generally optimistic statements regarding the overall health of the

business.  Rather, as is evident from their context, the statements reasonably could

have been understood to convey that CEC had rectified a long period of sustained

compliance problems.  Put another way, a reasonable investor could understand CEC's

representations about a "culture of compliance" to mean that the company was saying

that it had brought its reporting practices into compliance with applicable standards. For these reasons, the Court rejects defendants' contention that these statements amounted only to non-actionable puffery.

Plaintiffs allege a third set of misleading statements, regarding defendants' accreditation status. But because plaintiffs have, by the allegations already discussed, met their burden of alleging the first requirement of a Rule 10b-5 claim, the Court need not address the statements in the third category.

### b. Scienter

Plaintiffs' claims require them to prove scienter, namely, that defendants intended "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 188 (1976). This means that plaintiffs must prove that defendants either knew the particular statement was false or were reckless in disregarding a substantial risk that it was false. *Tellabs III*, 513 F.3d at 704. In this context, recklessness is defined as an "extreme departure from the standards of ordinary care" such that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. *Id.*

As stated above, the PSLRA requires a plaintiff to state with particularity facts giving rise to a "strong inference" that the defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2). To determine whether a strong inference of scienter exists, a court must engage in a comparative analysis. First, the court must accept as true all factual allegations in the complaint; second, the court must consider all of the facts alleged as a collective whole; and third, the court must take into account plausible innocent explanations for the defendant's conduct. *Tellabs II*, 551 U.S. at 322. Ultimately, a

complaint satisfies the PSLRA's requirements if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Id.* at 324.

Plaintiffs' complaint contains a number of allegations that, when taken collectively, support a strong inference of scienter. As discussed above, the CWs cited by plaintiffs have detailed facts supporting the claim that defendants' practice of improperly inflating job placement statistics was both widespread and pervasive. The magnitude of defendants' alleged fraud lends weight to plaintiffs' allegations of scienter. *See Rehm v. Eagle Finance Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the error, the less believable are defendants' protests that they were completely unaware . . . and the stronger is the inference that defendants must have known.").

Further, the facts alleged in the statements of the CWs indicate that "everyone" at CEC, including McCullough, was informed directly of problems regarding CEC's placement rates but nevertheless made contrary representations. Compl. ¶ 109. For instance, CW1 states that short-term health fair placements were widely and regularly discussed on weekly conference calls for CEC career services directors and that the improper practices were "encouraged and condoned." *Id.* ¶ 110. Plaintiffs also allege in the complaint that CW1 delivered a PowerPoint presentation regarding short-term job placements to the CEC divisional director responsible for overseeing all of the Presidents at CEC's colleges. According to CW1, the divisional director thought the presentation was "fabulous" and raised no objections to counting short-term jobs in CEC's reported placement rates. *Id.* ¶ 111. Given CEC's history of non-compliance, it

is highly unlikely that none of the career services directors or the divisional director were aware that it was improper to count short-term jobs in CEC's reported rates.

Defendants posit that other facts alleged in the complaint give rise to inferences contrary to a finding of scienter that tip the scale in their favor. Specifically, defendants argue that their decision to immediately investigate CEC's reporting practices following receipt of the NYAG subpoena is evidence that the company was doing "exactly what [it] should have done." Defs.' Opening Br. at 27. But it is at least an equally plausible and compelling inference that, given what plaintiffs have alleged about CEC's checkered past and its subsequent claims of renewed compliance, defendants initiated the inquiry as an exercise in damage control and to head off further investigations. Indeed, defendants' decision not to extend the investigation to earlier years covered by the class period – years for which plaintiffs' CWs allege massive reporting problems – lends credence to this contrary inference.

Plaintiffs also sufficiently allege an inference of scienter with respect to CEC's CEO, McCullough. For example, CW1 states that McCullough attended a three-day conference of career services directors at CEC's headquarters and that he told the attendees what a "great job" they were doing, specifically with respect with short-term placements. *Id.* ¶ 110. Defendants argue that this merely suggests an inference that McCullough supported the practice of having graduates work at health fairs. But such an inference is not more compelling than the opposing inference, when one considers the complaint in its entirety. *Tellabs II*, 551 U.S. at 322 (explaining that the inquiry "is whether *all* the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

standard"). Though McCullough's claimed knowledge that students were taking short-term jobs does not necessarily indicate awareness that those jobs were being reported improperly, "when facts known to a person place him on notice of risk, he cannot ignore the facts and plead ignorance of the risk." *Tellabs III*, 513 F.3d at 704.

Plaintiffs allege facts supporting an inference that McCullough was on such notice. Indeed, CEC's public statements suggest that McCullough was hired for the express purpose of, among other things, fixing CEC's compliance problems regarding its placement reporting. The complaint supports this claim with various public statements made by CEC upon McCullough's hiring, for instance: "[McCullough] has the critical qualities we were looking for in an individual to lead . . . a highly regarded record in guiding a regulated organization that places a premium on controls and procedures." Compl. ¶ 81. Moreover, as discussed above, McCullough made numerous public pronouncements in which he asserted that CEC was working on and had accomplished this task. One may readily and reasonable infer from these facts that McCullough made it his business to look into CEC's reporting practices, determine what constituted proper reporting, and bring the company into compliance. *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1060 (C.D. Cal. 2008) (finding plaintiffs properly pled scienter as to directors who were "specifically tasked with monitoring" the very issues that underlay the allegations of fraud). Given this responsibility, the complaint sufficiently supports a reasonable inference, as compelling as any contrary inference, that McCullough was aware that, for instance, short-term placements at health fairs should not be considered "placements" but that CEC nonetheless was reporting them as though they amounted to permanent employment.

*See Desai v. Gen. Growth Properties, Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009)

(stating that a strong inference of scienter may be found where "it is almost

inconceivable" that an individual defendant would be unaware of the matters at issue).

Plaintiffs also allege that McCullough's resignation the day before the results of

the Dewey investigation were announced shows that he made the alleged misleading

statements with scienter.  Defendants argue that this allegation, standing alone, does

not suggest any knowledge regarding the misleading nature of the challenged

statements.  The Seventh Circuit has not examined in detail the impact of a corporate

officer's resignation on a finding of scienter.  The Ninth Circuit and district courts in that

circuit have ruled that an inference of scienter arises only when a resignation or

termination is accompanied by additional evidence of the defendant's "wrongdoing."

*See, e.g., Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009)

(finding no inference of scienter where complaint merely alleged CFO's resignation in

close proximity to alleged fraud); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp.

2d 1248, 1273–74 (N.D. Cal. 2000) (finding strong circumstantial evidence of fraud from

multiple public statements by new corporate chairman and CEO that the terminated

executives were fired for cause because they knew or should have known of the

fraudulent accounting practices); *Middlesex Ret. Sys. v. Quest Software Inc.,* 527 F.

Supp. 2d 1164, 1188 (C.D. Cal. 2007) (finding support for inference of scienter where

officer resigned specifically to avoid cooperating with internal investigation).  But even if

a bare allegation of a high officer's resignation is not enough to support an inference of

scienter, that is not the situation here.  Plaintiffs have alleged that McCullough's

resignation preceded the disclosure of CEC's placement rate improprieties by only one

day and that three other senior vice presidents resigned concurrently. Just as importantly, given the complaint's additional allegations regarding McCullough's knowledge of improper practices, the timing of his resignation lends weight to a finding of scienter.

Defendants also argue that plaintiffs' failure to allege any personal motive to defraud causes the scienter needle to move in their favor. But defendants' argument regarding McCullough's lack of personal motive to gain financially does not add much to their argument. Though it is true that motive can be a relevant consideration, and personal financial gain may weigh in favor of an inference of scienter, "the absence of a motive allegation is not fatal." *Tellabs I*, 437 F.3d at 601. In the present context, where the complaint's other allegations provide a strong basis to infer intent, there is little if any significance attributable to the absence of an allegation of a personal financial motive. Consequently, plaintiffs have alleged sufficient facts supporting the strong inference that McCullough acted with scienter.

By contrast, plaintiffs allege insufficient facts to permit a reasonable inference of scienter with respect to CFO Graham. Under the PSLRA, "plaintiffs must create a strong inference of scienter with respect to *each* individual defendant." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (emphasis added); *Tellabs II*, 551 U.S. at 326 ("[A]llegations of scienter made against one defendant cannot be imputed to all other individual defendants."). In their complaint, however, plaintiffs allege merely that Graham was the CFO of CEC, that he "knew" about all material aspects of CEC's operations, and that he approved the company's SEC filings. Compl. ¶ 23. Plaintiffs allege no direct interaction that any CW had with Graham, nor do they allege how he

would be privy to information that would make his allegedly misleading statements knowingly or recklessly false. Plaintiffs' claim against Graham cannot survive "on information and belief" alone. *Davis v. SPSS, Inc.,* 385 F. Supp. 2d 697, 718 (N.D. Ill. 2005) (stating that a plaintiff must provide "some basis for his belief" at the motion to dismiss stage). The Court concludes that plaintiffs have alleged insufficient facts to support a strong inference of scienter against Graham.

### c.     Loss causation

The final element in dispute regarding plaintiffs' section 10(b) claim is loss causation. To state a claim, a plaintiff must allege that "the act or omission of the defendant alleged to violate [section 10(b)] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Although a plaintiff need not plead this causal connection with particularity, a simple allegation that "the price on the date of a stock's purchase was inflated due to the misrepresentation" does not suffice. *Dura Pharm., Inc. v. Brondo*, 544 U.S. 336, 342-43 (2005) ("[T]o 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires.") (citation omitted). Rather, Plaintiffs must allege that "but for the circumstances that the fraud concealed, the investment . . . would not have lost its value." *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (internal quotation marks omitted).

In this case, because plaintiffs are pursuing a "fraud-on-the-market" theory of loss causation, they must allege that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the stock's value deteriorated once the market learned of the deception. *Id.* at 995. Plaintiffs may satisfy the second part of this test by alleging the existence of a "corrective disclosure," in which the truth about

the previously misrepresented information was revealed and was followed by a decline in stock price. *See*, *e.g.*, *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009) ("Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops").

Plaintiffs allege that in 2011, a series of corrective disclosures about CEC's alleged misrepresentations caused CEC's stock price to fall. According to the allegations in the complaint, CEC released its first corrective disclosure on May 24 via a Form 8-K in which the company stated that it had received a subpoena from the NYAG in connection with an investigation of whether it was in compliance with state consumer protection laws. Specifically, CEC stated in the Form 8-K that "[p]ursuant to the [s]ubpoena, the Attorney General has requested . . . documents and detailed information on a broad spectrum of business practices for the time period May 17, 2005 to the present." Compl. ¶ 125. The next day, the price of CEC stock dropped by 5.16%. On August 3, CEC released a second Form 8-K, announcing that it had found "improper practices" at certain of its health education segment campuses relating to the determination of reported placement rates. *Id.* ¶ 126. The price of CEC stock promptly dropped by another 15.4%. Plaintiffs go on to detail in their complaint the subsequent Dewey investigation regarding CEC's placement-rate practices, the results of which were reported to ACICS and in a November 1, 2011 press release. This third disclosure stated that – based on an investigation of CEC's reported 2010-11 placement rates – CEC "did not meet applicable placement guidelines." The stock price then fell for a third time, by 54%. *Id.* ¶ 128. Finally, on November 21, CEC announced in another Form 8-K that in response to the findings reported in the Dewey investigation, the company had

received a letter from ACICS directing it to show cause why the accreditations of CEC's schools should not be suspended.  *Id.* ¶ 132.  The price of CEC's stock then fell by an additional 6.2%.

Defendants contend that plaintiffs' allegations fail to state a viable claim of loss causation for the company's alleged misrepresentations concerning years prior to the 2010-11 reporting period.  In doing so, defendants focus on the November 1 press release, which disclosed Dewey's determination of CEC's improper placement practices, but only with respect to CEC's 2010-11 reporting period.  Because the November 21 disclosure of the show cause demand was also based on Dewey's findings, CEC argues that it, too, was limited to informing the market of alleged misrepresentations for the 2010-11 reporting period.  CEC does not address plaintiffs' allegations regarding the May 24 and August 3 disclosures.

The Court agrees that neither the November 1 press release nor the November 21 show cause disclosure contained any information exposing CEC's alleged misrepresentations that had occurred prior to the 2010-11 reporting period.  Corrective disclosures limited to exposing misrepresentations from a specific time period apply only to that time period.  *See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007) (granting motion to dismiss because disclosure about misrepresentations expressly limited to 1998 and 1999 did not correct alleged misrepresentation from 1997).

Plaintiffs' allegations regarding CEC's May 24 Form 8-K disclosure are equally unavailing.  Although the disclosure refers to a period as far back as 2005, it mentions nothing about CEC's improper *reporting* practices – only that the NYAG's subpoena

relates to a "broad spectrum of *business* practices." Compl. ¶ 125 (emphasis added). The generic reference to business practices logically includes more than just reporting practices. Thus the decline in CEC's stock price following that disclosure could be attributable to some factor other than reporting practices. For this reason, the allegation that CEC's May 24 Form 8-K disclosure is "corrective" is insufficient to give rise to a viable claim of loss causation. *See Dura Pharm.*, 544 U.S. at 343-45 (emphasizing need to link the inflated purchase price and later economic loss because "other factors" outside of the alleged fraud can cause a loss in investment value).

CEC's August 3, 2011 disclosure, however, is sufficient in this regard. CEC's August 3 Form 8-K relates directly to the alleged misrepresentations regarding the company's practices in reporting placement rates. Moreover, the disclosure is not limited to any specific time period, suggesting that the "improper practices" referenced in the disclosure could have occurred before the 2010-11 reporting period. Because plaintiffs have alleged a sufficient connection between CEC's August 3 disclosure and the alleged fraud, the Court concludes that they have adequately alleged loss causation.

**2.      Section 20(a) claims**

To state a claim under section 20(a) of the Exchange Act, a plaintiff must allege: (1) a primary securities violation; (2) the individual defendant exercised general control over the issuer's operations; and (3) the individual defendant "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992). Because section 20(a) claims sound

in fraud, plaintiffs must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Zurich Capital Markets Inc. v. Coglianese*, 332 F. Supp. 2d 1087, 1109-10 (N.D. Ill. 2004). They are not, however, required to meet the even more stringent requirements of the PSLRA. *Id.*

Because the Court has found insufficient plaintiffs' scienter allegations regarding Graham, it addresses the section 20(a) claim only as to defendant McCullough. For the reasons discussed earlier, plaintiffs have satisfied the first element of the test for a section 20(a) claim. CEC, however, disputes plaintiffs' allegations regarding any of the individual defendant's ability to control CEC's operations. In response, plaintiffs argue that McCullough was a controlling person by virtue of his positions as a senior executive officer and director of CEC, his ability to approve content of CEC's public statements, and his ability to control CEC's day-to-day operations. Compl. ¶ 286. "Determination of whether an individual defendant is a 'controlling person' under section 20(a) is a question of fact that cannot be determined at the pleading stage." *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (quoting *Lindelow v. Hill*, 2001 WL 830956, at *9 (N.D. Ill. July 20, 2001). Plaintiffs have sufficiently alleged a section 20(a) claim.

## Conclusion

For the reasons stated above, the Court grants Defendants' motion to dismiss [docket no. 52] with respect to Graham but otherwise denies the motion.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 30, 2012