# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| THURMAN ROSS, by and on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CAREER EDUCATION CORPORATION, GARY E. McCULLOUGH, and MICHAEL J. GRAHAM,<br><br>Defendants. | Civil Action No. 12 C 276<br><br>Hon. John W. Darrah |

## LEAD PLAINTIFFS' UNOPPOSED MOTION TO FILE MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT IN EXCESS OF 15 PAGES

Jay W. Eisenhofer
Geoffrey C. Jarvis
Jeff A. Almeida
Christine M. Mackintosh
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100
*Co-Lead Counsel for Lead Plaintiffs*
*and Counsel for Thurman Ross*

Paul E. Slater (ARDC 2630567)
**SPERLING & SLATER, P.C.**
55 West Monroe Street
Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200
Facsimile: (312) 641-6492
*Liaison Counsel for Lead Plaintiffs*
*and Counsel for Thurman Ross*

Joseph F. Rice
James M. Hughes
David P. Abel
Meghan S. B. Oliver
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
*Co-Lead Counsel for Lead Plaintiffs*

James E. Barz (ARDC 6255605)
**ROBBINS GELLER RUDMAN
 & DOWD LLP**
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: (312) 674-4673
Facsimile: (312) 674-4676
*Additional Counsel for Plaintiffs*

Lead Plaintiffs KBC Asset Management NV, the Oklahoma Police Pension & Retirement System, and the Oklahoma Law Enforcement Retirement System hereby move the Court for leave to file their Lead Plaintiffs' Unopposed Motion to File Memorandum of Points and Authorities in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement in Excess of 15 Pages (the "Memorandum"). The Memorandum exceeds the 15-page limit imposed by Local Rule 7.1. The Memorandum is 18 pages long.

The Memorandum necessarily addresses the history of the litigation; the standards for approving class action settlements; the numerous requirements for the certification of a settlement class under Federal Rule of Civil Procedure 23; the contents and methodology of the proposed notice plan; and the timing of future settlement-related events.

Defendants will not be filing briefing in response to the Memorandum. Therefore, the Memorandum and Exhibits constitute the entire briefing record for purposes of preliminary approval of the settlement, and the Court will not be presented with additional pages of material for analysis. A copy of the proposed Memorandum, along with its Exhibits, is attached to this Motion as Exhibit A.

Counsel for Defendants do not oppose the relief sought in this Motion.

Dated: October 25, 2013                                   Respectfully submitted,

Jay W. Eisenhofer                                          Joseph F. Rice
Geoffrey C. Jarvis                                         James M. Hughes
Jeff A. Almeida                                            David P. Abel
Christine M. Mackintosh                                    Meghan S. B. Oliver
GRANT & EISENHOFER P.A.                                    MOTLEY RICE LLC
123 Justison Street                                        28 Bridgeside Blvd.
Wilmington, DE 19801                                       Mt. Pleasant, SC 29464
Telephone: (302) 622-7000                                  Telephone: (843) 216-9000
Facsimile: (302) 622-7100                                  Facsimile: (843) 216-9450
*Co-Lead Counsel for Lead Plaintiffs*                      *Co-Lead Counsel for Lead Plaintiffs*
*and Counsel for Thurman Ross*

*/s/ Paul E. Slater*
Paul E. Slater (ARDC 2630567)
**SPERLING & SLATER, P.C.**
55 West Monroe Street
Suite 3200
Chicago, IL  60603
Telephone:  (312) 641-3200
Facsimile:   (312) 641-6492
*Liaison Counsel for Lead Plaintiffs*
*and Counsel for Thurman Ross*

James E. Barz (ARDC 6255605)
**ROBBINS GELLER RUDMAN**
  **& DOWD LLP**
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  (312) 674-4673
Facsimile:   (312) 674-4676
*Additional Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Scott F. Hessell, hereby certify that on October 25, 2013, I caused a true and correct copy of Lead Plaintiffs' Unopposed Motion to File Memorandum of Points and Authorities in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement in Excess of 15 Pages to be filed and served via the Court's Electronic Case Filing (ECF) system, with electronic notice sent to all registered users of the ECF system.

*s/ Scott F. Hessell*
Scott F. Hessell

4

# APPENDIX A

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THURMAN ROSS, by and on behalf of himself and all others similarly situated, | |
| Plaintiff, | Civil Action No. 12 C 276 |
| vs. | Hon. John W. Darrah |
| CAREER EDUCATION CORPORATION, GARY E. McCULLOUGH, and MICHAEL J. GRAHAM, | |
| Defendants. | |

**LEAD PLAINTIFFS' MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF UNOPPOSED MOTION
FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

Jay W. Eisenhofer
Geoffrey C. Jarvis
Jeff A. Almeida
Christine M. Mackintosh
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100
*Co-Lead Counsel for Lead Plaintiffs
and Counsel for Thurman Ross*

Joseph F. Rice
James M. Hughes
David P. Abel
Meghan S. B. Oliver
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
*Co-Lead Counsel for Lead Plaintiffs*

Paul E. Slater (ARDC 2630567)
**SPERLING & SLATER, P.C.**
55 West Monroe Street
Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200
Facsimile: (312) 641-6492
*Liaison Counsel for Lead Plaintiffs
and Counsel for Thurman Ross*

James E. Barz (ARDC 6255605)
**ROBBINS GELLER RUDMAN
  & DOWD LLP**
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: (312) 674-4673
Facsimile: (312) 674-4676
*Additional Counsel for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................3

A.     Lead Plaintiffs' Factual Allegations ..................................................................3

B.     Procedural Posture, Mediation, And Settlement..............................................4

C.     The Notices And Plan Of Allocation Of The Net Settlement Fund ...................6

ARGUMENT ..................................................................................................................7

A.     The Settlement Should Be Preliminarily Approved ........................................7

B.     Preliminary Certification Of A Settlement Class Under Rule 23 Of The Federal Rules Of Civil Procedure Is Appropriate......................................................9

     1.     The Settlement Class is Sufficiently Numerous ....................................10

     2.     The Settlement Class Shares Common Issues of Law and Fact ...........10

     3.     The Claims of the Class Representatives Are Typical............................11

     4.     Lead Plaintiffs and Their Counsel Are Adequate .................................12

     5.     Common Issues of Law and Fact Predominate......................................12

C.     The Court Should Preliminarily Approve The Settlement And The Notices And Should Schedule A Final Approval Hearing ...............................................13

     1.     The Settlement Satisfies the Criteria for Preliminary Approval............13

     2.     The Proposed Notices Satisfy Due Process ..........................................15

CONCLUSION................................................................................................................17

i

## TABLE OF AUTHORITIES

<u>CASES</u>

*Abrams v. Van Kampen Funds, Inc.*,
    No. 01-C-7538, 2006 WL 163023 (N.D. Ill Jan. 18, 2006)................................................. 8, 11

*Amchem Products v. Windsor*,
    51 U.S. 591 (1997)........................................................................................................ 9, 10, 13

*Armstrong v. Board of School Directors of Milwaukee*,
    616 F.2d 305 (7th Cir. 1980) ................................................................................................. 8

*Bennett v. Behring Corp.*,
    96 F.R.D. 343 (S.D. Fla. 1982)............................................................................................. 14

*Berger v. Xerox Corp. Retirement Income Guarantee Plan*,
    No. 00-584-DRH, 2004 WL 287902 (S.D. Ill. Jan. 22, 2004)................................................. 7

*Gautreauz v. Pierce*,
    690 F.2d 6163 (7th Cir. 1982) ............................................................................................... 7

*Henry v. Sears Roebuck & Co.*,
    No. 98-CV-4110, 1999 WL 33496080 (N.D. Ill. Jul. 23, 1999) ........................................... 14

*In re Hartmarx Securities Litigation*,
    No 01 C 7832, 2002 WL 31103491 (N.D. Ill. Sept. 19, 2002)............................................. 10

*In re NeoPharm, Inc. Securities Litigation*,
    225 F.R.D. 563 (N.D. Ill. 2004)............................................................................................ 10

*In re Southern Ohio Correctional Facility*,
    173 F.R.D. 205 (S.D. Ohio 1997)......................................................................................... 14

*In re System Software Associates, Inc. Securities Litigation*,
    No. 97 C 177, 2000 WL 1810085 (N.D. Ill. Dec. 8, 2000) ......................................... 10, 12, 13

*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) ..................................................................................... 7, 13, 14

*King v. Kansas City Southern Industries, Inc.*,
    519 F.2d 20 (7th Cir. 1975) ................................................................................................. 10

*McKinnie v. JP Morgan Chase Bank, N.A.*,
    No. 07-CV-774, 2009 WL 4782736 (E.D. Wis. Apr. 8, 2009) ............................................. 14

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)............................................................................................................. 16

*Pesek v. Donahue*,
    No. 04 C 4525, 2006 WL 1049969 (N.D. Ill. Feb. 9, 2006)................................................. 13

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)............................................................................................................. 13

*Pierce v. Atchison, Topeka & Santa Fe Railway Co.*,
  65 F.3d 562 (7th Cir. 1995) ............................................................................ 13

*Rosario v. Livaditis*,
  963 F.2d 1013 (7th Cir. 1992) ........................................................................ 11

*Ross v. Career Education Corp.*,
  12-cv-276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ............................... 8

*Silverman v. Motorola, Inc.*,
  259 F.R.D. 163 (N.D. Ill. 2009)...................................................................... 12

*Tatz v. Nanophase Technologies Corp.*,
  No. 01-8440, 2003 WL 21372471 (N.D. Ill. Jun. 13, 2003) ...................... 10, 12

*Turner v. Murphy Oil USA, Inc.*,
  472 F. Supp. 2d 830 (E.D. La. 2007).............................................................. 14

*Will v. General Dynamics Corp.*,
  06-cv-698, 2010 U.S. Dist. LEXIS 95630 (S.D. Ill. Aug. 9, 2010)................ 17

STATUTES

15 U.S.C. § 78u-4(a)(7) ........................................................................................ 15

15 U.S.C. § 78u-4(a)(7)(A)................................................................................... 16

15 U.S.C. § 78u-4(a)(7)(B) ................................................................................... 16

15 U.S.C. § 78u-4(a)(7)(C) ................................................................................... 16

15 U.S.C. § 78u-4(a)(7)(D)................................................................................... 16

15 U.S.C. § 78u-4(a)(7)(E) ................................................................................... 16

RULES

Fed. R. Civ. P. 23(a)(1)......................................................................................... 10

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................... 15

Fed. R. Civ. P. 23(c)(2)(B)(i)................................................................................ 16

Fed. R. Civ. P. 23(c)(2)(B)(ii)............................................................................... 16

Fed. R. Civ. P. 23(c)(2)(B)(iii) ............................................................................. 16

Fed. R. Civ. P. 23(c)(2)(B)(iv).............................................................................. 16

Fed. R. Civ. P. 23(c)(2)(B)(v)............................................................................... 16

Fed. R. Civ. P. 23(c)(2)(B)(vi).............................................................................. 16

Fed. R. Civ. P. 23(c)(2)(B)(vii)............................................................................. 16

TREATISES

Manual for Complex Litigation (Fourth) § 21.632 (2004) ..................................... 9

## INTRODUCTION

Co-Lead Plaintiffs KBC Asset Management NV, the Oklahoma Police Pension & Retirement System, and the Oklahoma Law Enforcement Retirement System (collectively, "Lead Plaintiffs"), on behalf of themselves and all other purchasers of common stock of Career Education Corporation ("CEC") between and including February 19, 2009, and November 21, 2011 (the "Settlement Class Period"), respectfully submit this Memorandum of Points and Authorities in Support of Lead Plaintiffs' Unopposed Motion for preliminary approval of a proposed settlement of this Class Action, the terms of which are set forth in the Stipulation of Settlement dated October 25, 2011 ("Stipulation")[1] filed contemporaneously herewith as Exhibit 1. The $27.5 million cash settlement, if approved, would resolve the putative class's claims against all Defendants in this action.

The Settlement was reached after an intensive coordinated investigation and litigation by teams of attorneys from each of the two Lead Counsel firms and their expert consultants and was the product of good faith, arms'-length negotiations among experienced securities law practitioners representing the parties. Additionally, because the parties did not agree on the terms of a settlement until after Judge Kennelly's decision on Defendants' motion to dismiss Lead Plaintiffs' claims, the settling parties are fully conversant with the strengths and weaknesses of this case, and have thoroughly evaluated the risks of continued litigation and the fairness of Settlement at this time. The Settlement, as set forth in the Stipulation, provides an excellent result for the putative class, given the factual and legal obstacles to prevailing at trial and on any appeal, and taking into account CEC's current financial condition, whose ability to

---

[1] All capitalized terms that are not defined herein have the same meanings as set forth in the Stipulation

withstand a greater settlement or adverse verdict is questionable in light of its recent financial performance and available insurance coverages.

For these reasons and those that follow, the Court should enter an order (1) granting preliminary approval of the proposed Settlement; (2) preliminarily certifying the proposed Settlement Class for purposes of Settlement; (3) approving the parties' proposed form and method of giving notice of the pendency of this litigation and the Settlement to the Class; (4) directing that notice be given to the putative Settlement Class members as approved by the Court; and (5) setting a schedule for the settlement approval process as set forth in the accompanying proposed order, including the scheduling of a hearing at which the Court will consider (a) the parties' request for final approval of the Settlement and entry of the [Proposed] Final Judgment and Order of Dismissal with Prejudice, and (b) Lead Plaintiffs' counsels' application for an award of attorneys' fees and reimbursement of expenses.  Lead Plaintiffs propose the following schedule:

- Mailing of individual Postcard Notices to all Settlement Class members who can be identified through reasonable effort, and directing them to the Claim Administrator's website for the Settlement Notice, Claim Form, and other documents, within *fourteen (14) calendar days after entry of the Preliminary Approval Order (the "Notice Date")*.

- Publication of Summary Notice once over the PR Newswire and on two different dates in the publications set forth in the proposed order within *fourteen (14) calendar days after the Notice Date*.

- Deadline for submission of requests for exclusion from the Settlement Class or objections to the Settlement, Plan of Allocation, or the application for fees and expenses:  *received, not simply postmarked, **ninety (90) calendar days after the Notice Date***.

- Settlement Hearing:  at the Court's convenience, *but no fewer than one-hundred ten (110) calendar days after the Notice Date*.

- Deadline for filing motions for Final Approval of Class Action Settlement and for Attorneys' Fees and Reimbursement of Expenses:  *seven (7) calendar days before the Settlement Hearing*.

- Postmark deadline for submission of Proofs of Claim: *one hundred twenty (120) calendar days after the Notice Date*.

## BACKGROUND

### A.    Lead Plaintiffs' Factual Allegations

CEC is one of the largest for-profit educational companies in the United States.  ¶ 43.[2] Because the majority of CEC students depend on federal student loans provided under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1001, 1094(a)(21), and 1099(j), Title IV funds constitute  the lion's share of CEC's revenue.  ¶ 45.  Only schools that are accredited by an accrediting organization approved by the Department of Education can access Title IV funds, and thus, accreditations were (and remain) key to CEC's success.   ¶ 44.  To maintain their accreditations, CEC's schools are required to place a certain percentage of their students – typically 65% or 70% – in jobs related to their fields of study after they graduate.  ¶¶ 6, 48. Thus, CEC's publicly-reported placement rates after graduation are very important to accreditors, students, and investors.  ¶¶ 53, 147, 195-212.

Since at least 2003, CEC has faced scrutiny based on concerns that it inflates its publicly-reported placement rates.  ¶¶ 56-75.  This scrutiny ultimately led John M. Larson, CEC's founder and Chief Executive Officer, to resign in 2006.   ¶ 76.  CEC's Board hired Defendant Gary McCullough as his replacement for the express purpose of "cleaning house" at CEC.   ¶¶ 79-80. Thereafter, CEC publicly portrayed itself as a picture of reform, claiming that its legal and regulatory issues were behind it, and citing "[m]ajor transformation work," a "very, very strong" quality of compliance, and robust internal controls to promptly identify and correct any backsliding.  ¶¶ 82-83, 180-92.

---

[2] All citations of the form "¶ __" refer to the Consolidated Class Action Complaint, ECF No. 33, unless otherwise noted.

Despite these assurances, CEC continued to inflate its job placement rates under Defendant McCullough. ¶¶ 97-121. Between February 19, 2009, and November 21, 2011 (the "Class Period"), Defendants reported high placement rates and attributed these rates to a strong and steady demand for CEC. ¶¶ 140-59. However, on May 17, 2011, CEC received a subpoena from the New York Attorney General ("NYAG") seeking information about CEC's placement rate reporting. ¶ 122. On August 3, 2011, CEC announced that certain of its Health Education schools had engaged in "improper practices" in calculating its placement rates for the 2010-2011 academic year. ¶ 126. This revelation caused CEC's stock to drop 15%, falling from $21.87 per share to $18.51 per share. *Id.*

CEC's Board hired Dewey & LeBoeuf LLP ("Dewey") to investigate the Company's placement rate reporting practices, but constrained the Dewey investigation to two of CEC's reporting categories – its Health Education schools and its Art & Design schools – over a one-year period. ¶ 127-29; MTD at 8, 13 (ECF No. 37). On November 1, 2011, CEC announced that Dewey had "confirmed the existence of improper placement determination practices" at the Health Education segment schools, that Dewey had also identified problems in the placement rate reporting in the Art & Design segment schools, and that only 13 of the 49 schools in the Health Education and Art & Design segments – all of which had consistently reported placement rates exceeding 74% throughout the Class period – actually met their accreditors' 65% minimum placement rate standard. ¶ 128. Shortly after this announcement, Defendant McCullough resigned. ¶ 129. In the two days following this announcement, CEC's stock lost 54% of its value. ¶ 130.

### B.     Procedural Posture, Mediation, And Settlement

Based on the foregoing facts, on January 13, 2012, Thurman Ross, an individual investor, filed the first putative securities fraud class action against CEC and certain officers and directors

of the Company.  ECF No. 1.  Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Ross issued notice of the suit, and thereafter on March 13, 2012, KBC Asset Management NV and the Oklahoma Police Pension & Retirement System jointly moved to be appointed Lead Plaintiff as the Institutional Investor Group.  Likewise, the Public Service Pensions Board moved to be appointed Lead Plaintiff.  ECF Nos. 17-21.  On March 21, 2012, the competing investors stipulated that the Institutional Investor Group would serve as Lead Plaintiff, and Motley Rice LLC and Grant & Eisenhofer P.A. would serve as Co-Lead Counsel for the putative class.  ECF No. 25.  On March 23, 2012, the Court entered a revised stipulation and Order appointing Lead Plaintiffs and their chosen Co-Lead Counsel consistent with the parties' stipulation.  ECF No. 30.

On May 3, 2013, Lead Plaintiffs filed their Consolidated Amended Class Action Complaint against CEC and McCullough, CEC's former President and Chief Executive Officer, and Michael J. Graham, CEC's Executive Vice President and Chief Financial Officer.  ECF No. 33.  Defendants moved to dismiss the Complaint on June 4, 2012.  ECF No. 36.  On October 30, 2013, the Court granted Defendants' Motion to Dismiss as to Defendant Graham, but denied the Motion in all other respects.  ECF No. 52.  Defendants answered the Complaint on January 28, 2013.  ECF Nos. 67-68.  On March 15, 2013, Lead Plaintiffs moved for certification of a class that included all persons who purchased the common stock of CEC between and including February 19, 2009, and November 21, 2011.  ECF No. 74.  Lead Plaintiffs also had fully briefed motions to compel documents and interrogatory responses from Defendants, and served several third party subpoenas targeting additional documentary evidence.

While Lead Plaintiffs' Motion for Class Certification and discovery motions were pending, the parties agreed to engage in early mediation.  In the late Fall of 2013, and thereafter,

the parties engaged in in-person mediation sessions utilizing the services of the Honorable Daniel Weinstein (Ret.), a nationally recognized mediator with JAMS, and had several telephonic exchanges regarding a potential settlement of the Litigation. By agreement, and with the approval of Judge Weinstein, the parties also utilized the services of Jed Melnick, also a nationally recognized mediator with JAMS, and a neutral financial economics expert (Mr. Chad Coffman), to address potential damages of the Class under various liability scenarios. At a final mediation session held on June 6, 2013, the parties were unable to reach a resolution of the Litigation. On June 7, 2013, Jed Melnick made a mediator's proposal that the Litigation be settled for $27.5 million. The parties accepted the mediator's proposal on June 12, 2013, subject to approval by the Court.

On October 10, 2013, the parties moved pursuant to Rule 40.4 of the Local Rules to have the Litigation reassigned to the Honorable John W. Darrah, before whom an earlier filed, related case, *Cook v. McCullough, et al.*, No. 1:11-cv-09119, is pending. On October 17, 2013, Chief Judge Ruben Castillo, on Behalf of the Executive Committee of the United States District Court for the Northern District of Illinois, granted the motion and the Litigation was reassigned.

### C. The Notices And Plan Of Allocation Of The Net Settlement Fund

A Postcard Notice of Pendency and Proposed Settlement of Class Actions, Motions for Attorneys' Fees, and Settlement Hearings ("Notice") providing detailed descriptions of this Action, the proposed Settlement, and the options available to Class members (including the right to object or opt out) will be sent to the last known mailing addresses of those members of the Class whose addresses can be identified through reasonable effort, directing them to www.CecSecuritiesLitigation.com to access the Settlement Notice, Proof of Claim and Release Form, Plan of Allocation, and other case-related documents. Additionally, a Summary Publication Notice ("Summary Notice") will be published in *Investor's Business Daily* and a

press release will be sent over the PR Newswire.[3]  The proposed Plan of Allocation (the "Plan")[4] is similar to plans of allocation that have been approved in numerous securities class actions asserting claims under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. The Plan allocates the Net Settlement Fund based on an estimate (determined by Co-Lead Counsel and their experts) of the amounts by which the market prices of CEC common stock trading on the NASDAQ were artificially inflated at various points during the Settlement Class Period, and takes into consideration when an Authorized Claimant purchased shares in CEC and when those shares were sold (if at all).

## ARGUMENT

### A.    The Settlement Should Be Preliminarily Approved

"Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).  The approval of a proposed class action settlement is a two-step process:  (1) a "preliminary approval" order; and (2) a "final approval" order after notice of the settlement is provided to the class and a hearing is held to consider the fairness of the proposed settlement.  *See Berger v. Xerox Corp. Ret. Income Guarantee Plan*, No. 00-584-DRH, 2004 WL 287902, at *1-2 (S.D. Ill. Jan. 22, 2004) (granting final approval after entering Preliminary Approval Order).

The primary question raised by a request for preliminary approval is whether the proposed settlement is "within the range of possible approval." *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982).  Preliminary approval does not require the district court to answer the ultimate question of whether a proposed settlement is fair, reasonable, and adequate, or to

---

[3] The Notice, Proof of Claim and Release Form, Summary Notice, and Postcard Notice are attached as Exhibits A-1 through A-4 to the Stipulation of Settlement, which is Exhibit 1 to this Memorandum.

[4] The Plan of Allocation is attached as Exhibit 2.

definitively certify the class. *See Armstrong v. Bd. of Sch. Dirs. of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980). Rather, these decisions are made only at the final approval stage, after notice of the settlement has been provided to the class members, and they have had an opportunity to opt-out of or object to the settlement. *Id.* However, courts do make a preliminary determination regarding the fairness, reasonableness, and adequacy of the settlement terms, and in that context, consider the recommendations of experienced litigators, so long as there were arms'-length negotiations and no evidence of collusion. *Abrams v. Van Kampen Funds, Inc.*, No. 01-C-7538, 2006 WL 163023, at *2 (N.D. Ill Jan. 18, 2006) (noting that the parties' attempts to settle in "private mediation before a retired judge" and considering the "recommend[ation] [of] experienced plaintiff securities litigators").

Here, the proposed Settlement is an excellent result for the Settlement Class, as it provides the Class with a substantial monetary benefit of $27.5 million, and eliminates the risk that further litigation might lead to no recovery, or a smaller recovery. In particular, while the Court's denial of CEC's motion to dismiss demonstrated the strength of the merits of Lead Plaintiffs' claims, the Court's opinion raised concerns regarding the amount of recoverable damages. In particular, the Court determined that several statements identified by Lead Plaintiffs as "corrective disclosures" might not support a finding of loss causation. *Ross v. Career Educ. Corp.*, 12-cv-276, 2012 WL 5363431, at *12-13 (N.D. Ill. Oct. 30, 2012). This could have reduced the amount of recoverable damages substantially.

Co-Lead Counsel also weighed the fact that CEC has been experiencing financial hardship and that its outlook does not appear to be improving. On February 27, 2013, CEC reported a net loss of $120.4 million for fiscal year 2012. *See* CEC Current Report (Form 8-K) (Feb. 27, 2013) Ex. 99-1. These results have not improved since that time; CEC reported on

8

August 7, 2013 that it had a net loss of $31.4 million in the second quarter of 2013. *See* CEC Current Report (Form 8-K) (Aug. 7, 2013) Ex.-99.1. Thus, there is a real risk that CEC would not have the means (or the insurance) to compensate the Class in the future to a greater extent than set forth in this Settlement, even if full liability and full damages were established after trial and appeals. In light of these risks, among others, Co-Lead Counsel believe a payment of $27.5 million to the Class is an excellent result.

Moreover, the proposed Settlement should be approved because it was reached after extensive, arms'-length negotiations between informed counsel, with the help of two mediators, and Co-Lead Counsel (as directed by the institutional investors who served as Lead Plaintiffs) support the Settlement as the best result available to the Settlement Class under the circumstances. Finally, the Settlement has no obvious deficiencies as it does not improperly grant preferential treatment to the Lead Plaintiff or any Class member, and falls within an acceptable range for approval. *See* Manual for Complex Litigation (Fourth) § 21.632 (2004).

**B.      Preliminary Certification Of A Settlement Class Under Rule 23 Of The Federal Rules Of Civil Procedure Is Appropriate**

The Court should also certify the Settlement Class, which is defined as: all persons who purchased or otherwise acquired the common stock of CEC between February 19, 2009, and November 21, 2011, and were damaged thereby.[5] Despite the settlement posture, the Settlement Class must nonetheless satisfy the strictures of Federal Rule of Civil Procedure 23. *See Amchem Prods. v. Windsor*, 51 U.S. 591 (1997). Rule 23(a) establishes four prerequisites to certification: (i) "numerosity," (ii) "commonality," (iii) "typicality," and (iv) "adequacy" of representation.

---

[5] The Settlement Class excludes: (a) Defendants; (b) members of the immediate family of Defendant Gary E. McCullough; (c) the subsidiaries and affiliates of CEC, as these terms are defined by the federal securities laws, including the 401(k) plans of CEC; (d) any entity in which any Defendant has a controlling interest; (e) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (f) the legal representatives, heirs, successors, and assigns of any such excluded party.

*See id*. at 613. The Settlement Class must also meet one of the three requirements of Rule 23(b). Generally, Rule 23 is readily satisfied and certification is particularly appropriate in securities fraud actions. *See, e.g.*, *King v. Kan. City S. Indus., Inc.*, 519 F.2d 20, 26 (7th Cir. 1975) (recognizing that Rule 23 should be construed liberally to allow for class actions "where denial of class status would effectively terminate further litigation of the securities fraud claims"). As shown below, the Settlement Class here is no exception.

### 1. The Settlement Class is Sufficiently Numerous

Rule 23(a)(1) requires that the Settlement Class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no question that the Settlement Class meets this requirement. Given the large number of Settlement Class members[6] and their varied geographical locations, it is not practicable to join all members in a single action. *See Tatz v. Nanophase Techs. Corp.*, No. 01-8440, 2003 WL 21372471, at *6 (N.D. Ill. Jun. 13, 2003). Indeed, because CEC was publicly traded on NASDAQ, "numerosity may be assumed." *In re Sys. Software Assocs., Inc. Sec. Litig.*, No. 97 C 177, 2000 WL 1810085, at *1 (N.D. Ill. Dec. 8, 2000); *see also In re NeoPharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 565 (N.D. Ill. 2004) (certifying class when registrant had over 16 million shares traded on NASDAQ such that it could be "reasonably inferred that hundreds, if not thousands, of persons would be included in the proposed class"). Thus, the Settlement Class is sufficiently numerous.

### 2. The Settlement Class Shares Common Issues of Law and Fact

Rule 23(a)(2) requires that the Settlement Class's claims share common questions of law or fact. *See In re Hartmarx Sec. Litig.*, No 01 C 7832, 2002 WL 31103491, at *4 (N.D. Ill. Sept. 19, 2002). "A common nucleus of operative facts is usually enough to satisfy the commonality

---

[6] As of October 31, 2011, CEC had 75,854,861 shares of common stock outstanding. *See* CEC Quarterly Report (Form 10-Q) (Nov. 9, 2011).

requirement . . . ." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "Rule 23(a)(2) commonality is not a demanding requirement; one issue of fact or law common to all class members will suffice." *Abrams*, 2002 WL 1989401, at *3. Common questions of law and fact clearly exist in this case. Without exception, almost all of the legal and factual questions facing each member of the Settlement Class are the same. For example, common questions include: (1) whether the Defendants made misrepresentations in or omitted material information from their public statements regarding CEC's placement rates; (2) whether Defendants acted with scienter; and (3) whether those misrepresentations or omissions caused damage to the members of the Settlement Class. Thus, the Settlement Class satisfies the commonality requirement.

### 3. The Claims of the Class Representatives Are Typical

Rule 23(a)(3) also requires that the claims of the Lead Plaintiffs, the proposed Class Representatives, be typical of the Settlement Class's claims. This requirement is satisfied when, as here, the Lead Plaintiffs' claims arise from the same course of conduct that gives rise to the claims of other class members and are based on the same legal theory. *See Rosario*, 963 F.2d at 1018.

Here, Lead Plaintiffs and all other members of the Settlement Class allege that they suffered damages as a result of Defendants' false and misleading statements regarding CEC's placement rates. All Settlement Class members also allege that those statements artificially inflated the price of CEC's common stock throughout the Class Period. And Lead Plaintiffs, like all other members of the Settlement Class, purchased CEC securities on the open market during the Class Period. Finally, Lead Plaintiffs' claims are premised on the same legal theories as any other Settlement Class member's claims: violation of Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder, and violations of Section

20(a) of the 1934 Act.  In these circumstances, typicality is present.  *See Software Assocs.*, 2000 WL 1810085, at *2.

### 4.      Lead Plaintiffs and Their Counsel Are Adequate

Lead Plaintiffs and their counsel also meet the adequacy requirement of Rule 23.  This inquiry is two-fold.  First, the court inquires whether the interests of the plaintiffs are sufficiently aligned with those of the settlement class and whether plaintiffs are sufficiently motivated to pursue the class's claims.   Second, the court asks whether the attorneys that plaintiffs have chosen to represent them are competent to prosecute and resolve a complex class action.  *See Silverman v. Motorola, Inc.*, 259 F.R.D. 163, 173 (N.D. Ill. 2009); *Tatz*, 2003 WL 21372471, at *8.  The answer to both questions here is "yes."  Lead Plaintiffs have no interests that are antagonistic to the interests of the Class because they suffered the same alleged economic damages as the other Settlement Class members.  Furthermore, Lead Plaintiffs have retained attorneys that are highly qualified, experienced, and able to successfully conduct this litigation. *See* Exs. 3 and 4 (Co-Lead Counsels' Resumes).  Indeed, Judge Kennelly recognized as much when he appointed them Lead Counsel, ECF No. 30, as the PSLRA lead counsel appointment provisions require a similar analysis.  Thus, the "adequacy" prong of Rule 23(a) is satisfied.

### 5.      Common Issues of Law and Fact Predominate

In addition to satisfying the criteria of Rule 23(a), a party seeking class certification must also satisfy Rule 23(b).  Certification is appropriate under Rule 23(b)(3) when common issues predominate over individual issues and the class action mechanism is superior to other methods of adjudicating the controversy.  Both requirements are met here.

Predominance requires not merely that common issues exist, but that they dominate the factual and legal issues to be resolved.   Put another way, predominance asks whether individualized issues that are unique to individual Settlement Class members will overwhelm and

12

ultimately distract from the resolution of common issues. In securities fraud cases, the predominance prong is easily met because the focus of the inquiries revolves not around the individual situation of any given class member, but around the conduct of the Defendants and whether they caused damage. *See Software Assocs.*, 2000 WL 1810085, at *4 ("The principal issues of law and fact relate to defendants' alleged misrepresentations. The issues are common to the members of the class and predominate over any questions affecting only individual members."). As the Supreme Court recognized in *Amchem*: the "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." 521 U.S. at 625. Finally, resolving this case on a classwide basis is far superior to litigating thousands of individual claims when the expense for a single investor to pursue a separate action would far exceed the individual's loss. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (class action device permits pooling of claims when it would be uneconomical to litigate individually).

In sum, the proposed Settlement Class meets all of the requirements of Rules 23(a) and (b)(3) and should therefore be preliminarily certified.

### C. The Court Should Preliminarily Approve The Settlement And The Notices And Should Schedule A Final Approval Hearing

#### 1. The Settlement Satisfies the Criteria for Preliminary Approval

Federal Rule of Civil Procedure Rule 23(e) requires this Court to review and, if appropriate, approve the proposed settlement of any class action. The Court's inquiry is guided by the "strong federal policy favoring the voluntary resolutions of disputes." *Pesek v. Donahue*, No. 04 C 4525, 2006 WL 1049969, at *4 (N.D. Ill. Feb. 9, 2006) (citing *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562 (7th Cir. 1995)). This policy is particularly strong in the context of class action litigation. *See Isby*, 75 F.3d at 1196 ("Federal courts naturally favor

13

the settlement of class action litigation."). Although the decision is within this Court's discretion, it should "consider the facts in the light most favorable to the settlement." *Henry v. Sears Roebuck & Co.*, No. 98-CV-4110, 1999 WL 33496080, at *8 (N.D. Ill. Jul. 23, 1999); *see also Bennett v. Behring Corp.*, 96 F.R.D. 343, 348 (S.D. Fla. 1982) (settlements of class actions are "highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits."). The Court should not resolve contested legal or factual issues at this stage of the proceedings. *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007).

When approval is *preliminary*, as it is here, the Court's inquiry is slightly relaxed. Ultimately, at the Final Approval Hearing, the Court will determine if the Settlement is fair, reasonable, adequate, and in the best interests of the Settlement Class. *See McKinnie v. JP Morgan Chase Bank, N.A.*, No. 07-CV-774, 2009 WL 4782736, at *1 (E.D. Wis. Apr. 8, 2009). At this stage, however, the Court need only determine that the Settlement is a product of arms'-length negotiations, that it is neither illegal nor collusive, *see In re S. Ohio Corr. Facility*, 173 F.R.D. 205, 211 (S.D. Ohio 1997); *see also Isby*, 75 F.3d at 1196 (the Court's inquiry "is limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate"), and that there is a probability that the Settlement could be finally approved as fair and adequate, *see generally McKinnie*, 2009 WL 4782736. This alone warrants notice to the Settlement Class. *See generally McKinnie*, 2009 WL 47823736.

The Settlement here easily satisfies these criteria. It is the product of extensive arm's-length negotiations between counsel for the parties under the supervision and participation of

14

two reputable mediators. And the monetary result – $27.5 million – is significant when compared to the typical securities fraud class action.[7]

### 2. The Proposed Notices Satisfy Due Process

The parties have agreed on the contents and format of the attached Notice, Summary Notice, and Postcard Notice. *See* Exs. A-1, A-3, & A-4 to Ex. 1. The Postcard Notice will be sent by mail to Settlement Class Members and will direct them to a case-specific web site, www.CecSecuritiesLitigation.com, where the full Settlement Notice, Proof of Claim and Release Form, Plan of Allocation, and other case-related documents will be available. Class members may also call a toll-free number set up by the Claims Administrator to ask any questions or receive hard copies of Notice forms or a Proof of Claim and Release Form. The Claims Administrator will send the full Settlement Notice and Proof of Claim and Release Form to any Settlement Class Member who requests them. The Summary Notice will be published in *The Investor's Business Daily* and a press release will be sent over the PR Newswire. Courts routinely find that these methods of notice are sufficient. *See, e.g.*, *In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530 (N.D. Ill. Aug. 23, 2010) (Grady, J.) (preliminarily approving method of notice using postcard notice); *In re Mut. Funds Inv. Litig.*, No. 04-md-15861, 2010 WL 2342413, at *7 (D. Md. May 19, 2010) (approving postcard notice in securities fraud class action); *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 08-MD-1998, 2009 WL 5184352, at *12-13 (W.D. Ky. Dec. 22, 2009) (approving postcard notice and summary notice, both of which referred class members to website and toll-free number to obtain full-length notice); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1375-77 (S.D. Fla. 2007)

---

[7] *See* Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements 2012 Review and Analysis*, Cornerstone Research, 2013, at 3 (noting that the median securities class action settlement amount in 2012 was $10.2 million).

(approving postcard notice in consumer class action alleging improprieties with wireless telephone insurance).[8]

The Notices also have been carefully drafted to comply with the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(7), Rule 23(c)(2)(B), and due process. Rule 23 requires the court to "direct the best notice that is practicable" to "all members who can be identified through reasonable effort," and identifies a list of specific topics the notice must address. Fed. R. Civ. P. 23(c)(2)(B). The PSLRA likewise provides specific information that the notice must include. *See generally* 15 U.S.C. § 78u-4(a)(7). Due process further requires that the Notices be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The Settlement Notice in this case satisfies these standards and, among other things, provides the following information:

- a statement of Plaintiff recovery, *compare* 15 U.S.C. § 78u-4(a)(7)(A) *with* Notice § I;

- the nature of the action and statement of the potential outcome of the case, *compare* Rule 23(c)(2)(B)(i) and 15 U.S.C. § 78u-4(a)(7)(B) *with* Notice § II;

- a statement of the fees and costs that counsel are seeking, *compare* 15 U.S.C. § 78u-4(a)(7)(C) *with* Notice § IV;

- the name of representatives for class counsel who can answer Settlement Class members questions, *compare* 15 U.S.C. § 78u-4(a)(7)(D) *with* Notice § V;

- the Settlement Class definition, *compare* Rule 23(c)(2)(B)(ii) *with* Notice § VII.3;

---

[8] *See also* Ex. 5, Declaration of Jeanne C. Finegan, APR, Concerning Proposed Postcard Notification (describing advantages of postcard notice and listing cases in which they have been approved and used).

- the Settlement Class's claims, issues, and defenses and the reasons for the Settlement, *compare* Rule 23(c)(2)(B)(iii) and 15 U.S.C. § 78u-4(a)(7)(E) *with* Notice §§ III, IX;

- that a Settlement Class member may, if he or she wishes, appear at a fairness hearing and object through his or her own attorney, *compare* Rule 23(c)(2)(B)(iv) *with* Notice §§ XII.5-6, XVIII;

- that any Settlement Class member may opt-out and the timing and mechanism for that procedure, *compare* Rule 23(c)(2)((B)(v)-(vi) *with* Notice § XII.2; and

- that the final judgment in this case will bind all Settlement Class members, *compare* Rule 23(c)(2)(B)(vii) *with* Notice § XII.3-4.

Notices including this information have been held to be sufficient. *See, e.g.*, *Will v. Gen. Dynamics Corp.*, 06-cv-698, 2010 U.S. Dist. LEXIS 95630, at *17 (S.D. Ill. Aug. 9, 2010) (approving notice that (i) described terms of settlement; (ii) described plan of allocation; (iii) described attorneys' fees provisions; (iv) described payment of administration expenses; (v) notified class of final fairness hearing; and (vi) described methods of objection to the settlement). With the Postcard Notice, Settlement Class Members will be able to receive a Proof of Claim form via website or by toll-free telephone on which to provide information regarding their purchases and sales of CEC common stock. Settlement Class Members who wish to share in the Settlement proceeds will need to complete and mail their Proofs of Claim to Heffler Claims Group, as clearly delineated in the Notices.

## CONCLUSION

For all the foregoing reasons, Lead Plaintiffs respectfully request that the Court: (1) preliminarily approve the proposed Settlement as within the range of possible fairness, reasonableness, and adequacy; (2) preliminarily certify the Settlement Class; (3) preliminarily approve the form and manner of proposed Notice and Summary Notice and Proof of Claim form; and (4) enter an Order setting a date and time for the hearing regarding final approval of the

17

Settlement and Co-Lead Counsels' application for attorneys' fees and expenses. A proposed Order is attached as Exhibit A to Exhibit 1, and will also be emailed to the Court.

Dated: October 25, 2013                                   Respectfully submitted,


| | |
|---|---|
| Jay W. Eisenhofer | Joseph F. Rice |
| Geoffrey C. Jarvis | James M. Hughes |
| Jeff A. Almeida | David P. Abel |
| Christine M. Mackintosh | Meghan S. B. Oliver |
| **GRANT & EISENHOFER P.A.** | **MOTLEY RICE LLC** |
| 123 Justison Street | 28 Bridgeside Blvd. |
| Wilmington, DE 19801 | Mt. Pleasant, SC 29464 |
| Telephone: (302) 622-7000 | Telephone: (843) 216-9000 |
| Facsimile: (302) 622-7100 | Facsimile: (843) 216-9450 |
| *Co-Lead Counsel for Lead Plaintiffs* | *Co-Lead Counsel for Lead Plaintiffs* |
| *and Counsel for Thurman Ross* | |

*/s/ Paul E. Slater*
Paul E. Slater (ARDC 2630567)                             James E. Barz (ARDC 6255605)
**SPERLING & SLATER, P.C.**                               **ROBBINS GELLER RUDMAN**
55 West Monroe Street                                        **& DOWD LLP**
Suite 3200                                                200 South Wacker Drive, 31st Floor
Chicago, IL 60603                                         Chicago, IL 60606
Telephone: (312) 641-3200                                 Telephone: (312) 674-4673
Facsimile: (312) 641-6492                                 Facsimile: (312) 674-4676
*Liaison Counsel for Lead Plaintiffs*                     *Additional Counsel for Plaintiffs*
*and Counsel for Thurman Ross*

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

THURMAN ROSS, by and on behalf of himself and all others similarly situated,

        Plaintiff,

    v.

CAREER EDUCATION CORPORATION, GARY E. McCULLOUGH and MICHAEL J. GRAHAM,

        Defendants.

No. 12-CV-00276

Honorable John W. Darrah

## STIPULATION OF SETTLEMENT

This Stipulation of Settlement (the "Stipulation"), dated October 25, 2013, is made and entered into by and among: (i) lead plaintiffs KBC Asset Management NV ("KBC"), the Oklahoma Police Pension & Retirement Systems ("OPPRS"), and the Oklahoma Law Enforcement Retirement System ("OLERS") (hereafter "Lead Plaintiffs") on behalf of themselves and each of the Class Members (as defined herein); (ii) Thurman Ross; and (iii) defendants Career Education Corporation ("CEC") and Gary E. McCullough, by and through their respective counsel of record in the Litigation (as defined herein). The Stipulation is intended to fully, finally, and forever resolve, discharge, and settle the Released Claims (as defined herein), subject to the approval of the Court and the terms and conditions set forth in this Stipulation.

## I.    THE LITIGATION

This action, captioned *Ross v. Career Education Corp., et al.*, No. 12-cv-00276 (the "Litigation"), was commenced in the United States District Court for the Northern District of Illinois (the "Court") on January 13, 2012, by the filing of an initial complaint by plaintiff Thurman Ross alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. On March 13, 2012, KBC, OPPRS, and OLERS filed a motion to be appointed lead plaintiffs and for approval of their selection of Motley Rice LLC ("Motley Rice") and Grant & Eisenhofer P.A. ("Grant & Eisenhofer") as lead counsel. On March 23, 2012, the Court entered a Stipulation and Order appointing KBC, OPPRS, and OLERS to serve as lead plaintiffs and approving Lead Plaintiffs' selection of Motley Rice and Grant & Eisenhofer as lead counsel ("Lead Counsel").

On May 3, 2012, the Consolidated Class Action Complaint (the "Complaint") was filed, naming CEC, Gary E. McCullough, and Michael J. Graham as defendants and also alleging

violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  On June 4, 2012, defendants moved to dismiss the Complaint.  On October 30, 2012, the Court granted in part and denied in part defendants' motion to dismiss, including dismissing the claims against defendant Graham.  Thereafter, defendants CEC and Mr. McCullough (collectively, "Defendants") each filed an answer to the Complaint, denying Lead Plaintiffs' claims and asserting defenses thereto.

On November 16, 2012, Defendants and Lead Plaintiffs (the "Parties") filed the Initial Joint Status Report and [Proposed] Rule 26(f) Discovery Plan.  The Parties subsequently exchanged respective Rule 26(a) disclosures and served requests for production of documents.

In the late Fall of 2012, the Parties engaged the services of the Honorable Daniel Weinstein (Ret.), a nationally recognized mediator.  The Parties subsequently engaged in in-person mediation sessions and had various telephonic exchanges regarding a potential settlement of the Litigation.  By agreement, and with the approval of Judge Weinstein, the Parties also utilized the services of Jed Melnick, also a nationally recognized mediator, as well as the services of a neutral economist, to address the alleged potential damages of the Class (as defined herein).  At a final mediation session held on June 6, 2013, the Parties were unable to reach a resolution of the Litigation.  On June 7, 2013, the mediator made a mediator's proposal to settle the Litigation for $27.5 million.  The Parties accepted the mediator's proposal to settle the Litigation for that amount on June 12, 2013, subject to the negotiation of the terms of a stipulation of settlement and approval by the Court.

On October 10, 2013, Defendants moved pursuant to LR 40.4 of the Rules of the Court to have the Litigation reassigned to the Honorable John W. Darrah, before whom an earlier filed related case, *Cook v. McCullough, et al.*, No. 1:11-cv-09119, is pending.  On October 17, 2013,

3

Chief Judge Ruben Castillo, on behalf of the Executive Committee of the Court, granted the motion and the Litigation was reassigned.

## II.    DEFENDANTS' DENIALS OF WRONGDOING AND LIABILITY

Defendants have denied and continue to deny each and all of the claims alleged by Lead Plaintiffs in the Litigation. Defendants expressly have denied and continue to deny all charges of wrongdoing or liability against them arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Litigation. Defendants also have denied and continue to deny, among other allegations, the allegations that Lead Plaintiffs or the Class (as defined herein) have suffered any damage, that the price of CEC common stock was artificially inflated by reasons of alleged misrepresentations, non-disclosures or otherwise, or that Lead Plaintiffs or the Class were harmed by the conduct alleged in the Complaint. Defendants believe that the evidence developed to date supports their position that they acted properly at all times and that the Litigation is without merit.

Nonetheless, Defendants have concluded that further conduct of the Litigation would be protracted and expensive, and that it is desirable that the Litigation be fully and finally settled in the manner and upon the terms and conditions set forth in this Stipulation. Defendants also have taken into account the uncertainty and risks inherent in any litigation, especially in complex cases such as the Litigation. Defendants have, therefore, determined that it is desirable and beneficial to them that the Litigation be settled in the manner and upon the terms and conditions set forth in this Stipulation.

## III.    LEAD PLAINTIFFS' CLAIMS AND THE BENEFITS OF SETTLEMENT

Lead Plaintiffs believe that the claims asserted in the Litigation have merit and that the evidence developed to date supports the claims. However, Lead Plaintiffs and Lead Counsel

4

have considered the expense and length of continued proceedings necessary to prosecute the Litigation against Defendants through trial and appeals.  Lead Plaintiffs and Lead Counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Litigation, as well as the difficulties and delays inherent in such litigation.  Lead Plaintiffs and Lead Counsel also are mindful of the inherent problems of proof under, and possible defenses to, the securities law violations asserted in the Litigation.  Lead Plaintiffs and Lead Counsel also recognize the risks related to the current financial condition of CEC, and believe that the settlement set forth in the Stipulation confers substantial benefits upon the Class.  Based on their evaluation, Lead Plaintiffs and Lead Counsel have determined that the settlement set forth in the Stipulation is fair, adequate, reasonable, and in the best interests of Lead Plaintiffs and the Class.

## IV.     TERMS OF STIPULATION AND AGREEMENT OF SETTLEMENT

NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and among Lead Plaintiffs (for themselves and the Class Members (as defined herein)), Thurman Ross, and Defendants, by and through their respective counsel or attorneys of record, that, subject to the approval of the Court, the Litigation and the Released Claims (as defined herein) shall be finally and fully compromised, settled, and released, and the Litigation shall be dismissed with prejudice, as to all Settling Parties (as defined herein), upon and subject to the terms and conditions of the Stipulation, as follows.

### 1.     "Definitions"

As used in the Stipulation, the following terms have the meanings specified below:

1.1     "Authorized Claimant" means any Class Member whose claim for recovery has been allowed pursuant to the terms of the Stipulation.

5

1.2     "Claims Administrator" means the firm of Heffler Claims Group, 1515 Market Street, Suite 1700, Philadelphia, PA 19102.

1.3     "Class" means all Persons (other than those Persons and entities who timely and validly request exclusion from the Class) who purchased or otherwise acquired the common stock of CEC during the period from February 19, 2009, through November 21, 2011, inclusive, excluding (a) defendant McCullough and his immediate family; (b) any entity in which Defendants have or had a controlling interest; (c) officers and directors of CEC during the Class Period; and (d) the legal representatives, heirs, successors, or assigns of any excluded party.

1.4     "Class Escrow Agent" means Huntington National Bank, the escrow agent for the Class Settlement Fund defined in ¶ 3.1(i) herein.   Derivative Escrow Agent means Huntington National Bank, the escrow agent for the Derivative Settlement Fund defined in ¶ 3.1(i) herein.   The Class Escrow Agent and Derivative Escrow Agent are collectively defined as Escrow Agents.

1.5     "Class Member(s)" or "Member(s) of the Class" mean a Person who falls within the definition of the Class as set forth in ¶ 1.3, above.

1.6     "Class Period" means the period commencing on February 19, 2009, through and including November 21, 2011.

1.7     "Class Settlement Fund" means the Class settlement amount of Twenty-Seven Million Five Hundred Thousand Dollars ($27.5 million), plus all interest and accretions thereto, which may be reduced by payments or deductions as provided herein or by Court order.

1.8     "Defendants" means defendants CEC and Gary E. McCullough.   A defendant shall be deemed to have a "controlling interest" in an entity if such defendant has a beneficial

6

ownership interest, directly or indirectly, in more than 50% of the total outstanding voting power of any class or classes of capital stock, or more than 50% of the partnership interests, of such entity.

1.9    "Effective Date," or the date upon which this settlement becomes "effective," means five (5) business days after the date by which all of the events and conditions specified in ¶ 8.1 of the Stipulation have been met and have occurred.

1.10    "Federal Derivative Actions" means the actions captioned *Cook v. McCullough, et al.*, No. 1:11-cv-09119, and *Alex v. McCullough, et al.*, No. 1:12-cv-00834, both pending in the United States District Court for the Northern District of Illinois.

1.11    "Final" means when the last of the following shall occur: (a) the expiration of the time to file a motion to alter or amend the Judgment (as defined herein) under Federal Rule of Civil Procedure 59(e) without any such motion having been filed; (b) the time in which to appeal the Judgment has passed without any appeal having been taken; (c) if a motion to alter or amend the Judgment is filed or if an appeal from the Judgment is taken, immediately after the determination of that motion or appeal so that it is no longer subject to any further judicial review or appeal whatsoever, whether by reason of affirmance by a court of last resort, lapse of time, voluntary dismissal of the appeal or otherwise in such a manner as to permit the consummation of the settlement substantially in accordance with the terms and conditions of this Stipulation; and (d) the entry of the final order and judgment approving the settlement in the Derivative Actions and shareholder demands ("Final Derivative Judgment") and the entry of orders dismissing each of the Federal and State Derivative Actions with prejudice ("Final Derivative Orders") and (i) the time to file a motion to alter or amend the Final Derivative Orders and Final Derivative Judgment has passed without any such motion having been filed; (ii)

7

the time in which to appeal such Final Derivative Orders and Final Derivative Judgment has passed without any appeal having been taken; and (iii) if a motion to alter or amend any such Final Derivative Orders or Final Derivative Judgment is filed or if an appeal from any such order or judgment is taken, immediately after the determination of that motion or appeal so that it is no longer subject to any further judicial review or appeal whatsoever, whether by reason of affirmance by a court of last resort, lapse of time, voluntary dismissal of the appeal or otherwise. For purposes of this Paragraph, an "appeal" shall include any petition for a writ of certiorari or other writ that may be filed in connection with approval or disapproval of this settlement, but shall not include any appeal which concerns only the issue of Plaintiffs' attorneys' fees and expenses, the Plan of Allocation of the Class Settlement Fund, or the procedures for determining recognized claims of Authorized Claimants, or any appeal which concerns only the issue of the attorneys' fees and expenses awarded in the Derivative Actions (as defined herein).

1.12    "Individual Defendant" means Gary E. McCullough.

1.13    "Insurers" means the insurers for CEC's D&O Liability program.

1.14    "Judgment" means the Final Judgment and Order of Dismissal with Prejudice to be rendered by the Court, substantially in the form of Exhibit B, attached hereto.

1.15    "Lead Counsel" means Motley Rice and Grant & Eisenhofer.

1.16    "Lead Plaintiffs" and "Class Representatives" means KBC, OPPRS, and OLERS.

1.17    "Litigation" means the action under case number 1:12-cv-00276, pending in the United States District Court for the Northern District of Illinois.

1.18    "Net Class Settlement Fund" means the Class Settlement Fund, less any attorneys' fees, costs, or expenses, provided for herein or approved by the Court, and less notice

8

and administration costs, Taxes and Tax Expenses (as defined herein), and other Court-approved deductions.

1.19    "Person" means an individual, corporation, partnership, limited partnership association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives, or assignees.

1.20    "Plan of Allocation" or the "Plan" means the plan of allocation that dictates how the Class Settlement Fund shall be distributed to Authorized Claimants on a *pro rata* basis after payment of expenses of notice and administration of the settlement, Taxes and Tax Expenses, and such attorneys' fees, costs, and expenses as may be awarded by the Court. The Plan of Allocation is not part of the Stipulation and neither Defendants nor their Related Parties (as defined herein) shall have any responsibility or liability with respect thereto.

1.21    "Related Parties" means Defendants' past or present directors, officers, employees, partners, insurers, co-insurers, reinsurers, controlling shareholders, agents, attorneys, accountants or auditors, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, executors, successors in interest, related or affiliated entities, any entity in which a Defendant has a controlling interest, any members of the Individual Defendant's immediate family, or any trust of which the Individual Defendant is the settlor or which is for the benefit of the Individual Defendant's family.

1.22    "Released Claims" shall collectively mean any and all claims, demands, rights, liabilities, and causes of action of every nature and description whatsoever, known or unknown, whether or not concealed or hidden, asserted or that might have been asserted, in the Complaint

9

or any other pleading or forum, including, without limitation, claims for negligence, gross negligence, breach of fiduciary duty, fraud, or violation of any federal, state, common or foreign law or statutes, rules, or regulations, by Lead Plaintiffs or any Class Member against the Released Persons (as defined herein) arising out of or based upon the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the Complaint and the purchase or other acquisition of CEC common stock during the Class Period and the acts, facts, events, statements or omissions that were or could have been alleged in the Litigation. "Released Claims" includes "Unknown Claims" as defined in ¶ 1.28 hereof.

1.23 "Released Persons" means each of the Defendants and their Related Parties.

1.24 "Settling Parties" means Defendants, Lead Plaintiffs, and the Class Members, including Thurman Ross.

1.25 "Settlement Class" means the class to be certified for settlement purposes only and is defined as all Persons (other than those Persons and entities who timely and validly request exclusion from the Class) who purchased or otherwise acquired the common stock of CEC during the period from February 19, 2009, through November 21, 2011, inclusive, excluding (a) defendant McCullough and his immediate family; (b) any entity in which Defendants have or had a controlling interest; (c) officers and directors of CEC during the Class Period; and (d) the legal representatives, heirs, successors, or assigns of any excluded party.

1.26 "State Derivative Action" means the action captioned *Bangari v. Lesnik, et al.*, No. 11-CH-41973, pending in the Circuit Court of Cook County, Illinois, County Department, Chancery Division. The Federal Derivative Actions and the State Derivative Action are collectively defined as the "Derivative Actions."

10

1.27   "Tax" or "Taxes" means any and all taxes, fees, levies, duties, tariffs, imposts, and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any governmental authority, including income tax and other taxes and charges on or regarding franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation or net worth; taxes or other charges in the nature of excise, withholding ad valorem, stamp, transfer, value added or gains taxes; license registration and documentation fees; and customs duties, tariffs, and similar charges on any income or gains earned by the Class Settlement Fund.

1.28   "Unknown Claims" means any Released Claims which Lead Plaintiffs or Class Members (including Thurman Ross) do not know or suspect to exist in his, her or its favor at the time of the release of the Released Persons which, if known by him, her or it, might have affected his, her or its settlement with and release of the Released Persons, or might have affected his, her or its decision not to object to this settlement.  With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Lead Plaintiffs shall expressly waive and each of the Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived the provisions, rights, and benefits of California Civil Code § 1542, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Lead Plaintiffs shall expressly waive and each of the Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or

11

principle of common law, which is similar, comparable or equivalent to California Civil Code § 1542. Lead Plaintiffs and Class Members may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Lead Plaintiffs shall expressly settle and release and each Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. Lead Plaintiffs acknowledge, and the Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

## 2. Class Certification

Solely for purposes of the settlement and for no other purpose, the Settling Parties stipulate and agree to: (a) certification of the Class under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure; (b) certification of Lead Plaintiffs as Class Representatives; and (c) the appointment of Lead Counsel as Class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

## 3. The Settlement

### a. The Class Settlement Fund

3.1    CEC shall pay and/or cause to be paid the total amount of Twenty-Seven Million Five Hundred Thousand Dollars ($27.5 million) (the "Class Settlement Amount") in cash by

12

wire transfer in accordance with relevant payment instructions to be provided by the Class Escrow Agent for which instructions shall be provided within two (2) business days of the entry of an order preliminarily approving the settlement of this Litigation, substantially in the form of Exhibit A attached hereto ("Preliminary Approval Order"), subject to the following:

(i)     In the event the settlements in this Litigation and the Derivative Actions are preliminarily approved at the same time, within fifteen (15) business days thereafter, the Insurers and CEC will deposit, respectively, $12.5 million and $5 million into an escrow account established for the settlement of this Litigation (the "Class Settlement Fund"), and the Insurers will deposit $20 million into an escrow account established for the settlement of the Derivative Actions (the "Derivative Settlement Fund");

(ii)     In the event preliminary approval of the settlement in this Litigation precedes preliminary approval of the settlement in the Derivative Actions, within fifteen (15) business days after preliminary approval of the settlement in this Litigation, the Insurers and CEC will deposit $12.5 million and $5 million, respectively, into the Class Settlement Fund, and the Insurers will deposit $10 million (the "Class Settlement Pass Through Amount") into the Derivative Settlement Fund.  Upon the subsequent preliminary approval of the settlement in the Derivative Actions, the Insurers will deposit the remaining $10 million portion of the Derivative Actions' settlement into the Derivative Settlement Fund within fifteen (15) business days thereafter;

(iii)     In the event the settlements in this Litigation and in the Derivative Actions are finally approved at the same time, CEC and/or the Insurers will promptly cause the Class Settlement Pass Through Amount, plus interest accrued thereon, less any applicable Taxes and

13

Tax Expenses, to be transferred from the Derivative Settlement Fund to the Class Settlement Fund; and

(iv)     In the event the date of final approval of the settlement in this Litigation ("Class Final Approval Date") precedes final approval of the settlement in the Derivative Actions ("Derivative Actions' Final Approval Date"), there shall be a ninety (90) day cure period (the "Cure Period").  During the Cure Period, CEC has two options:  (A) CEC may cure any issue giving rise to the delay in the Derivative Actions' Final Approval Date, thereby causing the Class Settlement Pass Through Amount to be transferred to the Class Settlement Fund prior to the close of the Cure Period; or (B) CEC and/or its Insurers may deposit alternative funding in the amount of $10 million plus interest (as it would have accrued on the Settlement Pass Through Amount) into the Class Settlement Fund ("Alternative Funding") in lieu of the Class Settlement Pass Through Amount.  Other than for purposes of transferring the Class Settlement Pass Through Amount into the Class Settlement Fund, in no event prior to (90) days after the Class Final Approval Date will the Insurers have the right to withdraw any of the Class Settlement Pass Through Amount from the Derivative Settlement Fund.

(v)     If the Cure Period expires without CEC having exercised either option (iv)(A) or (iv)(B) and neither Alternative Funding nor the Class Settlement Pass Through Amount has been deposited in the Class Settlement Fund, Lead Plaintiffs shall have the right to terminate this Stipulation.

### b.     The Escrow Agents

3.2     The Escrow Agents shall invest amount(s) deposited in the Class Settlement Fund and Derivative Settlement Fund pursuant to ¶ 3.1 hereof in short term United States Agency or Treasury Securities or other instruments backed by the Full Faith & Credit of the United States Government or an Agency thereof, or fully insured by the United States

14

Government or an Agency thereof, and shall reinvest the proceeds of these instruments as they mature in similar instruments at their then-current market rates. All risks related to the investment of the Class Settlement Fund in accordance with the investment guidelines set forth in this Paragraph shall be borne by the Class Settlement Fund. All risks related to the investment of the Derivative Settlement Fund in accordance with the investment guidelines set forth in this Paragraph shall be borne by the Derivative Settlement Fund.

3.3    The Escrow Agents shall not disburse any funds in the Class Settlement Fund, except as provided in the Stipulation, by an order of the Court, or with the written agreement of counsel for Defendants. The Escrow Agents shall not disburse any funds in the Derivative Settlement Fund, except as provided in the Stipulation, the Stipulation of Settlement in the Derivative Actions, by an order of the Court, or with the written agreement of counsel for Defendants.

3.4    Subject to further order(s) and/or directions as may be made by the Court, or as provided in the Stipulation, the Escrow Agents are authorized to execute such transactions as are consistent with the terms of the Stipulation.

3.5    All funds held by the Escrow Agents in the Class Settlement Fund and Derivative Settlement Fund shall be deemed and considered to be *in custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to the Stipulation and/or further order(s) of the Court.

3.6    Without further order of the Court, funds in the Class Settlement Fund may be used by Lead Counsel to pay reasonable costs and expenses actually incurred in connection with providing notice to the Class, locating Class Members, soliciting claims, assisting with the filing of claims, administering and distributing the Class Settlement Fund to Authorized

15

Claimants, processing Proof of Claim and Release forms, and paying escrow fees and costs, if any ("Notice and Administration Expenses").

      **c.**    **Taxes**

3.7    (i)    The Settling Parties and the Escrow Agents agree to treat each of the Class Settlement Fund and Derivative Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. § 1.4688-1. In addition, the Escrow Agents shall timely make such elections as necessary or advisable to carry out the provisions of this ¶ 3.7, including the "relation-back" election (as defined in Treas. Reg. § 1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Escrow Agents to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

    (ii)    For the purpose of § 1.468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Escrow Agents. The Escrow Agents shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Class Settlement Fund and Derivative Settlement Fund (including, without limitation, the returns described in Treas. Reg. § 1.468B-2(k)). Such returns (as well as the election described in ¶ 3.7(i) hereof) shall be consistent with this ¶ 3.7 and in all events shall reflect that all Taxes (including any estimated Taxes, interest or penalties) on the income earned by the Class Settlement Fund shall be paid out of the Class Settlement Fund as provided in ¶ 3.7(iii) hereof.

    (iii)    All: (A) Taxes (including any estimated Taxes, interest or penalties) arising with respect to the income earned by the Class Settlement Fund, including any Taxes or

16

tax detriments that may be imposed upon the Released Persons or their counsel with respect to any income earned by the Class Settlement Fund for any period during which either or both the Class Settlement Fund or the Derivative Settlement Fund does or do not qualify as a "qualified settlement fund" for federal or state income tax purposes; and (B) expenses and costs incurred in connection with the operation and implementation of this ¶ 3.7 (including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) the returns described in this ¶ 3.7) ("Tax Expenses"), shall be paid out of the Class Settlement Fund. The Escrow Agents, through the Class Settlement Fund and Derivative Settlement Fund, shall indemnify and hold each of the Released Persons and their counsel harmless for Taxes and Tax Expenses (including, without limitation, Taxes payable by reason of any such indemnification). Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Class Settlement Fund or Derivative Settlement Fund, as applicable, and shall be timely paid by the Escrow Agents out of the Class Settlement Fund or Derivative Settlement Fund, respectively, without prior order from the Court and the Class Escrow Agent shall be authorized (notwithstanding anything herein to the contrary) to withhold from distribution from the Class Settlement Fund to Authorized Claimants any funds necessary to pay such amounts, including the establishment of adequate reserves for any Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg. § 1.4688-2(1)(2)). Neither the Released Persons nor their counsel are responsible nor shall they have any liability for any Taxes or Tax Expenses. The parties hereto agree to cooperate with the Escrow Agents, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this ¶ 3.7.

17

### d. Termination of Settlement

3.8    In the event that the Stipulation is not approved or the Stipulation is terminated, canceled, or fails to become effective for any reason, the Class Settlement Fund, less Notice and Administration Expenses or Taxes or Tax Expenses paid, incurred, or due and owing in connection with the settlement provided for herein, shall be refunded pursuant to written instructions from counsel to Defendants in accordance with ¶ 8.4 herein.

### 4.    Preliminary Approval Order and Settlement Hearing

4.1    After execution of the Stipulation, Lead Counsel shall submit the Stipulation, together with its Exhibits, to the Court and shall apply for entry of the Preliminary Approval Order, substantially in the form of Exhibit A, attached hereto, requesting, *inter alia*, certification of the Settlement Class for settlement purposes, the preliminary approval of the settlement set forth in the Stipulation, and approval for the dissemination and publication of notice of the settlement (the "Notice"), substantially in the form of Exhibits A-1 (Settlement Notice), A-3 (Summary Notice), and A-4 (Postcard Notice), attached hereto.  The Notice shall include the general terms of the settlement set forth in the Stipulation, the general terms of the proposed Plan of Allocation, the general terms of the Fee and Expense Application, as defined in ¶ 7.1 herein, and the date of the Settlement Hearing, as defined in ¶ 4.8 herein.

4.2    Following entry of the Preliminary Approval Order, within fourteen (14) days thereafter, the Claims Administrator shall cause a copy of the Postcard Notice to be sent to brokerage firms and other nominees ("Nominees") who can be identified with reasonable effort as holding or having held CEC common stock for the benefit of a Class Member.  The Claims Administrator shall instruct the Nominees to either send the Postcard Notice to such Class Members promptly after receipt thereof, or send a list of the names and addresses of such Class Members to the Claims Administrator, in which case the Claims Administrator promptly shall

18

mail the Postcard Notice to such beneficial owners. Reasonable and actual out-of-pocket expenses incurred by Nominees as a result of the actions taken in accordance with this Paragraph shall be reimbursed as provided in the Notice.

4.3    Within fourteen (14) days of the entry of the Preliminary Approval Order, the Claims Administrator shall cause the Summary Notice to be published once in the *Investor's Business Daily*, or otherwise published as directed by the Court.

4.4    Within fourteen (14) days of the entry of the Preliminary Approval Order, the Claims Administrator shall issue a nationwide press release over the PR Newswire consisting primarily or exclusively of the information contained in the Summary Notice.

4.5    On or before the entry of the Preliminary Approval Order, the Claims Administrator shall cause the Settlement Notice, Proof of Claim, Stipulation of Settlement, and any other relevant documents to be made available at www.CecSecuritiesLitigation.com, a website dedicated solely to the CEC settlement and available to the general public.

4.6    The Claims Administrator shall mail or otherwise distribute the full-length Settlement Notice and Proof of Claim to any Class Members who request copies of the Settlement Notice and Proof of Claim in response to the Postcard Notice, published Summary Notice, press release, or other means.

4.7    Lead Counsel shall request court approval to distribute a Postcard Notice in lieu of the full Settlement Notice and Proof of Claim. If such approval is not granted, the Settlement Notice and Proof of Claim will be distributed.

4.8    Lead Counsel shall request that, after Notice is given, the Court hold a hearing (the "Settlement Hearing") and approve the settlement of the Litigation as set forth herein. At or

19

after the Settlement Hearing, Lead Counsel also will request that the Court approve the proposed Plan of Allocation and the Fee and Expense Application.

**5.    Releases**

5.1    Upon the Effective Date, Lead Plaintiffs shall, and each of the Class Members (including Thurman Ross) shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against the Released Persons, whether or not such Class Member executes and delivers the Proof of Claim and Release or shares in the Class Settlement Fund.   Claims to enforce the terms of this Stipulation are not released.

5.2    The Proof of Claim and Release to be executed by Class Members shall release all Released Claims against the Released Persons and shall be substantially in the form contained in Exhibit A-2, attached hereto.

5.3    Upon the Effective Date, all Class Members and anyone claiming through or on behalf of any of them, will be forever barred and enjoined from commencing, instituting, prosecuting or continuing to prosecute any action or other proceeding in any court of law or equity, arbitration tribunal, or administrative forum, asserting the Released Claims against any of the Released Persons.

5.4    Upon the Effective Date, each of the Released Persons shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged Lead Plaintiffs, each and all of the Class Members, and Lead Plaintiffs' counsel from all claims (including Unknown Claims) arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement or resolution of the Litigation or the Released Claims.  Claims to enforce the terms of this Stipulation are not released.

20

6.      **Administration and Calculation of Claims, Final Awards, and Supervision and Distribution of the Settlement Fund**

6.1      The Claims Administrator, subject to such supervision and direction of the Court as may be necessary or as circumstances may require, shall administer and calculate the claims submitted by Class Members and shall oversee distribution of the Net Class Settlement Fund to Authorized Claimants.

6.2      The Class Settlement Fund shall be applied as follows:

(a)      to pay all the costs and expenses reasonably and actually incurred in connection with providing notice, locating Class Members, soliciting Class claims, assisting with the filing of claims, administering and distributing the Net Class Settlement Fund to Authorized Claimants, processing Proof of Claim and Release forms, and paying escrow fees and costs, if any;

(b)      to pay the Taxes and Tax Expenses described in ¶ 3.7 hereof;

(c)      to pay attorneys' fees and expenses of Plaintiffs' counsel (the "Fee and Expense Award"), if and to the extent allowed by the Court; and

(d)      after the Effective Date, and subject to the provisions of ¶ 3.1, to distribute the Net Class Settlement Fund to Authorized Claimants as allowed by the Stipulation, the Plan of Allocation, or the Court.

6.3      After the Effective Date, and in accordance with the terms of the Stipulation, the Plan of Allocation, or such further approval and further order(s) of the Court as may be necessary or as circumstances may require, the Net Class Settlement Fund shall be distributed to Authorized Claimants, subject to and in accordance with the following.

6.4      Within ninety (90) days after the dissemination and publication of the Notice or such other time as may be set by the Court, each Person claiming to be an Authorized Claimant

21

shall be required to submit to the Claims Administrator a complete Proof of Claim and Release, substantially in the form of Exhibit A-2, attached hereto, signed under penalty of perjury and supported by such documents as are specified in the Proof of Claim and Release.

6.5     Except as otherwise ordered by the Court, all Class Members who fail to timely submit a valid Proof of Claim and Release within such period, or such other period as may be ordered by the Court, or otherwise allowed, shall be forever barred from receiving any payments pursuant to the Stipulation and the settlement set forth herein, but will in all other respects be subject to and bound by the provisions of the Stipulation, the Releases contained herein, and the Judgment.  Notwithstanding the foregoing, Lead Counsel shall have the discretion to accept late-submitted claims for processing by the Claims Administrator so long as the distribution of the Net Class Settlement Fund is not materially delayed thereby.

6.6     The Net Class Settlement Fund shall be distributed to the Authorized Claimants substantially in accordance with the Plan of Allocation set forth in the Notice and approved by the Court.  Claims must be at least $10.00 to be eligible for a distribution.  If there is any balance remaining in the Net Class Settlement Fund after six (6) months from the initial date of distribution of the Net Class Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise), Lead Counsel shall, if feasible, reallocate such balance among Authorized Claimants in an equitable and economic fashion.  Thereafter, any balance which still remains in the Net Class Settlement Fund shall be donated to the Wounded Warrior Project.

6.7     Defendants and their Related Parties shall have no responsibility for, interest in, or liability whatsoever with respect to the distribution of the Net Class Settlement Fund, the Plan of Allocation, the determination, administration, or calculation of claims, the payment or

22

withholding of Taxes or Tax Expenses, or any losses incurred in connection therewith. No Person shall have any claim of any kind against Defendants or their Related Parties with respect to the matters set forth in ¶¶ 3.2-3.7 and 6.1-6.6 hereof; and the Class Members, including Thurman Ross, Lead Plaintiffs, and Lead Counsel release Defendants and their Related Parties from any and all liability and claims arising from or with respect to the investment or distribution of the Class Settlement Fund.

6.8    No Person shall have any claim against Lead Plaintiffs, Lead Plaintiffs' counsel or the Claims Administrator, or any other Person designated by Lead Counsel based on distributions made substantially in accordance with the Stipulation and the settlement contained herein, the Plan of Allocation, or further order(s) of the Court.

6.9    It is understood and agreed by the Settling Parties that any proposed Plan of Allocation of the Net Class Settlement Fund including, but not limited to, any adjustments to an Authorized Claimant's claim set forth therein, is not a part of the Stipulation and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the settlement set forth in the Stipulation, and any order or proceeding relating to the Plan of Allocation shall not operate to terminate or cancel the Stipulation or affect the finality of the Court's Judgment approving the Stipulation and the settlement set forth therein, or any other orders entered pursuant to the Stipulation.

23

7.        **Attorneys' Fees and Expenses of Plaintiffs' Counsel**

7.1        Lead Counsel may submit an application or applications (the "Fee and Expense Application") for: (a) an award of attorneys' fees; plus (b) expenses incurred in connection with prosecuting the Litigation.

7.2        The fees and expenses, as awarded by the Court, shall be paid from the Class Settlement Fund to Lead Counsel within ten (10) calendar days after the Court executes an order awarding such fees and expenses, notwithstanding the existence of any timely filed objections, or potential for appeal, subject to the joint and several obligation of Lead Counsel and/or their successors to make appropriate refunds or repayments as described in ¶ 7.3.  Lead Counsel shall allocate the attorneys' fees among other plaintiffs' counsel in a manner in which they in good faith believe reflects the contributions of such counsel to the initiation, prosecution, and resolution of the Litigation.

7.3        In the event that the Effective Date does not occur, or the order making the Fee and Expense Award is reversed or modified, or the Stipulation is canceled or terminated for any other reason, and in the event that the Fee and Expense Award has been paid to any extent, then: Lead Counsel with respect to the entire Fee and Expense Award shall within ten (10) business days from receiving notice from Defendants' counsel or from a court of appropriate jurisdiction, refund to the Class Settlement Fund such fees and expenses previously paid to them from the Class Settlement Fund plus interest thereon at the same rate as earned on the Class Settlement Fund in an amount consistent with such reversal or modification.  Each such Lead Counsel's law firm receiving fees and expenses, as a condition of receiving such fees and expenses, on behalf of itself and each partner and/or shareholder of it, agrees that the law firm and its partners and/or shareholders are subject to the jurisdiction of the Court for the purpose of enforcing the

24

provisions of this Paragraph. Without limitation, Lead Counsel agree that the Court may, upon application of Defendants and notice to Lead Counsel, summarily issue orders including, but not limited to, judgments and attachment orders, and may make appropriate findings of or sanctions for contempt, should such law firm fail timely to repay fees and expenses pursuant to this Paragraph.

7.4    The procedure for and the allowance or disallowance by the Court of any applications by any plaintiff's counsel for attorneys' fees and expenses to be paid out of the Class Settlement Fund are not part of the settlement set forth in the Stipulation, and are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the settlement set forth in the Stipulation, and any order or proceeding relating to the Fee and Expense Application or any appeal from any order relating thereto or reversal or modification thereof, shall not operate to terminate or cancel the Stipulation, or affect or delay the finality of the Judgment approving the Stipulation and the settlement of the Litigation set forth therein.

7.5    Defendants and their Related Parties shall have no responsibility for any payment of attorneys' fees and expenses to plaintiffs' counsel over and above the funding of the Class Settlement Fund, as required by ¶ 3.1 herein.

7.6    Defendants and their Related Parties shall have no responsibility for the allocation among plaintiffs' counsel, and/or any other Person who may assert some claim thereto, of any Fee and Expense Award that the Court may make in the Litigation.

**8.    Conditions of Settlement, Effect of Disapproval, Cancellation or Termination**

8.1    The Effective Date of the Stipulation shall be conditioned on the occurrence of all of the following events:

25

(a)     Defendants and the Insurers have timely made and/or caused to be made their contributions to the Class Settlement Fund and Derivative Settlement Fund, as required by ¶ 3.1 herein;

(b)     the Court has entered the Preliminary Approval Order, substantially in the form of Exhibit A, attached hereto;

(c)     the Court has entered the Judgment, or a judgment substantially in the form of Exhibit B, attached hereto; and

(d)     the Judgment has become Final, as defined in ¶ 1.11 herein.

8.2     Upon the Effective Date, any and all remaining interest or right of Defendants or the Insurers in or to the Class Settlement Fund, if any, shall be absolutely and forever extinguished.  If the conditions specified in ¶ 8.1 herein are not met, then the Stipulation shall be canceled and terminated subject to ¶ 8.4 herein, unless Lead Counsel and Defendants' counsel mutually agree in writing to proceed with the Stipulation.

8.3     Defendants shall have the option to terminate the settlement in the event that Class Members representing more than a certain percentage of CEC common stock subject to this settlement have excluded themselves from the Class, as set forth in a separate agreement (the "Supplemental Agreement") executed between Lead Plaintiffs and Defendants.  If the Court requires that the Supplemental Agreement be filed, it shall be filed under seal with the Court.

8.4     Unless otherwise ordered by the Court, in the event the Stipulation shall terminate, or be cancelled, or shall not become effective for any reason, within five (5) business days after written notification of such event is sent by counsel for Defendants or Lead Counsel to the Escrow Agent, the funds in the Class Settlement Fund, less expenses which have either been disbursed pursuant to ¶¶ 3.6 and 3.7 hereof, or are chargeable to the Class Settlement Fund

26

pursuant to ¶¶ 3.6 and 3.7 hereof, shall be refunded by the Escrow Agent directly to the entities that provided the funds based on their respective *pro rata* contribution. The Escrow Agent or its designee shall apply for any tax refund owed on the funds in the Class Settlement Fund and pay the proceeds, after deduction of any fees or expenses incurred in connection with such application(s) for refund, directly to the entities that provided the funds based on their respective pro rata contribution to the Class Settlement Fund.

8.5     In the event that the Stipulation is not approved by the Court or the settlement set forth in the Stipulation is terminated or fails to become effective in accordance with its terms, the Settling Parties shall be restored to their respective positions in the Litigation as of October 25, 2013. In such event, the terms and provisions of the Stipulation, with the exception of ¶¶ 1.1-1.28, 3.6-3.8, 6.7, 7.3-7.6, 8.4-8.6, and 9.3-9.4, herein, shall have no further force and effect with respect to the Settling Parties and shall not be used in this Litigation or in any other proceeding for any purpose, and any judgment or order entered by the Court in accordance with the terms of the Stipulation shall be treated as vacated, *nunc pro tunc*. No order of the Court or modification or reversal on appeal of any order of the Court concerning the Plan of Allocation or the amount of any attorneys' fees, costs, expenses, and interest awarded by the Court to any of plaintiffs' counsel shall operate to terminate or cancel this Stipulation or constitute grounds for cancellation or termination of the Stipulation.

8.6     If the Effective Date does not occur, or if the Stipulation is terminated pursuant to its terms, neither Lead Plaintiffs nor any of their counsel shall have any obligation to repay any amounts disbursed pursuant to ¶¶ 3.6 or 3.7. In addition, any expenses already incurred pursuant to ¶¶ 3.6 or 3.7 at the time of such termination or cancellation but which have not been paid,

27

shall be paid by the Escrow Agent in accordance with the terms of the Stipulation prior to the balance being refunded in accordance with ¶¶ 3.8 and 8.4 hereof.

**9.      Miscellaneous Provisions**

9.1      The Settling Parties: (a) acknowledge that it is their intent to consummate this agreement; and (b) agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of the Stipulation and to exercise their best efforts to accomplish the foregoing terms and conditions of the Stipulation.

9.2      The Settling Parties intend this settlement to be a final and complete resolution of all disputes between them with respect to the Litigation.  The settlement compromises claims which are contested and shall not be deemed an admission by any Settling Party as to the merits of any claim or defense.  The Final Judgment will contain a finding that, during the course of the Litigation, the Settling Parties and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11.  Defendants and Lead Plaintiffs agree that the Settlement Amount and the other terms of the settlement were negotiated in good faith by Defendants and Lead Plaintiffs, and reflect a settlement that was reached voluntarily after consultation with competent legal counsel.  The Settling Parties reserve their right to rebut, in a manner that such party determines to be appropriate, any contention made in any public forum that the Litigation was brought or defended in bad faith or without a reasonable basis.

9.3      Neither this Stipulation nor the settlement contained herein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability of Defendants or their respective Related Parties; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any Defendant or their respective Related Parties in any civil, criminal, or

28

administrative proceeding in any court, administrative agency, or other tribunal. Defendants and/or their respective Related Parties may file this Stipulation and/or the Judgment from this Litigation in any other action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

9.4 All agreements made and orders entered during the course of the Litigation relating to the confidentiality of information shall survive this Stipulation.

9.5 All of the Exhibits to the Stipulation are material and integral parts hereof and are fully incorporated herein by this reference.

9.6 The Stipulation may be amended or modified only by a written instrument signed by or on behalf of all Settling Parties or their respective successors-in-interest.

9.7 The Stipulation and the Exhibits attached hereto and the Supplemental Agreement constitute the entire agreement among the parties hereto and no representations, warranties or inducements have been made to any party concerning the Stipulation or its Exhibits other than the representations, warranties, and covenants contained and memorialized in such documents. Except as otherwise provided herein, each party shall bear its own costs.

9.8 Lead Counsel, on behalf of the Class, is expressly authorized by Lead Plaintiffs to take all appropriate action required or permitted to be taken by the Class pursuant to the Stipulation to effectuate its terms and also are expressly authorized to enter into any modifications or amendments to the Stipulation on behalf of the Class which they deem appropriate.

29

9.9     Each counsel or other Person executing the Stipulation or any of its Exhibits on behalf of any party hereto warrants that such Person has the full authority to do so.

9.10    The Stipulation may be executed in one or more counterparts.  All executed counterparts and each of them shall be deemed to be one and the same instrument.  A complete set of original executed counterparts shall be filed with the Court.

9.11    The Stipulation shall be binding upon, and inure to the benefits of, the successors and assigns of the parties hereto.

9.12    The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of the Stipulation, and all parties hereto submit to the jurisdiction of the court for purposes of implementing and enforcing the settlement embodied in the Stipulation.

9.13    This Stipulation and Exhibits hereto shall be considered to have been negotiated, executed and delivered, and to be wholly performed, in the State of Illinois, and the rights and obligations of the parties to the Stipulation shall be construed and enforced in accordance with, and governed by, the internal, substantive laws of the State of Illinois without giving effect to that State's choice-of-law principles.

IN WITNESS WHEREOF, the parties hereto have caused the Stipulation to be executed, by their duly authorized attorneys, dated October 25, 2013.

30

By: _____
Jay W. Eisenhofer
Geoffrey C. Jarvis
Jeffrey A. Almeida
Christine M. Mackintosh
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
Telephone: 302.622.7000
Facsimile: 302.622.7100
Email: gjarvis@gelaw.com
        jalmeida@gelaw.com
        cmackintosh@gelaw.com

*Co-Lead Counsel for Lead Plaintiffs and Counsel for Thurman Ross*

By: _____
Joseph F. Rice
James M. Hughes
David P. Abel
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: 843.216.9000
Facsimile: 843.216.9450
Email: jrice@motleyrice.com
        jhughes@motleyrice.com
        dabel@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs*

By: _____
Paul E. Slater
Scott F. Hessell
SPERLING & SLATER, P.C.
55 W. Monroe Street – Suite 3200
Chicago, IL 60603
Telephone: 312.641.3200
Facsimile: 312.641.6492
Email: pes@sperling-law.com
        shessell@sperling-law.com

*Liaison Counsel for Lead Plaintiffs and Counsel for Thurman Ross*

31

By: _____
Jay W. Eisenhofer
Geoffrey C. Jarvis
Jeffrey A. Almeida
Christine M. Mackintosh
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
Telephone: 302.622.7000
Facsimile: 302.622.7100
Email: gjarvis@gelaw.com
      jalmeida@gelaw.com
      cmackintosh@gelaw.com

*Co-Lead Counsel for Lead Plaintiffs and*
*Counsel for Thurman Ross*


By: _____
Joseph F. Rice
James M. Hughes
David P. Abel
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: 843.216.9000
Facsimile: 843.216.9450
Email: jrice@motleyrice.com
      jhughes@motleyrice.com
      dabel@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs*

By: _____
Paul E. Slater
Scott F. Hessell
SPERLING & SLATER, P.C.
55 W. Monroe Street – Suite 3200
Chicago, IL 60603
Telephone: 312.641.3200
Facsimile: 312.641.6492
Email: pes@sperling-law.com
      shessell@sperling-law.com

*Liaison Counsel for Lead Plaintiffs and*
*Counsel for Thurman Ross*

31

By:    James E. Barz by SMH w/permission
       James E. Barz
       ROBBINS GELLER RUDMAN
           & DOWD LLP
       200 South Wacker Dr.
       Chicago, IL 60606
       Telephone: 312.674.4674
       Facsimile: 312.674.4676
       Email: jbarz@rgrdlaw.com

       Darren J. Robbins
       Danielle S. Myers
       ROBBINS GELLER RUDMAN
           DOWD LLP
       655 West Broadway, Suite 1900
       San Diego, CA  92101
       Telephone: 619.231.1058
       Facsimile: 619.231.7423
       Email: drobbins@rgrdlaw.com

       *Additional Counsel for Plaintiffs*

32

By: _(signature)_

Lee Ann Russo
Daniel E. Reidy
Erin L. Shencopp
Thomas F. Rybarczyk
JONES DAY
77 W. Wacker Dr.
Chicago, IL 60601-1692
Telephone: 312.269.4283
Facsimile: 312.782.8585
Email: larusso@JonesDay.com
        dreidy@JonesDay.com
        eshencopp@JonesDay.com
        trybarczyk@JonesDay.com

*Counsel for Defendant*
*Career Education Corporation*

By: _(signature)_

Mary Ellen Hennessy
Aharon S. Kaye
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone: 312.902.5200
Facsimile: 312.902.1061
Email: maryellen.hennessy@kattenlaw.com
        aharon.kaye@kattenlaw.com

*Counsel for Defendant*
*Gary E. McCullough*

33

INDEX OF EXHIBITS TO STIPULATION OF SETTLEMENT

| DOCUMENT | EXHIBIT |
|---|---|
| [Proposed] Order Preliminarily Approving Settlement and Providing for Notice | A |
| Notice of Proposed Settlement of Class Action | A-1 |
| Proof of Claim and Release Form | A-2 |
| Summary Notice | A-3 |
| Postcard Notice | A-4 |
| [Proposed] Final Judgment and Order of Dismissal with Prejudice | B |

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THURMAN ROSS, by and on behalf of himself and all others similarly situated, | |
| Plaintiff, | |
| v. | No. 12-CV-00276 |
| CAREER EDUCATION CORPORATION, GARY E. McCULLOUGH and MICHAEL J. GRAHAM, | Hon. John W. Darrah |
| Defendants. | |

**[PROPOSED] ORDER PRELIMINARILY APPROVING**
**SETTLEMENT AND PROVIDING FOR NOTICE**

**EXHIBIT A**

WHEREAS, a class action is pending before this Court captioned *Ross v. Career Education Corporation, et al.*, No. 1:12-cv-00276 (the "Litigation");

WHEREAS, the parties having made application, pursuant to Federal Rule of Civil Procedure 23(e), for an order preliminarily approving the settlement of this Litigation, in accordance with a Stipulation of Settlement (the "Stipulation") dated as of October 25, 2013, which, together with the Exhibits annexed thereto, set forth the terms and conditions for a proposed settlement of the Litigation and for dismissal of the Litigation with prejudice upon the terms and conditions set forth therein; and the Court having read and considered the Stipulation and the Exhibits annexed thereto; and

WHEREAS, all defined terms herein have the same meanings as set forth in the Stipulation;

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.      The Court does hereby preliminarily approve the Stipulation and the settlement set forth therein, subject to further consideration at the Settlement Hearing described below.

2.      A hearing (the "Settlement Hearing") shall be held before this Court on _____, 2014, at _____ __.m., at the United States District Court for the Northern District of Illinois, Eastern Division, Everett McKinley Dirksen United States Courthouse, Courtroom 1203, 219 South Dearborn Street, Chicago, Illinois 60604, to determine whether the proposed settlement of the Litigation on the terms and conditions provided for in the Stipulation is fair, reasonable, and adequate to the Class and should be approved by the Court; whether a Judgment as provided in ¶ 1.14 of the Stipulation should be entered; whether the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved; and to determine the

amount of fees and expenses that should be awarded to Lead Counsel. The Court may adjourn the Settlement Hearing without further notice to the Members of the Class.

3.     The Court approves, as to form and content, the Notice of Proposed Settlement of Class Action (the "Notice"), the Proof of Claim and Release form (the "Proof of Claim"), the Summary Notice, and the Postcard Notice annexed as Exhibits A-1 through A-4 hereto, and finds that the dissemination and distribution of the Postcard Notice and publishing of the Summary Notice substantially in the manner and form set forth in ¶¶ 4-5 of this Order meet the requirements of Federal Rule of Civil Procedure 23 and due process, and is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all Persons entitled thereto.

4.     Pursuant to Federal Rule of Civil Procedure 23(b)(3), and for purposes of the Settlement only, this Litigation is hereby certified as a class action on behalf of all Persons who purchased or otherwise acquired the common stock of CEC during the period from February 19, 2009, through November 21, 2011, inclusive, excluding (a) Defendants; (b) members of the immediate family of Defendant Gary E. McCullough; (c) the subsidiaries and affiliates of CEC, as these terms are defined by the federal securities laws, including the 401(k) plans of CEC; (d) any entity in which any Defendant has a controlling interest; (e) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (f) the legal representatives, heirs, successors, and assigns of any such excluded party.

5.     The Court finds that, for purposes of settlement only, the prerequisites for a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) have been satisfied. Specifically, the Court finds that: (a) Settlement Class Members are so numerous that joinder of all Settlement Class Members in the Litigation is impracticable; (b) there are questions of law and

fact common to the Settlement Class; (c) the claims of the Lead Plaintiffs are typical of the claims of the Settlement Class; (d) Lead Plaintiffs and Lead Counsel have fairly and adequately represented and protected the interests of all Settlement Class Members; (e) questions of law and fact common to Settlement Class Members predominate over any questions affecting only individual Settlement Class Members; and (f) a class action is superior to other available methods for the fair and efficient adjudication of the controversy, considering: (i) the interests of Settlement Class Members in individually controlling the litigation of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by Settlement Class Members; (iii) the desirability or undesirability of continuing the litigation of these claims in this particular forum; and (iv) the difficulties likely to be encountered in the management of the class action.

6.     The firm of Heffler Claims Group ("Claims Administrator") is hereby appointed to supervise and administer the notice procedure as well as the processing of claims as more fully set forth below:

(a)     Within fourteen (14) days of the entry of this Order (the "Notice Date"), the Claims Administrator shall cause a copy of the Postcard Notice to be sent to Class Members, brokerage firms, and other nominees ("Nominees") who can be identified with reasonable effort as holding or having held CEC common stock for the benefit of a Class Member. The Claims Administrator shall instruct the Nominees to either send the Postcard Notice to such Class Members promptly after receipt thereof, or send a list of the names and addresses of such Class Members to the Claims Administrator, in which event the Claims Administrator promptly shall mail the Postcard Notice to such beneficial owners. Reasonable and actual out-of-pocket

expenses incurred as a result of the actions taken in accordance with this Paragraph shall be reimbursed as provided in the Notice;

(b)     Within fourteen (14) days of the entry of this Order, the Claims Administrator shall cause the Summary Notice to be published once in the *Investor's Business Daily*, or otherwise published as directed by the Court;

(c)     Within fourteen (14) days of the entry of this Order, the Claims Administrator shall issue a nationwide press release over the PR Newswire consisting primarily or exclusively of the information contained in the Summary Notice;

(d)     On or before the entry of this Order, the Claims Administrator shall cause the Settlement Notice, Proof of Claim, Stipulation of Settlement, Plan of Allocation, and any other relevant documents to be made available at www.CecSecuritiesLitigation.com, a website dedicated solely to the CEC settlement and available to the general public and shall set up a toll-free number for the purpose of answering any questions about the settlement;

(e)     The Claims Administrator shall mail or otherwise distribute the full-length Settlement Notice and Proof of Claim to any Class Members who request copies of the Settlement Notice and Proof of Claim in response to the Postcard Notice, published Summary Notice, press release, or other means.

(f)     At least ten (10) calendar days prior to the Settlement Hearing, Lead Counsel shall cause to be served on Defendants' counsel and filed with the Court proof, by affidavit or declaration, of such mailing and publishing.

7.     All Members of the Class who do not make a valid request for exclusion shall be bound by all determinations and judgments in the Litigation concerning the settlement, whether favorable or unfavorable to the Class.

8.      Class Members who wish to participate in the settlement shall complete and submit Proofs of Claim in accordance with the instructions contained therein.  Unless the Court orders otherwise, all Proofs of Claim must be postmarked no later than ninety (90) days from the Notice Date.  No claims less than $10.00 will be processed or distributed.  Any Class Member who does not timely submit a Proof of Claim within the time provided for shall be barred from sharing in the distribution of the proceeds of the Settlement Fund, but will nonetheless be bound by the Court's final judgment and will release his or her claims, unless otherwise ordered by the Court.   Notwithstanding the foregoing, Lead Counsel may, in their discretion, accept late-submitted claims for processing by the Claims Administrator so long as distribution of the Net Class Settlement Fund is not materially delayed thereby.

9.      Any Member of the Class may enter an appearance in the Litigation, at their own expense, individually or through counsel of their own choice.  If they do not enter an appearance, they will be represented by Lead Counsel.

10.      Any Person falling within the definition of the Class and who purchased or otherwise acquired CEC common stock may, upon request, be excluded from the Class.  Any such Person must submit to the Claims Administrator a request for exclusion ("Request for Exclusion"), postmarked no later than ninety (90) days after the Notice Date.  To be valid, a Request for Exclusion must state all of the information requested by ¶ 2 of Section XII of the Notice.  All Persons who submit valid and timely Requests for Exclusion in the manner set forth in this paragraph shall have no rights under the Stipulation, shall not share in the distribution of the Net Class Settlement Fund, and shall not be bound by the Stipulation or the Judgment entered in the Litigation.

11.     Any Member of the Class may appear and show cause, if he, she, or it has any, why the proposed settlement of the Litigation should or should not be approved as fair, reasonable, and adequate, why a judgment should or should not be entered thereon, why the Plan of Allocation should or should not be approved, why attorneys' fees and expenses should or should not be awarded to Lead Counsel for the Plaintiffs, or why the expenses of Plaintiffs should or should not be awarded; provided, however, that no Class Member or any other Person shall be heard or entitled to contest such matters, unless that Person has delivered by hand or sent by First-Class Mail written objections and copies of any papers and briefs such that they are received, not simply postmarked, on or before the ninetieth (90th) day after the Notice Date, by Jeffrey A. Almeida, Grant & Eisenhofer P.A., 123 Justison St., Wilmington, DE 19801 or James M. Hughes, Motley Rice LLC, 28 Bridgeside Blvd., Mt. Pleasant, SC 29464, and filed said objections, papers, and briefs with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, on or before the ninetieth (90th) day after the Notice Date. Any Member of the Class who does not make his, her, or its objection in the manner provided shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness or adequacy of the proposed settlement as set forth in the Stipulation, to the Plan of Allocation, or to the award of attorneys' fees and expenses to counsel for the plaintiffs or expenses of Plaintiffs, unless otherwise ordered by the Court.

12.     All funds held by the respective Escrow Agents shall be deemed and considered to be *in custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed from the Class Settlement Fund pursuant to the Stipulation and/or further order(s) of the Court.

13.     All opening briefs and supporting documents in support of the settlement, the Plan of Allocation, and any application by Lead Counsel for the Lead Plaintiffs for attorneys' fees and expenses shall be filed and served by _____, 2014.  Replies to any objections shall be filed and served by _____, 2014.  The deadline for filing motions for Final Approval of Class Action Settlement and for Attorneys' Fees and Reimbursement of Expenses shall be seven (7) calendar days before the Settlement Hearing.

14.     Neither Defendants and their Related Parties nor Defendants' counsel shall have any responsibility for the Plan of Allocation or any application for attorneys' fees or expenses submitted by Lead Counsel or Plaintiffs, and such matters will be considered separately from the fairness, reasonableness, and adequacy of the settlement.

15.     The fees and expenses, as awarded by the Court, shall be paid from the Class Settlement Fund to Lead Counsel within ten (10) calendar days after the Court executes an order awarding such fees and expenses, notwithstanding the existence of any timely filed objections, or potential for appeal, subject to the joint and several obligation of Lead Counsel and/or their successors to make appropriate refunds or repayments as described in ¶ 7.3 of the Stipulation. Lead Counsel shall allocate the attorneys' fees among other plaintiffs' counsel in a manner in which they in good faith believe reflects the contributions of such counsel to the initiation, prosecution, and resolution of the Litigation.

16.     At or after the Settlement Hearing, the Court shall determine whether the Plan of Allocation proposed by Lead Counsel, and any application for attorneys' fees or payment of expenses, shall be approved.  The Court may, without further notice to the Class, modify the Plan of Allocation.

17.     All reasonable expenses incurred in identifying and notifying Class Members, as well as administering the Class Settlement Fund, shall be paid as set forth in the Stipulation.  In the event the settlement is not approved by the Court, or otherwise fails to become effective, neither Plaintiffs nor any of their counsel shall have any obligation to repay any amounts incurred and properly disbursed pursuant to ¶¶ 3.6 or 3.7 of the Stipulation.

18.     Neither the Stipulation, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be construed as an admission or concession by Defendants of the truth of any of the allegations in the Litigation, or of any liability, fault, or wrongdoing of any kind.

19.     The Court reserves the right to adjourn the date of the Settlement Hearing without further notice to the Members of the Class, and retains jurisdiction to consider all further applications arising out of or connected with the proposed settlement.  The Court may approve the settlement, with such modifications as may be agreed to by the Settling Parties, if appropriate, without further notice to the Class.

20.     If the Stipulation and the settlement set forth therein are not approved or consummated for any reason whatsoever, the Stipulation and settlement and all proceedings had in connection therewith shall be without prejudice to the rights of the Settling Parties *status quo ante*.

21.     Pending final determination of whether the proposed settlement should be approved, neither the Plaintiffs nor any Class Member, directly or indirectly, representatively, or in any other capacity, shall commence or prosecute against any of the Defendants, any action or proceeding in any court or tribunal asserting any of the Released Claims.

IT IS SO ORDERED.

DATED:_____          _____
                                        THE HONORABLE JOHN W. DARRAH
                                        UNITED STATES DISTRICT JUDGE


                                        By:_____
                                            Jay W. Eisenhofer
                                            Geoffrey C. Jarvis
                                            Jeffrey A. Almeida
                                            Christine M. Mackintosh
                                            GRANT & EISENHOFER P.A.
                                            123 Justison Street
                                            Wilmington, DE  19801
                                            Telephone: 302.622.7000
                                            Facsimile: 302.622.7100
                                            Email: gjarvis@gelaw.com
                                                   jalmeida@gelaw.com
                                                   cmackintosh@gelaw.com

                                            *Co-Lead Counsel for Lead Plaintiffs and
                                            Counsel for Thurman Ross*

                                        By: _____
                                            Joseph F. Rice
                                            James M. Hughes
                                            David P. Abel
                                            MOTLEY RICE LLC
                                            28 Bridgeside Blvd.
                                            Mt. Pleasant, SC  29464
                                            Telephone: 843.216.9000
                                            Facsimile: 843.216.9450
                                            Email: jrice@motleyrice.com
                                                   jhughes@motleyrice.com
                                                   dabel@motleyrice.com

                                            *Co-Lead Counsel for Lead Plaintiffs*

                                        By: _____
                                            Paul E. Slater
                                            Scott F. Hessell
                                            SPERLING & SLATER, P.C.

55 W. Monroe Street – Suite 3200
Chicago, IL 60603
Telephone: 312.641.3200
Facsimile: 312.641.6492
Email: pes@sperling-law.com
      shessell@sperling-law.com

*Liaison Counsel for Lead Plaintiffs and Counsel
for Thurman Ross*


By: _____
    James E. Barz
    ROBBINS GELLER RUDMAN
      & DOWD LLP
    200 South Wacker Dr.
    Chicago, IL 60606
    Telephone: 312.674.4674
    Facsimile: 312.674.4676
    Email: jbarz@rgrdlaw.com

    Darren J. Robbins
    Danielle S. Myers
    ROBBINS GELLER RUDMAN
      DOWD LLP
    655 West Broadway, Suite 1900
    San Diego, CA  92101
    Telephone: 619.231.1058
    Facsimile: 619.231.7423
    Email: drobbins@rgrdlaw.com

*Additional Counsel for Plaintiffs*

By: _____

    Lee Ann Russo
    Daniel E. Reidy
    Erin L. Shencopp
    Thomas F. Rybarczyk
    JONES DAY
    77 W. Wacker Dr.
    Chicago, IL 60601-1692
    Telephone: 312.269.4283
    Facsimile: 312.782.8585
    Email: larusso@JonesDay.com
           dreidy@JonesDay.com
           trybarczyk@JonesDay.com

    *Counsel for Defendant*
    *Career Education Corporation*


By: _____

    Mary Ellen Hennessy
    Aharon S. Kaye
    KATTEN MUCHIN ROSENMAN LLP
    525 West Monroe Street
    Chicago, IL  60661
    Telephone: 312.902.5200
    Facsimile: 312.902.1061
    Email: maryellen.hennessy@kattenlaw.com
           aharon.kaye@kattenlaw.com

    *Counsel for Defendant Gary E. McCullough*

11

# EXHIBIT A-1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THURMAN ROSS, by and on behalf of himself and all others similarly situated, | |
| Plaintiff, | |
| v. | No. 12-CV-00276 |
| CAREER EDUCATION CORPORATION, GARY E. McCULLOUGH and MICHAEL J. GRAHAM, | Hon. John W. Darrah |
| Defendants. | |

**NOTICE OF PROPOSED SETTLEMENT OF CLASS ACTION**

**EXHIBIT A-1**

TO:    ALL PERSONS WHO PURCHASED OR OTHERWISE ACQUIRED THE COMMON
       STOCK OF CAREER EDUCATION CORPORATION ("CEC") DURING THE
       PERIOD FROM FEBRUARY 19, 2009, THROUGH NOVEMBER 21, 2011,
       INCLUSIVE

       PLEASE READ THIS NOTICE CAREFULLY AND IN ITS ENTIRETY. YOUR

RIGHTS MAY BE AFFECTED BY PROCEEDINGS IN THIS LITIGATION.  PLEASE NOTE

THAT IF YOU ARE A CLASS MEMBER, YOU MAY BE ENTITLED TO SHARE IN THE

PROCEEDS OF THE SETTLEMENT DESCRIBED IN THIS NOTICE.  TO CLAIM YOUR

SHARE OF THIS FUND, YOU MUST SUBMIT A VALID PROOF OF CLAIM AND

RELEASE FORM POSTMARKED ON OR BEFORE _____, 2014.

       This Notice of Proposed Settlement of Class Action ("Notice") has been sent to you

pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States

District Court for the Northern District of Illinois, Eastern Division (the "Court").  The purpose

of this Notice is to inform you of the proposed settlement of the case captioned *Ross v. Career*

*Education Corporation, et al*., No. 1:12-cv-00276 (the "Litigation") and of the hearing (the

"Settlement Hearing") to be held by the Court to consider the fairness, reasonableness, and

adequacy of the settlement as set forth in the Stipulation of Settlement between Plaintiffs and

Defendants (the "Stipulation") dated as of October 25, 2013, on file with the Court.

       This Notice is not intended to be, and should not be construed as, an expression of any

opinion by the Court with respect to the truth of the allegations in the Litigation as to any

Defendant or the merits of the claims or defenses asserted by or against Defendants.  This Notice

is solely to advise you of the proposed settlement of the Litigation and of your rights in

connection therewith.

I.      **STATEMENT OF PLAINTIFFS' RECOVERY**

The proposed settlement will result in the creation of a cash settlement fund in the principal amount of Twenty Seven Million Five Hundred Thousand Dollars ($27.5 million), plus any interest that may accrue thereon (the "Class Settlement Fund").

The Class Settlement Fund, subject to deduction for costs of class notice and administration, certain taxes and tax related expenses, and for attorneys' fees and expenses as approved by the Court, will be available for distribution to Class Members. Your recovery from this Fund will depend on a number of variables, including the amount of CEC common stock you purchased or otherwise acquired during the period from February 19, 2009, through November 21, 2011, inclusive, and the timing of your purchases and any sales. In the unlikely event that 100% of the common stock of CEC purchased or acquired by Class Members and entitled to a distribution under the Plan of Allocation described below participate in the settlement, the estimated average distribution per share of CEC common stock will be approximately 47¢ before deduction of Court-approved fees and expenses. Historically, actual claim rates are lower than 100%, resulting in higher per share distributions.

II.     **STATEMENT OF POTENTIAL OUTCOME**

Plaintiffs and Defendants do not agree on the average amount of damages per share, if any, that would have been recoverable if Plaintiffs were to have prevailed on each claim alleged. Defendants deny that they are liable in any respect or that Plaintiffs or the Class suffered any injury. The issues on which the parties disagree are many, but include: (1) whether Defendants engaged in conduct that would give rise to any liability to the Class under the federal securities laws, or any other laws; (2) whether Defendants have valid defenses to any such claims of liability; (3) the appropriate economic model for determining the amount by which the prices of CEC common stock were allegedly artificially inflated (if at all) during the Class Period; (4) the

amount by which the prices of CEC common stock were allegedly artificially inflated (if at all) during the Class Period; (5) the effect of various market forces on the prices of CEC common stock at various times during the Class Period; (6) the extent to which external factors influenced the prices of CEC common stock at various times during the Class Period; (7) the extent to which the various matters that Plaintiffs alleged were materially false or misleading influenced (if at all) the prices of CEC common stock at various times during the Class Period; and (8) the extent to which the various allegedly adverse material facts that Plaintiffs alleged were omitted influenced (if at all) the prices of CEC common stock at various times during the Class Period.

## III.    REASONS FOR SETTLEMENT

Plaintiffs believe that the proposed settlement is a good recovery and is in the best interests of the Class.  Because of the risks associated with continuing to litigate and proceeding to trial, there was a danger that the Class would not have prevailed on any of its claims, in which case the Class would receive nothing.  Also, the amount of damages recoverable by the Class was and is challenged by Defendants.  Recoverable damages in this case are limited to losses caused by conduct actionable under applicable law and, had the Litigation gone to trial, Defendants would have asserted that any alleged losses of Class Members were caused by non-actionable market, industry, or general economic factors.  Defendants would have also asserted that, throughout the Class Period, the uncertainties and risks associated with the purchase of CEC common stock were fully and adequately disclosed.  Co-Lead Counsel also weighed the fact that CEC has been experiencing financial hardship.  Thus, there is a real risk that CEC would not have the means (or the insurance) to compensate the Class in the future to a greater extent than set forth in this Settlement, even if full liability and full damages were established after trial and appeals.  The proposed settlement provides an immediate benefit to Class Members, and will avoid the years of delay that would likely occur in the event of a contested trial and appeals.

3

## IV.    STATEMENT OF ATTORNEYS' FEES AND EXPENSES SOUGHT

Plaintiffs' counsel have not received any payment for their services in conducting this Litigation on behalf of Plaintiffs and the Members of the Class, nor have they been paid for their expenses.  If the settlement is approved by the Court, Plaintiffs' counsel will apply to the Court for attorneys' fees of 25% of the Class Settlement Fund and expenses not to exceed $500,000, plus interest thereon, to be paid from the Class Settlement Fund.  If the amount requested is approved by the Court, the approximate recovery is an average of 34¢ per share.  This is an estimate.

## V.    IDENTIFICATION OF ATTORNEYS' REPRESENTATIVES

For further information regarding this settlement, you may contact the Claims Administrator, Heffler Claims Group, at CEC Securities Litigation, c/o Heffler Claims Group, PO Box 58669, Philadelphia, PA 19102, or by phone at 855-887-3479, or a representative of Lead Counsel:  Jeffrey A. Almeida, Grant & Eisenhofer P.A., 123 Justison St., Wilmington, DE 19801 and James M. Hughes, Motley Rice LLC, 28 Bridgeside Blvd., Mt. Pleasant, SC  29464.

## VI.    NOTICE OF HEARING ON PROPOSED SETTLEMENT

The Settlement Hearing will be held on _____, 2014, at _____.m., before the Honorable John W. Darrah, United States District Judge, or such other judge sitting in his place or stead, Courtroom 1203, United States District Court, Northern District of Illinois, Eastern Division, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn, Chicago, IL 60604.  The purpose of the Settlement Hearing will be to determine:  (1) whether the proposed settlement, as set forth in the Stipulation, consisting of Twenty Seven Million Five Hundred Thousand Dollars ($27.5 million) in cash should be approved as fair, reasonable, and adequate to the Members of the Class; (2) whether the proposed plan to distribute the settlement proceeds (the "Plan of Allocation") is fair, reasonable, and adequate; (3) whether the application by

Plaintiffs' counsel for an award of attorneys' fees and expenses should be approved; and (4) whether the Judgment, in the form attached to the Stipulation, should be entered. The Court may adjourn the Settlement Hearing from time to time and without further notice to the Class.

## VII.    DEFINITIONS USED IN THIS NOTICE

As used in this Notice, the following terms have the meanings specified below. Any capitalized terms not specifically defined in this Notice shall have the meanings set forth in the Stipulation. In the event of any inconsistency between any definition set forth below or elsewhere in this Notice and any definition set forth in the Stipulation, the definition set forth in the Stipulation shall control.

1.    "Authorized Claimant" means any Class Member whose claim for recovery has been allowed pursuant to the terms of the Stipulation.

2.    "Claims Administrator" means the firm of Heffler Claims Group, 1515 Market Street, Suite 1700, Philadelphia, PA 19102.

3.    "Class" means all Persons (other than those Persons and entities who timely and validly requested exclusion from the Class) who purchased or otherwise acquired the common stock of Career Education Corporation during the period from February 19, 2009 through November 21,2011, inclusive, excluding (1) the Individual Defendant and his immediate family; (2) any entity in which Defendants have or had a controlling interest; (3) officers and directors of CEC during the Class Period; and (4) the legal representatives, heirs, successors, or assigns of any excluded party.

4.    "Class Member" or "Member of the Class" mean a Person who falls within the definition of the Class as set forth in Paragraph 3 above.

5.    "Class Period" means the period commencing on February 19, 2009, through and including November 21, 2011.

6.     "Defendants" means CEC and Gary E. McCullough.   A Defendant shall be deemed to have a "controlling interest" in an entity if such defendant has a beneficial ownership interest, directly or indirectly, in more than 50% of the total outstanding voting power of any class or classes of capital stock, or more than 50% of the partnership interests, of such entity.

7.     "Individual Defendant" means Gary E. McCullough.

8.     "Judgment" means the Final Judgment and Order of Dismissal with Prejudice to be rendered by the Court.

9.     "Lead Counsel" means Grant & Eisenhofer, P.A. ("Grant & Eisenhofer"), 123 Justison St., Wilmington, DE  19801, and Motley Rice LLC ("Motley Rice"), 28 Bridgeside Rd., Mt. Pleasant, SC  29464.

10.     "Lead Plaintiffs" means KBC Asset Management NV ("KBC"), the Oklahoma Police Pension & Retirement System ("OPPRS"), and the Oklahoma Law Enforcement Retirement System ("OLERS").

11.     "Litigation" means the action under case number 1:12-cv-00276.

12.     "CEC" means Career Education Corporation.

13.     "Net Class Settlement Fund" means the Class Settlement Fund less any attorneys' fees, costs, or expenses provided for herein or approved by the Court, and less notice and administration costs, Taxes and Tax Expenses, and other Court-approved deductions.

14.     "Person" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives, or assignees.

15. "Plaintiffs" means KBC, OPPRS, OLERS, the Public Service Pensions Board, and Thurman Ross.

16. "Plan of Allocation" means a plan or formula of allocation of the Class Settlement Fund whereby the Class Settlement Fund shall be distributed to Authorized Claimants after payment of expenses of notice and administration of the settlement, Taxes and Tax Expenses, and such attorneys' fees, costs, and expenses as may be awarded by the Court. Any Plan of Allocation is not part of the Stipulation and neither Defendants nor their Related Parties shall have any responsibility or liability with respect thereto.

17. "Related Parties" means each Defendant's past or present directors, officers, employees, partners, insurers, co-insurers, reinsurers, controlling shareholders, attorneys, accountants or auditors, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, executors, successors in interest, related or affiliated entities, any entity in which a Defendant has a controlling interest, any members of the Individual Defendant's immediate family, or any trust of which the Individual Defendant is the settlor or which is for the benefit of the Individual Defendant's family.

18. "Released Claims" shall collectively mean any and all claims, demands, rights, liabilities, and causes of action of every nature and description whatsoever, known or unknown, whether or not concealed or hidden, asserted or that might have been asserted in the Complaint or any other pleading or forum, including, without limitation, claims for negligence, gross negligence, breach of fiduciary duty, fraud, or violation of any state or federal common or foreign law or statutes, rules, or regulations, by Plaintiffs or any Class Member against the Released Persons (as defined below) arising out of or based upon both the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or

7

referred to in the Complaint and the purchase or other acquisition of CEC common stock during the Class Period and the acts, facts, events, statements or omissions that were or could have been alleged in the Litigation. "Released Claims" includes "Unknown Claims" as defined in Paragraph 24 hereof.

19.     "Released Persons" means each Defendant and their Related Parties.

20.     "Class Settlement Amount" means Twenty Seven Million Five Hundred Thousand Dollars ($27.5 million) in cash.

21.     "Settlement Fund" or "Class Settlement Fund" means the Class Settlement Amount plus all interest and accretions thereto and which may be reduced by payments or deductions as provided herein or by Court order.

22.     "Settling Parties" means, collectively, Defendants, Plaintiffs, and the Class.

23.     "Tax" or "Taxes" means any and all taxes, fees levies, duties, tariffs, imposts, and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any governmental authority, including income tax and other taxes and charges on or regarding franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation or net worth; taxes or other charges in the nature of excise, withholding ad valorem, stamp, transfer, value added or gains taxes; license registration and documentation fees; and customs duties, tariffs, and similar charges.

24.     "Unknown Claims" means any Released Claims which Plaintiffs or Class Members do not know or suspect to exist in his, her or its favor at the time of the release of the Released Persons which, if known by him, her or it, might have affected his, her or its settlement with and release of the Released Persons, or might have affected his, her or its decision not to

object to this settlement. With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Plaintiffs shall expressly waive and each of the Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived the provisions, rights, and benefits of California Civil Code § 1542, which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

Plaintiffs shall expressly waive and each of the Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code § 1542. Plaintiffs and Class Members may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Plaintiffs shall expressly settle and release and each Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. Plaintiffs acknowledge, and the Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

## VIII.  THE LITIGATION

The initial complaint in this case, captioned *Ross v. Career Education Corp., et al.*, No. 12-cv-00276, was filed in the United States District Court for the Northern District of Illinois (the "Court") on January 13, 2012, and assigned to the Honorable Matthew F. Kennelly.  On March 13, 2012, KBC, OPPRS, and OLERS filed a motion to be appointed lead plaintiffs and for approval of their selection of Motley Rice and Grant & Eisenhofer as lead counsel.  The same day, the Pensions Board also filed a motion to be appointed lead plaintiff and for the approval of its selection of Robbins Geller Rudman & Dowd LLP as lead counsel.  On March 23, 2012, the Court entered a Stipulation and Order appointing KBC, OPPRS, and OLERS to serve as Lead Plaintiffs and approving Lead Plaintiffs' selection of Motley Rice and Grant & Eisenhofer as Lead Counsel.

On May 3, 2012, the Consolidated Class Action Complaint (the "Complaint") was filed, naming CEC, Gary E. McCullough, and Michael J. Graham as defendants and alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  On June 4, 2012, defendants moved to dismiss the Complaint.  On October 30, 2012, the Court granted in part and denied in part defendants' motion to dismiss, including dismissing the claims against defendant Graham.  Thereafter, defendants CEC and Mr. McCullough (collectively, "Defendants") each filed an answer to the Complaint, denying all allegations and asserting defenses thereto.

In early 2013, and thereafter, the parties engaged in in-person mediation sessions utilizing the services of the Honorable Daniel Weinstein (Ret.), a nationally recognized mediator with JAMS, and had various telephonic exchanges regarding a potential settlement of the Litigation. By agreement, and with the approval of Judge Weinstein, the parties also utilized the services of Jed Melnick, also a nationally recognized mediator with JAMS, as well as a neutral economist to address the alleged potential damages of the Class (as defined herein).  At a final mediation

10

session held on June 6, 2013, the parties were unable to reach a resolution of the Litigation. On June 7, 2013, the mediator made a mediator's proposal to settle the Litigation for Twenty Seven Million Five Hundred Thousand Dollars ($27.5 million). The parties accepted the mediator's proposal to settle the Litigation for that amount on June 12, 2013, subject to the negotiation of the terms of a stipulation of settlement and approval by the Court.

On October 10, 2013, the parties moved pursuant to Rule 40.4 of the Local Rules to have the Litigation reassigned to the Honorable John W. Darrah, before whom an earlier filed, related case, *Cook v. McCullough, et al.*, No. 1:11-cv-09119, is pending. On October 17, 2013, the Executive Committee of the Court granted the motion and the Litigation was reassigned.

## IX.    CLAIMS OF PLAINTIFFS AND BENEFITS OF SETTLEMENT

Plaintiffs believe that the claims asserted in the Litigation have merit and that the evidence developed to date supports the claims. However, Plaintiffs and their counsel recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Litigation against Defendants through trial and through appeals. Plaintiffs and their counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Litigation, as well as the difficulties and delays inherent in such litigation. Plaintiffs and their counsel also are mindful of the inherent problems of proof under and possible defenses to the securities law violations asserted in the Litigation. Co-Lead Counsel also weighed the fact that CEC has been experiencing financial hardship, and that there is a real risk that CEC would not have the means (or the insurance) to compensate the Class in the future to a greater extent than set forth in this Settlement. Lead Plaintiffs and their counsel believe that the settlement set forth in the Stipulation confers substantial benefits upon the Class. Based on their evaluation, Lead Plaintiffs and their counsel have determined that the settlement set forth in the Stipulation is in the best interests of Plaintiffs and the Class.

## X.    DEFENDANTS' DENIALS OF WRONGDOING AND LIABILITY

Defendants have denied and continue to deny each and all of the claims alleged by Plaintiffs in the Litigation.  Defendants expressly have denied and continue to deny all charges of wrongdoing or liability against them arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Litigation.  Defendants also have denied and continue to deny, among other allegations, the allegations that the Plaintiffs or the Class have suffered any damage, that the prices of CEC common stock were artificially inflated by reasons of alleged misrepresentations, non-disclosures or otherwise, or that the Plaintiffs or the Class were harmed by the conduct alleged in the Complaint.  Defendants believe that the evidence developed to date supports their position that they acted properly at all times and that the Litigation is without merit.

Nonetheless, Defendants have concluded that further conduct of the Litigation would be protracted and expensive, and that it is desirable that the Litigation be fully and finally settled in the manner and upon the terms and conditions set forth in the Stipulation.  Defendants also have taken into account the uncertainty and risks inherent in any litigation, especially in complex cases such as the Litigation.  Defendants have, therefore, determined that it is desirable and beneficial to them that the Litigation be settled in the manner and upon the terms and conditions set forth in the Stipulation.

## XI.    TERMS OF THE PROPOSED SETTLEMENT

A settlement has been reached in the Litigation between Plaintiffs and Defendants, the terms and conditions of which are set forth in the Stipulation and the Exhibits thereto.  The following description of the proposed settlement is only a summary, and reference is made to the text of the Stipulation, on file with the Court or accessible at www.CecSecuritiesLitigation.com, for a full statement of its provisions.

The settlement consists of the aggregate principal amount of Twenty Seven Million Five Hundred Thousand Dollars ($27.5 million) in cash, plus any interest earned thereon.  A portion of the settlement proceeds will be used to pay attorneys' fees and expenses to Lead Counsel, to pay for this Notice and the processing of claims submitted by Class Members, and to pay Taxes and Tax Expenses.  The balance of the Class Settlement Fund (the "Net Class Settlement Fund") will be distributed, according to the Plan of Allocation described below, to Class Members who submit valid and timely Proof of Claim and Release forms.

The effectiveness of the settlement is subject to a number of conditions and reference to the Stipulation is made for further particulars regarding these conditions.

## XII.    THE RIGHTS OF CLASS MEMBERS

If you are a Class Member, you may receive the benefit of, and you will be bound by the terms of, the proposed settlement described in this Notice, upon approval of the proposed settlement by the Court.

If you are a Class Member, you have the following options:

1.    You may file a Proof of Claim and Release form as described below.  If you choose this option, you will share in the proceeds of the proposed settlement if your claim is timely, valid, and entitled to a distribution under the Plan of Allocation described below and if the proposed settlement is finally approved by the Court, and you will be bound by the Judgment and Release to be entered by the Court as described below.

2.    If you purchased or otherwise acquired CEC common stock and you do not wish to be included in the Class and you do not wish to participate in the proposed settlement described in this Notice, you may request to be excluded.  To do so, you must submit a written request for exclusion that must be postmarked on or before _____, 2014.  You must set forth:  (a) your name, address, and telephone number; (b) the number of shares of CEC common

13

stock purchased or otherwise acquired and sold during the Class Period and the dates of such purchase(s), acquisition(s), and/or sale(s); and (c) that you wish to be excluded from the Class. The exclusion request should be addressed as follows:

> CEC Securities Litigation
> c/o Heffler Claims Group
> PO Box 58669
> Philadelphia, PA 19102
> _____

NO REQUEST FOR EXCLUSION WILL BE CONSIDERED VALID UNLESS ALL OF THE INFORMATION DESCRIBED ABOVE IS INCLUDED IN ANY SUCH REQUEST.

If you timely and validly request exclusion from the Class: (a) you are excluded from the Class; (b) you will not share in the proceeds of the settlement described herein; (c) you are not bound by any judgment entered in the Litigation; and (d) you are not precluded, by reason of your decision to request exclusion from the Class, from otherwise prosecuting an individual claim, if timely, against Defendants based on the matters complained of in the Litigation.

3.      If you do not make a valid and timely request in writing to be excluded from the Class, you will be bound by any and all determinations or judgments in the Litigation in connection with the settlement entered into or approved by the Court, whether favorable or unfavorable to the Class, and you shall be deemed to have, and by operation of the Judgment shall have, fully released all of the Released Claims against the Released Persons, whether or not you submit a valid Proof of Claim and Release form.

4.      You may do nothing at all.  If you choose this option, you will not share in the proceeds of the settlement, but you will be bound by any judgment entered by the Court, and you shall be deemed to have, and by operation of the Judgment shall have, fully released all of the Released Claims against the Released Persons.

5.    You may object to the settlement, the Plan of Allocation, and/or the application for attorneys' fees and expenses in the manner described in Section XVIII, below.

6.    If you are a Class Member, you may, but are not required to, enter an appearance through counsel of your own choosing and at your own expense, provided that such counsel must file an appearance on your behalf on or before _____, 2014, and must serve copies of such appearance on the attorneys listed in Section XVIII below.  If you do not enter an appearance through counsel of your own choosing, you will be represented by Lead Counsel:  Grant & Eisenhofer P.A., Jeffrey A. Almeida, 123 Justison St., Wilmington, DE  19801 and Motley Rice LLC, James M. Hughes, 28 Bridgeside Blvd., Mt. Pleasant, SC  29464.

## XIII.  PLAN OF ALLOCATION

The Net Class Settlement Fund will be distributed to Class Members who, in accordance with the terms of the Stipulation, are entitled to a distribution from the Net Class Settlement Fund pursuant to any Plan of Allocation or any order of the Court and who submit a valid and timely Proof of Claim and Release form under the Plan of Allocation described below.  The Plan of Allocation provides that you will be eligible to participate in the distribution of the Net Class Settlement Fund only if you have an overall net loss on all of your transactions in CEC common stock during the Class Period.

For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Counsel have conferred with their damage expert who concluded that only the CEC securities described below were damaged by the matters alleged by Plaintiffs in this Litigation and the Plan of Allocation reflects an assessment of the damages that they believe could have been recovered by Class Members had Plaintiffs prevailed at trial.

In the unlikely event there are sufficient funds in the Net Class Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's claim, as

15

defined below. If, however, and as is more likely, the amount in the Net Class Settlement Fund is not sufficient to permit payment of the total claim of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage of the Net Class Settlement Fund that each Authorized Claimant's claim bears to the total of the claims of all Authorized Claimants. Payment in this manner shall be deemed conclusive against all Authorized Claimants.

A claim will be calculated as follows:

The allocation below for common stock is based on market adjusted price declines as well as the statutory Private Securities Litigation Reform Act of 1995 ("PSLRA") 90-day look-back amount:

| Transaction Period | Loss Per Share |
|---|---|
| February 19, 2009 – August 3, 2011 | $11.70 |
| August 4, 2011 – November 1, 2011 | $9.25 |
| November 2, 2011 | $1.75 |
| November 3, 2011 – November 18, 2011 | $0.32 |
| November 21, 2011 and after | $0.00 |

NO CLAIMS OF LESS THAN $10.00 WILL BE PROCESSED OR PAID.

The Court has reserved jurisdiction to allow, disallow, or adjust the claim of any Class Member on equitable grounds.

Payment pursuant to the Plan of Allocation set forth above shall be conclusive against all Authorized Claimants. No Person shall have any claim against the Plaintiffs, Plaintiffs' counsel, the Claims Administrator, or other Person designated by Plaintiffs' counsel, or Defendants or Defendants' counsel based on distributions made substantially in accordance with the Stipulation

and the settlement contained therein, the Plan of Allocation, or further orders of the Court. All Class Members who fail to complete and file a valid and timely Proof of Claim and Release form shall be barred from participating in distributions from the Net Class Settlement Fund (unless otherwise ordered by the Court), but otherwise shall be bound by all of the terms of the Stipulation, including the terms of any judgment entered and the releases given.

## XIV. PARTICIPATION IN THE SETTLEMENT

**TO PARTICIPATE IN THE DISTRIBUTION OF THE NET SETTLEMENT FUND, YOU MUST TIMELY COMPLETE AND RETURN THE PROOF OF CLAIM AND RELEASE FORM THAT ACCOMPANIES THIS NOTICE.** The Proof of Claim and Release form must be postmarked on or before _____, 2014, and delivered to the Claims Administrator at the address set forth in Section XIX, below. Unless the Court orders otherwise, if you do not timely submit a valid Proof of Claim and Release form, you will be barred from receiving any payments from the Net Class Settlement Fund, but will in all other respects be bound by the provisions of the Stipulation and the Judgment.

## XV. DISMISSAL AND RELEASES

If the proposed settlement is approved, the Court will enter a Final Judgment and Order of Dismissal with Prejudice (the "Judgment"). In addition, upon the Effective Date, Plaintiffs and each of the Class Members, for themselves and for each of their respective officers, directors, shareholders, employees, agents, spouses, subsidiaries, heirs at law, successors and assigns, and any other Person claiming (now or in the future) through or on behalf of them, and regardless of whether any such Plaintiff or Class Member ever seeks or obtains by any means, including, without limitation, by submitting a Proof of Claim and Release form, any distribution from the Settlement Fund, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against the

Released Persons, shall have covenanted not to sue the Released Persons with respect to all such Released Claims, and shall be permanently barred and enjoined from instituting, commencing, or prosecuting any such Released Claim against the Released Persons except to enforce the releases and other terms and conditions contained in the Stipulation or the Judgment entered pursuant thereto.

## XVI.   APPLICATION FOR FEES AND EXPENSES

At the Settlement Hearing, Lead Counsel will request the Court to award attorneys' fees of 25% of the Class Settlement Fund, plus expenses not to exceed $500,000.  Such sums as may be approved by the Court will be paid from the Class Settlement Fund.  Class Members are not personally liable for any such fees or expenses.

To date, Plaintiffs' counsel have not received any payment for their services in conducting this Litigation on behalf of Plaintiffs and the Class, nor have counsel been paid their expenses.   The fee requested by Lead Counsel will compensate counsel for their efforts in achieving the Class Settlement Fund for the benefit of the Class, and for their risk in undertaking this representation on a wholly contingent basis.  Lead Counsel believe that the fee requested is well within the range of fees awarded to plaintiffs' counsel under similar circumstances in other litigation of this type.  The fee to be requested has been approved by each of the Lead Plaintiffs.

## XVII.  CONDITIONS FOR SETTLEMENT

The settlement is conditioned upon the occurrence of certain events described in the Stipulation.  Those events include, among other things: (1) entry of the Judgment by the Court, as provided for in the Stipulation; and (2) expiration of the time to appeal from the Judgment or to move to alter or amend the Judgment, or the determination of any such appeal or motion in a manner to permit the consummation of the settlement substantially as provided for in the Stipulation.  If, for any reason, any one of the conditions described in the Stipulation is not met,

the Stipulation might be terminated and, if terminated, will become null and void, and the parties

to the Stipulation will be restored to their respective positions as of October 25, 2013. In that

event, the settlement will not proceed and no payments will be made to Class Members.

## XVIII. THE RIGHT TO BE HEARD AT THE HEARING

Any Class Member who objects to any aspect of the settlement, the Plan of Allocation, or

the application for attorneys' fees and expenses, may appear and be heard at the Settlement

Hearing. Any such Person must submit a written notice of objection, such that it is ***received***, not

simply postmarked, on or before _____, 2014, by each of the following:

> ***To the Court:***
>
> CLERK OF THE COURT
> UNITED STATES DISTRICT COURT
> NORTHERN DISTRICT OF ILLINOIS
> EASTERN DIVISION
> EVERETT MCKINLEY DIRKSEN UNITED STATES COURTHOUSE
> 219 South Dearborn Street
> Chicago, IL 60604
>
> ***To Lead Counsel for Plaintiffs:***
>
> MOTLEY RICE LLC
> James M. Hughes
> 28 Bridgeside Blvd.
> Mt. Pleasant, SC 29464
>
> GRANT & EISENHOFER P.A.
> Jeffrey A. Almeida
> 123 Justison St.
> Wilmington, DE 19801
>
> ***To Counsel for CEC:***
>
> JONES DAY
> Lee Ann Russo
> 77 W. Wacker Dr.
> Chicago, IL 60601-1692
>
> ***To Counsel for Gary E. McCullough:***

> KATTEN MUCHIN ROSENMAN LLP
> Mary Ellen Hennessy
> 525 West Monroe Street
> Chicago, IL 60661

The notice of objection must demonstrate the objecting Person's membership in the Class, including the amount of CEC common stock purchased or acquired and sold during the Class Period and contain a statement of the reasons for objection. Only Members of the Class who have submitted written notices of objection in this manner will be entitled to be heard at the Settlement Hearing, unless the Court orders otherwise.

## XIX. SPECIAL NOTICE TO NOMINEES

Nominees who purchased or otherwise acquired the common stock of CEC for the beneficial interest of other Persons during the Class Period shall, within ten (10) calendar days after receipt of this Notice: (1) provide the Claims Administrator with the names and addresses of such beneficial owners; or (2) forward a copy of this Notice and the Proof of Claim and Release form by First-Class Mail to each such beneficial owner and provide Lead Counsel with written confirmation that the Notice and Proof of Claim and Release form have been so forwarded. Upon submission of appropriate documentation, Lead Counsel will reimburse your reasonable costs and expenses of complying with this provision. Additional copies of this Notice may be obtained from the Claims Administrator by writing to:

> CEC Securities Litigation
> c/o Heffler Claims Group
> PO Box 58669
> Philadelphia, PA 19102

## XX. EXAMINATION OF PAPERS

This Notice contains only a summary of the terms of the proposed settlement and does not describe all of the details of the Stipulation. For a more detailed statement of the matters

involved in the Litigation, reference is made to the pleadings, to the Stipulation, and to other papers filed in the Litigation, which may be inspected at the office of the Clerk of the Court, United States District Court, Northern District of Illinois, Eastern Division, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn, Chicago, IL 60604.  In addition, certain settlement related documents including the Stipulation of Settlement may be viewed at www.CecSecuritiesLitigation.com.

      If you have any questions about the settlement of the Litigation, you may contact Lead Counsel by writing to:

      MOTLEY RICE LLC
      James M. Hughes
      28 Bridgeside Blvd.
      Mt. Pleasant, SC  29464

      GRANT & EISENHOFER P.A.
      Jeffrey A. Almeida
      123 Justison St.
      Wilmington, DE  19801

      **DO NOT TELEPHONE THE COURT REGARDING THIS NOTICE.**


DATED: _____, 2013      BY ORDER OF THE COURT
                                     UNITED STATES DISTRICT COURT
                                     NORTHERN DISTRICT OF ILLINOIS
                                     EASTERN DIVISION

# EXHIBIT A-2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THURMAN ROSS, by and on behalf of himself and all others similarly situated, | |
| Plaintiff, | |
| v. | No. 12-CV-00276 |
| CAREER EDUCATION CORPORATION, GARY E. McCULLOUGH and MICHAEL J. GRAHAM, | Hon. John W. Darrah |
| Defendants. | |

**PROOF OF CLAIM AND RELEASE**

**EXHIBIT A-2**

**GENERAL INSTRUCTIONS**

To recover as a Member of the Class based on your claims in the action entitled *Ross v. Career Education Corporation, et al.*, No. 1:12-cv-00276 (the "Litigation"), you must complete and, on page 9 hereof, sign this Proof of Claim and Release form. If you fail to submit a timely and properly addressed (as set forth in Paragraph 3 below) Proof of Claim and Release form, your claim may be rejected and you may not receive any recovery from the Net Class Settlement Fund created in connection with the proposed settlement.

Submission of this Proof of Claim and Release form, however, does not assure that you will share in the proceeds of the settlement of the Litigation.

YOU MUST MAIL YOUR COMPLETED AND SIGNED PROOF OF CLAIM AND RELEASE FORM POSTMARKED ON OR BEFORE _____, 2014, ADDRESSED AS FOLLOWS:

> CEC Securities Litigation
> c/o Heffler Claims Group
> PO Box 58669
> Philadelphia, PA 19102

If you are NOT a Member of the Class (as defined in the Notice of Proposed Settlement of Class Action ("Notice")), DO NOT submit a Proof of Claim and Release form. Also, NOTE THAT NO CLAIMS FOR LESS THAN $10.00 WILL BE PROCESSED OR PAID.

If you are a Member of the Class and you did not timely request exclusion in connection with the proposed settlement, you are bound by the terms of any judgment entered in the Litigation, including the releases provided therein, WHETHER OR NOT YOU SUBMIT A PROOF OF CLAIM AND RELEASE FORM.

**CLAIMANT IDENTIFICATION**

If you purchased or otherwise acquired CEC common stock and held the certificate(s) in your name, you are the beneficial purchaser as well as the record purchaser. If, however, you purchased or otherwise acquired CEC common stock and the certificate(s) were registered in the name of a third party, such as a nominee or brokerage firm, you are the beneficial purchaser and the third party is the record purchaser.

Use Part I of this form entitled "Claimant Identification" to identify each purchaser of record ("nominee"), if different from the beneficial purchaser of the CEC common stock which form the basis of this claim. THIS CLAIM MUST BE FILED BY THE ACTUAL BENEFICIAL PURCHASER(S) OR ACQUIRER(S) OR THE LEGAL REPRESENTATIVE OF SUCH PURCHASER(S) OR ACQUIRER(S) OF THE CEC COMMON STOCK UPON WHICH THIS CLAIM IS BASED.

All joint purchasers must sign this claim. Executors, administrators, guardians, conservators, and trustees must complete and sign this claim on behalf of persons represented by them and their authority must accompany this claim and their titles or capacities must be stated. The Social Security (or taxpayer identification) number and telephone number of the beneficial owner may be used in verifying the claim. Failure to provide the foregoing information could delay verification of your claim or result in rejection of the claim.

**CLAIM FORM**

Use Part II of this form entitled "Schedule of Transactions in CEC Common Stock" to supply all required details of your transaction(s) in CEC common stock listed in Part II. If you need more space or additional schedules, attach separate sheets giving all of the required information in substantially the same form. Sign and print or type your name on each additional sheet.

On the schedules, provide all of the requested information with respect to **all** of your purchases or acquisitions of CEC common stock which took place at any time from February 19, 2009, through November 21, 2011, inclusive (the "Class Period"), and **all** of your sales of CEC common stock which took place at any time between February 19, 2009, through November 21, 2011.

List each transaction separately and in chronological order, by trade date, beginning with the earliest. You must accurately provide the month, day, and year of each transaction you list.

The date of covering a "short sale" is deemed to be the date of purchase of CEC common stock. The date of a "short sale" is deemed to be the date of sale of CEC common stock.

Copies of broker confirmations or other documentation of your transactions in CEC common stock should be attached to your claim. Failure to provide this documentation could delay verification of your claim or result in rejection of your claim.

NOTICE REGARDING ELECTRONIC FILES: Certain claimants with large numbers of transactions may request, or may be requested, to submit information regarding their transactions in electronic files. All claimants MUST submit a manually signed paper Proof of Claim and Release form whether or not they also submit electronic copies. If you wish to file your claim electronically, you must contact the Claims Administrator at CEC Securities Litigation, c/o Heffler Claims Group, PO Box 58669, Philadelphia, PA 19102 or visit their website at www.CecSecuritiesLitigation.com to obtain the required file layout. No electronic files will be considered to have been properly submitted unless the Claims Administrator issues to the claimant a written acknowledgment of receipt and acceptance of electronically submitted data.

3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*Ross v. Career Education Corporation, et al.*

No. 1:12-cv-00276

PROOF OF CLAIM AND RELEASE

Must be Postmarked No Later Than:

_____, 2014

Please Type or Print

PART I:        CLAIMANT IDENTIFICATION

_____
Beneficial Owner's Name (First, Middle, Last)

_____
Street Address

_____        _____
City                                                               State or Province

_____        _____
Zip Code or Postal Code                              Country

_____        _____        Individual
Social Security Number or                                                    Corporation/Other
Taxpayer Identification Number              _____

_____        _____
Area Code                     Telephone Number (work)

_____        _____
Area Code                     Telephone Number (home)

_____
Record Owner's Name (if different from beneficial owner listed above)

4

PART II:     SCHEDULE OF TRANSACTIONS IN CEC COMMON STOCK

A.     **CEC COMMON STOCK**

Number of shares of CEC common stock held at the close of trading on February 18, 2009: _____

Purchase or acquisitions of CEC common stock (February 19, 2009 – November 21, 2011):

| Trade Date Month Day Year | Number of Shares Purchased or Acquired | Total Purchase or Acquisition Price |
|---|---|---|
| 1._____ <br><br> 2._____ <br><br> 3._____ | 1._____ <br><br> 2._____ <br><br> 3._____ | 1._____ <br><br> 2._____ <br><br> 3._____ |

Sales of CEC common stock (February 19, 2009 – November 21, 2011, inclusive):

| Trade Date Month Day Year | Number of Shares Sold | Total Sales Price |
|---|---|---|
| 1._____ <br><br> 2._____ <br><br> 3._____ | 1._____ <br><br> 2._____ <br><br> 3._____ | 1._____ <br><br> 2._____ <br><br> 3._____ |

If you require additional space, attach extra schedules in the same format as above. Sign and print your name on each additional page. NOTE THAT NO CLAIMS LESS THAN $10.00 WILL BE PROCESSED OR PAID.

**YOU MUST READ AND SIGN THE RELEASE ON PAGE 9. FAILURE TO SIGN THE RELEASE MAY RESULT IN A DELAY IN PROCESSING OR THE REJECTION OF YOUR CLAIM.**

**IV.     SUBMISSION TO JURISDICTION OF COURT AND ACKNOWLEDGMENTS**

5

I (We) submit this Proof of Claim and Release under the terms of the Stipulation of Settlement described in the Notice. I (We) also submit to the jurisdiction of the United States District Court for the Northern District of Illinois, Eastern Division, with respect to my (our) claim as a Class Member and for purposes of enforcing the release set forth herein. I (We) further acknowledge that I am (we are) bound by and subject to the terms of any judgment that may be entered in the Litigation. I (We) agree to furnish additional information to the Claims Administrator to support this claim (including transactions in other CEC securities) if requested to do so. I (We) have not submitted any other claim covering the same purchases, acquisitions or sales of CEC common stock during the Class Period and know of no other person having done so on my (our) behalf.

**RELEASE**

I (We) hereby acknowledge full and complete satisfaction of, and do hereby fully, finally, and forever settle, release, and discharge from the Released Claims each and all of the "Released Persons," defined as each of the Defendants and their Related Parties. "Related Parties" means each Defendant's past or present directors, officers, employees, partners, insurers, co-insurers, reinsurers, controlling shareholders, attorneys, accountants or auditors, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, related or affiliated entities, any entity in which a Defendant has a controlling interest, any members of the Individual Defendant's immediate family, or any trust of which the Individual Defendant is the settlor or which is for the benefit of the Individual Defendant's family.

"Released Claims" shall collectively mean any and all claims, demands, rights, liabilities, and causes of action of every nature and description whatsoever, known or unknown, whether or not concealed or hidden, asserted or that might have been asserted, including, without limitation,

claims for negligence, gross negligence, breach of fiduciary duty, fraud, or violation of any state or federal common law or statutes, rules, or regulations, by Plaintiffs or any Class Member against the Released Persons (as defined above) arising out of or based upon the purchase or other acquisition of CEC common stock during the Class Period and the acts, facts, events, statements or omissions that were or could have been alleged in the Litigation. "Released Claims" includes "Unknown Claims" as defined below.

"Unknown Claims" means any Released Claims which Plaintiffs or Class Members do not know or suspect to exist in his, her or its favor at the time of the release of the Released Persons which, if known by him, her or it, might have affected his, her or its settlement with and release of the Released Persons, or might have affected his, her or its decision not to object to this settlement. With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Plaintiffs shall expressly waive and each of the Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived the provisions, rights, and benefits of California Civil Code § 1542, which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

Plaintiffs shall expressly waive and each of the Class Members shall be deemed to have, and by operation of the Judgment shall have, expressly waived any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code § 1542. Plaintiffs and Class Members may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the subject matter of the Released Claims, but Plaintiffs shall expressly settle and release and each Class Member, upon

the Effective Date, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. Plaintiffs acknowledge, and the Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

This release shall be of no force or effect unless and until the Court approves the Stipulation of Settlement and the Stipulation becomes effective on the Effective Date (as defined in the Stipulation).

4.      I (We) hereby warrant and represent that I (we) have not assigned or transferred or purported to assign or transfer, voluntarily or involuntarily, any matter released pursuant to this release or any other part or portion thereof.

5.      I (We) hereby warrant and represent that I (we) have included information about all of my (our) transactions in CEC common stock which are the subject of this claim, which occurred during the Class Period as well as the opening and closing positions in such common stock held by me (us) on the dates requested in this claim form.

I declare under penalty of perjury under the laws of the United States of America that all of the foregoing information supplied on this Proof of Claim and Release form by the undersigned is true and correct.

Executed this _____ day of _____
                                              (Month/Year)

in _____
            (City)                              (State/Country)


_____
(Sign your name here)

_____
(Type or print your name here)

_____
(Capacity of person(s) signing,
e.g., Beneficial Purchaser, Acquirer
Executor or Administrator)


**ACCURATE CLAIMS PROCESSING TAKES A
SIGNIFICANT AMOUNT OF TIME.
THANK YOU FOR YOUR PATIENCE.**

Reminder Checklist:

Please sign the above release and declaration.

Remember to attach supporting documentation, if available.

Do not send original stock certificates.

Keep a copy of your claim form and all supporting documentation for your records.

If you desire an acknowledgement of receipt of your claim form, please send it Certified Mail, Return Receipt Requested.

If you move, please send us your new address.

# EXHIBIT A-3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THURMAN ROSS, by and on behalf of himself and all others similarly situated,<br><br>           Plaintiff,<br><br>    v.<br><br>CAREER EDUCATION CORPORATION, GARY E. McCULLOUGH and MICHAEL J. GRAHAM,<br><br>          Defendants. | No. 12-CV-00276<br><br>Hon. John W. Darrah |

**SUMMARY NOTICE**

**EXHIBIT A-3**

TO:   ALL PERSONS WHO PURCHASED OR OTHERWISE ACQUIRED THE COMMON STOCK OF CAREER EDUCATION CORPORATION ("CEC") FROM FEBRUARY 19, 2009, THROUGH NOVEMBER 21, 2011, INCLUSIVE

YOU ARE HEREBY NOTIFIED, pursuant to an Order of the United States District Court for the Northern District of Illinois, that a hearing will be held on _____, 2014, at _.m., before the Honorable John W. Darrah, at the United States District Court, Northern District of Illinois, Eastern Division, Everett McKinley Dirksen United States Courthouse, Courtroom 1203, 219 South Dearborn Street, Chicago, IL 60604, for the purpose of determining (1) whether the proposed settlement of the claims in the Litigation for the principal amount of $27,500,000, plus accrued interest, should be approved by the Court as fair, just, reasonable, and adequate; (2) whether a Final Judgment and Order of Dismissal with prejudice should be entered by the Court dismissing the Litigation with prejudice; (3) whether the Plan of Allocation is fair, reasonable, and adequate and should be approved; and (4) whether the application of Lead Counsel for the payment of attorneys' fees in the amount of 25% and expenses not to exceed $500,000 in connection with this Litigation should be approved.

IF YOU PURCHASED OR ACQUIRED ANY OF THE COMMON STOCK OF CEC DURING THE PERIOD FROM FEBRUARY 19, 2009, TO NOVEMBER 21, 2011, INCLUSIVE, YOUR RIGHTS MAY BE AFFECTED BY THE SETTLEMENT OF THIS LITIGATION.  You may obtain copies of a detailed Notice of Proposed Settlement of Class Action ("Notice") and a copy of the Proof of Claim and Release form by writing to CEC Securities Litigation, c/o Heffler Claims Group, PO Box 58669, Philadelphia, PA 19102, visiting the internet at www.CecSecuritiesLitigation.com, or calling the Claims Administrator at 855-887-3479.  Inquiries other than requests for the above-referenced documents may also be made to Plaintiffs' Lead Counsel:

James M. Hughes, Esq.             Jeffrey A. Almeida
Motley Rice LLC                 Grant & Eisenhofer P.A.
28 Bridgeside Blvd.              123 Justison St.
Mt. Pleasant, SC 29464         Wilmington, DE 19801
(843) 216-9000                 (302) 622-7000

If you are a Class Member, in order to share in the distribution of the Net Class Settlement Fund, you must submit a Proof of Claim and Release ***postmarked no later than _____, 2014***, establishing that you are entitled to recovery. NOTE THAT NO CLAIMS LESS THAN $10.00 WILL BE PROCESSED OR PAID.

If you purchased or otherwise acquired CEC common stock and you desire to be excluded from the Class, you must submit a request for exclusion postmarked no later than _____, 2014, in the manner and form explained in the detailed Notice referred to above. All Members of the Class who do not timely and validly request exclusion from the Class will be bound by any judgment entered in the Litigation pursuant to the Stipulation of Settlement.

Any objection to the settlement must be ***received***, not simply postmarked, by each of the following recipients ***no later than _____, 2014***:

CLERK OF THE COURT
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
EVERETT MCKINLEY DIRKSEN UNITED STATES COURTHOUSE
219 South Dearborn Street
Chicago, IL 60604

*Lead Counsel for Plaintiffs*:

MOTLEY RICE LLC
James M. Hughes
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

GRANT & EISENHOFER P.A.
Jeffrey A. Almeida
123 Justison St.
Wilmington, DE 19801

2

*Counsel for Defendant Career Education Corporation:*

JONES DAY
Lee Ann Russo
77 W. Wacker Dr.
Chicago, IL 60601-1692

*Counsel for Gary E. McCullough:*

KATTEN MUCHIN ROSENMAN LLP
Mary Ellen Hennessy
525 West Monroe Street
Chicago, IL  60661


**PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE**

**REGARDING THIS NOTICE.**  If you have any questions about the settlement, you may

contact Lead Counsel at the address listed above.

DATED: _____, 2013          BY ORDER OF THE COURT
                                        UNITED STATES DISTRICT COURT
                                        NORTHERN DISTRICT OF ILLINOIS
                                        EASTERN DIVISION

# EXHIBIT A-4

You have been identified as a potential class member in a securities fraud class action against Career Education Corporation ("CEC") and other persons or entities. You may be eligible to receive a payment from a $27.5 million class action settlement in *Ross v. Career Education Corp.*, U.S. Dist. Court, N.D. Ill., No. 12-CV-00276. The case involves alleged material misrepresentations in violation of the federal securities laws concerning CEC's placement rate reporting. You must submit a Proof of Claim form to share in the settlement proceeds. Additional information is contained in a detailed settlement notice ("Settlement Notice"). The Proof of Claim form and Settlement Notice are available by visiting www.CecSecuritiesLitigation.com or calling or writing the Claims Administrator noted below.

**Class Definition**: You are a class member if you purchased or otherwise acquired the common stock of CEC between February 19, 2009, and November 21, 2011 (the "Class Period"). However, to be eligible to share in the settlement proceeds, a class member must have both acquired CEC stock during the Class Period and also continued to hold any of those shares through one of the following dates: August 3, November 1, November 2, or November 18, 2011.

**Settlement Amount**: $27.5 million. This represents an estimated average recovery of 47¢ per share, before attorneys' fees and expenses, based on the estimated number of allegedly damaged shares acquired during the Class Period and held through at least one corrective disclosure during the Class Period.

**Reasons for Settlement**: The parties wish to avoid the costs and risks of continued litigation.

**Disagreement on Amount of Damages**: The parties do not agree on the average amount of damages per share that would be recoverable if Plaintiffs prevailed. The primary issues on which the parties disagree include: (1) whether Defendants are liable under the securities laws; and (2) the method for determining whether and to what extent CEC shares were damaged.

**Attorneys' Fees and Expenses**: Attorneys for the class will ask the court for attorneys' fees of 25% of the settlement fund, plus reimbursement of out-of-pocket costs (excluding notice and claims administration costs, which will be deducted separately from the settlement fund) in an amount not to exceed $500,000. These amounts will reduce the per share recovery by an estimated 14¢ per damaged share. Attorneys' fees and costs will be paid out of the settlement fund as expenses for investigating the facts, litigating the case, and negotiating the settlement. In addition, expenses associated with notice and administration of the Settlement will be incurred in an amount not to exceed $785,000.

**Your Options**: You can file a claim, object to the settlement (with or without appearing at the final approval hearing and with or without hiring your own attorney), exclude yourself from the class, or do nothing. No claims for less than $10.00 will be processed or paid. Unless you exclude yourself from the class, you will be bound by the settlement and you will release any claims you may have against the released parties. More information is contained in the Settlement Notice.

**Deadlines**:  To file a claim:  _____, 2014; to object to the settlement:  _____, 2014; to request exclusion from the class:  _____, 2014;  the Court's hearing on final approval of the settlement:  _____, 2014.

**Plaintiffs' Counsels' Representatives**:   The Claims Administrator, Heffler Claims Group, is available to answer questions concerning the settlement or any matter contained in the Settlement Notice.   You may contact the Claims Administrator by calling 855-887-3479 or writing to:  "CEC Securities Litigation, c/o Heffler Claims Group, PO Box 58669, Philadelphia, PA 19102."

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| THURMAN ROSS, by and on behalf of himself and all others similarly situated, | |
| Plaintiff, | |
| v. | No. 12-CV-00276 |
| CAREER EDUCATION CORPORATION, GARY E. McCULLOUGH and MICHAEL J. GRAHAM, | Hon. John W. Darrah |
| Defendants. | |

**[PROPOSED] FINAL JUDGMENT AND ORDER OF DISMISSAL WITH PREJUDICE**


**EXHIBIT B**

This matter came before the Court for hearing pursuant to the Preliminary Approval Order dated _____, 2013, on the application of the parties for approval of the settlement set forth in the Stipulation of Settlement (the "Stipulation"), dated October 25, 2013.  Due and adequate notice having been given to the Class as required in said Order, and the Court having considered all papers filed and proceedings had herein and otherwise being fully informed in the premises and good cause appearing therefore, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1.      This Judgment incorporates by reference the definitions in the Stipulation, and all terms used herein shall have the same meanings as set forth in the Stipulation, unless otherwise set forth herein.

2.      This Court has jurisdiction over the subject matter of the Litigation and over all parties to the Litigation, including all Members of the Class.

3.      Pursuant to Federal Rule of Civil Procedure 23, the Court hereby approves the settlement set forth in the Stipulation and finds that:

(a)      said Stipulation and the settlement contained therein, are, in all respects, fair, reasonable, and adequate and in the best interest of the Class;

(b)      there was no collusion in connection with the Stipulation;

(c)      the Stipulation was the product of informed, arm's-length negotiations among competent, able counsel; and

(d)      the record is sufficiently developed and complete to have enabled Plaintiffs and Defendants to have adequately evaluated and considered their positions.

4.      Accordingly, the Court authorizes and directs implementation and performance of all the terms and provisions of the Stipulation, as well as the terms and provisions hereof.

Except as to any individual claim of those Persons (identified in Exhibit 1 attached hereto) who have validly and timely requested exclusion from the Class, the Court hereby dismisses the Litigation and all Released Claims of the Class with prejudice. The Settling Parties are to bear their own costs, except as and to the extent provided in the Stipulation and herein.

5. Upon the Effective Date, Plaintiffs shall, and each of the Class Members shall be deemed to have, and by operation of this Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against the Released Persons, whether or not such Class Member executes and delivers the Proof of Claim and Release form or shares in the Class Settlement Fund. Claims to enforce the terms of the Stipulation are not released.

6. All Class Members are hereby forever barred and enjoined from prosecuting any of the Released Claims against any of the Released Persons.

7. Upon the Effective Date, each of the Released Persons shall be deemed to have, and by operation of this Judgment shall have, fully, finally, and forever released, relinquished, and discharged Plaintiffs, each and all of the Class Members, and Plaintiffs' counsel from all claims (including Unknown Claims) arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement or resolution of the Litigation or the Released Claims. Claims to enforce the terms of the Stipulation are not released.

8. The Notice of Proposed Settlement of Class Action given to the Class, including the individual notice to all Members of the Class who could be identified through reasonable effort, provided the best notice practicable under the circumstances of the Litigation and of the matters set forth therein, including the proposed settlement set forth in the Stipulation, to all Persons entitled to such notice, and said notice fully satisfied the requirements of Federal Rule of Civil Procedure 23 and the requirements of due process.

9.     Any Plan of Allocation submitted by Lead Counsel or any order entered regarding any attorneys' fee and expense application shall in no way disturb or affect this Final Judgment and shall be considered separate from this Final Judgment.

10.     Neither the Stipulation nor the settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the settlement:  (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability of Defendants or their respective Related Parties; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any Defendant or their respective Related Parties in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal.  Defendants and/or their respective Related Parties may file the Stipulation and/or this Judgment from this action in any other action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

11.     Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over:  (a) implementation of this settlement and any award or distribution of the Class Settlement Fund, including interest earned thereon; (b) disposition of the Class Settlement Fund; (c) hearing and determining applications for attorneys' fees, interest, and expenses in the Litigation; and (d) all parties hereto for the purpose of construing, enforcing, and administering the Stipulation.

12.     The Court finds that, during the course of the Litigation, the Settling Parties and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11.

13.     In the event that the settlement does not become effective in accordance with the terms of the Stipulation, or the Effective Date does not occur, or in the event that the Class Settlement Fund, or any portion thereof, is returned to CEC and/or Defendants' insurers, then this Judgment shall be rendered null and void to the extent provided by and in accordance with the Stipulation and shall be vacated and, in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Stipulation.

14.     Without further order of the Court, the Settling Parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

IT IS SO ORDERED.

DATED:_____          _____
                                        THE HONORABLE JOHN W. DARRAH
                                        UNITED STATES DISTRICT JUDGE

                                        By:_____
                                            Jay W. Eisenhofer
                                            Geoffrey C. Jarvis
                                            Jeffrey A. Almeida
                                            Christine M. Mackintosh
                                            GRANT & EISENHOFER P.A.
                                            123 Justison Street
                                            Wilmington, DE  19801
                                            Telephone: 302.622.7000
                                            Facsimile: 302.622.7100
                                            Email: gjarvis@gelaw.com
                                                   jalmeida@gelaw.com
                                                   cmackintosh@gelaw.com

                                            *Co-Lead Counsel for Lead Plaintiffs and Plaintiff Thurman Ross*

4

By: _____

    Joseph F. Rice
    James M. Hughes
    David P. Abel
    MOTLEY RICE LLC
    28 Bridgeside Blvd.
    Mt. Pleasant, SC 29464
    Telephone: 843.216.9000
    Facsimile: 843.216.9450
    Email: jrice@motleyrice.com
          jhughes@motleyrice.com
          dabel@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs*


By: _____

    Paul E. Slater
    Scott F. Hessell
    SPERLING & SLATER, P.C.
    55 W. Monroe Street – Suite 3200
    Chicago, IL 60603
    Telephone: 312.641.3200
    Facsimile: 312.641.6492
    Email: pes@sperling-law.com
          shessell@sperling-law.com

*Liaison Counsel for Lead Plaintiffs and Counsel for Thurman Ross*

By: _____

    James E. Barz
    ROBBINS GELLER RUDMAN
      & DOWD LLP
    200 South Wacker Dr.
    Chicago, IL 60606
    Telephone: 312.674.4674
    Facsimile: 312.674.4676
    Email: jbarz@rgrdlaw.com

Darren J. Robbins
Danielle S. Myers
ROBBINS GELLER RUDMAN
  DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619.231.1058
Facsimile: 619.231.7423
Email: drobbins@rgrdlaw.com

*Additional Counsel for Plaintiffs*


By: _____

Lee Ann Russo
Daniel E. Reidy
Erin L. Shencopp
Thomas F. Rybarczyk
JONES DAY
77 W. Wacker Dr.
Chicago, IL 60601-1692
Telephone: 312.269.4283
Facsimile: 312.782.8585
Email: larusso@JonesDay.com
      dreidy@JonesDay.com
      trybarczyk@JonesDay.com

*Counsel for Defendant*
*Career Education Corporation*


By: _____

Mary Ellen Hennessy
Aharon S. Kaye
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone: 312.902.5200
Facsimile: 312.902.1061
Email: maryellen.hennessy@kattenlaw.com
      aharon.kaye@kattenlaw.com

*Counsel for Defendant*
*Gary E. McCullough*

6

# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| THURMAN ROSS, by and on behalf of himself and all others similarly situated,<br><br><br><br>Plaintiff,<br><br>v.<br><br>CAREER EDUCATION CORPORATION, GARY E. McCULLOUGH and MICHAEL J. GRAHAM,<br><br><br>Defendants. | No. 12-CV-00276<br><br>Honorable John W. Darrah |

## PLAN OF ALLOCATION OF NET SETTLEMENT FUND

**I.  GENERAL PROVISIONS**

    **A.  Definitions:**

        1.  The term "market loss" means the amount by which the actual purchase or acquisition price is greater than the actual sale or holding price of Career Education common stock.

        2.  The term "market profit" means the amount by which the actual purchase or acquisition price is less than the actual sale or holding price of Career Education common stock.

        3.  The terms "net market loss" and "net market profit" means any market loss or profit that occurs from the trading of Career Education common stock during the Class Period, as discussed in "Computation Of Net Recognized Loss For Each Class Member" below.

        4.  The term "Recognized Loss," as used herein, is not market loss or net market loss.  Rather, it is a calculation to arrive at a loss figure for purposes of calculating an Authorized Claimant's *pro rata* participation in the Net Settlement Fund as described below.

        5.  The term "Net Settlement Fund" means the Settlement Fund less any costs associated with notice to the Class and administration of the Settlement, any taxes, attorneys' fees, expert fees, costs, and expenses approved by the Court.

**B.** **The Class includes:** all persons or entities who purchased or otherwise acquired the common stock of Career Education between February 19, 2009, through November 21, 2011, inclusive (the "Class Period") and were damaged thereby.

    1.    The Class does not include:

        (a)    persons or entities who submit valid and timely requests for exclusion from the Class in accordance with the procedures described in the Notice;

        (b)    any of such persons or entities who are (i) Career Education's officers and directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which they have a controlling interest or of which they are a parent; and (ii) all Defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest members of the immediate family of the Individual Defendants; any parent, subsidiary, affiliate, partner, officer or director of any defendant who is not an individual; any entity in which any such excluded person has a controlling interest; and the heirs, successors, and assigns of any such excluded person or entity.

**C.** **To Receive a Distribution from the Net Settlement Fund, a Class Member MUST:**

    1.    Establish membership in the Class; that is have purchased Career Education common stock during the Class Period and have sustained damage as a result of that acquisition;

    2.    Have a Recognized Loss as calculated by the claims administrators;

    3.    Complete and sign a Proof of Claim form and supply all required documentation; and

    4.    Submit the completed claim form and documentation so that it is postmarked for mailing to, or otherwise actually received by, the Claims Administrator Heffler Claims Group postmarked on or before _____, _____.

**D.** **Distributions Will Be Made to Persons Who Purchased or Otherwise Acquired Career Education Common Stock During the Class Period**

Lead Plaintiffs' counsel concluded that persons who purchased or otherwise acquired Career Education common stock during the Class Period were damaged because the prices of Career Education common stock were artificially inflated.

2

    **E.**    **Each Proof of Claim Form Must Separately Set Forth:**

        1.    The claimant's position in Career Education common stock as of the close of trading on February 18, 2009, the day before the first day of the Class Period;

        2.    Each transaction, *i.e.*, purchase made during the Class Period of Career Education common stock, and/or sale made during the Class Period through February 17, 2012, in Career Education common stock; and

        3.    Each claimant's position in Career Education common stock as of the close of trading on February 17, 2012.

## II.    <u>BASIS FOR RECOGNIZED LOSS FOR CLAIMS</u>

A "Recognized Loss" will be calculated for each purchase or acquisition of Career Education common stock that occurred during the Class Period, listed in the claim form, and for which adequate documentation is provided.

The Recognized Loss for a claimant's transactions will be calculated by the Claims Administrator in consultation with Lead Counsel in accordance with the provisions of this Plan of Allocation.

### A.    **Computation of Recognized Losses for Common Stock Purchases**

For purposes of developing the Plan of Allocation, Lead Plaintiffs' consultant relied on an expert's analysis that estimated the amount of Loss Per Share in the daily closing market prices for Career Education common stock for each day of the Class Period based on the allegations of Lead Plaintiff.  In computing the Loss Per Share, Lead Plaintiffs' expert considered price changes of Career Education common stock in reaction to certain public announcements regarding Career Education, and adjusted the price changes in Career Education common stock for changes that were attributable to market and industry forces.

### B.    **Use of "FIFO" Methodology for Computation of Recognized Losses for Class Members Who Made Multiple Transactions in Career Education Common Stock During the Class Period**

For Class members who made multiple purchases or sales of Career Education common stock during the Class Period, the earliest subsequent sale shall be matched first against the claimant's closing position the day before the first day of the Class Period, and then matched chronologically thereafter against each purchase or acquisition made during the Class Period.

### C.    **Acquisition by Gift, Inheritance or Operation of Law**

If a Class member acquired Career Education common stock during the Class Period by way of gift, inheritance or operation of law, such a claim will be computed by using the date and price of the original purchase and not the date and price of transfer.  To the extent those shares

were originally purchased prior to commencement of the Class Period, the Recognized Loss for that acquisition shall be zero.

### D. Payments Less Than $10

A payment to any Class Member that would amount to less than $10.00 in total will not be included in the calculation of the Net Settlement Fund, and no payment to these Class Members will be distributed.

## III. CALCULATION OF RECOGNIZED LOSS PER SHARE

### A. Purchases of Career Education Common Stock

For shares of Career Education common stock purchased during the Class Period, and:

(a) Sold on or before the close of trading on November 18, 2011, the Recognized Loss Per Share is the lesser of (but not less than zero): (i) the purchase price minus the sale price; or (ii) the Loss Per Share at purchase shown in Table A below minus the Loss Per Share at sale shown in the Table A below;

(b) Still held as of the close of business on November 18, 2011, the Recognized Loss Per Share is the lesser of (but not less than zero): (i) the purchase price minus the PSLRA price on the date of sale (or 2/17/2012 if not sold as of 2/17/2012) in Table B below;[1] or (ii) the Loss Per Share at purchase shown in Table A below.

For shares of Career Education common stock purchased on November 21, 2011, the Recognized Loss Per Share is $0.00.

### Table A – Common Stock Loss Per Share

| Transaction Period | Loss Per Share |
|---|---|
| February 19, 2009 – August 3, 2011 | $11.70 |
| August 4, 2011 – November 1, 2011 | $9.25 |
| November 2, 2011 | $1.75 |
| November 3, 2011 – November 18, 2011 | $0.32 |
| November 21, 2011 and after | $0.00 |

---

[1] The PSLRA limits damages to the purchase price less the average closing price from the dissemination of the corrective information through the date of sale (up to 90 days).

4

**Table B – Common Stock PSLRA Prices**

| Sale Date | PSLRA Price | Sale Date | PSLRA Price | Sale Date | PSLRA Price |
|---|---|---|---|---|---|
| 11/21/2011 | $7.21 | 12/21/2011 | $7.02 | 1/24/2012 | $7.85 |
| 11/22/2011 | $7.13 | 12/22/2011 | $7.04 | 1/25/2012 | $7.92 |
| 11/23/2011 | $7.07 | 12/23/2011 | $7.07 | 1/26/2012 | $7.97 |
| 11/25/2011 | $7.03 | 12/27/2011 | $7.10 | 1/27/2012 | $8.03 |
| 11/28/2011 | $7.02 | 12/28/2011 | $7.12 | 1/30/2012 | $8.08 |
| 11/29/2011 | $7.00 | 12/29/2011 | $7.15 | 1/31/2012 | $8.12 |
| 11/30/2011 | $7.01 | 12/30/2011 | $7.17 | 2/1/2012 | $8.18 |
| 12/1/2011 | $7.04 | 1/3/2012 | $7.21 | 2/2/2012 | $8.24 |
| 12/2/2011 | $7.07 | 1/4/2012 | $7.23 | 2/3/2012 | $8.30 |
| 12/5/2011 | $7.09 | 1/5/2012 | $7.25 | 2/6/2012 | $8.37 |
| 12/6/2011 | $7.12 | 1/6/2012 | $7.26 | 2/7/2012 | $8.42 |
| 12/7/2011 | $7.14 | 1/9/2012 | $7.29 | 2/8/2012 | $8.47 |
| 12/8/2011 | $7.13 | 1/10/2012 | $7.32 | 2/9/2012 | $8.53 |
| 12/9/2011 | $7.13 | 1/11/2012 | $7.37 | 2/10/2012 | $8.57 |
| 12/12/2011 | $7.14 | 1/12/2012 | $7.43 | 2/13/2012 | $8.62 |
| 12/13/2011 | $7.13 | 1/13/2012 | $7.49 | 2/14/2012 | $8.66 |
| 12/14/2011 | $7.11 | 1/17/2012 | $7.54 | 2/15/2012 | $8.70 |
| 12/15/2011 | $7.11 | 1/18/2012 | $7.59 | 2/16/2012 | $8.74 |
| 12/16/2011 | $7.10 | 1/19/2012 | $7.65 | 2/17/2012 or after | $8.79 |
| 12/19/2011 | $7.07 | 1/20/2012 | $7.72 | | |
| 12/20/2011 | $7.03 | 1/23/2012 | $7.79 | | |

## IV.   COMPUTATION OF NET RECOGNIZED LOSS FOR EACH CLASS MEMBER

The Recognized Loss with respect to a purchase or acquisition of Career Education common stock is calculated by multiplying the number of shares by the appropriate Recognized Loss Per Share, as set forth above.  The Net Recognized Loss equals the sum of all Recognized Losses for all transactions.

**NOTE:**  ALL MARKET PROFITS SHALL BE SUBTRACTED FROM ALL MARKET LOSSES ON ALL TRANSACTIONS IN CAREER EDUCATION COMMON STOCK DURING THE CLASS PERIOD TO DETERMINE THE NET MARKET LOSS OF EACH CLASS MEMBER.

For purposes of determining whether a Claimant had a net market profit or suffered a net market loss from his, her or its overall transactions in Career Education common stock during the Class Period, the Claims Administrator shall: (i) total the amount paid (excluding commissions and other charges) for Career Education common stock purchased during the Class Period by the Claimant (the "Total Purchase Amount"); (ii) match any sales of Career Education common stock during the Class Period first against the Claimant's opening position in Career Education

common stock (the proceeds of those sales will not be considered for purposes of calculating gains or losses); (iii) total the amount received (excluding commissions, etc.) for sales of Career Education common stock sold during the Class Period (the "Sales Proceeds"); and (iv) assign the holding price of $7.21 per share for Career Education common stock (the closing price of Career Education common stock on November 21, 2011) for Career Education common stock purchased or acquired during the Class Period and still held at the end of the Class Period ("Holding Value"). The Total Purchase Amount (i) less the Sales Proceeds (iii) and less the Holding Value (iv) will be deemed a Claimant's net market profit or net market loss (a profit occurs if a negative number is calculated) on his, her or its overall transactions Career Education common stock during the Class Period.

IF, DURING THE CLASS PERIOD, A CLASS MEMBER MADE A NET MARKET PROFIT IN HIS, HER OR ITS TRANSACTIONS IN CAREER EDUCATION COMMON STOCK, THE AMOUNT OF THE CLASS MEMBER'S CLAIM SHALL BE ZERO.

IF, DURING THE CLASS PERIOD, A CLASS MEMBER HAS A NET MARKET LOSS IN HIS, HER OR ITS TRADING IN CAREER EDUCATION COMMON STOCK THAT IS LESS THAN HIS, HER OR ITS NET RECOGNIZED LOSS, THE CLASS MEMBER'S CLAIM SHALL BE LIMITED TO THE CLASS MEMBER'S NET MARKET LOSS.

## V.    DISTRIBUTION OF THE NET SETTLEMENT FUND

The Net Recognized Loss will be used for calculating the relative amount of participation by authorized claimants in the net settlement fund and does **not** reflect the actual amount an authorized claimant can expect to recover from the Net Settlement Fund. The Net Recognized Losses of all Authorized Claimants may be greater than the Net Settlement Fund. In such event, each Authorized Claimant shall receive his, her or its *pro rata* share of the Net Settlement Fund, which shall be his, her or its Net Recognized Loss divided by the total of all Net Recognized Losses to be paid, multiplied by the total amount in the Net Settlement Fund.

Dated:  October 25, 2013                                  Respectfully submitted,

Jay W. Eisenhofer                                         Joseph F. Rice
Geoffrey C. Jarvis                                        James M. Hughes
Jeff A. Almeida                                           David P. Abel
Christine M. Mackintosh                                   Meghan S. B. Oliver
**GRANT & EISENHOFER P.A.**                               **MOTLEY RICE LLC**
123 Justison Street                                       28 Bridgeside Blvd.
Wilmington, DE  19801                                     Mt. Pleasant, SC  29464
Telephone:   (302) 622-7000                               Telephone:   (843) 216-9000
Facsimile:   (302) 622-7100                               Facsimile:    (843) 216-9450

*Co-Lead Counsel for Lead Plaintiffs*                     *Co-Lead Counsel for Lead Plaintiffs*
*and Counsel for Thurman Ross*

6

/s/ Paul E. Slater
Paul E. Slater (ARDC 2630567)
**SPERLING & SLATER, P.C.**
55 West Monroe Street
Suite 3200
Chicago, IL  60603
Telephone:  (312) 641-3200
Facsimile:  (312) 641-6492

*Liaison Counsel for Lead Plaintiffs
and Counsel for Thurman Ross*

James E. Barz (ARDC 6255605)
**ROBBINS GELLER RUDMAN
  & DOWD LLP**
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  (312) 674-4673
Facsimile:  (312) 674-4676

*Additional Counsel for Plaintiffs*

7

# EXHIBIT 3

# SHAREHOLDER AND SECURITIES FRAUD RESUME



# INTRODUCTION:

**Founded as a trial lawyers' firm with a complex litigation focus by Ron Motley, Joe Rice and nearly 50 other lawyers, Motley Rice LLC has become one of the nation's largest plaintiffs' law firms.**

Motley Rice LLC ("Motley Rice") is led by lawyers who received their training and trial experience in complex litigation involving in-depth investigations, discovery battles and multi-week trials.

From asbestos and tobacco to counter-terrorism and human rights cases, Motley Rice attorneys have shaped developments in U.S. jurisprudence over several decades. Shareholder litigation has earned an increasing portion of our firm's focus in recent years as threats to global retirement security have increased. Motley Rice seeks to create a better, more secure future for pensioners, unions, government entities and institutional investors through improved corporate governance and accountability.

## APPROACH TO SECURITIES LITIGATION

As concerns about our global financial system have intensified, so has our focus on securities litigation as a practice area. As one presenter at the 2009 International Foundation of Employee Benefit Plans annual conference noted, "2008 likely will go down in history as one of the worst years for retirement security in the United States."

Our securities litigation philosophy is straightforward – obtain the best possible results for our clients and any class of investors we represent. Unlike some other firms, we are extremely selective about the cases that we recommend our clients pursue, recognizing that many securities fraud class action cases filed each year are unworthy of an institutional investor's involvement for a variety of reasons.

Our attorneys have substantial experience analyzing securities cases and advising institutional investor clients, whether to seek lead-plaintiff appointment (alone or with a similarly-minded group), remain an absent class member, or consider an opt-out case based on the particular factual and legal circumstances of the case.

When analyzing new filings, our attorneys draw upon their securities, business, and litigation experience, which is supplemented by our in-house team of paralegals and business analysts. In addition, the firm has developed close working relationships with widely-respected forensic accountants and expert witnesses, whose involvement at the earliest stages of complex cases can be critical to determining the best course of action. If Motley Rice believes that a case deserves an institutional investor's involvement, we provide our clients with a detailed written analysis of potential claims and loss-recoupment strategies.

Motley Rice attorneys have secured important corporate governance reforms and returned money to shareholders in shareholder derivative cases, served as lead or co-lead counsel in several significant, multi-million dollar securities fraud class actions, and taken leadership roles in cases involving fiduciaries who failed to maximize shareholder value and fulfill disclosure obligations in a variety of merger and acquisition cases.



# BACKGROUND:

## BACKGROUND IN COMPLEX LITIGATION

### Asbestos Litigation

From the beginning, our lawyers were integral to the story of how "a few trial lawyers and their asbestos-afflicted clients came out . . . to challenge giant asbestos corporations and uncover the greatest and longest business cover-up of an epidemic disease, caused by a product, in American history."[1] Motley Rice has represented numerous public entities in asbestos cases, including Canadian provincial compensation boards in subrogation actions and many state subdivisions in property-damage cases. Our attorneys have litigated claims alleging various insurers of asbestos defendants engaged in unfair settlement practices in connection with the resolution of underlying asbestos personal injury claims. This litigation resulted in, among other things, an eleven-state settlement with Travelers Insurance Company, which is presently working its way through the appellate process.

### Tobacco Master Settlement Agreement

In the 1990s, Motley Rice attorneys took on the tobacco industry. Armed with evidence acquired from whistleblowers, individual smokers' cases and tobacco liability class actions, the attorneys led the campaign of 26 states' attorneys general to recoup state healthcare funds and exact marketing restrictions from cigarette manufacturers. Through the litigation, "a powerful industry was forced by U.S. courts to reveal its internal documents, documents that explain what nine tobacco companies knew, when they knew it and what they concealed from the public about their dangerous product."[2] The effort resulted in significant restrictions on cigarette marketing to children and culminated in the $246 billion Master Settlement Agreement, the largest civil settlement in U.S. history.

### Anti-Terrorism and Human Rights

At the request of victims' families and survivors of the 9/11 terrorist attacks, our attorneys initiated legal action against the airline industry for security lapses in *In re September 11 Litigation*, representing 56 families that opted out of the Victim Compensation Fund in the hope of gaining fuller answers and obtaining greater accountability. The resulting settlements shattered a settlement matrix developed and utilized for decades. The family in the last remaining case, *Bavis v. United Airlines,* reached a settlement agreement in September 2011, bringing to an end nearly a decade of wrongful death litigation in connection with the attacks.

In *In re Terrorist Attacks on September 11, 2001*, Motley Rice attorneys brought a landmark lawsuit against the alleged private and state sponsors of al Qaeda and Osama bin Laden in an action filed on behalf by more than 6,500 family members, survivors, and those killed on 9/11, including more than 1,000 firefighters. Motley Rice has since undertaken a global investigation into terrorism financing, and, in keeping with our "no stone left unturned" discovery philosophy, spent more in the first 18 months of our investigation of al Qaeda's financing than the $15 million budgeted by the U.S. Congress for the entire 9/11 Commission.

### BP PLC Oil Spill Litigation

In April 2010, the Deepwater Horizon disaster spilled approximately 4.9 million gallons of oil into the water, killed 11 oil rig workers, devastated our nation's natural resources and profoundly harmed the economic and emotional well-being of hundreds of thousands of people. The Deepwater Horizon Economic and Property Damages Settlement is the largest civil class action settlement in U.S. history and will provide billions of dollars to resolve eligible claims. Motley Rice co-founder Joseph Rice, a PSC member, served as one of the primary negotiators of the Settlement, and many other of the firm's attorneys played central roles in the negotiation process and the development of the Medical Benefits Settlement.

---

[1] Ralph Nader, commenting on the story told by the book *Outrageous Misconduct.*
[2] World Health Org., *The Tobacco Industry Documents: What They Are, What They Tell Us, and How to Search Them,* at 1 (July 2004), available at *http://www.who.int/tobacco/communications/TI_manual_content.pdf.* As explained in this guide, documents obtained by Motley Rice lawyers during the state of Mississippi's lawsuit against the industry comprise a distinct 54,000-document collection. *Id.* at 21.

CASES:

## Securities Fraud Class Actions

*Alaska Electrical Pension Fund v. Pharmacia Corp.,* No. 03-1519 (D.N.J.). Motley Rice served as co-class counsel in federal securities fraud litigation alleging that the defendants misrepresented clinical trial results of Celebrex® to make its safety profile appear better than rival drugs. In January 2013, the lawsuit settled in mediation for $164 million.

*Minneapolis Firefighters' Relief Association v. Medtronic, Inc.,* No. 08-6324 (PAM/AJB) (D. Minn.). Motley Rice is co-lead counsel for a class of investors who purchased Medtronic common stock in this case that survived the defendants' motion to dismiss. The suit alleges that Medtronic engaged in a pervasive campaign of illegal off-label marketing in which the company advised doctors to use Medtronic's Infuse Bone Graft in ways not FDA-approved, leading to severe complications in patients. Medtronic's stock price dropped significantly after investors learned that the FDA and Department of Justice were investigating Medtronic's off-label marketing. The $85 million settlement was approved on Nov. 8, 2012.

*South Ferry LP #2 v. Killinger,* No. C04-1599C-(W.D. Wash.) (regarding Washington Mutual). Motley Rice served as co-lead counsel on behalf of a class of investors who purchased WaMu common stock between April 15, 2003, and June 28, 2004. The suit alleged that WaMu misrepresented its ability to hedge risk and withstand changes in interest rates, as well as its integration of differing technologies resulting from various acquisitions. The Court granted class certification in January 2011 and approved the $41.5 million settlement on June 5, 2012.

*In re Dell, Inc. Securities Litigation,* No. A-06-CA-726-SS (W.D. Tex.). Motley Rice was appointed lead counsel for the lead plaintiff, Union Asset Management Holding AG, which sued on behalf of a class of purchasers of Dell common stock. The suit alleged that Dell and certain senior executives lied to investors and manipulated financial announcements to meet performance objectives that were tied to executive compensation. The defendants' alleged fraud ultimately caused the price of Dell's stock to decline by over 40 percent. After the case was dismissed by the district court, Motley Rice attorneys launched an appeal to the Fifth Circuit Court of Appeals. After fully briefing the case and oral arguments, the parties settled the case for $40 million.

*In re MBNA Corporation Securities Litigation,* No. 05-CV-00272-GMS (D. Del.). Motley Rice served as co-lead counsel on behalf of investors who purchased MBNA common stock. The suit alleged that MBNA manipulated its financial statements in violation of GAAP, and MBNA executives sold over one million shares of stock based on inside information for net proceeds of more than $50 million, knowing these shares would drop in value once MBNA's true condition was revealed to the market. The case was settled with many motions pending. The $25 million settlement was approved on October 6, 2009.

*In re NPS Pharmaceuticals, Inc. Securities Litigation,* No. 2:06-cv-00570-PGC-PMW (D. Utah). Motley Rice represented the lead plaintiff as sole legal counsel in a class action brought on behalf of stockholders of NPS Pharmaceuticals, Inc., concerning the drug PREOS. NPS claimed that PREOS would be a "billion dollar drug" that could effectively treat "millions of women around the world who have osteoporosis." The complaint alleged fraudulent misrepresentations regarding PREOS's efficacy, market potential, prospects for FDA approval and dangers of hypercalcimic toxicity. The case settled after the lead plaintiff moved for class certification and the parties engaged in document production and protracted settlement negotiations. The $15 million settlement was approved on June 18, 2009.

*In re Citigroup Inc. Securities Litigation,* No. 07 Civ. 9901 (SHS) (DCF) (S.D.N.Y.). Motley Rice serves as co-counsel in this securities fraud action alleging that Citigroup responded to the widely-known financial crisis by concealing both the extent of its ownership of toxic assets—most prominently, collateralized debt obligations (CDO) backed by nonprime mortgages—and the risks associated with them. By alleged misrepresentations and omissions of what amounted to more than two years of income and an entire significant line of business, Citigroup allegedly artificially manipulated and inflated its stock prices throughout the class period. Citigroup's alleged actions caused its stock price to trade in a range of $42.56 to $56.41 per share for most of the class period. These disclosures helped place Citigroup in serious danger of insolvency, a danger that was averted only through a $300 billion dollar emergency government bailout. On August 1, 2013, the Court approved the settlement resolving all claims in the Citigroup action in exchange for payment of $590 million for the benefit of the class.

*Cornwell v. Credit Suisse Group,* No. 08 Civ. 3758 (VM) (S.D.N.Y.). Motley Rice served as co-counsel in an action against Credit Suisse Group alleging the defendants issued materially false and misleading statements regarding the company's business and financial results and failed to write down impaired securities containing mortgage-related debt. Subsequently, Credit Suisse's stock price relative to other market events declined 2.83 percent when impaired securities came to light. A $70 million settlement was approved in July 2011.

*In re Forest Laboratories, Inc. Securities Litigation,* No. 05 Civ. 2827 (RMB) (S.D.N.Y.). Motley Rice represented PIUMPF in a securities fraud class action alleging that the company and its officers misrepresented the safety, efficacy, and side effects of several drugs. Motley Rice, in cooperation with other class counsel, helped the parties reach a $65 million settlement that was approved on May 15, 2009.

## CASES:

**In re Molson Coors Brewing Co. Securities Litigation,** No. 1:05-cv-00294 (D. Del.). Motley Rice served as co-lead counsel for co-lead plaintiffs Drywall Acoustic Lathing and Insulation Local 675 Pension Fund and Metzler Investment GmbH in litigation against Molson Coors Brewing Co. and several of its officers and directors. The lawsuit alleged that, following the February 9, 2005, merger of Molson, Inc. and the Adolph Coors Company, the defendants fraudulently misrepresented the financial and operational performance of the combined company prior to reporting a net loss for the first quarter of 2005. Following protracted negotiations, the parties reached a $6 million settlement in May 2009.

**Marsden v. Select Medical Corporation,** No. 04-cv-4020 (E.D. Pa.). Motley Rice served as co-lead counsel on behalf of stockholders of Select Medical, a healthcare provider specializing in long-term care hospital facilities. The suit alleged that Select Medical exploited its business structure to improperly maximize Medicare reimbursements, misled investors and that the company's executives engaged in massive insider trading for proceeds of over $100 million. A $5 million settlement was reached and approved on April 15, 2009.

**Welmon v. Chicago Bridge & Iron Co., N.V.,** No. 06-CV-01283 (JES) (S.D.N.Y.). Motley Rice represented the co-lead plaintiff in this case that alleged that the defendants issued numerous materially false and misleading statements which caused CB&I's securities to trade at artificially inflated prices. The litigation resulted in a $10.5 million settlement that was approved on June 3, 2008.

**City of Brockton Retirement System v. Avon Products, Inc.,** No. 11 Civ. 4665 (PGG) (S.D.N.Y.). Motley Rice serves as lead counsel representing lead plaintiffs, as well as the City of Brockton Retirement System, in this class action on behalf of all persons who acquired Avon common stock between July 31, 2006 and Oct. 26, 2011. The action alleges that the defendants falsely assured investors they had effective internal controls and accounting systems, as required under the Foreign Corrupt Practices Act (FCPA). In October 2008, Avon disclosed that it had begun an investigation into possible FCPA violations in China in June 2008. The action alleges that, unbeknownst to investors, Avon had an illegal practice of paying bribes in violation of the FCPA extending as far back as 2004 and which continued even after its October 2008 disclosure. Despite its certifications of the effectiveness of its internal controls, Avon's internal controls were allegedly severely deficient, allowing the company to engage in millions of dollars of improper payments in more than a dozen countries. This case is ongoing.

**Hill v. State Street Corporation,** No. 09-cv-12146-NG (D. Mass.). Motley Rice represents institutional investors as co-lead counsel against State Street. The action alleges that State Street defrauded institutional investors – including the state of California's two largest pension funds, California Public Employees' Retirement System (CalPERS) and California State Teachers' Retirement System (CalSTRS) – by overcharging them for foreign exchange trades. The action also alleges that State Street misled investors about the quality of its portfolio of mortgage-backed securities. On Aug. 3, 2011, the U.S. District Court for the District of Massachusetts denied the defendants' motion to dismiss, and the case is currently in discovery.

**In re Synovus Financial Corp.,** No. 1:09-cv-01811 (N.D. Ga.). Motley Rice and our client, Sheet Metal Workers' National Pension Fund, serve as court-appointed co-lead counsel and co-lead plaintiff for investors in Synovus Financial Corp. The lawsuit alleges that the bank artificially inflated its stock price by concealing its troubled lending relationship with the Sea Island Company, a resort real estate and hospitality company to whom Synovus allegedly made hundreds of millions of dollars of "insider loans" with "little more than a handshake" facilitated by personal relationships among certain senior executives and board members. On March 23, 2012, the federal court denied the defendants' motion to dismiss and the plaintiffs moved to certify the case as a class action.

**Bennett v. Sprint Nextel Corporation,** No. 2:09-cv-02122-EFM-KMH (D. Kan.). As co-lead counsel, we represent the PACE Industry Union-Management Pension Fund (PIUMPF) and several other institutional investors who purchased Sprint Nextel common stock. The class action complaint alleges that the defendants made materially false and misleading statements regarding Sprint's business and financial results. As a result, it is alleged that Sprint stock traded at artificially inflated prices during the class period and that, when the market learned the truth, the value of Sprint's shares plummeted. The court denied the defendants' motion to dismiss in its entirety in 2011, and the action is currently in discovery.

**In re UBS AG Securities Litigation,** No.07 Cov. 11225 (RJS) (S.D.N.Y.). Motley Rice serves as co-lead counsel on behalf of purchasers of UBS common stock. The suit alleges that UBS knowingly invested in risky mortgage-backed securities during a steep decline in the mortgage industry and in direct contravention of its risk management policies and public representations. In addition, plaintiffs allege that UBS's senior executives continued to deceive its shareholders and make material misrepresentations after it learned that its $100 billion mortgage-backed asset portfolio was significantly overvalued. A motion to dismiss was granted in 2012. An appeal was filed on Feb. 8, 2013, and the case is ongoing.

**City of Sterling Heights General Employees' Retirement System v. Hospira, Inc.,** No. 11 C 8332 (N.D. Ill.). Motley Rice serves as co-lead counsel in this class action that was filed on behalf of all persons who purchased or acquired common stock of Hospira between March 24, 2009, and Oct. 17, 2011, and alleges that, during the class period, the defendants knew (but concealed from the investing public) that Hospira suffered from extensive

quality control problems that undermined the viability and touted benefits of its new growth strategy called "Project Fuel." The defendants also allegedly failed to disclose the extent of Hospira's inability to comply with problems identified in the FDA's Warning Letters regarding the company's quality controls, manufacturing processes and infusion pumps. As a result of the defendants' alleged wrongful acts and the decline in the market value of the company's stock, Hospira investors suffered significant losses. The litigation is in the discovery phase.

## Shareholder Derivative Litigation

*Manville Personal Injury Settlement Trust v. Gemunder,* No. 10-CI-01212 (Ky. Cir. Ct.) (regarding Omnicare, Inc.). On April 14, 2010, Motley Rice filed a shareholder derivative complaint on behalf of plaintiff Manville Personal Injury Settlement Trust. Plaintiff's claims stem from a November 3, 2009, announcement by the U.S. Department of Justice that Omnicare, Inc. had agreed to pay $98 million to settle state and federal investigations into three kickback schemes through which the company paid or solicited payments in violation of state and federal anti-kickback laws. The court denied the defendants' motions to dismiss in their entireties on April 27, 2011. The defendants sought an interlocutory appeal, which was denied on October 6, 2011. Following significant discovery, which included plaintiff's counsel's review and analysis of literally millions of pages of documents, the parties reached agreement on a settlement. Under the settlement, a $16.7 million fund will be created to be used over a four year period by Omnicare to fund certain corporate governance measures and provide funding for the company's compliance committee in connection with the performance of its duties. Additionally, the settlement calls for Omnicare to adopt and/or maintain corporate governance measures relating to, among other things, employee training and ensuring the appropriate flow of information to the compliance committee. On August 9, 2013, the court granted preliminary approval to the settlement. A final settlement approval hearing is scheduled for October 28, 2013.

*Service Employees International Union v. Hills,* No. A0711383 (Ohio Ct. Com. Pl.) (regarding Chiquita Brands International, Inc.). In this shareholder derivative litigation, SEIU retained Motley Rice to bring an action on behalf of Chiquita Brands International. The plaintiff alleged that the defendants breached their fiduciary duties by paying bribes to terrorist organizations in violation of U.S. and Columbian law. In October 2010, the plaintiffs resolved their state court action as part of a separate federal derivative claim.

*Mercier v. Whittle,* No. 2008-CP-23-8395 (S.C. Ct. Com. Pl.) (regarding the South Financial Group). This shareholder derivative action was brought on behalf of South Financial Group, Inc., following the company's decision to apply for federal bailout money from the Troubled Asset Relief Program (TARP) while allegedly accelerating the retirement of its former

chairman and CEO to protect his multi-million dollar golden parachute, which would be prohibited under TARP. The litigation was settled prior to trial and achieved, among other benefits, payment back to the company from chairman Whittle, increased board independence and enhanced shareholder rights.

*Pompano Beach Police & Firefighters' Retirement System v. Page,* No. 7064-CS (Del. Ch.) (regarding Google, Inc.). On November 23, 2011, Motley Rice filed a shareholder derivative complaint on behalf of its institutional investor client against the Board of Directors of Google, Inc. in connection with the August 24, 2011 announcement by the U.S. Department of Justice that Google had agreed to pay $500 million to settle a federal investigation into allegations that it improperly accepted advertisements from online Canadian pharmacies that import prescription drugs into the United States. The case is currently stayed while parallel shareholder litigation proceeds in California federal court.

*California State Teachers' Retirement System v. Blankenship,* No. 10-C-715 (W. Va. Cir. Ct.) (regarding Massey Energy Co.); and *Manville Personal Injury Settlement Trust v. Blankenship,* No. 07-C-1333 (W. Va. Cir. Ct.) (regarding Massey Energy Co.). In the wake of the deadliest coal mining disaster in a generation on April 5, 2010, at Massey Energy Company's Upper Big Branch mine, Motley Rice filed suit on behalf of investors against Massey officers and directors, simultaneously prosecuting a civil contempt action against the directors and a shareholder derivative action against all defendants. In the shareholder derivative action, the firm serves as lead counsel, representing co-lead plaintiffs Amalgamated Bank, the Manville Trust, and the California State Teachers' Retirement System (CalSTRS), the largest teachers' retirement fund and second largest public pension fund in the United States. The Manville Trust is the named plaintiff in the civil contempt proceeding. Following significant progress in these cases, Massey Energy made substantial corporate governance changes before announcing that controversial Chairman and CEO Don Blankenship would retire at the end of 2010. Such corporate governance enhancements and Blankenship's retirement are primary objectives of this ongoing litigation. *(See continued discussion under Corporate Takeover Litigation section.)*

*Manville Personal Injury Settlement Trust v. Farmer,* No. A 0806822 (Ohio Ct. Com. Pl.) (regarding Cintas Corporation). In this shareholder derivative action brought on behalf of Cintas Corporation, the plaintiff alleged that the defendants breached their fiduciary duties by, among other things, failing to cause the company to comply with applicable worker safety laws and regulations. In November 2009, the court approved a settlement agreement that provided for the implementation of corporate governance measures designed to increase the flow of employee safety information to the company's board; ensure the company's compliance with a prior agreement between itself and OSHA relating to workplace safety violations; and secure the attendance of the company's chief health and safety officer at shareholder meetings.

# CASES:

*Sheet Metal Workers' National Pension Fund v. Ritter,* No. 2009-001980 (Ala. Cir. Ct.) (regarding Regions Financial Corporation). In this shareholder derivative action brought on behalf of Regions Financial Corporation, the plaintiff alleges that the defendants breached their fiduciary duties by, among other things, engaging in self-dealing. This action is pending.

## Corporate Takeover Litigation

*In re The Shaw Group, Inc., Shareholders Litigation,* No. 614399 (19th Jud. Dist. La.). Motley Rice attorneys served as co-lead counsel in this class action brought by our client, a European asset management company, on behalf of the public shareholders of The Shaw Group, Inc. The lawsuit challenged Shaw's proposed sale to Chicago Bridge & Iron Company N.V. in a transaction valued at approximately $3.04 billion. The plaintiffs alleged that the defendants breached their fiduciary duties to Shaw's shareholders by agreeing to a transaction that was financially unfair and the result of an improper sales process, which the defendants pursued at a time when Shaw's stock was poised for significant growth. The plaintiffs also alleged that the transaction offered substantial benefits to Shaw insiders not shared with the company's public shareholders. In December 2012, the parties reached a settlement with two components. Shaw agreed to make certain additional disclosures to shareholders of financial analyses indicating a potential share price impact of certain alternative transactions of as much as $19.00 per share versus the status quo. To provide a remedy for Shaw shareholders who believed the company was worth more than CB&I was paying for it, the settlement contained a second component – universal appraisal rights for all Shaw shareholders who properly dissented from the proposed merger, and the opportunity for Shaw dissenters to pursue that remedy on a class-wide basis. The court granted final approval of the settlement on June 28, 2013.

*In re Coventry Health Care, Inc. Securities Litigation,* No. 7905-CS (Del. Ch.). Motley Rice represents three public pension funds as court-appointed sole lead counsel in a shareholder class action challenging the $7.2 billion acquisition of Coventry Health Care, Inc., by Aetna, Inc. The plaintiffs allege that the defendants breached their fiduciary duties to Coventry's shareholders by undertaking a flawed process, involving a severely conflicted financial advisor, to sell Coventry at a time when it was poised for remarkable growth as a result of recent government healthcare reforms. A preliminary settlement has been reached, which provides for improvements to the deal's terms and enhanced disclosures.

*In re Allion Healthcare, Inc. Shareholders Litigation,* No. 5022-cc (Del. Ch.). Motley Rice attorneys served as co-lead counsel representing a group of institutional shareholders in their challenge to the going-private buy-out of Allion Healthcare, Inc., by private equity firm H.I.G. Capital, LLC, and a group of insider stockholders led by the company's CEO, who controlled about 41 percent the company's shares. The shareholders alleged that the CEO used his stock holdings and influence over board members to accomplish the buyout at the expense of Allion's public shareholders. After a lengthy mediation, the shareholders succeeded in negotiating a settlement resulting in a $4 million increase in the merger consideration available to shareholders. In January 2011, the Delaware Court of Chancery approved the settlement.

*In re RehabCare Group, Inc. Shareholders Litigation,* No. 6197-VCL (Del. Ch.). Motley Rice represented institutional shareholders in their challenge to the acquisition of healthcare provider RehabCare Group, Inc., by Kindred Healthcare, Inc. As co-lead counsel, Motley Rice uncovered important additional facts about the relationship between RehabCare, Kindred, and the exclusive financial advisor for the transaction, as well as how those relationships affected the process RehabCare's board of directors undertook to sell the company. After extensive discovery, the parties reached a settlement in which RehabCare agreed to make a $2.5 million payment for the benefit of RehabCare shareholders. In addition, RehabCare and Kindred agreed to waive certain standstill agreements with potential higher bidders for the company; lower the merger agreement's termination fee from $26 million to $13 million to encourage any potential higher bidders; eliminate the requirement that Kindred have a three-business day period during which it has the right to match any superior proposal; and make certain additional public disclosures about the proposed merger. The Delaware Court of Chancery granted final approval of the settlement on Sept. 8, 2011.

*In re Atheros Communications Inc. Shareholder Litigation,* No. 6124-VCN (Del. Ch.). In this action involving Qualcomm Incorporated's proposed acquisition of Atheros Communications, Inc., for approximately $3.1 billion, Motley Rice served as co-lead counsel representing investors alleging that, among other things, Atheros' preliminary proxy statement was materially misleading to the company's shareholders, who were responsible for voting on the proposed acquisition. In March 2011, the Court issued a preliminary injunction delaying the shareholder vote, ruling that Atheros' proxy statement was materially misleading because, even though the proxy stated that the company's CEO "had not had any discussions with Qualcomm regarding the terms of his potential employment," it failed to disclose that he in fact "had overwhelming reason to believe he would be employed by Qualcomm after the transaction closed." The proxy also failed to inform shareholders of an almost entirely contingent $24 million fee to the company's financial advisor, Qatalyst Partners, LLP.

*California State Teachers' Retirement System v. Blankenship,* No. 10-C-715 (W. Va. Cir. Ct.) (regarding Massey Energy Co.). (Continued discussion from Shareholder Derivative Litigation section). On January 29, 2011, a proposed merger between Massey Energy Company and Alpha Natural Resources was announced. A subsequent announcement that a key defendant, Massey's COO Chris Adkins, would be in charge of implementing Alpha's safety program across the post-merger company and

## CASES:

that other primary defendants would also be offered positions. The co-lead plaintiffs filed an amended complaint seeking to enjoin the merger and force complete disclosure to Massey's shareholders on May 2, 2011. Following expedited discovery and the circuit court's refusal to consider an injunction ahead of the June 1, 2011, shareholder vote, the co-lead plaintiffs filed an emergency petition for preliminary injunction in the West Virginia Supreme Court. Although the court declined to exercise jurisdiction, it effectively granted a portion of the relief sought by unsealing the emergency petition on May 31, 2011, one day before the shareholder vote. The unsealed petition revealed a secret pact between Massey lead independent director Bobby Inman and Alpha CEO Kevin Crutchfield through which the defendants allegedly hoped to escape liability. As revealed by the emergency petition, pursuant to an Oct. 1, 2010, telephone call, Inman had Crutchfield pledge to hire Adkins, three other main defendants in the shareholder derivative action and the two men responsible for operating the Upper Big Branch mine. A hearing on a motion to dismiss was held in August 2011, and that motion is still pending largely as a result of the ongoing federal criminal investigation that has stayed all civil litigation related to the explosion. In *Manville Personal Injury Settlement Trust v. Blankenship* (W. Va. Cir. Ct.), issues relating to a contempt petition are on appeal.

***Maric Capital Master Fund, Ltd. v. PLATO Learning, Inc.,*** No. 5402-VCS (Del. Ch.). The firm's institutional investor client won a partial preliminary injunction against the proposed acquisition of PLATO Learning, Inc., by a private equity company. In its ruling, the Delaware Court of Chancery found that the target company's proxy statement was misleading to its shareholders and omitted material information. The court's opinion has since been published and has been cited by courts and the legal media.

***In re Lear Corporation Shareholder Litigation,*** No. 2728-N (Del. Ch.). In this deal case, Motley Rice helped thwart a merger out-of-line with shareholder interests. Motley Rice represented an institutional investor in this case and, along with Delaware co-counsel, was appointed co-chair of the Plaintiffs' Executive Committee. Motley Rice and its co-counsel conducted expedited discovery and the briefing. The court ultimately granted in part and denied in part the plaintiffs' motion for a preliminary injunction. In granting the injunction, the court found a reasonable probability of success in the plaintiffs' disclosure claim concerning the Lear CEO's conflict of interest in securing his retirement through the proposed takeover. Lear shareholders overwhelmingly rejected the merger.

***Helaba Invest Kapitalanlagegesellschaft mbH v. Fialkow,*** No. 2683-VCL (Del. Ch.) (regarding National Home Health Care Corp.). This action was brought on behalf of the shareholders of National Home Health Care Corporation in response to the company's November 2006 announcement that it had entered into a merger agreement with affiliates of Angelo Gordon. The matter settled prior to trial and was approved on April 18, 2008. The defendants agreed to additional consideration and proxy disclosures for the class.

***In re Comprehensive Care Corporation Shareholders Litigation,*** No. 2692-VCN (Del. Ch.). As court-appointed co-lead counsel, Motley Rice helped protect minority investors from being squeezed out by suing on behalf of the minority shareholders of Comprehensive Care Corporation to block a proposed "squeeze play" merger with Hythiam, Inc. The defendants voluntarily terminated the merger after the lawsuit was filed and partial discovery was completed.

***Schultze Asset Management, LLC v. Washington Group International, Inc.,*** No. 3261-VCN (Del. Ch.). This action followed Washington Group's announcement that it had agreed to be acquired by URS Corporation. The action alleged that Washington Group and its board of directors breached their fiduciary duties by failing to maximize shareholder value, choosing financial projections that unfairly undervalued the company and pursuing a flawed decision-making process. Motley Rice represented the parties, which ultimately settled the lawsuit with Washington Group. Washington Group agreed to make further disclosures to its shareholders regarding the proposed alternative transactions it had rejected prior to its accepting URS's proposal and agreed to make disclosures regarding how the company was valued in the proposed transaction with URS. These additional disclosures prompted shareholders to further question the fairness of the URS proposal. Ultimately, URS increased its offer for Washington Group to the benefit of minority stockholders.

***In re The DirecTV Group, Inc. Shareholder Litigation,*** No. 4581-VCP (Del. Ch.). As court-appointed co-lead counsel, Motley Rice attorneys represented a group of institutional investors on behalf of the minority shareholders of DirecTV Group. A settlement was reached and approved by the court on Nov. 30, 2009. It provided for material changes to the merger agreement and the governing documents of the post-merger DirectTV.

***KBC Asset Management N.V. v. Bankrate, Inc.,*** No. 50-2009-CA-025312 (Fla. Cir. Ct.). Motley Rice attorneys served as co-lead counsel on behalf of the minority shareholders of Bankrate, Inc., in their challenge to a freeze-out merger by which a foreign private equity fund proposed to cash out Bankrate's minority shareholders for inadequate consideration and without the required consent of a single minority shareholder. Pursuant to the initial merger agreement, company insiders allegedly stood to reap millions while retaining an equity stake in the surviving private company. The parties participated in extensive expedited discovery and motion practice, and, as a result of the litigation, the defendants agreed not to waive the requirement that a majority of the minority shareholders must approve the transaction. A settlement was approved in Nov. 2010.

## CASES:

*In re Celera Corporation Shareholder Litigation,* No. 6304-VCP (Del. Ch.). Motley Rice attorneys, with co-counsel, serve as lead counsel in this action challenging the acquisition of Celera Corporation by Quest Diagnostics Incorporated. In April 2011, the court-appointed lead plaintiff in the case, New Orleans Employees' Retirement System (NOERS), approved a settlement. As part of the settlement, Celera and Quest agreed to alter key features of their merger agreement. The settlement was approved by the Delaware Court of Chancery on March 23, 2012.

### State Law Securities Cases

*In re Tremont Group Holdings, Inc. Securities Litigation,* No. 09 Civ. 03137 (S.D.N.Y.). Motley Rice represents an individual investor in consolidated litigation regarding investments made in Bernard L. Madoff Investment Securities, LLC, through a variable universal life insurance policy.

*Brown v. Charles Schwab & Co.,* No. 2:07-cv-03852-DCN (D.S.C.). Motley Rice attorneys served as class counsel in this case, one of the first to interpret the civil liabilities provision of the Uniform Securities Act of 2002. The U.S. District Court for the District of South Carolina certified a class of investors with claims against broker-dealer Charles Schwab & Co., Inc., for its role in allegedly aiding the illegal sale of securities as part of a $66 million Ponzi scheme. A subclass of 38 plaintiffs in this case reached a settlement agreement with Schwab under which they receive approximately $5.7 million, an amount representing their total unrecovered investment losses plus attorneys' fees.

### Opt-Out/Individual Actions

*In re Vivendi Universal, S.A. Securities Litigation,* No. 02 Civ. 5571 (S.D.N.Y.). In this action, Motley Rice represents more than 20 foreign institutional investors who were excluded from the class. The firm's clients include the Swedish public pension fund Första AP-fonden (AP1), one of five buffer funds in the Swedish pay-as-you-go pension system. In light of a recent Supreme Court ruling preventing foreign clients from gaining relief, Motley Rice has worked with institutional investor plaintiffs to file suit in France. The French action is pending.

# AWARDS AND ACCOLADES:

**Our firm has garnered the following awards:**

"**Most Feared Plaintiffs Firm**" | *Law360*
2013   mass tort litigation/class actions-plaintiffs

"**Best Law Firm**" | *U.S. News– Best Lawyers*®
2010–2013   mass tort litigation/class actions-plaintiffs

*Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys*
2012–2013   national  and local rankings

*The Legal 500 United States* Litigation editions
2007, 2009, 2011, 2012, 2013 mass tort and class action: plaintiff representation–toxic tort

**The Plaintiffs' Hot List** | *The National Law Journal*
2006, 2012, 2013

*SCAS 50* list | ISS– Securities Class Action Services
2009–2011

**Motley Rice attorneys have been individually recognized by such publications as *Super Lawyers*®, *The Best Lawyers in America*®, *The Roundtable: America's 100 Most Influential Trial Lawyers, Top 100 Trial Lawyers*™ and others. Please see their bios for a full listing of accolades.**

*The Best Lawyers in America*®
**Mass tort litigation/class actions- plaintiffs**
Fidelma Fitzpatrick: 2013
Anne McGinness Kearse: 2013
Bob McConnell: 2013
Don Migliori: 2013
Ron Motley: 2013
Joe Rice: 2013
Mary Schiavo: 2013
**Personal injury litigation- plaintiffs, product liability- plaintiffs**
Ron Motley: 2013
**Litigation- banking & finance, litigation- mergers & acquisitions, litigation- securities**
Bill Narwold: 2013

"**Lawyers of the Year**" | Best Lawyers'®
**Ron Motley: 2010** *Charleston, SC personal injury litigation;*
2012 *Charleston, SC mass tort litigation/class actions– plaintiffs*
Joe Rice: 2013 *Charleston, SC mass tort litigation/class actions– plaintiffs*
Bill Narwold: 2013 *Hartford, CT litigation– banking & finance*

**The National Trial Lawyers** / *The Trial Lawyer* magazine
Ron Motley: 2012 inducted into **The Trial Lawyer Hall of Fame**
David Hoyle: 2012 *Top 100 Trial Lawyers*™
Ron Motley: 2011 member **The Roundtable: America's 100 Most Influential Trial Lawyers**
Joe Rice, Don Migliori, Anne Kearse: 2010 **Top 100 Trial Lawyers™**

**Leadership in Law Award** | *SC Lawyers Weekly*
Joe Rice: 2012
Ron Motley: 2011

*Benchmark Litigation, The Definitive Guide to America's Leading Litigation Firms & Attorneys*
Nate Finch: 2013  *"Local Litigation Star:" civil litigation, creditors' rights and white-collar crime*

*The Legal 500 United States*
**Mass tort and class action: plaintiff representation– toxic tort**
Ron Motley: 2011–2013
Joe Rice: 2011–2012
Fidelma Fitzpatrick: 2013
John Herrick: 2009, 2011–2012
Anne McGinness Kearse: 2009, 2011–2012
**Mass tort and class action: plaintiff representation– securities**
Rebecca Katz: 2012

*Lawdragon*™ *500 Leading Lawyers in America*
Ron Motley: 2005–2012
Jodi Westbrook Flowers: 2010–2012
*Lawdragon™ 3,000 Guide to the Leading Lawyers in America*
Michael Elsner, Don Migliori: 2010

*Chambers USA*
Ron Motley: 2007, 2010–2012 *products liability and mass torts: plaintiffs* "an accomplished trial lawyer and a formidable opponent."

*Super Lawyers*®
Ron Motley: *2012 Top 25 South Carolina Super Lawyers*
Don Migliori: 2012 *Top 10 Rhode Island Super Lawyers*

*South Carolina Super Lawyers*®
Ron Motley: 2008–2013
Joe Rice: 2008–2013
Anne McGinness Kearse: 2013

*Southern California Super Lawyers*®
Mark Labaton: 2009–2013

*Connecticut/New England Super Lawyers*®
Bill Narwold: 2009–2013

*Rhode Island/New England Super Lawyers*®
Leah Donaldson: 2013
Fidelma Fitzpatrick: 2008, 2010–2013
Bob McConnell: 2008–2013
Don Migliori: 2009–2013

*Washington, D.C. Super Lawyers*®
Nate Finch: 2012–2013

*New York Metro Super Lawyers*®
Rebecca Katz: 2008–2010, 2013

*Super Lawyers*® *Business Edition*
Rebecca Katz: 2011

*Rhode Island/New England Rising Stars*
Leah Donaldson: 2012

*South Carolina Rising Stars*
Kimberly Barone Baden: 2013
T. David Hoyle: 2012–2013
Badge Humphries: 2012–2013
James Ledlie: 2012–2013

# AWARDS AND ACCOLADES:

Josh Littlejohn: 2013
Bill Norton: 2013
Lance Oliver: 2013
Carmen Scott: 2013

**Connecticut Rising Stars**
Mathew Jasinski: 2013
Michael Pendell: 2013

**West Virginia Rising Stars**
Vicki Antion Nelson: 2012–2013

**Lawyers of the Year** | *Rhode Island Lawyers Weekly* and *Massachusetts Lawyers Weekly*
Don Migliori: 2011

**Platinum Compleat Lawyer Award** | University of South Carolina School of Law Alumni Association
Joe Rice: 2011

**The American Association for Justice**
Nate Finch: 2013 **Wiedemann & Wysocki Award**
Ron Motley: 2012 **Lifetime Member**
Ron Motley: 2010 **Lifetime Achievement Award**
James Ledlie: 2010 **F. Scott Baldwin Award**
Ron Motley: 2007 **David S. Shrager President's Award**
Ron Motley: 1998 **Harry M. Philo Trial Lawyer of the Year**

**Trial Lawyer Kingpins** | *Am Law Litigation Daily*
Ron Motley, Joe Rice: 2010 named to a list of 75 **"formidable trial lawyers"**

Bill Narwold was named **one of eleven lawyers "who made a difference"** by *The Connecticut Law Tribune.*

"[Ron Motley is] **one of the most influential lawyers** in corporate America."— *The National Law Journal*

Joe Rice was named one of the nation's "**Five Most Respected Plaintiff Attorneys**" in a poll conducted by *Corporate Legal Times.*

**Youth Advocates of the Year Award** | Campaign for Tobacco-Free Kids Award
Ron Motley: 1999

**President's Award** | The National Association of Attorneys General
Ron Motley, Joe Rice: 1998

*Roberts v. AP Green Industries, Inc.,* No. 49D02-9601-MI-0001-687 (Marion Cty., Ind.) — The judge stated, "That was some of the best final arguments I think I've ever heard. That was a treat. Congratulations to you all. I expected the best, and you delivered the best, and I appreciate it."

*Marsden v. Select Medical Corporation,* No. 04-cv-4020 (E.D. Pa., Oct. 5, 2006) — "Motley Rice LLC possess[es] the requisite knowledge and skill in securities litigation to ably prosecute this matter on behalf of the class."

*In re NPS Pharmaceuticals, Inc. Securities Litigation,* No. 2:06-cv-00570-PGC-PMW (D. Utah, Nov. 17, 2006) — "As demonstrated by their submissions to the court, [Motley Rice has] expertise and experience in the prosecution of shareholder and securities class actions and, as a result, [is] adequate to represent the interests of the class."

*For full methodologies and selection criteria, visit www.motleyrice.com/info/award-methodology*

Please remember that every case is different. Although they endorse certain lawyers, *The Legal 500 United States* and *Chambers USA* and other similar organizations listed above are not Motley Rice clients. Any result we achieve for one client in one matter does not necessarily indicate similar results can be obtained for other clients.

## TEAM BIOS:

# THE FIRM'S MEMBERS

### Ronald L. Motley (1944–2013)

EDUCATION:
J.D., University of South Carolina School of Law, 1971
B.A., University of South Carolina, 1966

Ron Motley fought for greater justice, accountability and recourse, and has been widely recognized as one of America's most accomplished and skilled trial lawyers. During a career that spanned more than four decades, his persuasiveness before a jury and ability to break new legal and evidentiary ground brought to justice two once-invincible giant industries whose malfeasance took the lives of millions of Americans—asbestos and tobacco. Armed with a combination of legal and trial skills, personal charisma, nose-to-the-grindstone hard work and record of success, Ron built Motley Rice into one of the nation's largest plaintiffs' law firms.

Noted for his role in spearheading the historic litigation against the tobacco industry, Ron served as lead trial counsel for 26 State Attorneys General in the lawsuits. His efforts to uncover corporate and scientific wrongdoing resulted in the Master Settlement Agreement, the largest civil settlement in U.S. history and in which the tobacco industry agreed to reimburse states for smoking-related health care costs.

Through his pioneering discovery and collaboration, Ron revealed asbestos manufacturers and the harmful and disabling effects of occupational, environmental and household asbestos exposure. He represented thousands of asbestos victims and achieved numerous trial breakthroughs, including the class actions and mass consolidations of *Cimino, et al. v. Raymark, et al.* (U.S.D.C. TX); *Abate, et al. v. ACandS, et al.* (Baltimore); and *In re Asbestos Personal Injury Cases* (Mississippi).

In 2002, Ron once again advanced cutting-edge litigation as lead counsel for the 9/11 Families United to Bankrupt Terrorism with a lawsuit filed by more than 6,500 family members, survivors and those who lost their lives in the Sept. 11, 2001, terrorist attacks. The suit seeks justice and ultimately bankruptcy for al Qaeda's financiers, including many individuals, banks, corporations and charities that provided resources and monetary aid. He also served as lead counsel in numerous individual aviation security liability and damages cases under the *In re September 11 Litigation* filed against the aviation and aviation security industries by victims' families devastated by the security failures of 9/11.

Ron brought the landmark case of *Oran Almog v. Arab Bank* against the alleged financial sponsors of Hamas and other terrorist organizations in Israel and was a firm leader in the BP Deepwater Horizon litigation and claims efforts involving people and businesses in Gulf Coast communities suffering as a result of the oil spill. Two settlements were reached with BP, and one of which is the largest civil class action settlement in U.S. history.

Ron won widespread honors for his ability to win justice for his clients and for his seminal impact on the course of civil litigation. In 2013, the South Carolina Association for Justice (SCAJ) recognized him with its prestigious Founders' Award, and he was inducted into *The Trial Lawyer 2012 Hall of Fame* in recognition of his lifetime of public service. He was selected by his peers for inclusion in *The Best Lawyers in America®* from 1993 to 2013 for his work in mass tort litigation/class actions - plaintiffs; personal injury litigation - plaintiffs; and product liability litigation - plaintiffs. In addition, he was named the *Best Lawyers®* 2010 Charleston, SC Personal Injury Litigation "Lawyer of the Year" and *Best Lawyers®* 2012 Charleston-SC Mass Tort Litigation/Class Actions - plaintiffs "Lawyer of the Year." The inaugural 2012 edition of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys* recognized Ron as a "Litigation Star" in its national rankings for mass tort/product liability and securities and, in 2013, ranked him nationally again for his work in civil rights/human rights and mass tort/product liability. *Benchmark Plaintiff* recognized him in both 2012 and 2013 in its South Carolina rankings in human rights, product liability, securities and toxic tort.

Ron was a 2011 recipient of the *SC Lawyers Weekly* Leadership in Law Award and was highlighted in the 2011–2013 Litigation editions of *The Legal 500 United States* for his work in mass tort and class action: plaintiff representation- toxic tort. *The Trial Lawyer Magazine* named him as a 2011 member of *The Roundtable: America's 100 Most Influential Trial Lawyers. Chambers USA* named him in the 2007, 2010, 2011 and 2012 editions for his work in product liability and mass torts: plaintiffs, calling him in one edition "an accomplished trial lawyer and a formidable opponent." Recognized as an AV® rated attorney by Martindale-Hubbell®, Ron was also selected for inclusion in the *South Carolina Super Lawyers®* list 2008–2013 and was named numerous times among the "Best of the Best" on the *Top 10 South Carolina Super Lawyers* list (2008) and *Top 25 South Carolina Super Lawyers* list (2008, 2009, 2011, 2012). He was included in every edition of the *The Lawdragon™ 500 Leading Lawyers in America* list from 2005 to 2012 for his work in the plaintiffs' field.

The American Association for Justice (AAJ) elected Ron to be a lifetime member in 2012, and in 2010, awarded him with its highest honor, the Lifetime Achievement Award. The AAJ also honored Ron in 2007 with the David S. Shrager President's Award for his outstanding contributions to the safety and protection of American consumers and the civil justice system, and in 1998, named him the Harry M. Philo Trial Lawyer of the Year. Ron served on the AAJ Board of Governors from 1977 to 2012 and was chair of its Asbestos Litigation Group from 1978 to 2012.

In 1998, he received the President's Award of the National Association of Attorneys General for his "courage, legal skills and dedication to our children and the public health of our nation." The Campaign for Tobacco-Free Kids gave him its Youth Advocates of the Year Award in 1999. For his trial achievements, *BusinessWeek* characterized Ron's courtroom skills as "dazzling." *American Lawyer* dubbed him "The man who took on Manville," and *The National Law Journal* ranked him, "One of the most influential lawyers in America."

## TEAM BIOS:

He authored or co-authored more than two dozen publications, including:

"Decades of Deception: Secrets of Lead, Asbestos and Tobacco" (*Trial Magazine,* October 1999)

"Asbestos Disease Among Railroad Workers: 'Legacy of the Laggin' Wagon'" (*Trial Magazine,* December 1981)

"Asbestos and Lung Cancer," *New York State Journal of Medicine,* June 1980; Volume 80: No.7, New York State Medical Association, New York.

"Occupational Disease and Products Liability Claims" (*South Carolina Trial Lawyers Bulletin,* September and October 1976)

He has also been featured in numerous articles, books and scripts, including:

Shackelford, Susan. "Major Leaguer" (*South Carolina Super Lawyers,* April 2008)

Senior, Jennifer. "A Nation Unto Himself" (*The New York Times,* March 2004)

Freedman, Michael. "Turning Lead into Gold," (*Forbes,* May 2001)

Zegart, Dan. *Civil Warriors: The Legal Siege on the Tobacco Industry.* Delacorte Press, 2000.

Ansen, David. "Smoke Gets in Your Eyes" (*Newsweek,* 1999)

Mann, Michael & Roth, Eric. "The Insider" (Blue Lion Entertainment, November 5, 1999)

Brenner, Marie. "The Man Who Knew Too Much" (*Vanity Fair,* May 1996)

Reisig, Robin. "The Man Who Took on Manville" (*The American Lawyer,* January 1983)

Ron is a member of the American Bar Association, Civil Justice Foundation, Inner Circle of Advocates, International Academy of Trial Lawyers and South Carolina Association for Justice. In 2002, Ron founded the Mark Elliott Motley Foundation, Inc., in loving memory of his son to help meet the health, education and welfare needs of children and young adults in the Charleston, S.C. community.

### Joseph F. Rice

LICENSED IN: DC, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court
U.S. Court of Appeals for the Second, Third, Fourth and Fifth Circuits
U.S. District Court for the District of Nebraska and the District of South Carolina
EDUCATION:
J.D., University of South Carolina School of Law, 1979
B.S., University of South Carolina, 1976

Motley Rice co-founding member Joe Rice is recognized as a skillful and innovative negotiator of complex litigation settlements. As lead private counsel for 26 State Attorneys General, he played a central role in crafting the landmark Master Settlement Agreement, the largest civil settlement in U.S. history, in which the tobacco industry agreed to reimburse states for smoking-related health costs. Over the past two decades, Joe has also been recognized for his role in structuring some of the most significant resolutions of asbestos liabilities on behalf of victims injured by asbestos-related products.

Joe has held leadership and negotiating roles involving the bankruptcies of several large organizations, including AWI, Federal Mogul, Johns Manville, Celotex, Garlock, W.R. Grace, Babcock & Wilcox, U.S. Gypsum, Owens Corning and Pittsburgh Corning. He remains a key player in developing and negotiating the structured settlements of asbestos manufacturers emerging from bankruptcy and has worked on numerous Trust Advisory Committees.

Currently, Joe serves on the Plaintiffs' Steering Committee for the Deepwater Horizon oil spill MDL *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.* As a lead negotiator, he helped reach the two settlements with BP, one of which is the largest civil class action settlement in U.S. history.

Joe also directs the Motley Rice securities litigation team in securities fraud litigation, shareholder derivative cases and actions against proposed merger and acquisition transactions. He is sought by investment funds for guidance on strategies to increase shareholder value and enhance corporate governance reforms and asset recovery through litigation.

Joe continues to negotiate on behalf of the firm's clients in anti-terrorism and human rights, environmental, drugs, devices and catastrophic injury cases. He held a crucial role in executing the strategic mediations and/or resolutions in all of the firm's aviation liability and damages cases against multiple defendants on behalf of families of the victims of the 9/11 attacks who opted out of the Victim Compensation Fund. In addition to providing greater answers, accountability and recourse to victims' families, the resulting settlements shattered a settlement matrix developed and utilized for decades, and the litigation helped provide public access to evidence in an archive of selected discovery materials gathered in the litigation.

## TEAM BIOS:

A frequent guest speaker, Joe has presented as numerous conferences and seminars nationwide, including the National Asbestos Litigation Conference, the National Conference on Public Employee Retirement Systems, the Public Funds Summit, Class Action Settlements: Approval, Distribution and Oversight Workshop and several asbestos bankruptcy and complex litigation conferences.

Described as one of the nation's "five most feared and respected plaintiffs' lawyers in corporate America" in a poll of defense counsel and legal scholars conducted by *Corporate Legal Times,* Joe was cited time after time as one of the toughest, sharpest and hardest-working litigators they have faced. As the article notes, "For all his talents as a shrewd negotiator ... Rice has earned most of his respect from playing fair and remaining humble." Joe was named the *Best Lawyers'®* 2013 Charleston-SC Mass Tort Litigation/Class Actions- Plaintiffs "Lawyer of the Year," and he was a 2012 recipient of the *SC Lawyers Weekly* Leadership in Law Award. In 2011, the University of South Carolina School of Law Alumni Association honored him with its platinum Compleat Lawyer Award, and he was highlighted in the 2011 and 2012 Litigation editions of *The Legal 500 United States* (mass tort and class action: plaintiff representation-toxic tort). The 2012 and 2013 editions of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys* recognized Joe as a "Litigation Star" in its national rankings for mass tort/product liability, as well as its South Carolina rankings in environmental, mass tort and product liability. Recognized as an AV® rated attorney by Martindale-Hubbell®, he has been selected by his peers for inclusion in each annual edition of *The Best Lawyers in America®* since 2007 for his work in mass tort litigation/class actions- plaintiffs. He has been included in every edition of *South Carolina Super Lawyers®* since 2008 and, in 2010, was named by The National Trial Lawyers as one of its *Top 100 Trial Lawyers™* in South Carolina. *The American Lawyer* described Joe in 2006 as "one of the shrewdest businessmen practicing law."

In 1998, Joe received the President's Award of the National Association of Attorneys General. In 1999 and 2000, he served on the faculty at Duke University School of Law as a Senior Lecturing Fellow, and he has taught classes at the University of South Carolina School of Law, Duke University School of Law and Charleston School of Law on the art of negotiating. Joe serves his community through several organizations, including First Tee of Greater Charleston, the Center for Birds of Prey and the Dee Norton Lowcountry Children's Center, for which he co-chaired the inaugural Campaign for the Next Child. In 2010, MUSC Children's Hospital honored Joe with its Johnnie Dodds Award for his longtime support of its annual Bulls Bay Golf Challenge Fundraiser and continued work on behalf of our community's children. The University of South Carolina awarded Joe and his family with its 2011 Garnet Award for their passion for and devotion to Gamecock athletics. Joe was also awarded the 2011 Tom Fazio Service to Golf Award in recognition of his efforts to help promote the SC Junior Golf Association Programs.

He is a member of the American Association for Justice, American Bar Association, American Inns of Court, South Carolina Association for Justice and the American Constitution Society for Law and Policy.

### John A. Baden IV

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Second Circuit, U.S. Bankruptcy Court for the Southern District of New York and Western District of North Carolina
EDUCATION:
J.D., University of South Carolina School of Law, 2002
B.A., College of Charleston, 1996

John Baden represents clients harmed by asbestos exposure in individual and mass tort forums, as well as in complex asbestos bankruptcies, handling complete case management and settlement negotiations for individuals and families suffering from mesothelioma and other asbestos-related diseases.

Working closely with Joe Rice, John also handles the negotiation and complex case resolution of multiple asbestos bankruptcies, including NARCO and W.R. Grace. He manages the related claims processes and directs the firm's team of senior claims administrators.

John has additionally been actively involved with the firm's representation of people and businesses in Gulf Coast communities suffering as a result of the BP Deepwater Horizon oil spill. He held a central role in the negotiation process involving the two settlements reached with BP that will fairly compensate thousands of victims who suffered economic loss, property damage and physical injuries caused by the spill.

John began his legal career as a litigation trial paralegal for Ron Motley in 1997, working with the State Attorneys General on the landmark tobacco litigation primarily in Florida, Mississippi and Texas. He also supported occupational litigation in several states, including the exigent trial dockets of Georgia and West Virginia. John served as a judicial intern for Judge Sol Blatt, Jr., of the U.S. District Court of South Carolina and Judge Jasper M. Cureton of the South Carolina Court of Appeals. After earning a law degree in 2002, John began working with Motley Rice attorneys as part of the Occupational Disease practice group. He was named a Motley Rice member in 2008.

A member of the American Association for Justice and South Carolina Association for Justice, John has lectured on asbestos bankruptcy issues at various legal seminars.

# TEAM BIOS:

## Kimberly Barone Baden

LICENSED IN: CA, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Third Circuit
U.S. District Court for the Central, Northern and Southern Districts of California and District of South Carolina
EDUCATION:
J.D., California Western School of Law, 1999
B.A. *cum laude,* Clemson University, 1996

Kimberly Barone Baden leads the firm's birth defect litigation, representing hundreds of children who were born with congenital birth defects allegedly caused by antidepressants, including Zoloft®, Prozac® and Wellbutrin®; the smoking cessation drug, Zyban®; and the migraine/anti-seizure medication, Topamax®. On July 13, 2012, Kimberly was appointed to the Plaintiffs' Steering Committee in the *In re Zoloft (sertraline hydrochloride) Products Liability Litigation,* MDL 2342. She manages the firm's Avandia® and Crestor® litigations, as well as the Actos® bladder cancer litigation.

Kimberly continues to manage the firm's nursing home abuse and neglect litigation. Representing the elderly, our nation's most defenseless population, she specifically litigates cases on behalf of both nursing home residents and assisted living facility residents who are victims of abuse and neglect nationwide. Published case: *Grant v. Magnolia Manor-Greenwood, Inc.,* 678 S.E.2d 435 (S.C. 2009).

Additionally, Kimberly co-manages the firm's active misappropriated human remains litigation: *In re New York Human Tissue Products Liability Litigation* and co-managed the firm's tainted tissue litigation in both the state and federal multidistrict litigation.

Prior to joining Motley Rice, Kimberly worked on the Fen-Phen diet drug litigation at Harrison, Kemp & Jones in Las Vegas and served as an attorney with the California District Attorney's Office in San Diego.

Recognized as a BV® rated attorney by Martindale-Hubbell®, Kimberly was also selected by her peers for inclusion in the 2013 *South Carolina Super Lawyers® Rising Stars* list. She is a member of the American Association for Justice, American Bar Association and South Carolina Association for Justice.

## Frederick C. Baker

LICENSED IN: NY, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the First, Second, Third, Fourth and Tenth Circuits
U.S. District Court for the Southern District of New York and the District of South Carolina
EDUCATION:
LL.M./J.D., Duke University School of Law, 1993
B.A., University of North Carolina at Chapel Hill, 1985

Fred Baker represents individual and institutional investors, consumers, governmental entities and whistleblowers in complex securities and consumer fraud litigation, including shareholder rights, unfair trade practices and whistleblower/ qui tam claims. He has a diverse complex litigation background and holds a leadership role within firm's environmental and occupational disease and toxic tort teams as well.

Fred has litigated a broad range of complex cases in the environmental, medical costs recovery, consumer and products liability fields. A member of the legal team that litigated the groundbreaking tobacco litigation on behalf of several State Attorneys General, he also participated in the litigation of individual tobacco cases, entity tobacco cases and a tobacco class action.

Fred has served as counsel in a number of class actions, including the two class action settlements arising out of the 2005 Graniteville train derailment chlorine spill and the currently pending West Virginia unfair trade practices insurance class action.

He additionally litigates large scale environmental contamination cases. After representing the state of Oklahoma in a case against poultry integrators alleging that poultry waste polluted natural resources in Eastern Oklahoma, Fred became actively involved with the firm's representation of people and businesses in Gulf Coast communities suffering as a result of the BP Deepwater Horizon oil spill. He held a central role in the negotiation process involving the two settlements reached with BP that will fairly compensate thousands of victims who suffered economic loss, property damage and physical injuries caused by the spill.

Fred began practicing with Motley Rice attorneys in 1994 and currently chairs the firm's attorney hiring committee.

## V. Brian Bevon

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the District of South Carolina and Northern District of Florida
EDUCATION:
J.D., University of South Carolina School of Law, 1992
B.S., Catholic University of America, 1989

Motley Rice member Brian Bevon has spent more than fifteen years representing individuals and families suffering from mesothelioma and other asbestos-related diseases as a result of occupational, environmental and household asbestos exposure.

An integral player in the firm's Occupational Disease and Toxic Tort practice, he continues to fight for the rights of victims harmed by asbestos and other occupational diseases and advocates for the improved health and welfare of the American worker. Brian has also worked with the firm's Environmental team to assist individuals and businesses in their efforts to hold corporate defendants accountable for alleged ground contamination.

Prior to joining Motley Rice attorneys in 1994, Brian practiced real estate, property owners, probate and construction defect law with another South Carolina firm and served on the legislative

staff of Senator Ernest "Fritz" Hollings. He is a proud participant in the Lawyer Mentoring Program of the Supreme Court of South Carolina Commission on Continuing Legal Education and Specialization, serving as a mentor to young lawyers entering the legal profession.

Recognized as a BV® rated attorney by Martindale-Hubbell®, Brian is an active member of the South Carolina Bar Association Fee Disputes Resolution Board, for which he investigates fee dispute issues between attorneys and their clients. Brian is also a member of the American Association for Justice, American Bar Association, Federal Bar Association and South Carolina Association for Justice.

### Michael M. Buchman

LICENSED IN: CT, NY
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court
U.S. Court of Appeals for the Second Circuit
U.S. District Court for the Districts of Connecticut and Southern and Eastern Districts of New York
U.S. Court of International Trade
EDUCATION:
LL.M., International Antitrust and Trade Law, Fordham University School of Law, 1993
J.D., The John Marshall Law School, 1992
B.A. cum laude, Alfred University, 1988

A leader of Motley Rice's antitrust practice, Michael Buchman has more than 20 years of experience litigating antitrust, consumer protection and privacy class actions in federal/state trial and appellate courts. Michael has a diverse antitrust background, having represented as lead or co-lead counsel a variety of plaintiff clients, from Fortune 500 companies to individual consumers, in complex cases covering matters such as restraint of trade, price-fixing, generic drug antitrust issues and anticompetitive "reverse payment" agreements between brand name pharmaceutical companies and generic companies.

Michael served as an Assistant Attorney General in the New York State Attorney General's Office, Antitrust Bureau, after receiving his LL.M. degree in International Antitrust and Trade Law. Also prior to joining Motley Rice, he was a managing partner of the antitrust department at a New York-based class action law firm. He played an active role in resolving two of the largest U.S. multi-billion dollar antitrust settlements since the Sherman Act was enacted, In re NASDAQ Market-Makers Antitrust Litigation and In re Visa Check/Mastermoney Antitrust Litigation, as well as litigated numerous multi-million dollar antitrust cases. Today, he represents the largest retailer class representative in a historic antitrust case—the $7.2 billion case In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, MDL 1720.

Michael has more than thirteen years of experience representing consumers, union health and welfare plans, and health insurers in "generic drug" litigations such as In re Augmentin Antitrust Litigation, In re Buspirone Antitrust Litigation, In re Ciprofloxacin Antitrust Litigation, In re Flonase Antitrust Litigation, In re K-Dur Antitrust Litigation, In re Relafen Antitrust Litigation, In re Tamoxifen Antitrust Litigation, In re Toprol XL Antitrust Litigation and In re Wellbutrin SR Antitrust Litigation. He also has experience litigating a large aviation antitrust matter, as well as aviation crash, emergency evacuation and other aviation cases in federal and state court.

Michael completed the intensive two-week National Institute for Trial Advocacy National Trial Training program in Boulder, Colo., in 2002. An avid writer, he has authored and co-authored articles on procedure and competition law, including a Task Force on Dealer Terminations for The Association of the Bar of the City of New York, Committee on Antitrust and Trade Regulation, entitled Dealer Termination in New York dated June 1,1998 and What's in a Name - the Diversity Death-Knell for Underwriters of Lloyd's of London and their Names; Humm v. Lombard World Trade, Inc., Vol. 4, Issue 10 International Insurance Law Review 314 (1996).

Michael is active in his community, serving as a member of the Flood and Erosion Committee for the Town of Westport, Ct., and as pro bono counsel in actions involving the misappropriation of perpetual care monies. He has also coached youth ice hockey teams at Chelsea Piers in New York City.

### Samuel B. Cothran Jr.
### General Counsel

LICENSED IN: NC, SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the Western District of North Carolina and District of South Carolina
EDUCATION:
J.D., cum laude, University of South Carolina School of Law, 1998
M.B.A., Duke University, 1994
B.S., summa cum laude, University of South Carolina, 1981

Sam Cothran leads Motley Rice's legal department, directing and advising the firm's management on diverse in-house legal matters. He supervises and handles legal matters and opinions regarding governmental compliance, contracts and legal defense. He works closely with the firm's practice group leaders and executive administrative team members on labor and employment, marketing, financial and operational issues. Sam is also responsible for proactively addressing the complex ethical challenges inherent in practicing law, such as multi-jurisdictional and international practice.

After working for an international accounting firm as a certified public accountant and for several Fortune 1,000 companies as a financial manager, Sam attended law school to complement his

# TEAM BIOS:

background in business management and finance and joined Motley Rice attorneys shortly after graduation. Sam enjoys creatively addressing the many challenges and opportunities inherent in the cutting-edge practice of a dynamic, multi-jurisdictional law firm.

Recognized as a BV® rated attorney by Martindale-Hubbell®, Sam is a member of the American Bar Association, the Association of Professional Responsibility Lawyers, the American Institute of Certified Public Accountants and the South Carolina Association of Certified Public Accountants. As a law student, Sam served as Managing Editor of the *South Carolina Law Review*. He was named a Carolina Legal Scholar and awarded both the Order of the Coif and Order of the Wig and Robe. Sam is the author of *Dischargeability Of Consumer Credit Card Debt In Bankruptcy After Anastas v. American Savings Bank*, 48 S.C.L. Rev. 915 (1997).

## Kevin R. Dean

LICENSED IN: GA, MS, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Third, Fourth, Fifth and Eleventh Circuits, U.S District Court for the Middle, Northern and Southern Districts of Georgia, Central District of Illinois, Northern and Southern Districts of Mississippi and District of South Carolina
EDUCATION:
J.D., Cumberland School of Law, 1991
B.A., Valdosta State University, 1989

Kevin Dean focuses his litigation efforts on catastrophic injury, products liability, and wrongful death cases. As co-leader of Motley Rice's catastrophic injury practice group, Kevin represents individual victims and families affected by tragic events caused by hazardous consumer products, occupational and industrial accidents, fires, premise injuries and other incidents of negligence. He served as lead plaintiffs' counsel in *In re Charleston Firefighter Litigation*, a wrongful death and negligence case against Sofa Super Store, contractors and multiple furniture manufacturers on behalf of the families of the nine firefighters lost in the June 2007 warehouse fire in Charleston, S.C.

Since the 2010 explosion of the Deepwater Horizon, Kevin has been helping people and businesses pursuing litigation, as well as those needing help filing and negotiating their claims. He served as a member of the oil spill MDL's GCCF Jurisdiction & Court Oversight Workgroup and is now helping victims file claims through the new claims programs established by the two settlements reached with BP.

Kevin has maintained a leadership role since 2005 in litigating hundreds of cases alleging illegal organ harvesting, as well as potentially diseased human tissue and organ transplants. He is actively involved with malpractice, defective medical devices and drug litigation. Additionally, Kevin litigates vehicle defect cases, including against "the Big Three" automotive manufacturers in cases involving defective brakes, door locks, door latches, seat belts and roll overs. He was trial co-counsel

in *Guzman v. Ford* (2001), the first case brought to trial regarding a hidden defective outside door latch handle, as well as in the vehicle rollover case *Hayward v. Ford* (2005).

Prior to joining Motley Rice, Kevin was a partner with the Law Offices of J. Edward Bell III, LLC. Before moving to South Carolina, he was a member of the William S. Stone, P.C. law firm, and he began his career as an associate with The Bennett Law Firm. His experience includes the health insurance fraud and post-claims underwriting case *Clark v. Security Life Insurance Company*, the largest civil RICO case in Georgia history, and *Wiggins v. Parsons Nursery*, one of the largest environmental and health contamination cases in South Carolina. Kevin also served as a County Commissioner on the Early County Georgia Board of Commissioners and still has the distinguished honor of having been the youngest elected commissioner in county history.

Kevin frequently appears in local and national broadcast and print media discussing legal matters of workplace safety, fire prevention and other products liability, as well as specific casework and efforts for changes and improvements in various industries. The 2012 and 2013 editions of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys* recognized Kevin as a "Litigation Star" in its national rankings for mass torts/product liability, as well as its South Carolina rankings in product liability. Martindale-Hubbell® recognizes Kevin as a BV® rated attorney.

He is a member of the American Association for Justice, Georgia Trial Lawyers Association and South Carolina Association for Justice. He co-authored "Dangerous Doors and Loose Latches," published in *Trial Magazine* (2004) for the American Association for Justice (formerly Association of Trial Lawyers of America), and authored "The Right to Jury Trial in ERISA Civil Enforcement Actions" published in *The American Journal of Trial Advocacy* (1989).

## Michael E. Elsner

LICENSED IN: NY, SC, VA
ADMITTED TO PRACTICE BEFORE:
U.S District Court for the Eastern and Southern Districts of New York
EDUCATION:
J.D., University of Memphis Cecil C. Humphreys School of Law, 1997
B.A., John Carroll University, 1993

Michael Elsner manages complex, cross-border litigation and intricate investigations of infringement and abuse of human rights, multi-layered financial transactions and due diligence. He litigates complex civil matters on behalf of individuals and businesses victimized by commercial malfeasance, violations of human rights, inadequate security measures and state-sponsored terrorism. As a key member of Motley Rice's Anti-Terrorism and Human Rights practice group, Michael is using the U.S. civil justice system to seek social change and improved protection of Americans at home and abroad.

## TEAM BIOS:

Michael's understanding of the complex legal challenges of international matters is critical to litigating cases involving human rights and financial dealings. He is highly proficient in the use of legal mechanisms to track illicit finances, and his investigations through the maze of international banking and financial regulations continue to uncover violations that have allowed money laundering and terrorist financing. Michael is building upon legal theories and case precedents to represent plaintiffs harmed by financial crimes and actions and hold the global institutions and organizations accountable.

Michael is a lead plaintiffs' counsel in *Almog v. Arab Bank,* a suit brought on behalf of American and Israeli victims of terrorist attacks trying to prevent the financing of more terrorists and help bring peace to the Middle East region. In addition, he currently leads the worldwide investigation for liability evidence in the 9/11 Families United to Bankrupt Terrorism civil action against al Qaeda's alleged financiers and supporters. In this capacity, Michael meets with U.S. and foreign intelligence officers, witnesses, and informants, who have already helped him gather more than two million pages of documents in numerous languages identifying the activities of al Qaeda and its financiers. He is a member of the Plaintiffs' Steering Committee for this multidistrict litigation filed on behalf of more than 6,500 families and survivors of the September 11, 2001 attacks. He also served as a member of the Plaintiffs' Committee in *In re September 11th Litigation,* a suit brought against the airline industry alleging that it failed to detect and prevent the September 11, 2001 attacks.

Michael is also leading the firm in a consultation role to South African human rights lawyer Richard Spoor in the effort to take on leading global gold producers, seeking justice for tens of thousands of exploited gold mine workers suffering from silicosis. Few class actions have been brought in South Africa, and none have been filed for sick workers. If approved as a class, the suit would generate an unprecedented means of recovery for the country and ensure meaningful access to justice for the indigent and rural workers who are dying from this entirely preventable yet incurable disease.

Michael's work with financial transaction litigation includes commercial, securities fraud and shareholder derivative cases such as his extensive work on behalf of domestic and foreign investors in *In re Vivendi Universal, S.A. Securities Litigation.* Michael began his career with the Manville Personal Injury Trust and then practiced complex civil litigation in New York in the areas of toxic torts, security, personal injury, bankruptcy, and whistleblower protections prior to joining Motley Rice attorneys in 2002.

Sharing his experience and insight as a lecturer and consultant, Michael has discussed anti-terrorism and human rights litigation on several national and international news outlets, including CNN, MSNBC, NPR and the BBC, as well as international anti-money laundering and anti-terrorism industry conferences. Michael was named to the 2010 edition of the *Lawdragon™ 3,000.* He is a member of the American Association for Justice, American Bar Association, New York Bar Association, South Carolina Bar Association, Virginia Bar Association, National Crime Victims Bar Association, and Public Justice.

### Nathan D. Finch

LICENSED IN: DC, VA
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Third, Fourth, Fifth, Sixth and Tenth Circuits, U.S. District Court for the District of Columbia and the Eastern District of Virginia
EDUCATION:
J.D., University of Virginia School of Law, 1992
B.A., University of Virginia, 1989

Nate Finch brings almost twenty years of experience in complex civil litigation and trial work to Motley Rice. With a diverse background, as well as strong trial and negotiation skills, he holds a central role in the firm's work representing clients in various asbestos, toxic tort, commercial, securities fraud and other complex cases. Nate has served as the lead trial attorney for his clients in many federal and state courts and is sought after by co-counsel for advice on challenging cases and complex legal matters.

Nate's thorough knowledge of asbestos and medical issues is an asset to the firm's occupational disease and toxic tort clients. He has obtained plaintiffs' verdicts in cases against asbestos product manufacturer defendants and cigarette makers. He has extensive experience trying cases involving a wide variety of asbestos-containing products, including gaskets, automotive brakes, floor tiles, joint compounds, and various forms of insulation. He also has years of experience representing individuals, companies and creditors' committees in personal injury litigation, mass torts products liability litigation, securities and financial fraud litigation and an array of other complex litigation cases ranging from single plaintiffs' products liability cases to high-stakes business disputes.

Prior to joining Motley Rice, Nate was a partner for more than ten years in a Washington, D.C.-based law firm and frequently collaborated with Motley Rice attorneys in trials and negotiations to resolve large asbestos product manufacturers' bankruptcies. He tried numerous cases in federal district courts focusing on the medical and scientific factors associated with asbestos-related diseases and asbestos exposure. During this time, he also tried and helped to resolve in favor of his clients five asbestos bankruptcy cases, each having more than $1 billion at stake. In addition, Nate worked closely with Motley Rice attorneys on behalf of investors in *In re MBNA Securities Litigation* and *In re Vivendi Universal, S.A. Securities Litigation.*

Nate's understanding of the factual and legal challenges inherent in complex cases, combined with his trial experience, has positioned him as a considerable resource within many practice areas. A frequently invited speaker regarding a variety of legal matters, he has spoken at many asbestos litigation and bankruptcy conferences and has been a guest lecturer at the Georgetown University, George Washington University and University of Baltimore law schools on topics relating to civil procedure, mass tort litigation and the differences between litigating in Article III and Article I courts.

# TEAM BIOS:

Nate was honored in 2013 with the American Association for Justice (AAJ) Wiedemann & Wysocki Award, a national award honoring members for going above and beyond their commitments to the principles of the civil justice system and AAJ's mission. Recognized as a Martindale Hubbell® AV® rated attorney, Nate was named a "Local Litigation Star" in the 2012 and 2013 editions of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys* in its Washington, D.C., rankings in product liability and securities. He was additionally recognized as a "Local Litigation Star" in the 2013 fifth annual edition of *Benchmark Litigation, The Definitive Guide to America's Leading Litigation Firms & Attorneys* for his work in civil litigation, creditors' rights and white-collar crime. Nate was selected by his peers for inclusion in both the 2012 and 2013 *Washington, D.C. Super Lawyers®* lists and was also ranked a "Top Lawyer" in the 2009 and 2010 editions of *Chambers USA* in bankruptcy and restructuring. He is a member of the American Association for Justice and The Barristers. A graduate of the University of Virginia and the University of Virginia School of Law, Nate was a member of the *Virginia Law Review* and the Order of the Coif.

In addition to his professional activities, Nate has served his community for many years through volunteer activities coordinated by Greater D.C. Cares, an organization committed to connecting volunteers with community service groups. He is a former scholarship track and cross country athlete at UVA.

## Fidelma L. Fitzpatrick

LICENSED IN: DC, MA, NY, RI
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the First, Seventh and Eleventh Circuits, U.S. District Court for the District of Columbia, District of Massachusetts, District of Rhode Island and Eastern District of Wisconsin
EDUCATION:
J.D., *cum laude,* American University, 1994
B.A., Canisius College, 1991

Fidelma Fitzpatrick litigates environmental contamination claims on behalf of various states, cities, counties and individuals. She held a central role in the state of Rhode Island's lead paint trial against former corporate manufacturers of lead paint. Fidelma continues to manage cases seeking to hold the lead paint industry accountable for the childhood lead poisoning crisis and provide restitution and compensation to affected children and families. As a result of her work for lead poisoning victims, the Wisconsin State Supreme Court became the first to recognize the legal rights of poisoned children to sue lead pigment manufacturers. She worked on similar litigation filed by the City of New York and the City and County of San Francisco.

In addition to her work on lead poisoning issues, Fidelma represents communities and individuals in other toxic tort and environmental matters, including property damage and personal injury claims. She played a lead role in representing the community of Tallevast, Florida, in a lawsuit against Lockheed

Martin Corporation involving the pollution of the community's groundwater with PCE and TCE. Fidelma is currently litigating nuclear contamination cases on behalf of Pennsylvania residents who allege that local nuclear facilities exposed them to hazardous levels of toxic or radioactive material in the surrounding air, soil and water. Those cases, involving both personal injuries and property damage, are pending in federal court.

Fidelma's experience with complex civil litigation has also led her to represent other victims of corporate malfeasance. She plays a central role in representing hundreds of women allegedly harmed by transvaginal mesh/sling products in filed cases against defendants that include Boston Scientific, C.R. Bard, Inc., and Johnson & Johnson. She serves as co-liaison counsel in the *In re Bard Litigation* in New Jersey state court, as well as state court liaison counsel in both Delaware and Massachusetts. In 2012, Fidelma was also appointed co-lead counsel of the pelvic mesh MDL *In re American Medical Systems, Inc., Pelvic Repair Systems Products Liability Litigation.*

Fidelma began working with Motley Rice attorneys in 1997 on the Massachusetts, New York and Rhode Island groundbreaking lawsuits against the tobacco industry. She is the author of "Painting Over Long-Standing Precedent: How the Rhode Island Supreme Court Misapplied Public Nuisance Law in *State v. Lead Industries* Association" in the Roger Williams University Law Review (Summer 2010) and also has co-authored several other law articles, including "Access to Justice: The Use of Contingent Fee Arrangements by Public Officials to Vindicate Public Rights" in *Cardozo J.L. & Gender* (Spring 2008) and "Negligence in the Paint: The Case for Applying the Risk Contribution Doctrine to Lead Litigation" in *Pace Environmental Law Review* (Fall 2008). She frequently speaks on environmental and mass tort topics at conferences for federal and state court judges, attorneys, academic professionals and law students.

Fidelma was highlighted in the 2013 Litigation edition of *The Legal 500 United States* for her work in mass tort and class action: plaintiff representation- toxic tort. In recognition of her legal work on the Rhode Island lead paint case, *Rhode Island Lawyers Weekly* named Fidelma a 2006 Rhode Island Lawyer of the Year, and she was a 2006 finalist for the Public Justice Foundation's Trial Lawyer of the Year award. In 2010, The National Trial Lawyers named her one of its *Top 100 Trial Lawyers™* in Rhode Island. Fidelma has been selected by her peers for inclusion in the 2008 and 2010–2013 editions of *New England Super Lawyers®* and *Rhode Island Super Lawyers®*. She has also been listed every year since 2008 in *The Best Lawyers in America®* for her work in mass tort litigation/class actions- plaintiffs.

Named a Motley Rice member in 2006, Fidelma serves as a volunteer attorney with the American Civil Liberties Union. She is a member of the American Association for Justice, American Bar Association, Public Justice, Rhode Island Association for Justice and Rhode Island Women's Bar Association. She also serves on the Science Advisory Board at Canisius College and as the Rhode Island State Coordinator for the Public Justice Foundation.

## TEAM BIOS:

### Jodi Westbrook Flowers

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Fourth Circuit and District of Columbia Circuit
U.S. District Court for the District of South Carolina
EDUCATION:
J.D., University of South Carolina School of Law, Carolina Legal Scholar, 1993
B.A. magna cum laude, College of Charleston, 1989

Jodi Flowers leads Motley Rice's Anti-Terrorism and Human Rights practice group, the legal team that brought the groundbreaking complex litigation against the financiers and material supporters of al Qaeda. She represents thousands of family members and survivors of Sept. 11, 2001, in a pioneering civil action to hold al Qaeda's sponsors accountable and cut off the terror support pipeline, and she serves on the Plaintiffs' Executive Committee for the *In re Terrorist Attacks on September 11, 2001* litigation consolidated by the Multidistrict Litigation Panel. She was also an integral member of the Motley Rice aviation security litigation team seeking accountability and change in aviation security following the 9/11 attacks.

Jodi handles a variety of other anti-terrorism cases regarding the state-sponsorship of international terrorism, as well as human rights litigation involving violations of international law and human rights abuses. Using her experience in complex case resolution, she served as the lead negotiator in the last hold-out of the individual cases against Libya for the Lockerbie bombing of Pan Am Flight 103.

Additionally, Jodi has worked on toxic environmental cases in the Virgin Islands involving leaking gas tanks, and she is currently helping Deepwater Horizon oil spill victims file claims through the new claims programs established by the two settlements reached with BP.

Jodi's legal career has included developing, researching and managing complex litigation and class actions on behalf of injured consumers and citizens in lawsuits and trials involving tobacco, asbestos, lead pigment, aviation, transportation and vehicle defects. She litigated against lead paint/pigment manufacturers, Bridgestone/Firestone for injuries caused by tire defects cases, and the telecom industry for wiretapping. She has served on numerous MDL Executive Committees and Subcommittees. Currently, she plays an active role in litigating multiple complex securities fraud cases and shareholder derivative suits.

Jodi began her career applying restitution and fraud theories to the litigation against the tobacco industry which resulted in the historic Master Settlement Agreement between the state attorneys general and the tobacco industry. She developed expert and whistleblower testimony, synthesized millions of pages of documents and prepared the tobacco cases for trial. She prepared the false-marketing and child targeting case against the tobacco industry which resulted in restrictions on cartoon ads and the retirement of Joe Camel.

Jodi has been interviewed by various media outlets, including U.S. and foreign television, radio and print media, and is the author of "Remarks on the GJIL Symposium on Corporate Responsibility and the Alien Tort Statute," *Georgetown Journal of International Law,* Volume 43 - Issue 4, Summer 2012. (43 Geo. J. Int'l. L. 1601). She provides pro bono work on a variety of global, national and community issues and helped establish the firm's Charitable Contributions Committee. The 2012 and 2013 editions of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys* recognized Jodi as a "Litigation Star" in its national rankings for civil rights/human rights and mass tort/product liability, as well as its South Carolina rankings in environmental, human rights, mass tort and securities. She was also named to the 2010, 2011 and 2012 editions of *The Lawdragon™ 500 Leading Lawyers in America* list for her work in plaintiffs' litigation, and is recognized as a BV® rated attorney by Martindale-Hubbell®.

Jodi serves on the International Law Committee of the South Carolina Bar and is a member of the American Association for Justice, the South Carolina Association for Justice, the American Bar Association, the Charleston Bar Association and the Daughters of the American Revolution.

### Vincent L. Greene IV

LICENSED IN: RI
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the District of Rhode Island
EDUCATION:
J.D., George Washington University, 1998
B.A., College of the Holy Cross, 1995

Vin Greene works on behalf of victims of lead poisoning and asbestos-related diseases. He represents children and families poisoned by exposure to lead paint and pigments in trials, negotiations and settlements. Vin's legal efforts led to his critical role in defeating tort reform legislation in Rhode Island, utilizing testimony, analysis and grassroots outreach to push passage of a bill that helped prevent childhood lead poisoning without infringing on victims' rights. For his numerous efforts and accomplishments, the Childhood Lead Action Project honored him with its Beyond the Call of Duty Award in 2001.

Currently, Vin represents workers and families suffering from mesothelioma and other asbestos-related diseases as a result of occupational, environmental or household exposure to asbestos. He has managed asbestos cases and negotiations on behalf of hundreds of individuals, including arguing before the Supreme Courts of Ohio and Rhode Island.

Vin began working with Motley Rice attorneys in 1997 on the landmark litigation against the tobacco industry and medical malpractice cases. Both the 2012 and 2013 editions of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys* recognized him as a "Local Litigation

## TEAM BIOS:

Star" in the Rhode Island rankings in environmental, medical malpractice and toxic tort. Martindale-Hubbell® recognizes Vin as a BV® rated attorney.

Named a Motley Rice member in 2008, Vin is a member of the American Association for Justice and American Civil Liberties Union. He additionally serves on the Board of Directors for the Rhode Island Association for Justice.

### John E. Herrick

LICENSED IN: MD, SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the Central District of Illinois, District of Maryland, District of South Carolina, Eastern and Western Districts of Wisconsin
EDUCATION:
J.D., University of South Carolina School of Law, 1988
B.A., University of South Carolina, 1983

John Herrick has spent more than 20 years representing victims of asbestos exposure suffering from mesothelioma and other asbestos-related diseases. As a leader of the firm's occupational disease practice, John continues to fight for the rights of those harmed by asbestos and other occupational diseases and assists in managing the firm's asbestos litigation teams. A senior trial lawyer with years of courtroom experience, John represents individuals and families against defendants which manufactured and sold defective and unreasonably dangerous asbestos-containing products and equipment, as well as premise owners and contractors who specified and installed those products.

John has litigated asbestos cases resulting from occupational, environmental and household exposure, receiving verdicts in hundreds of matters. Most recently, John was lead trial counsel in a welding fume verdict for the plaintiff on behalf of a welder who developed manganism from exposure to welding fumes. He won the first affirmed jury verdict in the United States for a domestic, asbestos- exposed mesothelioma victim in the Marie Granski case and achieved the first verdict in the United States against SCAPA US, the former manufacturer of asbestos-containing dryer felts. John also worked as lead trial counsel in the Harlow trial group, cited as a top 100 case of the year by *The National Law Journal,* and litigated a personal injury case against a tobacco company for a plaintiff harmed by the use of asbestos in cigarette filters.

John was highlighted in the 2009, 2011 and 2012 Litigation editions of *The Legal 500 United States* (mass tort and class action: plaintiff representation- toxic tort) and was given an AV® rating by Martindale-Hubbell®. He is a member of the American Association for Justice, American Bar Association and South Carolina Association for Justice. He also serves as a frequent guest speaker at asbestos litigation-related seminars.

### James M. Hughes, Ph.D.

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court, U.S. Court of Appeals for the First and Fourth Circuits, U.S. District Court for the District of South Carolina
EDUCATION:
J.D., University of South Carolina School of Law, 1993
Ph.D., University of Illinois, Chicago, 1983
M.A., University of Illinois, Chicago, 1976
B.A., University of Minnesota, 1975

Jim Hughes practices securities fraud and shareholder litigation on behalf of institutional investors, public pension funds and unions. A former professor of philosophy, Jim's practice includes developing strategic legal arguments and drafting legal complaints and lead plaintiff motions. He plays a key role in cases involving corporate governance issues, shareholder derivative lawsuits and consumer and securities fraud.

Jim previously concentrated his practice on occupational disease and toxic torts, representing individuals such as steel and chemical workers injured by the exposure to silica and asbestos in the workplace. His efforts on behalf of occupational disease victims led to his arguing before appellate courts in Illinois and Minnesota. He shared his experience with silica litigation and product identification at several national conferences, addressing the plaintiff's perspective and other pertinent issues.

A published author on several legal and academic themes, Jim's law review article, "Informing South Carolina Capital Juries About Parole" (44 S.C. Law Review 383, 1993) was cited in 2000 by U.S. Supreme Court Justice John Paul Stevens in his dissenting opinion in Ramdass v. Angelone. His reported opinions include Ison *v. E.I. DuPont de Nemours & Co.* (Del. 1999), *In re Minnesota Asbestos Litigation* (Minn., 1996), *W.R. Grace & Co. v. CSR Ltd.,* (Ill. App. Ct. 1996) and *In re Tutu Wells Contamination Litigation* (D.V.I. 1995).

Jim began his legal career with the plaintiffs' bar after clerkships with the South Carolina Office of Appellate Defense and a business, employment and intellectual property defense firm. He is recognized as an AV® rated attorney by Martindale-Hubbell® and is a member of the American Association for Justice and the South Carolina Association for Justice.

## TEAM BIOS:

### Rebecca M. Katz

LICENSED IN: NY
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Second Circuit
U.S. District Court for the District of Colorado, and Southern, Eastern and Western Districts of New York
EDUCATION:
J.D., Hofstra University School of Law, 1990
B.S., Hofstra University, 1987

Rebecca Katz brings to Motley Rice's Securities and Consumer Fraud team more than 20 years of complex litigation experience, including experience as a former senior counsel for the SEC's Enforcement Division and an extensive background in both *qui tam* and SEC whistleblower cases. Rebecca currently represents individuals in SEC whistleblower litigation, as well as institutional investors in securities fraud class and individual actions. She is the managing member of the firm's New York office and leads its SEC whistleblower practice.

Prior to joining Motley Rice, Rebecca was a partner at a large New York firm, where she played a central management role in a number of major cases. She represented the Republic of Iraq and the Iraqi people in *Republic of Iraq v. ABB AG, et al.*, No. 08-CV-5951 (S.D.N.Y.), a case alleging corruption of the Oil-for-Food Programme that was established by the United Nations in 1995 to help provide basic necessities to Iraqi citizens. As a member of the Plaintiffs' Executive Committee for *In re Initial Public Offering Securities Litigation*, No. 21-MC-92 (S.D.N.Y.), which ultimately settled for $586 million, she oversaw the hundreds of coordinated actions involved in the litigation. In addition, Rebecca has represented the Public Employees Retirement Association of New Mexico and the New Mexico Educational Retirement Board in individual securities cases against numerous defendants, including Wells Fargo & Company, for their alleged breach of contract and fiduciary duty in connection with certain investments in a securities lending program.

Rebecca is a regular guest speaker at legal conferences throughout the country, including public pension and Taft-Hartley fund conferences, and has presented on issues that include emerging developments in securities litigation and the SEC whistleblower provisions of the Dodd-Frank Act, as well as complex and class action litigation. As a former faculty member at the Practising Law Institute's Securities Litigation & Enforcement Institute, she explored a variety of issues impacting securities law and lectured at the Fordham University School of Law's Eugene P. and Delia S. Murphy Conference on Corporate Law— Corporations, Investors and the Securities Markets. Rebecca has published numerous articles, including "Plaintiffs' Perspective: The SEC's Final Rules for Whistleblowers Offer a Balanced Approach to an Important New Program," *Securities Litigation Report* (with James M. Weir), July/August 2011; and "The Dodd-Frank Act: New Life for Whistleblowers and the SEC," *Securities Litigation Report* (with David B. Harrison), September 2010.

Rebecca's securities litigation experience earned her recognition in the 2013 edition of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys*, which honored her as a "Local Litigation Star" in the New York rankings in securities. She was selected by her peers for inclusion in the 2008, 2009, 2010 and 2013 editions of *New York Metro Super Lawyers®* and in the 2011 *Super Lawyers®* Business Edition in the litigation practice area. She was also recommended in the 2012 Litigation edition of The *Legal 500 United States* for her work in mass tort and class action: plaintiff representation – securities.

Rebecca earned a law degree from Hofstra University School of Law, where she was a member of the *Hofstra Law Review*. She is a member of the New York City Bar Association Securities Litigation Committee.

### Anne McGinness Kearse

LICENSED IN: DC, SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the Eastern District of New York, Eastern and Western Districts of Pennsylvania and District of South Carolina
EDUCATION:
J.D. cum laude, University of South Carolina School of Law, 1998
B.S., Syracuse University, 1983

Anne McGinness Kearse focuses her practice on severe personal injury, representing children and adults in cases involving workplace injuries, toxic exposure, catastrophic burns, brain damage, loss of limb and paralysis, as well as wrongful death resulting from negligence and defective products. Through litigation, she has spent more than a decade seeking to hold accountable numerous corporations that put profits before safety, from the asbestos and tobacco companies to various consumer product manufacturers. Anne's work has been instrumental in causing the implementation of better safety practices and corporate governance measures and holding companies accountable for consumers' health and safety. She serves in a managing role for the firm's occupational health and catastrophic injury practice groups.

Anne works closely with families suffering from extreme and life-altering injuries caused by negligent manufacturing or management. She represents people severely burned by the ethanol-based fuel gel used in decorative firepots and is a member of the Motley Rice team litigating dozens of claims against manufacturers Napa Home and Garden, Inc., and Fuel Barons, Inc., and their insurers. Additionally, she represents a West Virginia resident seriously injured by carbon monoxide poisoning while a hotel guest and recently resolved a suit filed by a family whose young daughter suffered brain damage after a near drowning.

During law school, Anne supported the legal team representing the State Attorneys General in the historic lawsuit against Big Tobacco, which resulted in the largest civil settlement in U.S.

# TEAM BIOS:

history. After graduation, she helped litigate *Falise v. American Tobacco Company* and began representing asbestos victims. Today, she continues to represent people diagnosed with the devastating, deadly occupational disease mesothelioma caused by asbestos exposure in the chemical, electric power generation, steel or construction industries. She also litigates asbestos claims for household exposure victims, including children and housewives who developed mesothelioma or other asbestos-related diseases because they were exposed to asbestos a family member brought home on clothes or belongings.

Anne has tried several noteworthy cases, including *Cox vs. A&I Company*, West Virginia's first domestic asbestos exposure case, and the 2002 West Virginia Consolidated Asbestos Trial against Union Carbide in which the company was found to have maintained unsafe working conditions at its plants throughout the state. In addition to maintaining an active trial schedule, Anne represents Canadian Workers' Compensation Boards in U.S. courts to recoup benefits they paid Canadian asbestos victims.

Anne has written several articles of interest to the plaintiffs' bar and frequently speaks on asbestos litigation, general product liability and tort reform at seminars across the country. She has been published on major legal issues, including *forum non conveniens* and defective products abroad, corporate misconduct, medicolegal aspects of asbestos litigation and mass tort litigation. Anne contributed to the 12th chapter of the book, "Pathology of Asbestos-Associated Diseases" (*Medicolegal Aspects of Asbestos-Related Diseases: A Plaintiff's Attorney's Perspective*, 2nd ed., 2004). Edited by Victor L. Roggli, MD; Tim D. Oury, MD, PhD; and Thomas A. Sporn, MD, this publication is a comprehensive asbestos reference book used by both physicians and attorneys.

Anne's peers selected her for inclusion in the 2011, 2012 and 2013 editions of *The Best Lawyers in America®* for her work in mass tort litigation/class actions- plaintiffs, and both the 2012 and 2013 editions of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys* recognized her as a "Litigation Star" in both its national and South Carolina rankings for mass tort/product liability. The National Trial Lawyers named her in 2010 as one of its Top 100 Trial Lawyers™ in South Carolina. She was also highlighted in the 2009, 2011 and 2012 Litigation editions of *The Legal 500 United States* (mass tort and class action: plaintiff representation- toxic tort). Anne was selected by her peers for inclusion in the 2013 *South Carolina Super Lawyers®* list and is recognized as a BV® rated attorney by Martindale-Hubbell®.

In 2012, Anne was elected to the Board of Governors for the South Carolina Association for Justice and asked to serve on its Legislative Policy Working Group. She was also elected in 2012 to be the South Carolina state delegate to the Board of Governors of the American Association for Justice. She serves as a chair of the AAJ Committee on Asbestos Education for the Asbestos Litigation Group and Vice-Chair for STEP (Section of Toxic, Environmental and Pharmaceutical Torts). In 2011, Anne

was re-elected to the Public Justice Foundation's Board of Directors and, in 2012, was elected to serve on the Foundation's Executive Committee. She also serves as Treasurer for the Public Justice Foundation. She was named in 2011 to the Executive Board for Safe Kids Trident Coalition, a local chapter of Safe Kids USA, to advocate for childhood injury prevention.

Anne is a member of the American Association for Justice, American Bar Association, South Carolina Association for Justice and Litigation Counsel of America Trial Lawyer Honorary Society. A University of South Carolina School of Law bronze Compleat Award recipient, she is also a member of the Order of the Coif, Order of the Wig and Robe, John Belton O'Neal Inn of Court and the James L. Petigru Chapter of the American Inns of Court.

## Marlon E. Kimpson

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the District of South Carolina
EDUCATION:
J.D., University of South Carolina School of Law, 1999
B.A., Morehouse College, 1991

Marlon Kimpson represents victims of corporate malfeasance, from investors in securities and consumer fraud cases to people injured or killed in aviation disasters and other catastrophic incidents. Building upon the firm's relationships with unions and governmental entities, Marlon represents individuals, state and municipality pension funds, multi-employer plans, unions and other institutional investors in securities fraud class actions and mergers and acquisition cases to help recover assets and improve corporate governance. Marlon has worked on shareholder derivative litigation and on mergers and acquisitions cases that include: *In re Atheros Communications, Inc., Shareholder Litigation, In re Celera Corporation Shareholder Litigation, In re RehabCare Group, Inc., Shareholders Litigation* and *In re Coventry Healthcare, Inc., Shareholder Litigation*. Marlon currently serves as South Carolina State Senator of District 42, representing citizens of Charleston and Dorchester Counties.

Marlon joined Motley Rice attorneys in 2000 and has played an integral role in developing the firm's catastrophic injury, aviation, asbestos and securities fraud practice groups. He has worked as a member of the aviation team on commercial and charter aviation cases with clients, defendants and accidents involving multiple countries. He has also worked with the Environmental team to represent people and businesses that need help filing their claims under the new claims programs established by the two Deepwater Horizon BP oil spill settlements.

A frequent speaker, Marlon has presented at seminars and conferences across the country, including the Public Funds Summit, the National Association of State Treasurers, the South Carolina Black Lawyers' Association, the National Conference on Public Employee Retirement Systems (NCPERS) and the National Association of Securities Professionals (NASP).

After five years in commercial banking, Marlon earned a law degree before serving as a law clerk to Judge Matthew J. Perry of the U.S. District Court of South Carolina. His work in the legal field was recognized by *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys,* which named Marlon in 2012 as a "Litigation Star" in its national rankings for mass tort/product liability and, in both 2012 and 2013, as a "Local Litigation Star" in its South Carolina rankings in environmental, mass tort and securities. His legal work and volunteer service also earned him the University of South Carolina School of Law bronze Compleat Award. Martindale-Hubbell® recognizes Marlon as a BV® rated attorney.

Marlon is active in his community and formerly served on the Board of Directors for the Peggy Browning Fund. He has also held leadership roles with the University of South Carolina Board of Visitors, the Charleston Black Lawyers Association and the South Carolina Election Commission. He is a lifetime member of the NAACP and a member of the American Association for Justice, American Bar Association, National Bar Association, South Carolina Association for Justice, Sigma Pi Phi Boulé and Omega Psi Phi fraternity.

### Mark I. Labaton

LICENSED IN: CA, DC
ADMITTED TO PRACTICE BEFORE:
Supreme Courts of California, the District of Columbia and Pennsylvania; U.S. Court of Appeals for the First, Second, Third, Fifth, Seventh, Ninth and D.C. Circuits; U.S. District Court for the Districts of Colorado, Massachusetts, Utah, and District of Columbia, Western District of Washington, Central, Northern, Southern and Eastern Districts of California
EDUCATION:
J.D., Duke University School of Law, 1988
M.A., Northwestern University Medill School of Journalism, 1981
B.A., Oberlin College, 1980

As a former federal prosecutor, Mark Labaton is a long-standing advocate for corporate responsibility and financial accountability. For many years, Mark has litigated complex securities fraud, whistleblower, shareholder rights, corporate governance, insurance, financial fraud and consumer fraud cases. He currently serves as managing partner of the firm's Los Angeles office, Motley Rice LLP, and leads its *qui tam* whistleblower litigation team.

Mark has been instrumental in securing multiple settlements and judgments for his clients totaling close to $1 billion. He has served as lead attorney or played an integral role in prosecuting (and defending) high-profile cases against a broad range of Fortune 500 and other large public and private companies, as well as prominent corporate officers and directors. A number of these cases have resulted in important legal precedents.

Early in his career, Mark served as an Assistant U.S. Attorney for the Central District of California, where he prosecuted white-collar fraud cases against officers, directors and senior executives of federally-insured financial institutions and False Claims Act actions against healthcare providers, defense contractors and other government contractors. He received awards and commendations from the U.S. Attorney General, several U.S. Attorneys, the FDIC, the FDIC's Office of the Inspector General, the Federal Bureau of Investigation, the Federal Reserve Board of Governors, the Immigration and Naturalization Service and the Small Business Administration. Mark also served as legal counsel to a mayoral transition team and, subsequently, as a special counsel to the District. He worked directly with the Director of the D.C. Department of Health, Vincent Gray, to develop a comprehensive ten-year plan for the District's healthcare system.

Mark's passion for writing has led to numerous published non-legal commentary, features and articles for daily, national and local newspapers and regional magazines. Awarded funding from the Ford Foundation, he wrote a series of articles on human rights issues for several international newspapers. Additionally, he has published more than two dozen legally-related commentary articles in publications that include: *Los Angeles Real Estate Journal, Los Angeles Lawyer, San Francisco Daily Journal,* the *Duke Law Journal,* the *Banking Law Review, Practising Law Institute's Securities Law Handbook,* the Consumer Lawyers *Advocate* magazine, *Legal Times, Texas Lawyer, New Jersey Lawyer, Manhattan Lawyer* and *Irish Times.* For years, he has written as a featured business law columnist in the Los Angeles Daily Journal. He also appeared in published symposia and was featured on the cover of Los Angeles Lawyer magazine in connection with a lead article on credit default swaps, which that magazine's editors solicited from him based on his work as an advocate for securities and consumer fraud victims.

At Duke University School of Law, Mark served as a staff and editorial board member of the *Duke Law Journal* and received the Hervey M. Johnson Writing Prize for the best law review article. The article was later cited in court opinions and other law review articles that led to an amendment of the Federal Rules of Civil Procedure.

Both national and local media frequently quote Mark, and he has been named for five consecutive years to the *Southern California Super Lawyers*® list. He has also been a featured speaker, panelist and moderator at legal conferences hosted by Duke University School of Law, Taxpayers Against Fraud, the Institute of Law and Economic Policy, the Rand Institute, the Claremont University Drucker and Ito Business School, the U.S. Department of Justice, the FDIC, the U.S. Department of Education, the Beverly Hills Bar Association and the National Association of Legal Professionals.

Mark is an elected member of the American Law Institute, serves as Vice President of the Institute of Law and Economic Policy, and is an appointed member of the Appellate Courts Committee of the Los Angeles Bar Association and its Antitrust and Unfair Business Practice section. He served on the Board of Governors of the Association of Business Trial Lawyers from 2008 to 2012. He is also a member of Taxpayers Against Fraud and its Dodd-Frank SEC Working Group, the American Association for Justice, the Association of Former U.S. Attorneys and Assistant U.S. Attorneys for the Central District of California, the National Association of Shareholder and Consumer Attorneys, and the American Bar Association White Collar Crime Committee.

# TEAM BIOS:

## Gregg S. Levin

LICENSED IN: DC, MA, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the First, Second, Third, Fifth, Ninth and Eleventh Circuits
U.S. District Court for the District of Colorado
EDUCATION:
J.D., Vanderbilt University School of Law, 1987
B.A., University of Rochester, 1984

With more than two decades of legal experience, Gregg Levin represents domestic and foreign institutional investors and union pension funds in corporate governance, directorial misconduct and securities fraud matters. His investigative, research and writing skills have supported Motley Rice as lead or co-lead counsel in numerous securities and shareholder derivative cases against Dell, Inc., UBS AG and Cintas Corporation. Gregg manages complaint and brief writing for class action deal cases, shareholder derivative suits and securities fraud class actions.

Prior to joining Motley Rice, Gregg was an associate with Grant & Eisenhofer in Delaware, where he represented institutional investors in securities fraud actions and shareholder derivative actions in federal and state courts across the country, including the WorldCom, Telxon and Global Crossing cases. He also served as corporate counsel to a Delaware Valley-based retail corporation from 1996-2003, where he handled corporate compliance matters and internal investigations.

Gregg is a published author on corporate governance and accountability issues, having written significant portions of the treatise *Shareholder Activism Handbook* (Aspen Publishers, November 2005), as well as several other articles of interest to institutional investors, including:

"*In re Cox Communications*: A Suggested Step in the Wrong Direction" (*Bank and Corporate Governance Law Reporter,* September 2005)

"Does Corporate Governance Matter to Investment Returns?" (*Corporate Accountability Report,* September 23, 2005)

"*In re Walt Disney Co. Deriv. Litig.* and the Duty of Good Faith under Delaware Corporate Law" (*Bank and Corporate Governance Law Reporter,* September 2006)

"Proxy Access Takes Center Stage: The Second Circuit's Decision in American Federation of State County and Municipal Employees, Employees Pension Plan v. American International Group, Inc." (*Bloomberg Law Reports,* February 5, 2007)

"Investor Litigation in the U.S. -- The System is Working" (*Securities Reform Act Litigation Reporter,* February 2007)

Appearing in the media to discuss a variety of securities matters, Gregg has also presented in more educational forums, including at the Ethics and Transparency in Corporate America Webinar held by the National Association of State Treasurers.

## Robert J. McConnell

LICENSED IN: MA, RI
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the District of Massachusetts, District of Rhode Island
EDUCATION:
J.D., Suffolk University School of Law, 1987
A.B., Brown University, 1979

Bob McConnell's practice concentrates on lead pigment litigation, childhood lead poisoning cases and other toxic environmental litigation with Motley Rice's Environmental practice group. For several years, Bob prepared for and served on the trial team in the landmark trial on behalf of the state of Rhode Island against corporate defendants from the lead paint industry. In 2005, he successfully argued the precedent-setting case *Thomas v. Mallett* 285 Wis 2d 236 as part of the Motley Rice trial team applying risk contribution theory to the lead paint industry before the Wisconsin Supreme Court.

Bob currently represents children injured by childhood lead poisoning against property owners, governmental agencies and lead pigment companies. In Rhode Island, Bob secured the largest lead paint poisoning settlement on behalf of a child injured by lead poisoning. He also played a leading role in a statewide lobbying effort to defeat legislation that would have denied lead-poisoned children and their families the right to seek justice. Through testimony, analysis and grassroots outreach, he helped the Rhode Island legislature pass a bill helping to prevent childhood lead poisoning without infringing on victims' rights.

Additionally, Bob litigates cases involving environmental hazards such as groundwater or soil contamination. He represents victims seeking corporate accountability as a result of personal injury, property damage and economic loss as a result of negligent environmental practices. Recently, Bob represented more than 100 residents of Tiverton, Rhode Island, in an environmental contamination lawsuit against a major New England utility company.

With over two decades of experience in asbestos litigation, Bob also works on the firm's occupational disease and toxic tort litigation. He continues to represent victims of asbestos exposure suffering from mesothelioma and other asbestos-related diseases. He has managed large consolidation trials in several states including Maryland, Mississippi and West Virginia.

After beginning his career as a teacher, Bob earned a law degree and clerked for the Honorable Donald F. Shea of the Rhode Island Supreme Court. He joined Motley Rice attorneys on the tobacco litigation team representing multiple state attorneys general, which resulted in the historic Master Settlement Agreement between the states and the tobacco industry.

Recognized as an AV® rated attorney by Martindale-Hubbell®, Bob was named a "Local Litigation Star" in the 2012 and 2013 editions of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys* in its Rhode Island rankings in environmental and toxic tort. He has been selected by his peers for inclusion in every edition of *The Best Lawyers in America*® since 2009 for his work in mass tort litigation/class

actions- plaintiffs. In addition, Bob has been selected by his peers for inclusion in the *New England Super Lawyers®* and *Rhode Island Super Lawyers®* lists each year since 2008.

Highly active in the Rhode Island community, Bob serves as board vice chairman of The Institute for the Study and Practice of Nonviolence, an organization that seeks to promote nonviolence among young people in Rhode Island's inner cities. He is also a board member for the George Wiley Center, which advocates for the rights of low income Rhode Island citizens, and the Fund for Community Progress, an organization that supports 26 grassroots organizations working for long-term community change.

Bob frequently speaks about lead paint litigation to local and regional groups such as the Rhode Island Bar Association and the Northeast Conference of Attorneys General. He is a member of the American Association for Justice and the American Bar Association.

## Donald A. Migliori

LICENSED IN: MA, MN, NY, RI
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the First and Fourth Circuits, U.S. District Court for the District of Rhode Island, District of Massachusetts and Northern, Southern and Eastern Districts of New York
EDUCATION:
M.A./J.D., Syracuse University, 1993
A.B., Brown University, 1988

Building upon his experience in complex asbestos cases, the historic tobacco lawsuits and 9/11 litigation, Don Migliori is a multifaceted litigator. He represents victims of terrorism, aviation disasters, environmental contamination, defective medical devices and drugs, occupational diseases and securities and consumer fraud in cutting-edge litigation that spans the country.

Don played a central role in the extensive discovery, mediations and settlements of more than 50 cases of 9/11 aviation liability and damages against numerous defendants. In this role, Don represents families of the victims of the September 11, 2001, attacks who opted-out of the Victim Compensation Fund to seek greater answers, accountability and recourse, and serves as liaison counsel for all wrongful death and personal injury cases in the 9/11 aviation security litigation. Additionally, he manages anti-terrorism litigation associated with the 9/11 terrorist attacks as a lead attorney of the 9/11 Families United to Bankrupt Terrorism groundbreaking litigation designed to bankrupt the financiers of al Qaeda.

Don serves as co-lead plaintiffs' counsel and liaison counsel for the Composix® Kugel® Mesh multidistrict litigation, *In re Kugel Mesh Hernia Patch Products Liability Litigation,* the first MDL in federal Rhode Island Court, on behalf of thousands of individuals alleging injury by the hernia repair patch. In *Christopher Thorpe and Laure Thorpe v. Davol, Inc. and C.R. Bard, Inc.,* the second case to go to trial out of thousands of cases filed in the MDL, the U.S. District Court for the District of Rhode Island found

hernia patch manufacturer Davol and parent company C.R. Bard liable for negligent design of the patch and failure to warn of the dangers associated with the patch. The jury awarded $1.5 million to the plaintiffs for personal injury damages and loss of consortium. He serves as liaison counsel for the Composix® Kugel® Mesh lawsuits consolidated in Rhode Island state court.

Don serves as co-liaison counsel in the N.J. Bard pelvic mesh litigation in Atlantic County and plays a central role in the thousands of cases involving women allegedly harmed by pelvic mesh/sling products. Hundreds of cases have been filed in federal and states courts against defendants that include American Medical Systems, Inc. (AMS), Boston Scientific, C.R. Bard, Inc., and Johnson & Johnson. He is a member of the Plaintiffs' Steering Committee in the Levaquin® litigation, as well as the Depuy® Orthopaedics, Inc. ASR™ and Pinnacle® Hip Implant MDLs.

Motley Rice's Securities and Consumer Fraud team relied upon Don's experience in connection with the commencement of and strategy for shareholder derivative litigation brought on behalf Chiquita Brands International, Inc., alleging the defendants breached their fiduciary duties by paying bribes to terrorist organizations in violation of U.S. and Columbian law. He also served as trial counsel for PACE Industry Union-Management Pension Fund in a securities case against Forest Laboratories, Inc., and was involved in the initial liability discovery and trial strategy in an ongoing securities fraud class action involving Household International, Inc.

Don began working with Motley Rice attorneys in 1997 on behalf of the State Attorneys General in the historic lawsuit against Big Tobacco, resulting in the largest civil settlement in U.S. history. He has more than a decade of interdisciplinary experience with asbestos, medical and securities litigation. He tried several noteworthy asbestos cases on behalf of mesothelioma victims, including the state of Indiana's first contractor liability verdict and first premises liability verdict for wrongful exposure to asbestos. He continues to manage asbestos cases and actively litigates mesothelioma lawsuits in the courtroom.

Don is a frequent speaker at legal seminars across the country and has appeared on numerous television and radio broadcast programs, as well as in print media to address legal issues related to terrorist financing, aviation security, class action litigation, premises liability, asbestos and defective medical devices cases. A "Distinguished Practitioner in Residence" at Roger Williams University School of Law for the 2010-2011 academic year, he currently teaches mass torts as an adjunct professor.

*Rhode Island Lawyers Weekly* and *Massachusetts Lawyers Weekly* each selected Don as being among their 2011 Lawyers of the Year. The 2012 and 2013 editions of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys* honored him as a "Local Litigation Star" in the Rhode Island rankings in human rights and product liability. An AV® rated attorney in Martindale-Hubbell®, Don was selected by his peers for inclusion in the 2009–2013 editions of *New England*

# TEAM BIOS:

Super Lawyers® and *Rhode Island Super Lawyers*® and was named among the "Best of the Best" on the *Top 10 Rhode Island Super Lawyers* 2012 list. He was also selected by his peers for inclusion in the 2011, 2012 and 2013 editions of *The Best Lawyers in America*® for his work in mass tort litigation/class actions-plaintiffs. Rhode Island Lawyers Weekly selected him in 2011 as one of its Lawyers of the Year. In 2010, The National Trial Lawyers named him one of its *Top 100 Trial Lawyers™* in Rhode Island, and he was named in the 2010 edition of the *Lawdragon™ 3,000*. Don was honored in 2005 as one of *Providence Business News'* Forty Under 40.

Don is the former President of the Rhode Island Association for Justice. He serves on the Board of Governors for the American Association for Justice and the Board of Directors for the National Center for Victims of Crime. He is also a member of the American Bar Association.

## Ingrid L. Moll

LICENSED IN: CT, DC, NY, SC
ADMITTED TO PRACTIC BEFORE:
U.S. Court of Appeals for the Second, Fourth and Tenth Circuits, U.S. District Court for the District of Colorado, District of Connecticut, Eastern and Southern Districts of New York
EDUCATION:
J.D., University of Connecticut School of Law, 1999
B.A., Wheaton College, 1995

Ingrid Moll is a trial and appellate attorney who represents consumers, businesses and governmental entities in complex consumer protection, unfair trade practices, commercial and environmental litigation.

Prior to joining Motley Rice, Ingrid was an associate attorney at two large defense firms. She also served as a law clerk to Justice David M. Borden of the Connecticut Supreme Court from 1999-2001. As a law student, Ingrid was editor-in-chief of the *Connecticut Law Review*.

In recognition of her professional achievements and commitment to the community, Ingrid was honored with the 2005 *Hartford Business Journal*'s Forty Under 40 award and the 2005 *Connecticut Law Tribune*'s New Leaders of Law Impact Award.

Active in the Connecticut community, Ingrid serves as an executive member of the Board of Directors of the Connecticut Bar Foundation and is a co-chair of the Bar Foundation's grantmaking committee. Ingrid also serves as President-Elect of the Board of Directors of the Alumni Association of the University of Connecticut School of Law, where she previously taught moot court as an adjunct professor. Ingrid is President of the Oliver Ellsworth Inn of Court, and is a member of Swift's Inn, the Connecticut State Advisory Committee of the U.S. Civil Rights Commission and the Connecticut Client Security Fund Committee.

## William H. Narwold

LICENSED IN: CT, DC, NY, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court, U.S. Court of Appeals for the First, Second, Third, Fourth, Fifth, Sixth, Ninth, Tenth, Eleventh and Federal Circuits, U.S. District Court for the District of Colorado, District of Connecticut, Eastern and Southern Districts of New York, District of South Carolina
EDUCATION:
J.D. *cum laude*, University of Connecticut School of Law, 1979
B.A., Colby College, 1974

Bill Narwold has advocated for corporate accountability and fiduciary responsibility for nearly 35 years, representing consumers, governmental entities, unions and institutional investors. He litigates complex securities fraud, shareholder rights and consumer fraud lawsuits, as well as matters involving unfair trade practices, antitrust violations, whistleblower/*qui tam* claims and intellectual property matters. Bill is the practice group leader of Motley Rice's Securities and Consumer Fraud practice group.

Additionally, Bill manages the firm's appellate group. His experience includes being involved in more than 200 appeals before the U.S. Supreme Court, U.S. Courts of Appeal and multiple state courts.

Bill joined Motley Rice in 2004, after directing corporate, financial, real estate, trust and estate litigation on behalf of private and commercial clients for 25 years at Cummings & Lockwood in Hartford, Connecticut, including 10 years as managing partner. Prior to his work in private practice, he served as a law clerk for the Honorable Warren W. Eginton of the U.S. District Court, District of Connecticut from 1979-1981.

Bill often acts as an arbitrator and mediator both privately and through the American Arbitration Association. He is a frequent speaker on legal matters, including class actions.

Named one of 11 lawyers "who made a difference" by *The Connecticut Law Tribune*, Bill serves the Hartford professional community as the past President of the Connecticut Bar Foundation and past member of the Board of Trustees of the University of Connecticut Law School Foundation. He was named in the 2008 *The Best of the U.S.* list and was selected by his peers for inclusion in the 2009–2013 editions of *Connecticut Super Lawyers*® and *New England Super Lawyers*®. He was named the *Best Lawyers'*® 2013 Hartford Litigation- Banking & Finance "Lawyer of the Year" and has also been selected by his peers for inclusion in every edition of *The Best Lawyers in America*® since 2005 for his work in litigation- banking and finance; litigation- mergers and acquisitions; and litigation-securities. Bill is recognized as an AV® rated attorney by Martindale-Hubbell®.

He has also been involved with the Greater Hartford Legal Assistance Foundation and Lawyers for Children America. He is a member of the American Bar Association and the National Association of Consumer Advocates. For more than twenty years, Bill served as a Director and Chairman of Protein Sciences Corporation, a biopharmaceutical company in Meriden, Connecticut. In 2008, Bill received the Connecticut Bar Foundation's Legal Services Leadership Award.

## TEAM BIOS:

### Vincent I. Parrett

LICENSED IN: CA, NY, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court, U.S. Court of Appeals for the First, Second and Ninth Circuits, U.S. District Court for the Central, Northern and Southern Districts of California, Eastern and Southern Districts of New York and District of South Carolina, U.S. Navy - Marine Court of Criminal Appeals, U.S. Courts – Martial
EDUCATION:
LT, JAG Corps, Naval Justice School, 1999
J.D., New York University School of Law, 1998
Goethe Institute, Mannheim, Germany, 1995
B.A., Yale University, 1994

Vince Parrett represents individual and institutional clients in complex litigation involving terrorist financing, human rights violations, securities and consumer fraud, aviation disasters and occupational diseases, as well as in maritime, asbestos, tobacco and lead paint cases.

As a member of Motley Rice's Anti-Terrorism and Human Rights practice group, Vince represents American and Israeli terrorism victims in international litigation seeking to hold accountable terrorist financiers who allegedly supported dozens of terror attacks in Israel during the Second Intifada. Vince also represents more than 6,500 family members, survivors and those who lost their lives in the 9/11 terrorist attacks in groundbreaking litigation against the alleged financial and material sponsors of al Qaeda.

Working with the firm's Securities and Consumer Fraud team, Vince litigates deal cases to protect shareholders' financial interests against under-priced and coercive corporate mergers and acquisitions and represents both individual and institutional investors seeking redress for financial injuries in securities fraud class actions. He is also a member of the trial team representing the People of the State of California and multiple counties, including the counties of San Francisco, Santa Clara, Los Angeles, and San Diego, in litigation against national lead paint manufacturers. This case, which is expected to try in late 2013, seeks to compel those manufacturers to remove lead paint from homes throughout California, particularly those occupied by lower-income families in inner-city, community housing.

Vince is additionally a part of the litigation team fighting ship owners and manufacturers of asbestos-containing products on behalf of crew members exposed for decades to asbestos aboard ships. He is litigating cases against international tobacco companies, as well, including litigation involving the issue of federal preemption. Motley Rice has intervened in this litigation to support the constitutional power of states and localities to protect the health and safety of citizens by regulating the time, place and manner of sale of certain tobacco products. Earlier in 2013, Vince won a liability verdict for the family of a wrongful death victim in a federal trial in the Middle District of Florida against a tobacco company.*

Before joining Motley Rice, Vince represented victims of the 9/11 attacks as an associate with a New York firm, where he handled multidistrict litigation and litigated aviation wrongful-death cases involving crashes of commercial and general aviation aircraft and helicopters internationally.

Upon graduating from NYU Law School, Vince worked for one year as an associate in the Litigation Department of Hale and Dorr in Boston, focusing on securities fraud litigation and SEC investigations. Vince next joined the U.S. Navy Judge Advocate General's Corps, where, after graduating with honors from the Naval Justice School in Newport, R.I., he served as a Naval Officer trying scores of courts-martial trials before juries at Naval Station Norfolk, Va. In 2002, LT Parrett was appointed as Officer-In-Charge of Naval Legal Service Office at Naval Air Station Oceana, where he led a team of JAG Officers providing legal counsel to the large Naval Aviation community in Virginia Beach, Va., until March 2003.

Vince has co-authored several articles and presentations, including *Aviation Lawyers Striking Back at the Terror Network; and Reflections on the 1999 Montreal Convention Affecting Victims of International Aviation Disasters in Congested Skies*. He was recognized in the inaugural 2012 edition of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys*, which named him as a "Litigation Star" in its national rankings for civil rights/human rights, as well as its South Carolina rankings in human rights, personal injury and securities. Vince was recognized by *Benchmark Plaintiff* again in 2013 as a "Local Litigation Star" in the South Carolina rankings for human rights, product liability, securities and toxic tort.

In 2012, Vince was appointed to the Board of Advisers of the Academy of American Legal Writers, a division of LawProse, the "oldest and largest provider of continuing legal education in writing, advocacy, and transactional drafting in the United States." He is also a member of the American Association for Justice, American Bar Association and Federal Bar Council Inn of Court.

### Mary F. Schiavo

LICENSED IN: DC, FL, MD, MO, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court
EDUCATION:
J.D., New York University School of Law, 1980 (Root-Tilden Scholar)
M.A., The Ohio State University, 1977 (University Fellow)
B.A., cum laude, Harvard University, 1976

Throughout her career in law and public service, Mary Schiavo has sought accountability and industry change from corporations, institutions and the government so that they may meet their obligation to protect the safety and security of the traveling public. With experience in transportation litigation, Mary represents victims and their families suffering from negligence of airline, automotive, commercial trucking, motorcoach and rail companies.

A leader of the firm's aviation team, Mary has represented passengers and crew of most major U.S. air crashes, as well as pilots and passengers on private or charter planes. She represents passengers, pilots, flight attendants and select owners and operators. Her experience with major, complex aviation litigation includes more than 50 cases on behalf of the family members of the passengers and crew of all the planes hijacked on Sept. 11, 2001.

# TEAM BIOS:

Mary has held numerous government appointments under three U.S. Presidents, including that of Inspector General of the U.S. Department of Transportation from 1990 to 1996. Under Mary's direction, the agency investigated air safety, crimes and disasters; secured more than 1,000 criminal convictions; and exposed billions of dollars of fraud, waste and abuse of taxpayer money. She testified before Congress multiple times on transportation safety, security, budgeting and infrastructure. In recognition of her work combating the use of bogus aircraft parts worldwide, Mary was honored at the Smithsonian Institution with its Aviation Laurel Award in 1992 and 1995 and was inducted to the Aviation Laurel Hall of Fame in 1997.

As an Assistant U.S. Attorney early in her career, Mary litigated civil cases and prosecuted federal white-collar crimes, bank and securities fraud, mail and wire fraud, drug trafficking and counterfeiting. During her appointment, she also served on the U.S. Department of Justice's Organized Crime and Racketeering Strike Force, prosecuting high-profile criminal cases of bank and securities fraud and related mail and wire fraud, including a large investigation of a bank and securities fraud scheme that resulted in the federal takeover of banks, savings and loans throughout the Midwest.

In 1987, Mary was selected as a White House Fellow and assigned to the U.S. Attorney General, where she worked as the Special Assistant for Criminal Affairs. In this role, she reviewed high security prosecutions, prepared Foreign Intelligence Surveillance Act Requests, attended foreign legal summits with the Attorney General and worked on international prisoner and evidence exchanges. During this time, she also taught trial technique at the U.S. Attorney General's Advocacy Institute and the Federal Bureau of Investigation Academy. Her work earned her an appointment as the Assistant U.S. Secretary of Labor in 1989, where she led the Office of Labor Management Standards, supervising union elections and investigations on election and financial irregularities.

A frequent on-air contributor or consultant for several networks, Mary has appeared on ABC, CNN, CBS, Fox News, NBC, BBC, the History Channel and Discovery Channel. Named by *Glamour* magazine as a 1997 Woman of the Year, 1987 Working Woman of the Year and a Top Ten College Student in 1975, she has spoken about aviation safety on *20/20, 60 Minutes, Good Morning America, Larry King Live, Nancy Grace, Nightline, Oprah, The O'Reilly Factor, Today,* and *Your World with Neil Cavuto,* among others. Mary is the author of *Flying Blind, Flying Safe,* a *New York Times* bestseller, featured in *Time* magazine for exposing the poor safety and security practices of the airlines and the failures of the federal government to properly regulate the aviation industry. She contributed to *Aviation Security Management* (Volume One, 2008) and *Supply Chain Security* (Volumes One and Two, 2010).

The 2012 and 2013 editions of *Benchmark Plaintiff, The Definitive Guide to America's Leading Plaintiff Firms & Attorneys* recognized Mary as a "Litigation Star" in its national rankings for mass tort/product liability, as well as its South Carolina rankings in mass tort and securities. She was also selected by her peers for inclusion in the 2010, 2011, 2012 and 2013 editions of *The Best Lawyers in America®* for her work in mass tort litigation/class actions- plaintiffs.

Mary received her pilot's license soon after her driver's license, and later completed private and commercial flight training at The Ohio State University. She returned to The Ohio State University as the McConnell Aviation Chair and professor from 1998-2002 and as the Enarson Professor of Public Policy from 1997-1998. She has also served as a practitioner in residence at the New York University School of Law. Mary is an affiliate member of the International Society of Air Safety Investigators, as well as a member of the American Association for Justice and the American Bar Association, where she served in the House of Delegates and as the First Female Assembly Delegate from 1986-1989.

## Carmen S. Scott

LICENSED IN: SC
EDUCATION:
J.D., University of South Carolina School of Law, 1999
B.A., College of Charleston, 1996

Carmen Scott helps lead Motley Rice's mass tort pharmaceutical litigation by managing complex personal injury and economic recovery damages cases on behalf of victims of harmful medical drugs and devices, medical negligence, and corporate misconduct.

With a focus on women's products, Carmen has been on the forefront of national contraceptive litigation involving products such as Mirena®IUD, Nuvaring®, Yaz® and Yasmin®. She serves on the Plaintiffs' Steering Committee in the *In re NuvaRing Products Liability Litigation,* as co-lead counsel in the *In re Mirena Product Liability* state court consolidation in New Jersey, and as Co-Chair of the AAJ Mirena® IUD Litigation Group. Carmen currently represents clients in a variety of drug product matters, including osteonecrosis and femur fracture cases related to the osteoporosis drug Fosamax®.

Prior to joining Motley Rice in 2005 and concentrating her efforts on the medical practice area, Carmen represented numerous clients in jury trials, working on products liability, personal injury and business cases for both plaintiffs and defendants.

Carmen is a frequent speaker on medical litigation and topics involving women's products, regularly lecturing at both legal seminars and public advocacy events on such issues as plaintiffs' rights in medical negligence and dangerous drug cases. She has been quoted in numerous national media outlets and publications, including The Associated Press, NBC News New York, *Marie Claire, MotherJones* and *The Safety Report.* Carmen was selected by her peers for inclusion in the 2013 *South Carolina Super Lawyers® Rising Stars* list.

Active in her community, Carmen proudly serves as Vice Chair on the Board for the Make-A-Wish Foundation of South Carolina, fundraising and promoting the Foundation's mission, as well as serving as a "wish-granter" for families that have been selected by the organization. She has also served as a board member for the nonprofit organization Charleston County Friends of the Library. Carmen is a member of the American Association for Justice (AAJ), serving on its Exchange Advisory Committee, the American Bar Association (ABA), the South Carolina Association

## TEAM BIOS:

for Justice (SCAJ) and the South Carolina Women Lawyers Association. A South Carolina native, Carmen was honored with the *Charleston Regional Business Journal's* Forty Under 40 award in 2013 in recognition of her professional achievements and contributions to the community.

### Fred Thompson III

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court, U.S. Court of Appeals for the Fourth Circuit, U.S. District Court for the District of South Carolina
EDUCATION:
J.D., with distinction, Duke University School of Law, 1979
B.A., *cum laude,* Yale University, 1973

Fred Thompson leads Motley Rice's medical practice group, managing the firm's litigation related to defective medical devices, harmful pharmaceutical drugs, and medical malpractice, as well as overseeing the firm's nursing home abuse litigation team. In this role, Fred litigates personal injury and economic damage recovery cases on behalf of individuals harmed by negligence, product defects or misconduct.

His work has led to his appointment to numerous leadership positions, including co-lead coordinating counsel for the pelvic mesh lawsuits consolidated in the U.S. District Court for the Southern District of West Virginia and plaintiffs' co-lead counsel for both the Mirena® IUD multidistrict litigation in the U.S. District Court for the Southern District of New York and the federal Digitek® consolidation. Fred also holds membership on the Plaintiffs' Steering Committees for the Medtronic Sprint Fidelis® defibrillator lead, Avandia® and Trasylol® federal multidistrict litigations and serves as chairman of the American Association for Justice's Digitek® Litigation Group and co-chairman of the Kugel® Mesh Litigation Group. He co-authored "Composix® Kugel® Mesh: A Primer" for the Spring 2008 AAJ Section on Toxic, Environmental & Pharmaceutical Torts newsletter.

With more than two decades of diverse experience in personal injury, commercial and toxic tort law, Fred is also active with the firm's consumer fraud, commercial and economic damage litigation. He has represented clients in litigation involving bond issues and securities fraud in federal, state and bankruptcy forums as well as through alternative dispute resolution. Additionally, Fred has practiced commercial transaction work, including contracting, corporate, partnership and limited liability company formation, and capital acquisitions.

Recognized as an AV® rated attorney by Martindale-Hubbell®, Fred is a member of the American Association for Justice and frequently speaks on medical litigation topics at legal seminars throughout the country. He serves his local community as a Board Member for the East Cooper Community Outreach organization.

## ADDITIONAL SECURITIES LITIGATORS

### David P. Abel

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the District of South Carolina
EDUCATION:
J.D., cum laude, Charleston School of Law, 2009
M.B.A., The Citadel, 2005
B.A., cum laude, Clemson University, 2002

David Abel represents institutional investors and individuals in securities and consumer fraud litigation. With a diverse background in securities litigation, from identifying clients' financial losses and complaint drafting to calculating class-wide damages and settlement plan of allocation analysis, David focuses on initial case evaluation for securities fraud class actions, shareholder derivative actions, and mergers and acquisitions litigation.

David also serves as Director of Shareholder Services and Business Analysts, supervising the firm's securities portfolio monitoring service and financial analysis for securities actions. The portfolio monitoring service identifies losses suffered by clients due to corporate fraud or misconduct and enables them to carefully evaluate their options. The service additionally provides securities class action settlement claims processing.

David joined Motley Rice in 2006 as a Business Analyst for the Securities and Consumer Fraud practice group. He was later elevated to the position of Director of Shareholder Services and Business Analysts and began practicing as an attorney with the firm in 2010. Prior to his tenure at Motley Rice, David gained professional experience serving as a consultant for small businesses, Vice President of Operations for a mid-size tour company, and General Manager and Editor for a political consulting firm.

David is a graduate of the Charleston School of Law and holds an MBA from The Citadel. As an undergraduate at Clemson University, he was a member of the men's varsity cross country and track & field teams. David is fluent in Spanish, having once lived in Spain.

### Rebecca M. Deupree

LICENSED IN: AL, FL, SC
EDUCATION:
J.D., University of Virginia School of Law, 2008
B.A., summa cum laude, Washington and Lee University, 2005

Rebecca Deupree is a member of Motley Rice's Securities and Consumer Fraud practice group, litigating securities and consumer fraud cases on behalf of institutional investors, government entities and consumers. Rebecca also works closely with the Environmental team, helping people and businesses in Gulf Coast communities file claims through the new claims programs established by the two settlements reached with BP.

# TEAM BIOS:

Prior to joining Motley Rice, Rebecca served as a law clerk to the Honorable William H. Pryor Jr. of the Eleventh Circuit Court of Appeals, for whom she focused on appellate advocacy and conducted legal writing and research.

Rebecca earned a J.D. from the University of Virginia School of Law, where she served as Managing Editor of the *Virginia Law Review* and was named a member of the Order of the Coif. Before earning a law degree, she graduated Phi Beta Kappa from Washington and Lee University where she was a George Washington Honors Scholar and was honored with several awards during her studies in recognition of scholarship within the field of English language and literature.

## Max N. Gruetzmacher

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the District of South Carolina
EDUCATION:
J.D., Marquette University Law School, 2008
B.A., University of Wisconsin-Madison, 2004

Max Gruetzmacher focuses his practice on securities and consumer fraud, representing large public pension funds, unions and other institutional investors in securities and consumer fraud class actions and shareholder derivative suits.

Max has represented clients in a variety of complex litigation cases, including the following: *City Of Sterling Heights Retirement System v. Hospira, Inc.; In re Coventry Health Care, Inc. Shareholders Litigation; In re Force Protection, Inc. Litigation; Minneapolis Firefighter's Relief Association v. Medtronic, Inc.; In re NYSE EURONEXT Shareholder Litigation; In re Par Pharmaceutical Companies, Inc. Shareholders Litigation; In re Synovus Financial Corp.; In re The Shaw Group Shareholders Litigation;* and *In re Winn-Dixie Stores, Inc. Shareholders Litigation.*

Prior to joining Motley Rice, Max gained experience working on a variety of complex discovery matters as a project attorney. He served as a legal intern during law school for the Wisconsin State Public Defender, Appellate Division, where he aided assistant public defenders in appellate criminal defense and handled legal research and appellate brief writing projects. Max was also a member of the Pro Bono Society and conducted research for the Legal Aid Society of Milwaukee.

He is a member of the South Carolina Bar Association and the Charleston County Bar Association.

## Badge Humphries

LICENSED IN: KY, SC, TX, WV
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Fourth Circuit, U.S. District Court for the District of South Carolina, Eastern District of Michigan, Northern District of Illinois, Eastern District of Texas and Southern District of Texas
EDUCATION:
J.D., with honors, The University of Texas School of Law, 2001
B.A., *summa cum laude,* Tulane University, 1996

Badge Humphries represents institutional investors and individuals in complex securities fraud and shareholder litigation. He has achieved corporate governance enhancements for Motley Rice's clients in shareholder derivative cases and has litigated direct class actions in the Delaware Court of Chancery and other state courts. His shareholder litigation experience includes cases involving Massey Energy, The South Financial Group, Bankrate and Lear, among others. Securities fraud cases in which he has played a significant litigation role include actions against State Street, Synovus, Hecla Mining, UBS, Charles Schwab & Co., Vivendi and Washington Mutual. Badge has experience in many aspects of shareholder and securities fraud litigation, from initial case evaluation and complaint drafting to directing settlement negotiations of corporate governance reforms.

Badge has litigated other types of complex litigation as well. He has conducted discovery and motion practice before courts across the country and has participated in several multi-week trials representing victims of asbestos exposure, including a mass consolidation of more than 1,200 plaintiffs lasting eight weeks in Virginia state court and a three week trial in the U.S. District Court for the District of Maryland, Baltimore Division. He represented the Commonwealth of Kentucky's Division of Workers' Compensation Funds in claims against the manufacturers of allegedly defective dust masks and is involved with the firm's litigation efforts on behalf of people and businesses in Gulf Coast communities suffering as a result of the BP oil spill.

Badge was selected by his peers for inclusion in both the 2012 and 2013 *South Carolina Super Lawyers® Rising Stars* lists. A frequent guest lecturer, he recently presented for the South Carolina Association for Justice, Texas Association of Public Employee Retirement Systems (TEXPERS), Opal Financial Group's Investment Education Symposium in Conjunction with the Louisiana Trustee Education Council (LATEC) and the National Association of State Treasurers. Badge is also an active participant in the National Conference on Public Employee Retirement Systems (NCPERS) and the Council for Institutional Investors (CII). He is a member of the American Association for Justice and the James L. Petigru American Inn of Court and currently serves as the elected Consumer and Securities Law Section Chair of the South Carolina Association for Justice.

## TEAM BIOS:

He previously served as the Director of Land Protection for the South Atlantic region of Ducks Unlimited, an international conservation organization. A member of Phi Beta Kappa, Badge worked for a nonprofit human rights organization before attending The University of Texas School of Law, where he was a member of the *Texas Law Review* and an honors graduate. He served as a judicial intern to the Honorable Lee Yeakel of the Texas Third Court of Appeals and later clerked with the Honorable Thad Heartfield of U.S. District Court, Eastern District of Texas.

### John A. Ioannou

LICENSED IN: NY
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court
U.S. District Court for the Eastern and Southern Districts of New York
EDUCATION:
J.D., St. John's University School of Law, 1994
B.S. magna cum laude, St. John's University, 1991

With 18 years of antitrust law experience, John Ioannou has sought monetary and equitable recoveries on behalf of consumers and businesses injured by allegedly illegal, anti-competitive conduct in complex antitrust matters.

John litigates antitrust matters in both federal and state court involving horizontal and vertical restraints of trade and monopolization claims in a broad range of industries. Prior to joining Motley Rice, he practiced at a large New York-based firm, where he actively litigated a variety of complex cases, including *In re American Express Anti-Steering Rules Antitrust Litigation; Garber, et al. v. Office of the Commissioner of Baseball, et al.;* and *Laumann, et al. v. National Hockey League, et al.*

John began his career as an Assistant Attorney General (AAG) in the Antitrust Bureau of the New York State Attorney General's Office, conducting confidential government antitrust investigations and litigating cases involving alleged anticompetitive acts in violation of federal and/or state antitrust laws on behalf of consumers, businesses and the State of New York in its proprietary capacity. As an AAG, he often worked in conjunction with other state attorneys general offices and federal agencies such as the U.S. Department of Justice and Federal Trade Commission. He also held leadership positions in multistate investigations and litigations.

John has managed litigation compliance and counseled major New York state agencies, as well as New York State political subdivisions, quasi-governmental entities and other public entities. He has also reviewed the competitive impact of transactions (mergers and acquisitions) in numerous industries, including airlines (United-US Airways), health insurance (GHI-HIP), minerals (road deicing salt), energy (Exxon-Mobil), supermarkets (A&P-Pathmark), publishing (Thomson-West Publishing) and enterprise software (Oracle-PeopleSoft).

John is fluent in Greek and is a member of the American Bar Association and New York State Bar Association.

### Mathew P. Jasinski

LICENSED IN: CT, NY
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court, U.S. Court of Appeals for the Second Circuit, U.S. District Court for the District of Connecticut and Southern District of New York
EDUCATION:
J.D. with high honors, University of Connecticut School of Law, 2006
B.A. summa cum laude, University of Connecticut, 2003

An associate in Motley Rice's Securities and Consumer Fraud practice group, Mathew Jasinski represents consumers, businesses, unions and governmental entities in class action and complex cases involving consumer protection, unfair trade practices, commercial, environmental and securities litigation. Mathew additionally serves the firm's appellate group.

Mathew currently represents the plaintiffs in several putative and certified class actions involving such claims as breach of contract and unfair trade practices. He has experience in multi-forum cases regarding claims of fraud and breach of fiduciary duty and has represented an institutional investor in its efforts to satisfy a judgment obtained against the operator of a Ponzi scheme. Mathew has also worked on numerous appeals before several state and federal appellate courts throughout the country.

Mathew is the co-author of "On the Causes and Consequences of and Remedies for Interstate Malapportionment of the U.S. House of Representatives" (Jasinski and Ladewig, *Perspectives on Politics,* Vol. 6, Issue 1, March 2008) and "Hybrid Class Actions: Bridging the Gap Between the Process Due and the Process that Functions" (Jasinski and Narwold), *The Brief,* Fall 2009. Prior to joining Motley Rice in 2009, Mathew practiced complex commercial and business litigation at a large defense firm. He began his legal career as a law clerk for Justice David M. Borden of the Connecticut Supreme Court. During law school, Mathew served as executive editor of the *Connecticut Law Review* and judging director of the Connecticut Moot Court Board. He placed first in various mock court and mock court competitions, including the Boston region mock trial competition of the American Association for Justice. As an undergraduate, Mathew served on the board of associate directors for the University of Connecticut's honors program and was recognized with the Donald L. McCullough Award for his student leadership.

Mathew was selected by his peers for inclusion in the 2013 *Connecticut Super Lawyers® Rising Stars* list, and was honored with the *Hartford Business Journal's* "40 Under Forty" award in 2009.

Mathew continues to demonstrate civic leadership in the local Hartford community. He is a member of the board of directors for the Hartford Symphony Orchestra and has served on the city's Charter Revision Commission and its Young Professionals Task Force, an organization focused on engaging young professionals and positioning them for future business and community leadership. He is a member of the American Association for Justice, American Bar Association, Connecticut Bar Association, the Oliver Ellsworth Inn of Court and Phi Beta Kappa.

# TEAM BIOS:

## Joshua Littlejohn

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Third Circuit, U.S. District Court for the District of Colorado, District of South Carolina
EDUCATION:
J.D., Charleston School of Law, 2007
B.A., University of North Carolina at Asheville, 1999

Josh Littlejohn represents public pension funds, unions and other institutional investors in complex securities fraud cases, as well as shareholder derivative and takeover litigation.

In addition to handling discovery, case strategy and analysis, he plays a lead role in initial case selection and start-up with the firm's Securities and Consumer Fraud team. Josh also works closely with both individual and institutional investor clients to counsel them on all aspects of the litigation process, from filing the initial complaint to case resolution.

Josh's experience litigating takeover cases includes actions involving Atheros Communications, Inc.; PLATO Learning, Inc.; Allion Healthcare, Inc.; The DirecTV Group, Inc.; and Lear Corporation, among numerous others. He has also been central to the expansion of Motley Rice's shareholder derivative practice, litigating cases against boards of directors of publicly traded companies such as Omnicare, Inc.; Massey Energy Company; Cintas Corporation; Force Protection, Inc.; and Regions Financial Corporation. Securities fraud cases on which he has worked extensively include actions against NPS Pharmaceuticals and Pharmacia Corporation.

Josh additionally supports Motley Rice's Environmental team in its efforts to help people and businesses in Gulf coast communities that suffered economic loss, property damage and physical injuries due to the Deepwater Horizon oil spill. With experience handling medical drug and device cases, including a case against Merck & Co., Inc., related to the drug Vioxx®, Josh served as second chair at a 2012 trial in a medical malpractice action tried in Georgetown, S.C.

Josh was selected by his peers for inclusion in the 2013 *South Carolina Super Lawyers® Rising Stars* list, and is a member of the American Bar Association and South Carolina Association for Justice.

## Christopher F. Moriarty

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the District of Colorado, District of South Carolina
EDUCATION:
J.D., Duke University School of Law, 2011
M.A., Trinity College, University of Cambridge, 2007
B.A., Trinity College, University of Cambridge, 2003

As a member of Motley Rice's Securities and Consumer Fraud practice group, Christopher Moriarty represents public pension funds, unions and other institutional investors in securities fraud class actions, mergers and acquisitions, and shareholder derivative suits.

Christopher has represented clients in a variety of complex litigation cases, including the following: *Bricklayers of Western Pennsylvania Pension Plan v. Hecla Mining Co.; City of Brockton Retirement System v. Avon Products, Inc.; Hill v. State Street Corporation; In re Hewlett-Packard Co. Securities Litigation; In re NYSE EURONEXT Shareholder Litigation; In re The Shaw Group Shareholder Litigation* and *Ross v. Career Education Corp.*

Prior to joining Motley Rice, Christopher served as a summer associate with an international law firm in Texas, where he gained experience in commercial litigation. He previously held internships with the Texas Defender Service, Texas Moratorium Network, and The Rutherford Institute, and has drafted *amicus curiae* briefs in numerous U.S. Supreme Court cases.

While in law school, Christopher was a member of the Moot Court Board and served as an Executive Editor of the *Duke Journal of Constitutional Law and Public Policy*. He also taught a course on constitutional law to LL.M. students.

Christopher was called to the Bar in England and Wales by the Honourable Society of the Middle Temple and is a member of the American Bar Association, the South Carolina Bar Association, the Charleston County Bar Association and the South Carolina Association for Justice.

## William S. Norton

LICENSED IN: MA, NY, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the First and Second Circuits
U.S. District Court for the District of Colorado, Northern District of Illinois, Eastern and Southern Districts of New York, and District of South Carolina
EDUCATION:
J.D., Boston University School of Law, 2004
B.A./B.S. *magna cum laude,* University of South Carolina, 2001

Bill Norton litigates securities fraud, shareholder derivative, mergers and acquisitions, consumer fraud and general commercial matters. He has represented public retirement systems, union pension funds, investment companies, banks and private investors before federal and state courts around the country.

Bill has represented investors in a variety of complex litigation, including the following matters: *In re Alberto Culver Company Shareholder Litigation; In re Allion Healthcare, Inc., Shareholders Litigation; In re Atheros Communications, Inc., Shareholder Litigation; Bennett v. Sprint Nextel Corp.; In re Celera Corporation Shareholder Litigation; City of Brockton Retirement System v. Avon Products, Inc.; In re Coca-Cola Enterprises, Inc., Shareholders Litigation; In re Constellation Energy Group, Inc., Securities Litigation; Hill v. State Street Corporation; In re Netezza Corporation Shareholders Litigation; In re NYSE EURONEXT Shareholder Litigation; In re Par Pharmaceutical Companies, Inc. Shareholders Litigation; In re RehabCare Group, Inc., Shareholders Litigation; In re The Shaw Group Shareholders Litigation; In re Synovus Financial Corp.; In re The South Financial Group, Inc.; In re Vivendi Universal, S.A. Securities Litigation;* and *In re Walgreens Co. Derivative Litigation.*

Prior to joining Motley Rice, Bill practiced securities litigation in the New York office of Cadwalader, Wickersham & Taft LLP. Bill also served as a law clerk in the United States Attorney's Office for the District of Massachusetts, represented asylum seekers at Greater Boston Legal Services and volunteered at Neighborhood Legal Assistance Program of Charleston.

Bill served as an Editor of the *Boston University Law Review*, was a G. Joseph Tauro Distinguished Scholar, and studied law at the University of Oxford. Bill graduated Phi Beta Kappa from the University of South Carolina Honors College. As an undergraduate, Bill worked for the United States Attorney's Office for the District of South Carolina.

Bill is a member of the American Bar Association, the American Association for Justice, the South Carolina Bar, the New York State Bar Association and the Charleston County Bar Association. Bill was selected by his peers to the 2013 list of *South Carolina Super Lawyers® Rising Stars*.

### Lance Oliver

LICENSED IN: AL, DC, FL, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the District of Columbia, Second, Fifth and the Eleventh Circuits, U.S. District Court for the District of Columbia
EDUCATION:
J.D., Duke University School of Law, 2004
B.A., Samford University, 2001

Lance Oliver represents institutional investors, unions and public pension funds in securities fraud class actions in federal court at both the trial and appellate levels. He also has experience handling unauthorized trading claims in FINRA proceedings and is currently litigating breach of contract and fraud claims arising from credit default swap investments. Lance additionally represents whistleblowers in *qui tam* actions under the False Claims Act.

Since joining Motley Rice's Securities and Consumer Fraud team in 2007, Lance has devoted a substantial amount of time to litigating and implementing settlements in securities fraud class actions. He has played a key role in the following cases: *In re Dell Securities Litigation; In re MBNA Securities Litigation; In re NPS Pharmaceuticals, Inc., Securities Litigation; In re RehabCare Group, Inc., Shareholders Litigation;* and *In re Select Medical Corporation Securities Litigation*.

Lance has also assisted in Motley Rice's efforts on behalf of victims of the Deepwater Horizon oil spill.

Prior to joining Motley Rice, Lance served as an associate in the Washington, D.C., office of a national law firm, where he litigated complex products liability actions. Lance also has experience in the areas of insurance coverage matters and the Freedom of Information Act.

After graduating from Duke Law School, Lance served as a law clerk to the Honorable James Hughes Hancock of the U.S. District Court for the Northern District of Alabama. He is an active member of the National Conference on Public Employee Retirement Systems (NCPERS) and the American Bar Association. Lance was selected by his peers for inclusion in the 2013 *South Carolina Super Lawyers® Rising Stars* list, and is recognized as an AV® rated attorney by Martindale-Hubbell®.

### Meghan S. B. Oliver

LICENSED IN: DC, SC, VA
EDUCATION:
J.D., University of Virginia School of Law, 2004
B.A. with distinction, University of Virginia, 2000

Meghan Oliver represents unions and other institutional investors in securities fraud class actions and merger suits. Her practice focuses on both general litigation and evaluation of potential merger cases. While at Motley Rice, she has worked on securities fraud cases and merger cases involving MBNA, Medtronic, Washington Mutual and DirecTV, among others. Meghan also litigates consumer fraud cases.

Prior to joining Motley Rice, Meghan worked as a business litigation and antitrust associate in Washington, DC. There, she assisted in the trial of a multidistrict litigation antitrust case and assisted in multiple corporate internal investigations. She is a member of Phi Beta Kappa and the American Bar Association.

### Michael J. Pendell

LICENSED IN: CT, NY
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the District of Connecticut, Southern and Eastern Districts of New York
EDUCATION:
J.D., *summa cum laude,* Albany Law School, 2007
B.A., *cum laude,* Emerson College, 2000

As an associate in Motley Rice's Securities and Consumer Fraud practice group, Michael Pendell represents individuals and institutional clients in complex securities and consumer fraud litigation, shareholder derivative suits and a wide array of other consumer and commercial cases.

Michael joined Motley Rice after serving as an associate with a Connecticut-based law firm, where he gained more than three years of experience in both federal and state courts in such areas as commercial and construction litigation, media and administrative law, personal injury defense and labor and employment matters. Michael was responsible for drafting complex pleadings, handling discovery, taking and defending depositions, and representing clients at prejudgement remedy hearings, arbitrations and trials.

Michael served as a legal intern for the Honorable Randolph F. Treece of the U.S. District Court for the Northern District of New York and as a law clerk for the Major Felony Unity of the Albany County District Attorney's Office. He served as the executive

# TEAM BIOS:

editor for the *New York State Bar Association Government Law & Policy Journal* and senior editor for the *Albany Law Review,* which published his 2008 article entitled, "How Far is Too Far? The Spending Clause, the Tenth Amendment, and the Education State's Battle Against Unfunded Mandates." An avid writer, Michael has additional experience in freelance writing, as well as teaching, photography and film production.

In addition to being selected during law school as a Sponslor Teaching Fellow and ACES Teaching Fellow, he won both of Albany Law School's major moot court competitions, the Gabrielli Moot Court Appellate Advocacy Competition and the Karen C. McGovern Senior Prize Trials. He is also a New York State Bar Association Trial Academy graduate and a member of The Order of the Barristers and the Gold Key Honor Society. Michael is currently a member of the Connecticut Bar Association, the New York State Bar Association and the American Bar Association.

## Ann K. Ritter
## Senior Counsel and Securities Case Coordination Manager

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Third and Eleventh Circuits
EDUCATION:
J.D., University of Tennessee, 1982
B.S., Florida State University, 1980

As Senior Counsel for Motley Rice, Ann Ritter plays a key role on Motley Rice's securities team, which represents domestic and foreign institutional investors in complex cases involving shareholder rights, corporate governance, securities and consumer fraud. She possesses more than 25 years of experience in complex litigation involving matters as varied as securities, products liability and consumer protection.

Ann serves as a frequent speaker on legal topics such as worker safety, shareholder rights and corporate governance. In 2007, she addressed leading German institutional investors as a keynote speaker on the impact of U.S. class actions at the Deutsche Schutzvereinigung für Wertpapierbesitz e. V. Practical Workshop for institutional investors in Frankfurt, Germany.

After earning a Bachelor of Science degree from Florida State University, Ann pursued a law degree from the University of Tennessee. She is the co-author of Asbestos in Schools, published by the National School Boards Association. Ann previously served on the Advisory Committee for the Tobacco Deposition and Trial Testimony Archives (DATTA) Project and currently serves on the Executive Committee of the Board of the South Carolina Special Olympics, the Advisory Board of the Medical University of South Carolina Hollings Cancer Center and the Advisory Board of The University of Mississippi School of Law. She is a member of the South Carolina Association for Justice and is recognized as a BV® rated attorney by Martindale-Hubbell®.

## Lisa M. Saltzburg

LICENSED IN: SC, CO
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Fourth Circuit
U.S. District Court for the District of South Carolina
EDUCATION:
J.D., Stanford Law School, 2006
B.A., with high distinction, University of California, Berkeley, 2003

An associate with Motley Rice's Securities and Consumer Fraud practice group, Lisa Saltzburg represents individuals and institutional clients in complex securities and consumer fraud actions, merger and acquisition cases, shareholder derivative suits and a variety of other consumer and commercial matters. Lisa also works closely with the Environmental team, helping people and businesses in Gulf Coast communities file claims through the new claims programs established by the two settlements reached with BP.

Prior to joining Motley Rice, Lisa was an associate attorney for a nonprofit advocacy organization, where she worked through law and policy to protect the environmental interests of the Southeast. She handled numerous legal matters, drafting briefs and other filings in South Carolina's federal and state courts and working with administrative agencies to prepare for hearings and mediation sessions. Lisa also served for two years as a judicial clerk for the Honorable Karen J. Williams of the U.S. Court of Appeals for the Fourth Circuit, where she developed valuable legal research and writing skills and gained experience involving a wide range of issues arising in civil and criminal cases.

Lisa held multiple positions in environmental organizations during law school, handling a broad array of constitutional, jurisdictional and environmental issues. She also served as an editor of the *Stanford Law Review* and as an executive editor of the *Stanford Environmental Law Journal*. A member of numerous organizations and societies, including the Stanford Environmental Law Society, Lisa attended the National Institute for Trial Advocacy's week-long Trial Advocacy College at the University of Virginia.

## TEAM BIOS:

### Alex R. Straus

LICENSED IN: MA, RI, SC
EDUCATION:
J.D., Roger Williams University School of Law, 2009
B.A., Rollins College, 1992

As a member of Motley Rice's Securities and Consumer Fraud team, Alex Straus represents individuals, unions, public pension funds and other institutional investors in securities fraud class actions and other shareholder lawsuits. In addition, Alex represents individuals in SEC whistleblower actions and in *qui tam* litigation under the False Claims Act.

Alex also has experience representing workers and family members suffering from mesothelioma or other asbestos-related diseases caused by occupational, environmental or household asbestos exposure. He is currently fighting on behalf of more than 2,000 merchant marines exposed to asbestos while on the job in litigation against ship owners and manufacturers of asbestos-containing products. In June 2013, Alex authored an *amicus curiae* brief filed in the Supreme Court of the United States in support of a shipyard worker killed as a result of asbestos exposure.

Alex previously worked as an associate attorney for a New York law firm handling construction, real estate, estate planning and family law cases. During this time, he represented construction industry employers, employer associations and ERISA funds in negotiating and drafting a broad range of contracts, policies and procedures as well as resolving and litigating disputes before state and federal courts. He also served as a family and divorce law mediator and is an American Arbitration Association (AAA) certified mediator.

Prior to joining Motley Rice as an associate, Alex served as a law clerk for the firm. Alex also clerked for The New England Patriots, working with the organization's General Counsel on real estate acquisitions, environmental compliance and collective bargaining issues.

An avid writer, Alex has authored two published books, *Medical Marvels: The 100 Most Important Medical Advances* (Prometheus Books) and *Guerrilla Golf: The Complete Guide to Playing Golf on Mountains, Pastures, City Streets and Everywhere But the Course* (Rodale Press), in addition to more than 100 nationally published feature-length articles. He was awarded the Kathleen Brit Memorial Prize in 2009 for Alternative Dispute Resolution, and the New York Press Association bestowed its Best Sports Feature award to Alex in 1999.

Alex serves as an Executive Board Member of the Gary Forbes Foundation, a nonprofit organization that advocates for diabetes research and education. Active in his community, he has volunteered with Volunteer of America's Operation Backpack, an organization that provides school supplies to more than 7,000 homeless children in New York City.

### Elizabeth C. Ward

LICENSED IN: NC, SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the Middle, Eastern and Western Districts of North Carolina and District of South Carolina
EDUCATION:
J.D. cum laude, University of South Carolina School of Law, 1999
B.A., University of North Carolina at Chapel Hill, 1995

Liza Ward's practice ranges from helping clients injured by acts of corporate negligence to seeking improvements in worker and environmental health and safety. She litigates commercial, products liability and personal injury cases with Motley Rice's Occupational and Toxic Tort practice group and additionally works with the Medical team to represent people affected by allegedly harmful prescription drugs such as Accutane®.

Liza is also heavily involved in the firm's consultation work for South African human rights lawyer Richard Spoor in the effort to take on leading global gold producers, seeking justice for tens of thousands of exploited gold mine workers suffering from silicosis. Few class actions have been brought in South Africa, and none have been filed for sick workers. If approved as a class, the suit would generate an unprecedented means of recovery for the country and ensure meaningful access to justice for the indigent and rural workers who are dying from this entirely preventable yet incurable disease.

Liza redirected her career to plaintiffs' law after working several years with large defense firms. At Motley Rice, she has represented welders harmed as a result of corporate malfeasance and conducted client relations and trial preparation for welding rod cases. In 2008, Liza was a member of the trial team that obtained the first welding fume plaintiff verdict in Mississippi state court since 2003.

Liza has advocated for domestic violence victims' rights by participating in training programs and pro bono litigation. She served as articles editor for the *South Carolina Law Review* while a law student at the University of South Carolina School of Law and is a member of the Order of the Wig and Robe.

## TEAM BIOS:

## SECURITIES LITIGATION PROFESSIONAL STAFF

### Ellie Kimmel

EDUCATION:
B.A., University of South Florida, 1993

Business Analyst Ellie Kimmel began working with Motley Rice attorneys in 2000. Prior to her work with the securities litigation team, she was a founding member of the firm's Central Research Unit and also supervised the firm's file management. She currently completes securities research and client portfolio analysis for the firm's securities cases.

Ellie has a diverse background that includes experience in education as well as the banking industry. She began her career in banking operations, where she served as an operations manager and business analyst in corporate banking support for 14 years. She then spent seven years teaching high school economics, Latin and history before joining Motley Rice.

### Lotan Korenblit

EDUCATION:
B.A., Syracuse University, 2007

Lotan Korenblit supports Motley Rice's Securities and Consumer Fraud Practice group as a Paralegal and Practice Development/Client Relations Specialist out of the firm's New York office. With more than seven years of experience specific to plaintiffs' securities work, she works closely with attorneys and other staff to manage litigation documents and discovery, prepare for depositions and maintain efficient communication with clients.

Prior to joining Motley Rice, Lotan worked as a Senior Paralegal for a New York-based plaintiffs' firm after first serving as an intern with the Office of the District Attorney in Onondaga County, where she helped with trial preparation and observed trials and arraignments. In addition to her legal experience, Lotan has a diverse technology background and is proficient in both administrative and legal software. Her legal and administrative skills, combined with her experience handling institutional client interactions, make her a valuable addition to the Motley Rice team.

Lotan is a member on the Corporate Advisory Board for Badges Supporting Fallen Officers' Families (Fallen), and is also a member of National Association of Professional Women (NAPW) and The International Women's Leadership Association (IWLA).

A graduate of Syracuse University, she majored in Political Science and was a Dean's Scholarship recipient and a member of the National Society of Collegiate Scholars. Fluent in Hebrew, Lotan was a foreign language tutor during her undergraduate studies.

### Andrew Lucas

EDUCATION:
M.B.A., The Citadel, 2007
B.A., University of the South (Sewanee), 2003

Andrew Lucas joined Motley Rice in 2010. As a Business Analyst for the Securities and Consumer Fraud practice group, he plays a key role in analyzing investor trading activity related to securities litigation and is responsible for client portfolio monitoring, company research and settlement claims processing.

Prior to joining Motley Rice, Andrew traded equities, gaining valuable knowledge about the various influences that dictate market performance and drastically impact the short and long-term price movement of company stock. He also has previous work experience involving both commercial and residential real estate development and sales.

### Evelyn Richards

EDUCATION:
A.S., Computer Technology, Trident Technical College, 1995
J.D., University of South Carolina School of Law, 1989
B.A., English Literature and Religion, University of Virginia, 1986

Evelyn Richards joined Motley Rice in 2007. As a law clerk for the Securities and Consumer Fraud practice group, she plays a key role in supporting the securities litigation team through editing, cite-checking and Shepardizing complaints, briefs, and other legal documents. She also trains support staff on how to use The Bluebook.

Evelyn has over fifteen years of experience in the legal field. As an Assistant Solicitor for the Ninth Circuit Solicitor's Office, she prosecuted child abuse and neglect and criminal cases. She also worked as a programmer/analyst for a few years. Prior to joining Motley Rice, Evelyn worked as an administrator for a large telecom, corporate and litigation firm, supervising all office operations, including human resources and accounting procedures. She also served as office manager for a small worker's compensation law office, where she managed trust and operating accounts and provided information technology support.

Evelyn's diverse background in information technology, management, programming and analysis adds great depth to the resources provided to Motley Rice clients.



**www.motleyrice.com**
**1 800.768.4026**

28 BRIDGESIDE BLVD.
MT. PLEASANT, SC 29464

**SC | RI | CT | NY | WV | DC | CA | LA**

William H. Narwold (CT, DC, NY, SC) is the attorney responsible for this communication. Motley Rice LLP operates the California office. The images in this advertisement are dramatizations. Prior results do not guarantee a similar outcome. *PD: 10.23.2013*

# EXHIBIT 4

## GRANT & EISENHOFER P.A.
## FIRM BIOGRAPHY

Grant & Eisenhofer P.A. ("G&E") is a national litigation boutique with almost 70 attorneys that concentrates on federal securities and corporate governance litigation and other complex class litigation. G&E primarily represents domestic and foreign institutional investors, both public and private, who have been damaged by corporate fraud, greed and mismanagement. The Firm was named to the National Law Journal's Plaintiffs' Hot List for the last three years and is listed as one of America's Leading Business Lawyers by Chambers and Partners, who reported that G&E "commanded respect for its representation of institutional investors in shareholder and derivative actions, and in federal securities fraud litigation." Based in Delaware, New York and Washington, D.C., G&E routinely represents clients in federal and state courts throughout the country. G&E's clients include the California Public Employees' Retirement System, New York State Common Retirement Fund, Ohio Public Employees' Retirement System, State of Wisconsin Investment Board, Teachers' Retirement System of Louisiana, PIMCO, Franklin Templeton, Trust Company of the West, The Capital Guardian Group and many other public and private domestic and foreign institutions.

G&E was founded in 1997 by Jay W. Eisenhofer and Stuart M. Grant, formerly litigators in the Wilmington office of the nationally prominent firm of Skadden, Arps, Slate, Meagher & Flom LLP. Over the years, the Firm's partners have gained national reputations in securities and corporate litigation. In fact, G&E was the first law firm in the country to argue the provisions of the Private Securities Litigation Reform Act ("PSLRA") allowing an institutional investor to be appointed as lead plaintiff in a securities class action. The Firm has gone on to build a national and international reputation as a leader in securities litigation. In both class action and "opt out" cases, G&E has attracted widespread recognition for protecting investors' rights and recovering damages for investors. The Firm has recovered over $12.5 billion dollars for shareholders in the last five years, and has repeatedly been named one of the nation's "Top Ten Plaintiff's Firms" by the National Law Journal. In recent years RiskMetrics Group has twice recognized G&E for winning the highest average investor recovery in securities class actions of any law firm in the U.S.

G&E has served as lead counsel in many of the largest securities class action recoveries in U.S. history, including:

$3.2 billion settlement from Tyco International Ltd. and related defendants
$922 million from United Healthcare
$450 million Pan-European settlement from Royal Dutch Shell
$448 million settlement in Global Crossing Ltd. securities litigation
$422 million recovery for investors in the stock and bonds of Refco
$420 million settlement for shareholders of Digex
$400 million recovery from Marsh & McLennan
$325 million from Delphi Corp.
$303 million settlement from General Motors
$300 million settlement from DaimlerChrysler Corporation
$300 million recovery from Oxford Health Plans
$276 million judgment & settlement for Safety-Kleen stock and bond investors

G&E has also achieved landmark results in corporate governance litigation, including:

*In re UnitedHealth Group Inc. Shareholder Derivative Litigation*: G&E represented the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Connecticut Retirement Plans and Trust Funds as lead plaintiffs in a derivative and class action suit in which G&E successfully challenged $1.2 billion in back-dated options granted to William McGuire, then-CEO of health care provider UnitedHealth Group ("UHG"). This was among the first – and most egregious – examples of options backdating. As previously stated, G&E's case against UHG produced a settlement of $922 million.

*In re Digex, Inc. Shareholders Litigation* – G&E initiated litigation alleging that the directors and majority stockholder of Digex, Inc. breached fiduciary duties to the company and its public shareholders by permitting the majority shareholder to usurp a corporate opportunity that belonged to Digex. G&E's efforts in this litigation resulted in an unprecedented settlement of $420 million, the largest cash payment in the history of the Delaware Chancery Court.

*Caremark / CVS Merger* - G&E represented two institutional shareholders in this derivative litigation challenging the conduct of the board of directors of Caremark Rx Inc. in connection with the negotiation and execution of a merger agreement with CVS, Inc., as well as the board's decision to reject a competing proposal from a different suitor. Through the litigation, Caremark's board was forced to renegotiate the terms of the merger agreement with CVS. The settlement ensured statutory rights of Caremark shareholders, providing an additional $3.19 billion in cash consideration.

*Teachers' Retirement System of Louisiana v. Greenberg, et al. and American International Group, Inc.*: In the largest settlement of shareholder derivative litigation in the history of the Delaware Chancery Court, G&E reached a $115 million settlement in a lawsuit against former executives of AIG for breach of fiduciary duty. The case challenged hundreds of millions of dollars in commissions paid by AIG to C.V. Starr & Co., a privately held affiliate controlled by former AIG Chairman Maurice "Hank" Greenberg and other AIG directors. The suit alleged that AIG could have done the work for which it paid Starr, and that the commissions were simply a mechanism for Greenberg and other Starr directors to line their pockets.

*AFSCME v. AIG* – This historic federal appeals court ruling in favor of G&E's client established the right, under the then-existing proxy rules, for shareholders to place the names of director candidates nominated by shareholders on corporate proxy materials – reversing over 20 years of adverse rulings from the SEC's Division of Corporate Finance and achieving what had long been considered the "holy grail" for investor

activists. Although the SEC took nearly immediate action to reverse the decision, the ruling renewed and intensified the dialogue regarding "proxy access" before the SEC, ultimately resulting in a new rule currently being considered by the SEC that, if implemented, will make "proxy access" mandatory for every publicly traded corporation.

*Unisuper Ltd. v. News Corp., et al*. – G&E forced News Corp. to rescind the extension of its poison pill on the grounds that it was obtained without proper shareholder approval.

*Teachers' Retirement System of Louisiana v. HealthSouth* – G&E negotiated a settlement which ousted holdover board members loyal to indicted CEO Richard Scrushy and created mechanisms whereby *shareholders* would nominate their replacements.

*Carmody v. Toll Brothers* – This action initiated by G&E resulted in the seminal ruling that "dead-hand" poison pills are illegal.

*In re Refco Inc. Securities Litigation* – G&E represented Pacific Investment Management Company LLC ("PIMCO") as co-lead plaintiff in a securities class action alleging that certain officers and directors of Refco Inc., as well as other defendants including the company's auditor, its private equity sponsor, and the underwriters of Refco's securities, violated the federal securities laws in connection with investors' purchases of Refco stock and bonds. Recoveries for the class exceeded $400 million, including $140 million from the company's private equity sponsor, over $50 million from the underwriters, and $25 million from the auditor.

In addition, the firm's lawyers are often called upon to testify on behalf of institutional investors before the SEC and various judicial commissions, and they frequently write and speak on securities and corporate governance issues. G&E partners Jay Eisenhofer and Michael Barry are co-authors of the *Shareholder Activism Handbook*, and in 2008, Jay Eisenhofer was named one of the 100 most influential people in the field of corporate governance.

G&E is proud of its success in "fighting for institutional investors" in courts and other forums across the country and throughout the world.

## G&E's Attorneys

**Jay W. Eisenhofer**

Jay Eisenhofer, co-founder and managing director of Grant & Eisenhofer P.A., has been counsel in more multi-hundred million dollar cases than any other securities litigator, including the $3.2 billion settlement in the Tyco case, the $895 million United Healthcare settlement, the $450 million settlement in the Global Crossing case, the historic $450 million pan-European settlement in the Shell case, as well as a $400 million settlement with Marsh & McLennan, a $303 million settlement with General Motors and a $300 million settlement with DaimlerChrysler. Mr. Eisenhofer was also the lead attorney in the seminal cases of *American Federation of State, County & Municipal Employees, Employees Pension Plan v. American International Group, Inc.*, where the U.S. Court of Appeals required shareholder proxy access reversing years of SEC no-action letters, and *Carmody v. Toll Brothers*, wherein the Delaware Court of Chancery first ruled that so-called "dead-hand" poison pills violated Delaware law.

Mr. Eisenhofer has served as litigation counsel to many public and private institutional investors, including, among others, California Public Employees Retirement System, Colorado Public Employees Retirement Association, the Florida State Board of Administration, Louisiana State Employees Retirement System, the Teachers' Retirement System of Louisiana, Ohio Public Employee Retirement Systems, State of Wisconsin Investment Board, American Federation of State, County & Municipal Employees, Service Employees International Union, Amalgamated Bank, Lens Investment Management, Inc. and Franklin Advisers, Inc.

Mr. Eisenhofer is consistently ranked as a leading securities and corporate governance litigator in *Chambers USA – America's Leading Business Lawyers*. In the 2010 edition, Mr. Eisenhofer is hailed as a "*master strategist*" and is lauded as an "*outstanding tactician ... especially recommended for his strategic guidance.*" Mr. Eisenhofer was recognized by Directorship Magazine in 2008 as one of the 100 most influential people in the field of corporate governance, a list that included figures like Ben Bernanke, Henry Paulson, Barney Frank and Warren Buffet. In addition, he has been named by Lawdragon to its list of the top 500 lawyers in America.

*The National Law Journal* has selected Grant & Eisenhofer as one of the top ten plaintiffs' law firms in the country for the last five years, earning the firm a place in *The National Law Journal's* Plaintiffs' Firms Hall Of Fame. Mr. Eisenhofer serves as a member of the Advisory Boards for the Program on Corporate Governance at Harvard Law School and the Weinberg Center for Corporate Governance at the University of Delaware.

Mr. Eisenhofer has written and lectured widely on securities fraud and insurance coverage litigation, business and employment torts, directors' and officers' liability coverage, and the Delaware law of shareholder rights and directorial responsibilities. Among the publications he has authored: "The Shareholders Activism Handbook" Aspen Publishers; "Proxy Access Takes Center Stage – The Second Circuit's Decision in <u>AFSCME Employees Pension Plan v. American International Group, Inc.</u>" *Bloomberg Law Reports*, Vol. 1, No. 5; "Investor Litigation in the U.S. - The System is Working" *Securities Reform Act Litigation Reporter*, Vol. 22, #5; "*In re Walt Disney Co. Deriv. Litig.* and the Duty of Good Faith Under Delaware Corporate Law" *Bank & Corporate Governance Law Reporter*, Vol. 37, #1; "Institutional Investors As Trend-Setters In Post-PSLRA Securities Litigation" *Practicing Law Institute*, July, 2006; "*In re Cox*

*Communications, Inc.*: A Suggested Step in the Wrong Direction," *Bank and Corporate Governance Law Reporter,* Vol. 35, #1; "Does Corporate Governance Matter to Investment Returns?" *Corporate Accountability Report*, Vol. 3, No. 37; "Loss Causation in Light of Dura: Who is Getting it Wrong?" *Securities Reform Act Litigation Reporter*, Vol. 20, #1; "Giving Substance to the Right to Vote: An Initiative to Amend Delaware Law to Require a Majority Vote in Director Elections," *Corporate Governance Advisor*, Vol. 13, #1; "An Invaluable Tool in Corporate Reform: Pension Fund Leadership Improves Securities Litigation Process," *Pensions & Investments*, Nov. 29, 2004; and "Securities Fraud, Stock Price Valuation, and Loss Causation: Toward a Corporate Finance-Based Theory of Loss Causation," *Business Lawyer*, Aug. 2004.

Mr. Eisenhofer serves as a member of the Board of the American Constitution Society. He is a graduate of the University of Pittsburgh, and a 1986 *magna cum laude* graduate of Villanova University School of Law, Order of the Coif. He was a law clerk to the Honorable Vincent A. Cirillo, President Judge of the Pennsylvania Superior Court and thereafter joined the Wilmington office of Skadden Arps Slate Meagher & Flom. Mr. Eisenhofer was a partner in the Wilmington office of Blank Rome Comisky & McCauley until forming Grant & Eisenhofer P.A. in 1997.

**Stuart M. Grant**

Stuart M. Grant, co-founder and managing director of Grant & Eisenhofer P.A., is internationally recognized for his extensive knowledge in the areas of Delaware corporate law, fiduciary responsibility, securities and investments, private equity and fixed income, appraisal remedies, valuation, proxy contests and other matters related to protecting and promoting the rights of institutional investors. He serves as litigation counsel to many of the largest public and private institutional investors in the world.

Mr. Grant was the first attorney to argue the provisions of the PSLRA allowing an institutional investor to be appointed as sole lead plaintiff and has served as lead counsel in six of the seven largest settlements in the history of Delaware Chancery Court.

Among his many accolades, Mr. Grant is consistently ranked in Band 1 of *Chambers USA* as a leading litigator for his work in Delaware Chancery and securities, regulatory and corporate governance litigation. In the 2010 edition, it is noted that Mr. Grant "*covers the full spectrum of personality, and is able to be everything to everyone in a very successful way.*" Mr. Grant, who has also been recognized as one of the Top 500 Leading Lawyers in America by Lawdragon, is rated AV by Martindale Hubbell.

Mr. Grant has successfully argued on behalf of institutional investors in many groundbreaking corporate governance cases including:

> *In re Del Monte Foods Company Shareholders Litigation,* which resulted in an unprecedented and immediate change in lending policy practices among major investment banks regarding the way the banks approach financing transactions in which they represent the seller;

> *In re Digex Stockholders Litigation*, the largest settlement in Delaware Chancery Court history, which led to the establishment of lead plaintiff provisions in Delaware;

*Teachers' Retirement System of Louisiana v. Aidinoff, et al. and American International Group, Inc.,* the largest derivative shareholder litigation settlement in the history of Delaware Chancery Court;

*UniSuper Ltd., et al. v. News Corporation, et al*., a landmark case in which the Delaware Chancery Court ruled that shareholders may limit board authority without amending the corporation's charter;

*In re Tyson Foods, Inc*., which resulted in historic rulings from the Delaware Court of Chancery clarifying the fiduciary duties of corporate directors in connection with the administration of stock option plans; *Teachers' Retirement Systems of Louisiana v. Richard M. Scrushy, et. al.*, which ousted holdover board members loyal to indicted CEO Richard Scrushy and created mechanisms whereby shareholders would nominate their replacements;

*In re Cablevision Systems Corp. Options Backdating Litigation* and *In re Electronics for Imaging, Inc. Shareholder Litigation*, both of which held directors and officers of their respective companies accountable for improperly granting backdated options and, most importantly, required the individual defendants to reach into their own pockets to cover a significant portion of the settlement.

Included among Mr. Grant's more notable securities class action representations are: *Gluck, et al. v. Cellstar*, the first allowing an institutional investor to be appointed as lead plaintiff in a securities class action under the Private Securities Litigation Reform Act (PSLRA) and widely considered the landmark on the standards applicable to lead plaintiff/lead counsel practice under the PSLRA; *In re Refco Inc. Securities Litigation*, which resulted in a $400 million settlement; *In re Safety-Kleen Securities Corporation Bondholders Litigation*, which, after a six-week securities class action jury trial, resulted in judgments holding the company's CEO and CFO jointly and severally liable for nearly $200 million and settlements with the remaining defendants for $84 million; and *In re Parmalat Securities Litigation*, which resulted in a settlement of approximately $100 million in what the SEC described as "one of the largest and most brazen financial frauds in history."

Mr. Grant serves as Vice-Chairperson of the Delaware Judicial Nominating Commission, as a member of the Board of Trustees for the University of Delaware and the Delaware Art Museum, and on the Advisory Board for the Weinberg Center for Corporate Governance at the University of Delaware. Mr. Grant was an Adjunct Professor of Law at the Widener University School of Law from 1994 - 2009, where he taught securities litigation.

Mr. Grant has authored a number of articles which have been cited with approval by the U.S. Supreme Court, U.S. Court of Appeals for the 2nd and 5th Circuits and numerous U.S. District Courts. His articles include, among others, "The Devil is in the Details: Application of the PSLRA's Proportionate Liability Provisions is so Fraught With Uncertainty That They May be Void for Vagueness"; "Class Certification and Section 18 of the Exchange Act"; "*Unisuper v. News Corporation*: Affirmation that Shareholders, Not Directors, Are the Ultimate Holders of Corporate Power"; "Executive Compensation: Bridging the Gap Between What Companies Are Required to Disclose and What Stockholders Really Need to Know"; and a number of annual

PLI updates under the heading of "Appointment of Lead Plaintiff Under the Private Securities Litigation Reform Act."

Mr. Grant was graduated in 1982 *cum laude* from Brandeis University with a B.A. in economics and received his J.D. from New York University School of Law in 1986. He served as Law Clerk to the Honorable Naomi Reice Buchwald in the U.S. District Court for the Southern District of New York. Mr. Grant was an associate at Skadden, Arps, Slate, Meagher & Flom (1987-94), and a partner in the Wilmington office of Blank Rome Comisky & McCauley from 1994 until forming Grant & Eisenhofer P.A. in 1997.

**Jeff A. Almeida**

Jeff Almeida is a director at Grant & Eisenhofer practicing in the areas of corporate, securities and complex commercial litigation. Mr. Almeida has represented domestic and foreign institutional investors in prominent securities fraud actions including, *In re Qwest Communications International Securities Litigation*; *In re Alstom SA Securities Litigation*; *In re Refco Inc. Securities Litigation*; *In re Merck & Co., Inc. Vytorin/Zetia Securities Litigation*; *In re Pfizer Inc. Securities Litigation*; and *In re Global Cash Access Holdings Securities Litigation*. Mr. Almeida has also been actively engaged in derivative and class litigation in the Delaware Court of Chancery, including the matters *In re Tyson Foods, Inc*., which resulted in historic rulings clarifying the fiduciary duties of corporate directors in connection with the administration of stock option plans; *Louisiana Police Employees Retirement System v. Crawford* ("*Caremark*"), a well-publicized derivative action challenging the terms of the Caremark and CVS merger that resulted in a $3.2 billion settlement; and *In re Genentech Inc. Shareholder Litigation*, where he successfully represented Genentech minority stockholders against Roche's heavy-handed attempt to squeeze out the minority to seize control of Genentech. In recent years, Mr. Almeida has also represented prominent hedge fund clients in complex commercial litigation involving claims of short-squeeze market manipulation and the marketing and sale of abusive tax shelters.

Prior to joining Grant & Eisenhofer in August 2004, Mr. Almeida was affiliated for seven years as an attorney with a major Philadelphia defense firm, where he practiced in the areas of complex commercial litigation, with a focus on consumer class actions, commercial contract disputes, and insurance coverage and bad faith defense.

Mr. Almeida is a 1994 graduate of Trinity College in Hartford, Connecticut, where he captained the varsity basketball team and achieved election to Phi Beta Kappa, and a 1997 graduate of William and Mary Law School in Williamsburg, Virginia. Mr. Almeida is admitted to practice in Delaware, Pennsylvania, and New Jersey, along with several federal district courts.

**Michael J. Barry**

Michael Barry is a director at Grant & Eisenhofer. His practice focuses on corporate governance and securities litigation. He also advises clients on SEC matters. As a foremost practitioner in these areas, Mr. Barry has been significantly involved in groundbreaking class action recoveries, corporate governance reforms and shareholders rights litigation.

Mr. Barry has been instrumental in landmark corporate governance cases, including *AFSCME v. AIG*, where the Court of Appeals for the Second Circuit recognized the right of shareholders to

introduce proxy access proposals; *Bebchuk v. CA, Inc.,* which opened the door for shareholders to introduce proposals restricting the ability of boards to enact poison pills; and *CA, Inc. v. AFSCME*, an historic 2008 decision of the Supreme Court of Delaware regarding the authority of shareholders to adopt corporate bylaws. Mr. Barry's case work also includes, among others, *In re Global Crossing Ltd. Securities Litigation*, which resulted in a $448 million settlement; a well-publicized derivative litigation action challenging the terms of the Caremark Rx, Inc. and CVS merger that resulted in a $3.2 billion settlement; and litigation between the Chicago Board of Trade and the Chicago Mercantile Exchange, which produced a $485 million settlement. Each of these cases resulted in substantial reforms to the terms of merger agreements to provide increased consideration and structural benefits to shareholders.

Mr. Barry has spoken widely on corporate governance and related matters. In addition to serving as a frequent guest lecturer at Harvard Law School, he speaks at numerous conferences each year. Mr. Barry has authored several published writings, including the *Shareholder Activism Handbook*, a comprehensive guide for shareholders regarding their legal rights as owners of corporations, which he co-authored.

Prior to joining Grant & Eisenhofer, Mr. Barry practiced at a large Philadelphia-based firm, where he defended the Supreme Court of Pennsylvania, the Pennsylvania Senate and Pennsylvania state court judges in a variety of trial and appellate matters. He is a 1990 graduate of Carnegie Mellon University and graduated *summa cum laude* in 1993 from the University of Pittsburgh School of Law, where he was an Executive Editor of the *University of Pittsburgh Law Review* and a member of the Order of the Coif.

**Daniel L. Berger**

Daniel Berger is a director at Grant & Eisenhofer. Prior to joining the firm, Mr. Berger was a partner at two major plaintiffs' class action firms in New York, including Bernstein Litowitz Berger & Grossmann (BLBG), where he had litigated complex securities and discrimination class actions for twenty two years.

Mr. Berger's previous experience includes trying two 10b-5 securities class actions to jury verdicts, which were among very few such cases ever tried. He also served as principal lead counsel in many of the largest securities litigation cases in history, achieving successful recoveries for classes of investors in cases including *In re Cendant Corp. Securities Litigation* ($3.3 billion); *In re Lucent Technologies, Inc. Securities Litigation* ($675 million); *In re Bristol-Myers Squibb Securities Litigation* ($300 million); *In re Daimler Chrysler A.G. Securities Litigation* ($300 million); *In re Conseco, Inc. Securities Litigation* ($120 million); *In re Symbol Technologies Securities Litigation* ($139 million); and *In re OM Group Securities Litigation* ($92 million).

Mr. Berger has successfully argued several appeals that made new law favorable to investors, including *In re Suprema Specialties, Inc. Securities Litigation,* 438 F.3d 256 (3d Cir. 2005); *McCall v. Scott,* 250 F.3d 997 (6th Cir. 2001) and *Fine v. American Solar King Corp.,* 919 F.2d 290 (5th Cir. 1990.) In addition, Mr. Berger was lead class counsel in many important discrimination class actions, in particular *Roberts v. Texaco, Inc.*, where he represented African-American employees of Texaco and achieved the then largest settlement ($175 million) of a race discrimination class action.

-8-

Mr. Berger currently serves on the Board of Visitors of Columbia University Law School. Previously, Mr. Berger was a member of the Board of Managers of Haverford College from 2000-2003. He also now serves on the Board of GO Project, a not-for profit organization that provides academic support for New York City public school students and he is also on the Board of Grace Church School in New York. He also served on the Board of in Motion, Inc., a non-profit organization providing legal services to victims of domestic violence, for six years.

Mr. Berger is a 1976 graduate from Haverford College, and graduated in 1979 from Columbia University School of Law.

## Cynthia A. Calder

Cynthia Calder is a director at Grant & Eisenhofer. She concentrates her practice in the areas of corporate governance and securities litigation. She has represented shareholders in such seminal cases in the Delaware Court of Chancery as *UniSuper Ltd. v. News Corp.*, vindicating the shareholders' right to vote; *Carmody v. Toll Brothers*, finding the dead-hand poison pill defensive measure was illegal under Delaware law, *Jackson National Life Insurance Co. v. Kennedy*, breaking new ground in the interpretation of fiduciary duties owed to preferred shareholders; *Haft v. Dart Group Corp.*, resolving a contest for control of a significant public corporation; and *Paramount Communications Inc. v. QVC Network*, obtaining an injunction preventing the closing of a merger to force the board of directors to appropriately consider a competing bid for the corporation. More recently, Ms. Calder prosecuted a derivative suit on behalf of American International Group, Inc. shareholders against the company's former CEO, Maurice Greenberg, and other former AIG executives. The action was concluded for a settlement of $115 million – the largest such settlement in the history of the Delaware Court of Chancery. Ms. Calder was also the Court-appointed representative on the shareholder counsel's committee in the UnitedHealth Group derivative litigation, which was settled for more than $900 million – the largest known derivative settlement in any court system. Ms. Calder also recently prosecuted a shareholder class action, *In re ACS Shareholder Litigation*, which resulted in one of the largest class recoveries in the history of the Court of Chancery.

Ms. Calder has co-authored numerous articles on corporate governance and securities litigation, including "Options Backdating from the Shareholders' Perspective" *Wall Street Lawyer*, Vol. 11, No. 3; "Securities Litigation Against Third Parties: Pre-Central Bank Aiders and Abettors Become Targeted Primary Defendants" *Securities Reform Act Litigation Reporter*, Vol. 16, No. 2; and "Pleading Scienter After Enron: Has the World Really Changed?" *Securities Regulation & Law*, Vol. 35, No. 45.

Ms. Calder graduated *cum laude* from the University of Delaware in 1987 and graduated from the Villanova University School of Law in 1991. Upon graduating from law school, Ms. Calder served as a Judicial Law Clerk in the Delaware Court of Chancery to the Honorable Maurice A. Hartnett, III. Prior to joining Grant & Eisenhofer, Ms. Calder was an associate at Blank, Rome, Comisky & McCauley.

## Charles T. Caliendo

Charles Caliendo is a director at Grant & Eisenhofer. He represents institutional investors in class action securities, opt-out and shareholder derivative litigation. Prior to joining Grant &

Eisenhofer, he served as an Assistant Attorney General in the Investment Protection Bureau of the New York State Attorney General's Office where he prosecuted cases and led investigations related to mutual fund market timing and late trading. Mr. Caliendo practiced at a Manhattan-based law firm in the areas of class action securities, mergers and acquisitions, corporate governance and other commercial litigation.

Mr. Caliendo has written and spoken on issues relating to regulatory enforcement, corporate internal investigations and securities and shareholder litigation. In November 2004 and June 2006, Mr. Caliendo was a speaker at financial services industry seminars sponsored by The Association of the Bar of the City of New York for which he authored articles entitled "The Investment Protection Bureau: An Overview of Financial Markets Regulation and Enforcement in New York" and "Thompson Memo Under A Microscope." In June 2005, Mr. Caliendo spoke before a delegation of Chinese mutual fund CEOs participating in the Penn-China Mutual Fund CEO Leadership Program, University of Pennsylvania Graduate School of Education. Mr. Caliendo co-authored "Who Says The Business Judgment Rule Does Not Apply To Directors Of New York Banks?" 118 *Banking Law Journal* 493 (June 2001) and "Board of Directors' 'Revlon Duties' Come Into Focus," *New York Law Journal*, vol. 222, no. 86, col. 1 (Nov. 1, 1999).

Mr. Caliendo received his B.S. from Cornell University and J.D. from St. John's University School of Law where he was an editor of the *St. John's Law Review* and a Saint Thomas More Scholar.

**Robert G. Eisler**

Robert Eisler is a director in Grant and Eisenhofer's antitrust practice. Mr. Eisler has been involved in many significant antitrust class action cases in recent years. He is experienced in numerous industries, including pharmaceuticals, paper products, construction materials, industrial chemicals, processed foods, municipal securities, and consumer goods.

Mr. Eisler has served as lead or co-lead counsel in the largest antitrust cases litigated, including, *In re Buspirone Antitrust Litigation*, (which led to a $90 million settlement and in which presiding Judge Koeltl stated that the plaintiffs' attorneys had done "a stupendous job"), *In re Ciprofloxacin Hydrochloride Antitrust Litigation, In re Flat Glass Antitrust Litigation*, *In re Municipal Derivatives Antitrust Litigation*, and *In re Chocolate Confectionary Antitrust Litigation*.

Mr. Eisler has played major roles in a number of other significant antitrust cases, including *In re Linerboard Antitrust Litigation*, *In re Aftermarket Filters Antitrust Litigation*, and *In re Publication Paper Antitrust Litigation*.

Mr. Eisler also has extensive experience in securities, derivative, complex commercial and class action litigation at the trial and appellate levels. He has been involved in numerous securities and derivative litigation matters on behalf of public pension funds, municipalities, mutual fund companies and individual investors in state and federal courts.

Mr.Eisler graduated from LaSalle University in 1986, and in 1989 from Villanova University School of Law.

**Reuben A. Guttman**

Reuben Guttman is a director at Grant & Eisenhofer. His practice involves complex litigation and class actions. He has represented clients in claims brought under the Federal False Claims Act, securities laws, the Price Anderson Act, Department of Energy (DOE) statutes and regulations, the Worker Adjustment and Retraining Notification Act (WARN), Racketeer Influenced and Corrupt Organizations Act (RICO) and various employment discrimination, labor and environmental statutes. He has also tried and/or litigated claims involving fraud, breach of fiduciary duty, antitrust, business interference and other common law torts.

Mr. Guttman has been counsel in some of the largest recoveries under the Federal False Claims Act, including *U.S. ex rel. Johnson v. Shell Oil Co.*, 33 F. Supp. 2d 528 (ED Tex. 1999), where over $300 million was recovered from the oil industry. He also represented one of the six main whistleblowers in litigation resulting in the government's September 2009, $2.3 billion settlement with Pfizer Pharmaceutical. Cases brought by Mr. Guttman under the False Claims Act on behalf of a European whistleblower resulted in a $13 million settlement with a Department of Defense contractor. He is currently lead counsel in three pending False Claims Act cases where the United States Department of Justice has intervened on the side of his whistleblower clients.

Mr. Guttman served as lead counsel in a series of cases resulting in the recovery of more than $30 million under the Federal Fair Labor Standards Act. Cases brought by Mr. Guttman on behalf of nuclear weapons workers at "Manhattan Project" nuclear weapons sites resulted in congressional oversight and changes in procurement practices, and dread disease compensation legislation, affecting the nation's nuclear weapons complex and its workforce. In addition, he served as lead counsel in litigation brought on behalf of prison workers in the District of Columbia, which resulted in injunctive relief protecting workers against exposure to blood-borne pathogens. Mr. Guttman served as lead counsel in a mediation before the United States Equal Employment Opportunity Commission, resulting in work place standards and back pay for minority employees at a large Texas oil refinery.

Mr. Guttman is the author and/or editor of numerous articles, book chapters, and technical publications and his commentary has appeared in *Market Watch*, *American Lawyer Media*, *AOL Government*, and *Accounting Today*. His article, *Pharmaceutical Regulation in the United States; A Confluence of Influences*, was published in Chinese by the *Peking University Public Interest Law Journal*, Vol 1, Page 187 (2010). He is co-author of *Gonzalez v. Hewitt*, *SEC v. HG Pharmaceutica*l, and *U.S. ex Rel Rodriguez v. Hughes* which are case files published by the Emory University Law School Center for Advocacy and Dispute Resolution (2010) and used to train law students and practicing attorneys. He has appeared on *ABC Nightly News,* CNN, Bloomberg News, and has been quoted in major publications including *The Wall Street Journal, The New York Times, The Washington Post, The Los Angeles Times, The Atlanta Journal-Constitution, USA Today, Houston Chronicle, Dallas Morning News* and national wire services including the Associated Press, Reuters and Bloomberg.

In addition to his writings, Mr. Guttman has testified before committees of the United States House of Representatives and the United States Senate on the Asbestos Hazard Emergency Response Act (AHERA). In 1992, he advised President-elect Clinton's transition team on labor policy and worker health and safety regulation.

Mr. Guttman earned his law degree at Emory University Law School graduating in 1985, and his Bachelor's Degree from the University of Rochester in 1981. He is a Senior Fellow and Adjunct Professor at the Emory University School of Law Center for Advocacy and Dispute Resolution and has been a Team Leader for Emory Law School's Kessler-Eidson Trial Techniques Program. As part of a U.S. State Department program in conjunction with the Center for Advocacy and Dispute Resolution, he has been one of five visiting professors at Universidad Panamericana in Mexico City training Mexican Judges and practitioners on oral advocacy and trial practice. He is a contributing editor of a soon to be published text book on trial practice for Mexican practitioners.

Mr. Guttman is a faculty member of the National Institute of Trial Advocacy. He has been a guest lecturer at a number of universities including Jao Tong University in Shanghai, Peking University in Beijing and Renmin University in Beijing. In 2006 he was invited by the Dutch Embassy in China to share his expertise with experts in China about changes to the nation's labor laws. He is a Co-Founder of Voices for Corporate Responsibility, www.voicesforcorporateresponsibility.com, and founder of www.whistleblowerlaws.com and www.thecorporateinsider.com.

**Geoffrey C. Jarvis**

Geoffrey Jarvis, a director at Grant & Eisenhofer, focuses on securities litigation for institutional investors. He had a major role in *Oxford Health Plans Securities Litigation* and *DaimlerChrysler Securities Litigation*, both of which were among the top ten securities settlements in U.S. history at the time they were resolved. Mr. Jarvis also has been involved in a number of actions before the Delaware Chancery Court, including a Delaware appraisal case that resulted in a favorable decision for the firm's client after trial. At the present time, he has primary responsibility for a number of cases in which Grant & Eisenhofer clients have opted-out of class actions, and has also played a lead role in class actions against Tyco, Alstom and Sprint.

Mr. Jarvis received a B.A. in 1980 from Cornell University, where he was elected to Phi Beta Kappa. He graduated *cum laude* from Harvard Law School in 1984. Until 1986, he served as a staff attorney with the Federal Communications Commission, participating in the development of new regulatory policies for the telecommunications industry. He then became an associate in the Washington office of Rogers & Wells, principally devoted to complex commercial litigation in the fields of antitrust and trade regulations, insurance, intellectual property, contracts and defamation issues, as well as counseling corporate clients in diverse industries on general legal and regulatory compliance matters. Mr. Jarvis was previously associated with a prominent Philadelphia litigation boutique and had first-chair assignments in cases commenced under the Pennsylvania Whistleblower Act and in major antitrust, First Amendment, civil rights, and complex commercial litigation, including several successful arguments before the U.S. Court of Appeals for the Third Circuit.

Mr. Jarvis authored "State Appraisal Statutes: An Underutilized Shareholder Remedy," *The Corporate Governance Advisor*, May/June 2005, Vol. 13, #3, and co-authored with Jay W. Eisenhofer and James R. Banko, "Securities Fraud, Stock Price Valuation, and Loss Causation: Toward a Corporate Finance-Based Theory of Loss Causation," *Business Lawyer*, Aug. 2004.

**John C. Kairis**

John Kairis is a director at Grant & Eisenhofer, where he represents institutional investors in class action litigation, individual "opt-out" securities litigation, and derivative and corporate governance litigation in the Delaware Chancery Court and other courts throughout the country. He has been a leader of G&E teams that have achieved some of the largest recoveries in securities class action history, and played major roles in the *Tyco*, *Parmalat*, *Marsh & McLennan*, *Hollinger International* and *Dollar General* securities class actions, and opt-out actions in *AOL Time Warner* and *Telxon Corporation*. Among his Delaware Chancery Court litigation experience is a landmark case against HealthSouth, involving a books and records trial under Section 220 of the Delaware General Corporations Law, to obtain certain documents that the corporation refused to produce, which led to a settlement implementing corporate governance improvements, such as HealthSouth's agreement to replace its conflicted directors with independent directors approved by a committee which included the institutional investor plaintiff.

Mr. Kairis has also been instrumental in prosecuting consumer class actions involving unfair competition and false marketing claims against both Johnson & Johnson and Bausch & Lomb, and is currently prosecuting off-label marketing cases brought under the federal False Claims Act and various state counterpart false claims acts. Mr. Kairis currently represents the lead plaintiffs and the class in a securities fraud suit against Merck & Co. and certain of its officers and directors relating to the defendants' alleged suppression of test results of Merck's cholesterol medication Vytorin, the lead plaintiffs in a securities class action against Apollo Group and certain of its officers and directors relating to the defendants' participation in a fraudulent accounting scheme, and the lead plaintiffs in various breach of fiduciary duty cases pending in the Delaware Chancery Court.

Mr. Kairis has authored articles including "Shareholder Proposals For Reimbursement Of Expenses Incurred In Proxy Contests: Recent Guidance From The Delaware Supreme Court," *PLI*, What All Business Lawyers Must Know About Delaware Law Developments 2009 (New York, NY May 21, 2009) (co-authored with Stuart Grant); "Challenging Misrepresentations in Mergers: You May Have More Time Than You Think," *Andrews Litigation Reporter*, Vol. 12, Issue 3, June 14, 2006; and was the principle writer of an *amicus brief* to the United States Supreme Court on behalf of various public pension funds in the *Merck* case involving the standard for finding that a plaintiff is on "inquiry notice" of potential claims such that the limitations period for pleading securities fraud has commenced.

Mr. Kairis is a 1984 graduate of the University of Notre Dame and a 1987 graduate of the Ohio State University Moritz College of Law, where he was Articles Editor of the *Ohio State Law Journal* and recipient of the American Jurisprudence and John E. Fallon Memorial Awards for scholastic excellence. He is a member of the Delaware and American Bar Associations and the Delaware Trial Lawyers Association. Mr. Kairis has served on the boards of several nonprofit organizations, including the West-End Neighborhood House, Inc., the Cornerstone West Development Corporation, and the board of the Westover Hills Civic Association. He has also served on the Delaware Corporation Law Committee, where he evaluated proposals to amend the Delaware General Corporation Law.

**Adam J. Levitt**

Adam J. Levitt is a director at Grant & Eisenhofer and leads the Firm's Consumer Class Action Litigation Practice. Substantially all of Mr. Levitt's practice is focused on complex commercial litigation and class action practice on both the trial and appellate court levels, in federal and state courts nationwide, in the areas of consumer protection, antitrust, securities, technology, and agricultural law. Since 1993, Mr. Levitt has served as lead counsel, co-lead counsel, or in other leadership positions in numerous class and other complex litigations throughout the United States. He presently serves as Co-Lead Counsel in In re Genetically Modified Rice Litigation, MDL No. 1811 (E.D. Mo.), in which he represents the interests of United States long-grain rice producers seeking to recover damages they sustained resulting from the contamination of the U.S. rice supply with unapproved, genetically-modified rice seed traits. That case settled on July 1, 2011 for $750,000,000. He also presently serves as Interim Co-Lead Counsel in In re Imprelis Herbicide, Sales Practice and Products Liability Litigation, MDL No. 2284 (E.D. Pa.), a multidistrict class action lawsuit brought by landowners and landscapers against E.I. DuPont de Nemours and Company seeking to recover damages for tree and other foliage death and other harm caused by DuPont's Imprelis herbicide. In addition to those cases, Mr. Levitt served as Co-Lead Counsel in In re StarLink Corn Products Liability Litigation, MDL No. 1403 (N.D. Ill.), where he recovered $110,000,000 on behalf of U.S. corn farmers who sustained market losses resulting from the contamination of the U.S. corn supply with genetically-modified StarLink corn.

Mr. Levitt also presently serves as Co-Lead Counsel in several other national class action cases, including In re Porsche Cars North America, Inc., Plastic Coolant Tubes Products Liability Litigation, MDL No. 2233 (S.D. Ohio), a consumer class action concerning defective parts in certain models of the Porsche Cayenne; In re ConAgra Foods, Inc., MDL No. 2291 (C.D. Cal.), a consumer class action against ConAgra pertaining to its marketing of its Wesson Oil products as being "100% Natural," when they are actually made from genetically-modified plants or genetically-modified organisms; and In re Sony Gaming Networks and Customer Data Security Breach Litigation, MDL No. 2258, a data breach class action arising out of the Sony defendants' alleged negligence leading to a system shutdown and theft of class members' personal and financial information.

Other cases in which Mr. Levitt has held leadership positions include In re Vytorin/Zetia Marketing, Sales Practices and Products Liability Litigation, Civil Action No. 08-285 (D.N.J.) (obtained $41.5 million recovery on behalf of consumers who overpaid for Vytorin and Zetia, which defendants deceptively marketed as being more effective than other anti-cholesterol drugs); In re Northstar Education Finance, Inc. Contract Litigation, Case No. 01990-MD-08 (D. Minn.) (action brought on behalf of student loan borrowers who were improperly denied prompt payment bonus rebates on their loan balances); Schoenbaum v. E.I. DuPont de Nemours and Company, et al., Case No. 4:05-cv-01108 ERW (E.D. Mo.) (consolidated antitrust action concerning genetically modified corn and soybean seeds); Court Reporting Services, et al. v. Compaq Computer Corporation, C.A. No. 02 CV 044 (E.D. Texas) (obtained full recovery, valued at not less than $35 million, on behalf of Compaq Presario purchasers with improperly partitioned hard disk drives); and various Internet privacy cases, including Supnick v. Amazon.com, Inc. (W.D. Wash.) and In re DoubleClick, Inc. Privacy Litigation (S.D.N.Y.). Mr. Levitt also provides legal services to various private companies involving complex litigation and general corporate matters.

Mr. Levitt is President of the Class Action Trial Lawyers division of The National Trial Lawyers; an elected member of the American Law Institute ("ALI"), participating in ALI's Members Consultative Groups on the Principles of the Law of Aggregate Litigation, the Restatement of the Law (Third) Restitution and Unjust Enrichment, and the Restatement of the Law (Third) Torts: Liability for Economic Loss; an Advisory Board member of the Institute for Consumer Antitrust Studies; a member of the Board of Advisors of the American Constitution Society for Law and Policy (Chicago Lawyer Chapter); and a member of the American Association for Justice. Mr. Levitt is also the Seventh Circuit Contributing Editor to the American Bar Association's Class Action & Derivative Suits newsletter; a consulting participant in the National Association of Public Pension Attorneys, Securities Litigation Damages Calculation Taskforce's project entitled "Calculation of Securities Litigation Damages"; and regularly serves as a moot court judge in the Julius H. Miner Moot Court Competition at the Northwestern University School of Law.

Mr. Levitt graduated from Columbia College, Columbia University in 1990 (A.B. magna cum laude) and the Northwestern University School of Law in 1993. Mr. Levitt was admitted to the Illinois Bar in 1993 and is also admitted to practice before the United States District Courts for the Northern, Central, and Southern Districts of Illinois; the United States District Courts for the Northern and Eastern Districts of Texas; the United States District Court for the District of Nebraska; the United States District Court for the Northern District of Indiana; the United States District Court for the District of Colorado; the United States Courts of Appeal for the First, Seventh, Eighth, and Ninth Circuits; and the Supreme Court of the United States. He is rated "AV" by Martindale-Hubbell, is an Illinois "Super Lawyer," and is included in the 2011 Lawdragon 500 Leading Lawyers in America.

Mr. Levitt's publications include Multidistrict Litigation Practice: The Function and Shifting Focus of the JPML in Class Action and Other "Bet the Company" Litigation (book chapter, included in Straight From the Top: Case Studies in the World of Litigation, published by ExecSense, December 2012); The Role and Function of Corporate Representatives at Trial, The Trial Lawyer, Vol. II, No . IV (Fall 2012); Class Action Litigation 2012 – Where Do We Go From Here?, Global Business Magazine, December 2012; Sticky Situations in Mass Tort Settlements, TRIAL, Vol. 48, No. 11 (November 2012); CAFA and Federalized Ambiguity: The Case for Discretion in the Unpredictable Class Action, 120 YALE L.J. ONLINE 231 (2011); Taming the Metadata Beast, New York Law Journal, May 16, 2008; Foreign Investors Serving as Lead Plaintiffs in U.S.-Based Securities Cases, International Practice Section Newsletter (Association of Trial Lawyers of America, Washington, D.C.), Winter 2004 and Spring 2005.; Proposed Rule 225: A Death Warrant for Class Actions in Illinois, 93 Illinois Bar Journal 202 (2005); The Big Business Wish List: Proposed Illinois Supreme Court Rule 225 and the Demolition of Consumer Rights, The Class Act (The Newsletter of the National Association of Securities and Consumer Law Attorneys), February 25, 2005; and An Illinois Lawyer's Guide to Service of Process in Mexico, 82 Illinois Bar Journal 434 (1994).

Mr. Levitt has testified before the Illinois Supreme Court Rules Committee on class action practice and related issues. He also speaks nationally on a wide range of topics, including: (a) "Lead Plaintiff 'Pickoffs', Offers of Judgment, Moving to Dismiss Class Allegations, and Other Early Attacks on the Class Process," Law Seminars International, Litigating Class Actions Conference, (Chicago, December 6-7, 2012) (Conference Co-Chair); (b) "The Evolution of Class Action Notice," CLE International, Class Actions – Plaintiff and Defense Perspectives (Chicago,

October 4-5, 2012); (c) "Thinking About Trial From Day One," American Association for Justice, 2012 Annual Convention (Chicago, July 31, 2012); (d) "The Basics of the MERS System," American Association for Justice, 2012 Annual Convention (Chicago, July 31, 2012); (e) "Removal, Remand, and Claims Asserted – Strategic Considerations in MERS Litigation," American Association for Justice, Mortgage Electronic Registration System (MERS) Teleseminar (June 2012); (f) "Class Actions in Medical Device and Pharmaceutical Litigation," HarrisMartin TVM/Actos Litigation Conference (Miami, January 25, 2012); (g) "Trial Lawyers and Class Actions: Protecting Consumers and Elevating Your Practice," The National Trial Lawyers Trial Lawyers Summit (Miami Beach, January 25, 2012); (h) "Current Developments in Consumer Protection Litigation," Louisiana State Bar Association, 11th Annual Class Action/Mass Tort Symposium (New Orleans, December 9, 2011); (i) "Imprelis Herbicide Litigation Spotlight," HB Litigation Conferences (November 2, 2011); (j) "Multi-State Litigation in the Post-CAFA World," Law Seminars International, Litigating Class Actions Conference, (Chicago, October 24-25, 2011) (Conference Co-Chair); (k) "Ethical Implications of Class Action and Mass Tort Settlements," American Association for Justice, 2011 Annual Convention (New York, July 12, 2011); (l) "Modifying Your Approach for Multi-State Class Actions," Law Seminars International, Litigating Class Actions Conference (Seattle, May 20, 2011); (m) "Privacy Litigation: The Evolution in Theories and Outcomes," International Association of Privacy Professionals "Privacy Academy" (Boston, September 2009); (n) "Securities Litigation Update," 2008 Class Action Institute, Illinois Institute of Continuing Legal Education (Chicago, Illinois, July 2008); (o) "Legal Strategies to Fight Negative Effects of Genetic Engineering," 2007 Public Interest Environmental Law Conference (Eugene, March 2007); and (p) "Corporate Governance Developments," Financial Management Association 2005 Conference (Chicago, Illinois, October 2005).

## Megan D. McIntyre

Megan McIntyre is a director at Grant & Eisenhofer, practicing in the areas of corporate, securities and complex commercial litigation. Among other work, she has represented institutional investors, both public and private, in corporate cases in the Delaware Court of Chancery as well as in securities class actions in federal courts throughout the country that have resulted in significant recoveries. She was a member of the trial team in *In re Safety-Kleen Corp. Bondholders Litigation*, which ended in settlements and judgments totaling approximately $280 million after six weeks of trial, and she played a lead role in *In re Refco Inc. Securities Litigation*, which culminated in settlements exceeding $400 million. Ms. McIntyre was also a member of the litigation teams that represented the plaintiffs in two cases whose settlements rank among the largest in the history of the Delaware Court of Chancery: *In re El Paso Corp. Shareholder Litigation*, which settled for $110 million, and *American International Group, Inc. Consolidated Derivative Litigation*, which settled for $90 million.

In addition to her work on behalf of investor plaintiffs in class and derivative litigation, Ms. McIntyre has represented institutional investors who have opted out of federal securities class actions to pursue separate actions, resulting in recoveries that exceeded what they would have received as class members. Ms. McIntyre has also successfully represented clients in obtaining access to corporate proxy statements for the purpose of presenting proposed shareholder resolutions, and has brought and defended actions seeking to enforce shareholders' rights to inspect corporate books and records pursuant to the statutory authority of Section 220 of the Delaware General Corporation Law.

-16-

Ms. McIntyre has appeared as a guest on CNBC's "On the Money," and on September 13, 2012 she was featured as "Litigator of the Week" in *The AmLaw Litigation Daily* for her work in the *In re El Paso Corp. Shareholder Litigation*.

Ms. McIntyre graduated from The Pennsylvania State University in 1991 and graduated *magna cum laude* in 1994 from The Dickinson School of Law.

**Matthew P. Morris**

Matthew Morris is a director of Grant & Eisenhofer P.A., focusing his practice on creditor-side representations in large bankruptcy cases and business restructurings. He has extensive experience in all aspects of complex bankruptcy and commercial litigation, and cross-border insolvency disputes and proceedings.

Prior to joining G&E, he was a partner in the bankruptcy and restructuring department at Hogan Lovells US LLP in New York. He formerly practiced in the bankruptcy group of Milbank, Tweed, Hadley & McCloy, as well as in the litigation department at Cravath, Swaine & Moore. Mr. Morris was a director of business and legal affairs at Time Warner's Home Box Office, Inc., and general counsel of Vencast, Inc., an internet-based marketing and placement agent for hedge and other investment funds.

Among his prominent engagements, Mr. Morris has represented numerous claimants in the Lehman Brothers Chapter 11 case, including former Lehman derivative contract counterparties. He represented Icelandic Straumur Investment Bank in U.S. Chapter 15 proceedings. He also represented the official liquidators of the collapsed Cayman Islands-based Sphinx Funds in the bankruptcy of commodities firm Refco, as well as participated in the representation of the Official Unsecured Creditors' Committee in the Enron Chapter 11 case.

Mr. Morris has lectured widely on bankruptcy litigation and fund restructuring litigation. He is a graduate of Columbia University School of Law, and a *cum laude* graduate of Middlebury College.

**Linda P. Nussbaum**

Linda Nussbaum is a director at Grant & Eisenhofer. Ms. Nussbaum is nationally recognized for her representation of class and individual litigants in antitrust and pharmaceutical litigation. Her experience prior to Grant & Eisenhofer was as sole or co-lead counsel in many significant antitrust class actions which have resulted in substantial recoveries, many in the realm of hundreds of millions of dollars: *In re Microcrystalline Cellulose Antitrust Litigation; Oncology & Radiation Associates, P.A. v. Bristol-Myers Squibb Co., et al. (Taxol Antitrust Litigation); North Shore Hematology-Oncology Associates, P.C. v. Bristol-Myers Squibb Co. (Platinol Antitrust Litigation); In re Children's Ibuprofen Oral Suspension Antitrust Litigation; In re Relafen Antitrust Litigation; In re Plastics Additives Antitrust Litigation; In re Remeron Antitrust Litigation; Meijer, et al. v. Warner Chilcott Holdings Company, III, Ltd., et al. (Ovcon Antitrust Litigation); and In re Lorazepam & Clorazepate Antitrust Litigation.*

Recently resolved cases in which Ms. Nussbaum served as lead counsel include: *In re Puerto Rican Cabotage Antitrust Litigation; In re DDAVP Direct Purchaser Antitrust Litigation; Meijer Inc. & Meijer Distribution, Inc. v. Abbott Laboratories; Meijer, Inc., et al. v. AstraZeneca*

*Pharmaceuticals LP, et al (Toprol Antitrust Litigation),* and *Rochester Drug Co-Operative v. Braintree Laboratories, Inc.*

Current cases in which Ms. Nussbaum serves as lead counsel include *In re Photochromic Lens Antitrust Litigation*; *Adriana M. Castro, M.D. v. Sanofi Pasteur Inc.; Mylan Pharmaceuticals, Inc. et al. v. Warner Chilcott Public Limited Company, et al.,* and *In Re: Skelaxin (Metaxalone) Antitrust Litigation.* In addition, she represents large corporate entities in individual actions including *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*; *In re Neurontin Marketing and Sales Practices Litigation*; *In re Chocolate Confectionary Antitrust Litigation*; and *CVS Pharmacy v. American Express Travel Related Services, et al.*

Ms. Nussbaum was selected "Litigator of the Week" by the *AmLaw Litigation Daily* on April 2, 2010 for her role in the trial of *Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals v. Pfizer.* She was named as a finalist for Public Justice Foundation's 2011 Trial Lawyer of the Year award.

Ms. Nussbaum has lectured extensively at various events, on many aspects of antitrust law, including: "The Fifth Annual Future of Antitrust Enforcement Conference" presented at the American Antitrust Institute's Fifth Annual Symposium on December 7, 2011; "The Evolving Challenges of Class Certification" presented at the American Antitrust Institute's Third Annual Symposium on Private Antitrust Enforcement on December 8, 2009; "Daubert 15 Years Later: How Have Economists Fared?" presented at the ABA Section of Antitrust Law Spring Meeting in March 2009; and "The Hatch-Waxman Act 25 Years Later: Successes, Failures and Prescriptions for the Future," presented at a panel on "Lawyers, Drugs and Money, a Prescription for Antitrust Enforcement in the Pharmaceutical Industry" at the University of San Francisco School of Law Antitrust Symposium on September 25, 2009.

Ms. Nussbaum has published numerous articles including "Where do we go now? The Hatch-Waxman Act 25 Years Later: Successes, Failures, and Prescriptions for the Future" published in the *Rutgers Law Journal*; and "Daubert and Rule 702 in the Context of Antitrust Economic Experts: A Practitioner's Guide". Ms. Nussbaum is a member of the Advisory Board of the American Antitrust Institute.

Ms. Nussbaum obtained her J.D. from George Washington University and her LL.M. degree in taxation from New York University School of Law.

**James J. Sabella**

James Sabella is a director at Grant & Eisenhofer. He has over thirty years of experience in complex civil litigation, including representing plaintiffs and defendants in class and derivative actions involving trial and appellate work in state and federal courts. He has substantial experience in securities litigation and litigation involving claims against accounting firms and underwriters. He has also handled antitrust litigation and cases involving the fiduciary obligations of trustees under state law.

Mr. Sabella has represented the lead plaintiffs in numerous major cases that have resulted in large recoveries, including the General Motors securities litigation, where the settlement was in excess of $300 million, and the Refco securities litigation, where the recovery was in excess of $400 million. He also represented the lead plaintiffs in the Parmalat securities litigation, which

-18-

resulted in landmark opinions establishing that the international firms that coordinate the audit services that audit firms conduct in various countries can be held liable for the conduct of such local audit firms.

Prior to joining Grant & Eisenhofer, Mr. Sabella practiced for twenty-eight years at several large Manhattan law firms, most recently as a partner in Sidley, Austin, Brown & Wood LLP, where his practice focused largely on accountants' liability defense, including the defense of actions alleging securities law violations and professional malpractice as well as grand jury investigations and investigations by the American Institute of Certified Public Accountants.

Mr. Sabella is a 1976 graduate of Columbia Law School, where he was a member of the Board of Directors of the *Columbia Law Review*. He received a B.A. *summa cum laude* from Columbia College in 1972 and a B.S. in 1973 from the Columbia School of Engineering, where he was valedictorian.

## Mary S. Thomas

Mary Thomas is a director at Grant & Eisenhofer. She spent twelve years practicing business litigation with two of Los Angeles' leading law firms before joining Grant & Eisenhofer in 2006. Her experience prior to Grant & Eisenhofer includes trade secret and intellectual property matters, contract actions, employment defense, consumer class action defense, insurance disputes and environmental matters.

At Grant & Eisenhofer, Ms. Thomas has successfully represented institutional investors in class action securities and shareholder derivative litigation. Notably, Ms. Thomas represented the lead plaintiffs in the Marsh & McLennan securities litigation, which resulted in a $400 million settlement. Representative of Ms. Thomas' experience in Delaware Chancery Court is her successful representation of investors in the ACS shareholders litigation.

Ms. Thomas served as a volunteer arbitrator for the L.A. County Bar Association and as a volunteer mediator for the L.A. Superior Court and now serves as a volunteer guardian *ad litem* through Delaware's Office of the Child Advocate. She co-authored "California Wage and Hour Laws" (published by the National Legal Center for the Public Interest, January 2005) and was one of several authors of the 10th and 11th editions of the *California Environmental Law Handbook*.

Ms. Thomas graduated *magna cum laude* from Harvard Law School in 1994 and *magna cum laude* from the University of Delaware in 1991.

## Michael E. Criden

Michael E. Criden is of counsel at Grant & Eisenhofer. He is an experienced trial lawyer who devotes a substantial amount of his practice to antitrust securities and consumer fraud class action litigation, securities and broker misconduct litigation and complex commercial litigation.

Mr. Criden is nationally recognized in the field of securities arbitration. On behalf of approximately three thousand individual investors in various limited partnerships, Mr. Criden recovered over $100 million from major brokerage firms such as Dean Witter, Prudential, Paine Webber and Merrill Lynch. Mr. Criden also has considerable experience in securities and other

class actions involving consumer fraud and antitrust matters. See, e.g., *Davis v. Prudential Sec., Inc.*, 59 F.3d 1186 (11th Cir. 1995). In addition, Mr. Criden was co-lead counsel in *Shea v. New York Life Insurance Co.*, No. 96-0746-Civ-Nesbitt (S.D. Fla.), wherein investors in limited partnerships received a full refund of their investment, nearly $200 million.

In October 2003, Mr. Criden's firm, as Lead Counsel in *Vista Healthplan, Inc. v. Bristol-Myers Squibb Co. and American Bioscience*, No. 1:01CV01295 (D.D.C.), an antitrust class action, recovered $15,000,000 in a settlement for a class of third-party payors. In February 2004, Mr. Criden's firm, as Lead Counsel, recovered $9,708,000 in *Johnson v. National Western Life Insurance Co.*, No. 01-032012-CP (Mich. Cir. Ct.), a consumer-fraud class action wherein it was alleged that National Western was selling inferior annuity products to the elderly. In recent years, Mr. Criden has been instrumental in recovering additional millions of dollars in several antitrust and consumer fraud cases. See, e.g., *In re Buspirone Antitrust Litig.*, (S.D.N.Y.) ($90,000,000); *Ivax v. Aztec Peroxides*, No. 02-0593 ($24,000,000); *Best v. Wilmington Trust Co.*, No. 99-889-Civ-Jordan (S.D. Fla.) ($3,225,000); and *Gregersen v. One Int'l Assocs Limited Partnership*, C.A. No. 17274 (Del. Ch.) ($2,000,000). Mr. Criden's firm also was Lead Counsel for Third-Party Payors in *In re Remeron Antitrust End-Payor Antitrust Litigation*, responsible for allocating a $36 million settlement fund with several State Attorneys General who represented consumers and state agencies.

Currently, Mr. Criden, as a member of the Plaintiffs' Steering Committee, is litigating *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1663 (D.N.J.); see also *In re: DDAVP Indirect Purchaser Litig.*, No. 05-2237 (CLB) (S.D.N.Y.) (Co-Lead Counsel); *In re Puerto Rican Cabotage Antitrust Litig.* (Steering Committee).

**Richard S. Schiffrin**

Richard S. Schiffrin is of counsel at Grant & Eisenhofer. He has represented institutional investors and consumers in securities and consumer class actions worldwide. In 2008, Mr. Schiffrin retired as a founding partner of Schiffrin Barroway Topaz & Kessler, LLP.

Mr. Schiffrin has been recognized for his expertise in many prominent cases, including *In re Tyco International Ltd. Securities Litigation*, the most complex securities class action in history, which resulted in a record $3.2 billion settlement. The $2.975 billion payment by Tyco represents the single largest securities class action recovery from a single corporate defendant in history, while the $225 million settlement with PricewaterhouseCoopers (PwC) represents the largest payment PwC has ever paid to resolve a securities class action and is the second-largest auditor settlement in securities class action history; *In re AremisSoft Corp. Securities Litigation*, a complex case involving litigation in four countries, resulting in a $250 million settlement providing shareholders with a majority of the equity in the reorganized company after embezzlement by former officers; *In re Tenet Healthcare Corp.*, resulting in a $216.5 million settlement and which led to several important corporate governance improvements; *Henry v. Sears, et al.*, one of the largest consumer class actions in history which resulted in a $156 million settlement distributed without the filing of a single proof of claim form by any class member; *Wanstrath v. Doctor R. Crants, et al.*, a derivative action filed against the officers and directors of Prison Realty Trust, Inc., challenging the transfer of assets to a private entity owned by company insiders, resulting in corporate governance reform in addition to the issuance of over 46 million shares to class members; *Jordan v. State Farm Insurance Company*, resulting in a $225

million settlement and other monetary benefits for current and former State Farm policy-holders; and *In re Sotheby's Holdings, Inc. Derivative Litigation*, resulting in a multi-million dollar settlement and significant governance changes.

Mr. Schiffrin is an internationally renowned speaker and lectures frequently on corporate governance and securities litigation. His lectures include: the MultiPensions Conference in Amsterdam, Netherlands; the Public Funds Symposium in Washington, D.C.; the European Pension Symposium in Florence, Italy; and the Pennsylvania Public Employees Retirement Summit (PAPERS) in Harrisburg, Pennsylvania. Mr. Schiffrin has also taught legal writing and appellate advocacy at John Marshall Law School and served as a faculty member at legal seminars, including the Annual Institute on Securities Regulation, NERA: Finance, Law & Economics - Securities Litigation Seminar, the Tulane Corporate Law Institute, and the CityBar Center for CLE (NYC): Ethical Issues in the Practice of Securities Law.

Mr. Schiffrin is a graduate of DePaul Law School and attended graduate school at the University of Chicago. After protecting the civil rights of clients for seven years as an Assistant Public Defender with the Office of the Public Defender of Cook County, where he tried hundreds of cases, Mr. Schiffrin founded Schiffrin & Craig, Ltd., representing consumers and individual investors in actions brought against public companies. He is licensed to practice law in Pennsylvania and Illinois and has been admitted to practice before numerous United States District Courts.

### William A.K. Titelman

William Titelman is of counsel at Grant & Eisenhofer. His practice focuses on plaintiff securities litigation, representing public pension funds, union and Taft-Hartley funds. Prior to joining Grant & Eisenhofer, Mr. Titelman spent more than six years as a partner in a New York based plaintiffs' securities litigation firm.

He has been actively involved in government, law and public policy throughout his career. Mr. Titelman is involved in *In re Fannie Mae Securities Litigation*, *In re Royal Dutch/Shell Transport Securities Litigation*, *In re Marsh & McLennan Companies, Inc. Securities Litigation*, *In re Cigna Corp. Securities Litigation*, and *In re HealthSouth Stockholder Litigation*. He organized and served as counsel for Amici Curiae states and public pension funds in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, No. 06-43, and *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, No. 06-484, both before the United States Supreme Court, and *In re Dynex Capital Securities Litigation*, No. 06-2902-cv, before the Second Circuit. The briefs in these three cases were filed on behalf of eight states and five public pension funds concerning critical issues of investor protection and securities litigation.

Mr. Titelman began his career in the early 1970's serving in several key positions in Pennsylvania state government, including Director of Motor Vehicles and Special Assistant to the Governor for Government Management. After graduating from The Dickinson School of Law in 1980, Mr. Titelman led the Pennsylvania Trial Lawyers Association for nearly a decade in its efforts to protect and expand individual rights, including shareholder rights, and drafted key provisions of Pennsylvania's automobile insurance and consumer safety laws. Subsequently, he became a partner at a leading Pennsylvania law firm, where he served on the firm's Board of Directors and chaired both its Harrisburg office and its Administrative Law and Government

-21-

Affairs Practice Group. One of his major clients was the Pennsylvania Public School Employees' Retirement System (PSERS).

In 1988, Mr. Titelman led the successful enactment of a new Pennsylvania Business Corporation Law. From 1989 to 1990, he led a national campaign organizing major public pension funds and other institutional investors, shareholder rights activists, former SEC Commissioners, leading economists and deans of business and law schools to oppose and successfully amend Pennsylvania Senate Bill 1310.

*The Wall Street Journal* described this legislation as the most onerous anti-shareholder, management-protection bill ever proposed in the United States. Mr. Titelman served as General Counsel to both the Pennsylvania Public School Building and Higher Educational Facilities Authorities. He went to serve on as Executive Vice President of Managed Care and Public Affairs at Rite Aid Corporation, where he suffered substantial losses as a victim of one of the nation's largest securities frauds. He subsequently brought and settled an individual action for securities fraud against Rite Aid.

Mr. Titelman is a graduate of the Washington & Jefferson College and The Dickinson School of Law.

**Peter A. Barile III**

Pete Barile is senior counsel at Grant & Eisenhofer. He is an antitrust litigator. Mr. Barile has more than twelve years' experience litigating significant antitrust matters, including numerous multidistrict class actions from both sides of the docket, on behalf of plaintiff classes, opt-outs, individual competitors, and defendants. He also has substantial experience handling federal appeals, including cases before the United States Supreme Court. Prior to joining Grant & Eisenhofer, Mr. Barile practiced in New York and Washington, D.C. with law firms renowned for their leading antitrust practices.

Mr. Barile's reported cases include: *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) (lead counsel for *amicus curiae* Consumer Federation of America in landmark antitrust case on resale price fixing); *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005) (represented *amicus curiae* in appeal concerning the Foreign Trade Antitrust Improvements Act (FTAIA)); *Metallgesellschaft AG v. Sumitomo Corp. of America*, 325 F.3d 836 (7th Cir. 2003) (represented opt-out plaintiffs in a leading case on the FTAIA concerning international commodities trading); *In re Online DVD Rental Antitrust Litigation*, 2010 U.S. Dist. LEXIS 138558 (2010) (obtained certification of 40 million member class of subscribers to Netflix against Netflix and Wal-Mart); *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 593 F. Supp. 2d 29, *aff'd*, 602 F.3d 444, *cert. denied*, 131 S. Ct. 822 (2010) (obtained dismissal, affirmance, and denial of *certiorari* in an indirect purchaser price fixing class action against major national railroads); *In re LTL Shipping Services Antitrust Litigation*, 2009 U.S. Dist. LEXIS 14276 (N.D. Ga. 2009) (obtained dismissal of price fixing class action brought against major trucking companies); *In re Southeastern Milk Antitrust Litigation*, 555 F. Supp. 2d 934 (2008) (defeated motion to dismiss price fixing and monopolization claims brought on behalf of classes of dairy farmers); *In re Medical Residents Antitrust Litigation (Jung v. AAMC)*, 339 F. Supp. 2d 26 (D.D.C. 2004), *aff'd*, 2006 U.S. App. LEXIS 14079 (D.C. Cir. 2006), *cert. denied*, 549 U.S. 1156 (2007) (obtained dismissal of price fixing class action alleging conspiracy

in the hiring and compensation of medical residents); *KoSa, B.V. v. Hoechst AG*, 727 F. Supp. 2d 199 (2010) (defense of a global chemicals company in fraud and breach of contract case concerning failure to disclose alleged ongoing antitrust conspiracy); *Digene Corp. v. Third Wave Technologies, Inc.*, 536 F. Supp. 996 (W.D. Wis. 2008), *aff'd*, 2009 U.S. App. LEXIS 7381 (2009) (obtained summary judgment and affirmance in Federal Circuit in patent-antitrust dispute between leading companies in the genetic testing industry); *Omnicare, Inc. v. United Health Group, Inc.*, 524 F. Supp. 2d 1031 (N.D. Ill. 2007) (prosecuted precedent-setting private action for pre-merger gun jumping conspiracy under Section 1 of the Sherman Act).

Mr. Barile's *pro bono* work includes: *Giles v. State of California* 554 U.S. 353 (2008), in which he served as lead counsel in the U.S. Supreme Court for *amicus curiae* Battered Women's Justice Project in case on the scope of the Confrontation Clause of the United States Constitution.

Mr. Barile has published numerous articles and served as a panelist or speaker on antitrust issues. His work has been cited by the Federal Trade Commission and the Antitrust Modernization Commission, as well as leading academics and practitioners. He has authored or co-authored the following: *Milton Handler, Dean of Antitrust*, in Yale Biographical Dictionary of American Law (2010); *Pattern Exception to Sham Litigation*, Antitrust Exemptions & Immunities Update (2009); *Private Right of Action for Pre-Merger Gun Jumping Recognized*, Antitrust Litigator (2008); *Supreme Court Confirms Viability of Predatory Bidding Claims*, Business Law Today (2007); *Antitrust Damages Resulting from Meritorious Patent Litigation*, Antitrust Exemptions & Immunities Update (2007); *Antitrust's New Big Brother, Business Law Today* (2006); *Antitrust in Wartime*, Antitrust (2003); *Health Care Providers and a Market Participation Exception to State Action Immunity*, Antitrust Report (2000); *The Microsoft Case*, Connecticut Law Review (Symposium Editor) (1999). He has contributed to the following books and treatises: Antitrust Law Developments (Seventh) (2012); Annual Review(s) of Antitrust Developments (2008-11); Antitrust & Trade Associations (2009); Antitrust & International Intellectual Property Licensing (2008); Antitrust Law Developments (Sixth) (2007); Annual Review(s) of Antitrust Developments (2005-06); Unfair Trade Practices (2003). His speaking engagements include: Panelist, ABA, Sham Litigation: Claiming and Defeating Antitrust Immunity (2011); Panelist, ABA, Fundamentals of Antitrust Exemptions & Immunities (2010); Moderator, ABA, Now the Feds Can Wiretap Suspected Antitrust Offenders (2006); Introduction, The Microsoft Case, Connecticut Law Review Symposium (1999).

Mr. Barile is active in the antitrust bar, having held a number of leadership posts in the ABA and other bar associations. He currently serves on the Advisory Board of the Loyola Institute for Consumer Antitrust Studies.

Mr. Barile graduated from the University of Connecticut in 1991 with a bachelor of arts in English, and received his J.D. from the University of Connecticut School of Law, *magna cum laude*, in 1999.

**Traci L. Buschner**

Traci Buschner is a senior counsel at Grant & Eisenhofer. A former state prosecutor, Ms. Buschner has spent the last 13 years representing plaintiffs in complex litigation ranging from class actions to government contract fraud under federal and state false claims acts. She has been involved in multi-million dollar recoveries on behalf of workers under the Federal Fair Labor

Standards Act and has served as counsel in False Claims actions, bringing tens of millions of dollars to the United States Government. Ms. Buschner represented one of the six main whistleblowers in False Claims Act litigation against Pfizer, Inc., which resulted in the Government's recovery of $2.3 billion in 2009.

Ms. Buschner's practice has involved representation of some of the nation's largest labor unions and their members. Prior to joining Grant & Eisenhofer, she was an attorney with the Washington, DC office of one of the nation's largest personal injury and labor firms and also practiced with an Austin, Texas firm where she spear-headed litigation on behalf of victims of asbestos exposure.

On behalf of the Oil, Chemical & Atomic Workers International Union (OCAW), AFL-CIO, Ms. Buschner was actively involved in environmental litigation which led to Secretary of Energy, William Richardson, canceling a project to recycle radioactive nickel at the Oak Ridge, Tennessee K-25 Nuclear Weapons Complex. The documentation of her efforts to expose faulty government contracting at Department of Energy Nuclear weapons sites was published in The Environmental Forum, Volume 17, No. 6, November/December 2000. Ms. Buschner graduated from Miami University in 1990, and received her J.D. from the University of Louisville in 1995.

## Nathan A. Cook

Nathan Cook is a senior counsel at Grant & Eisenhofer, focusing on corporate governance, class action and derivative litigation.

Previously, Mr. Cook worked as an associate at the law firm of Abrams & Bayliss LLP (formerly Abrams & Laster LLP) in Wilmington, Delaware. He has obtained substantial experience litigating before the Delaware Court of Chancery and the Delaware Supreme Court and providing corporate advisory services on a variety of matters relating to Delaware law. Mr. Cook also participated in a successful, highly-expedited arbitration involving complex transactional issues.

Mr. Cook co-authored *Frequently Asked Questions, Answers and More Questions about the Business Strategy Immunity*, 856 PLI/Lit 503 (2011), and The Delaware Supreme Court Weighs in on Fiduciary Duties to Creditors, Insights (June 2007).

Mr. Cook is a member of the Richard S. Rodney Inn of Court, the American Bar Association (Business Law Section), the Delaware State Bar Association, and the New York State Bar Association.

Mr. Cook received his J.D. from the University of Virginia in 2005, where he served on the Editorial Board for the Virginia Environmental Law Journal. Following graduation from law school, Mr. Cook served as a law clerk to the Honorable John W. Noble of the Delaware Court of Chancery. Mr. Cook received a B.A., with distinction, from the University of Virginia in 2002, where he majored in economics and history and was a Jefferson Scholar and an Echols Scholar.

**Deborah A. Elman**

Deborah Elman is a senior counsel at Grant & Eisenhofer. Ms. Elman focuses on securities fraud and derivative cases at Grant & Eisenhofer. Prior to joining Grant & Eisenhofer as an associate, Ms. Elman represented clients before the SEC and participated in numerous appearances before federal and state courts as an associate at a leading New York law firm.

Ms. Elman served as a law clerk for the Honorable William L. Standish, United States District Judge, in the United States District Court for the Western District of Pennsylvania, participating in all aspects of federal trial court practice.

Ms. Elman graduated *cum laude* in 2001 from the University of Pittsburgh School of Law, where she was Lead Executive Editor of the *Journal of Law and Commerce* and received the Horowitz Graduate Student Paper Prize, the National Association of Women Lawyers Law Student Achievement Award and the School of Law Community Service Award. She received a Masters of Public Health degree in 1997 from Columbia University, where she graduated *cum laude* with a Bachelor of Arts degree in 1995.

**David T. Fischer**

David Fischer is senior counsel at Grant & Eisenhofer. He has spent over a decade representing plaintiffs and defendants in complex litigation and antitrust litigation. Mr. Fischer's complex litigation practice has involved federal and state civil, criminal and administrative fraud investigations and litigation. He has been involved in numerous cases involving multi-million dollar recoveries in False Claim Act actions.

Mr. Fischer represented the lead whistleblowers in *qui tam* action under the False Claims Act alleging fraud by a Merck-Medco, national pharmacy benefit management company ("PBM")a related to services performed for federal health plans. The Government intervened in the case, which was litigated aggressively for several years, and which was settled for approximately $185 million just prior to summary judgment/trial.

Mr. Fischer is also an experienced antitrust litigation attorney, has been counsel in two antitrust trials and has defended companies facing Federal Trade Commission (FTC) merger investigations. In 2005, he obtained a multi-million jury verdict on behalf of Health Care Service Corporation (HCSC) in the first indirect-purchaser antitrust case to proceed to trial (Federal Court, District of Columbia). That lawsuit stemmed from a generic pharmaceutical company's anticompetitive conduct in the markets for lorazepam (generic equivalent of Ativan®) and clorazepate (generic equivalent of Tranxene®). After HCSC opted out of an underlying class settlement, and after several additional years of litigation, the case was tried to verdict in a month-long jury trial. Following verdict, the damages award for Plaintiffs was trebled and enhanced by the Court to nearly $80 million.

Mr. Fischer has published numerous articles and served as a panelist or speaker on False Claims Act and antitrust issues. His speaking engagements include: "Reimbursement and False Claims Act Fundamentals," ABA Health Law Section (May 19, 2011, February 7, 2013); "In-House Counsel Update," ABA Section of Antitrust Law Corporate Counseling Committee (June 2, 2011); "False Claims Act Changes and Challenges," Department of Energy Contractor Attorneys' Association's (DOECAA) Spring Conference (May 13, 2010); "The Government's

-25-

Crackdown on Clinical Research Misconduct," Drug Information Association's Liability Risks in Clinical Trials Program (February 25, 2010); and "Substantive and Procedural Motions," District of Columbia Bar Association CLE Program Pre-Trial Skills Series (October22, 2009, October 29, 2010, and October 20, 2011). He has authored or co-authored the following: *Digital evidence searches in competition investigations: Best Practices for effective fundamental rights*, 4-2009 Concurrences, November 2009; *Dr. Miles: Will The Supreme Court Find a Cure?*, The Antitrust Source, February 2007; and *Cardizem CD®, K-Dur®, Plavix® and OxyContin®: Have We Entered the Endgame of Antitrust Uncertainty Towards Pharmaceutical Patent Litigation Settlements?*, Health Lawyers Weekly, December 15, 2006.

Mr. Fischer is active in the health care and antitrust bars, having held a number of leadership posts in the ABA. He is currently the vice chair of the ABA Section of Health Law's Healthcare Litigation and Risk Management Interest Group. He is also on the Planning Committee for, and a speaker at, the ABA's forthcoming False Claims Act and Qui Tam Trial Institute (June 5-7, 2013).

Mr. Fischer's *pro bono* work has included representing disabled veterans and individuals in neglect and guardianship cases.

Mr. Fischer graduated from Miami University in 1996 with Bachelors of Arts in English Literature and Political Science, and received his J.D. from the Georgetown University Law Center in 1999. Prior to joining Grant & Eisenhofer, Mr. Fischer worked in Washington D.C. for Shook, Hardy & Bacon where he frequently litigated health care *qui tam* cases.

**Shelly L. Friedland**

Shelly Friedland is a senior counsel at Grant & Eisenhofer, and an experienced litigator with over twelve years of experience practicing both civil and criminal law. At Grant & Eisenhofer, she represents clients in securities and antitrust class actions. She has been the principal attorney overseeing day-to-day management of the antitrust class action brought against Sirius XM satellite radio, and is also litigating securities fraud cases against Citigroup and Genzyme, as well as several other antitrust matters.

Ms. Friedland is a *cum laude* graduate of Harvard Law School, where she was an Executive Editor of the Human Rights Law Journal. She received her bachelor's degree from Columbia College, graduating *summa cum laude*. She is a member of the New York City Bar Association and the American Bar Association, where she is a member of the Class Action and Derivatives Committee of the Litigation Section.

**Christine M. Mackintosh**

Christine Mackintosh is a senior counsel at Grant & Eisenhofer, practicing in the areas of corporate and securities litigation. She has represented institutional investors, both public and private, in corporate cases in the Delaware Court of Chancery and in securities fraud class actions in federal courts throughout the country.

Ms. Mackintosh has played significant roles in several landmark actions challenging mergers and acquisitions in the Delaware Court of Chancery, including In re Del Monte Foods Company Shareholder Litigation, which resulted in an $89.4 million recovery for the class, and In re El

Paso Corporation Shareholder Litigation, which resulted in a $110 million recovery for the class. Ms. Mackintosh also played a significant role in American International Group, Inc. Consolidated Derivative Litigation, which resulted in a $90 million recovery, one of the largest recoveries in a shareholder derivative action in the history of the Delaware Court of Chancery.

Ms. Mackintosh has also played a significant role in a number of securities fraud class actions that have achieved substantial recoveries for classes of investors, including In re Refco Securities Litigation ($358 million) and In re Merck & Co., Inc. Vytorin/Zetia Securities Litigation ($215 million settlement pending). Outside of the United States, Ms. Mackintosh was a member of the team that secured the historic $450 million pan-European settlement in the Royal Dutch Shell case. Ms. Mackintosh currently serves as co-lead counsel in In re JP Morgan Chase & Co. Securities Litigation and Ross v. Career Education Corporation, and is representing a number of institutional and individual investors who have opted out of In re Bank of America Corporation Securities, Derivative & ERISA Litigation.

Prior to joining Grant & Eisenhofer, Ms. Mackintosh practiced in the Philadelphia office of an international law firm, where she practiced in the areas of commercial, securities, and insurance recovery litigation.

A *magna cum laude* graduate of St. Joseph's University, Ms. Mackintosh earned her law degree at the University of Pennsylvania Law School. She is the co-author of two articles published by the Practising Law Institute's *Corporate Law & Practice Course Handbook Series. "Ethical Issues and Their Impact on Securities Litigation,"* published in September-October, 2003, was co-authored with Marc J. Sonnenfeld, Viveca D. Parker and Marisel Acosta. "Lessons From Sarbanes-Oxley: The Importance of Independence In Internal Corporate Investigations," published in July, 2003, was co-authored with Alfred J. Lechner, Jr.

**Brenda F. Szydlo**

Brenda Szydlo is senior counsel at Grant & Eisenhofer, where she focuses on securities litigation on behalf of institutional investors. Ms. Szydlo has more than twenty years of litigation experience in a broad range of matters.

Prior to joining Grant & Eisenhofer, Ms. Szydlo served as counsel in the litigation department of Sidley Austin LLP in New York, and its predecessor, Brown & Wood LLP, where her practice focused on securities litigation and enforcement, accountants' liability defense and general commercial litigation.

Ms. Szydlo is a 1988 graduate of St. John's University School of Law, where she was a St. Thomas More Scholar and member of the Law Review. She received a bachelor's degree in economics from Binghamton University in 1985.

**Diane Zilka**

Diane Zilka is senior counsel at Grant & Eisenhofer. For over a decade, Ms. Zilka has been in the forefront of the Firm's successful prosecution of securities fraud and corporate governance cases. As a member of numerous trial teams, Ms. Zilka has played a key role in achieving significant recoveries for funds managed by U.S. and international institutional investors and public pension plans. Representative cases include: *Safety Kleen Bondholder Litig.*, more than

$276 million in judgments and settlements; *In Re Merck & Co. Vytorin/ Zetia Sec. Litig.*, $215 million for investors—among the largest for a securities fraud case without a government finding of corporate wrongdoing; *In Re News Corp. S'holder Litig.*, $139 million recovered for the company—the largest cash recovery in the history of derivative shareholder litigation—and which resulted in significant corporate governance reforms; *Parmalat Securities Litig.*—the European "Enron" resulting in $110 million recovery; *TRSL v. AIG*, $115 million recovered for the company; *In Re Appraisal of Metromedia Int'l Group, Inc.*, a $188 million judgment in what was only the second appraisal action of preferred shares in the history of Delaware Chancery Court. In the corporate governance arena, Ms. Zilka's cases have addressed such cutting-edge issues as the propriety of "proxy puts" and of "Don't Ask, Don't Waive" standstill provisions, the use of derivative securities in "poison pills," and the conflicted role of Wall Street banks as financial advisors to target corporations and as lenders to buyers, which, in *Del Monte Corp. S'holder Litig.,* resulted in a preliminary injunction of a $5.3 billion leveraged buyout and an $89.4 settlement for the shareholders. Ms. Zilka has successfully defended clients before the SEC in "no-action" proxy proposal challenges, and has successfully prosecuted "books and records" actions.

Ms. Zilka co-authored "The Role of Foreign Investors in Federal Securities Class Actions," 1442 PLI/CORP. 91 (2004) and "The Current Role Of Foreign Investors In Federal Securities Class Actions," 1620 PLI/Corp 11 (2007), cited by the United States Supreme Court in *Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010). Ms. Zilka has lectured at CLE International's Annual Class Action Conference.

Ms. Zilka has concentrated her career in securities, corporate and complex commercial litigation. Before joining G&E, she was a partner in a prominent New York City law firm and a member of its Investor Protection practice group. Ms. Zilka is the Lead General Chair of the annual Combined Campaign For Justice which provides critical funding for Delaware's three legal services agencies. She is a member of the Board of The Print Center of Philadelphia and of the Board of Panetiere Partners, two non-profit organizations.

Ms. Zilka graduated from the State University of New York at Binghamton in 1982, and received her J.D. from Fordham University School of Law in 1985.

**Edmund S. Aronowitz**

Edmund Aronowitz is an associate at Grant & Eisenhofer, where his primary area of practice is consumer class action litigation. Prior to joining G&E, Mr. Aronowitz was a class action litigation associate in the Chicago office of a national law firm and practiced complex commercial litigation as an associate in the New York office of a large global firm.

Mr. Aronowitz graduated from Cornell University (B.A. with honors, History, 2002) and Cornell Law School (J.D. with honors, 2005) where he was a Managing Editor of the Cornell Journal of Law and Public Policy and a Bench Editor on the Moot Court Board. Following law school, Mr. Aronowitz served as a law clerk to the Hon. Robert L. Hinkle of the United States District Court for the Northern District of Florida.

**Bradley J. Demuth**

Brad Demuth is an associate at Grant & Eisenhofer, where he focuses his practice on complex antitrust litigation matters. Prior to joining G&E, Mr. Demuth worked as an antitrust associate at two of the leading and most well regarded defense firms in the world.

Mr. Demuth's antitrust litigation casework includes contributions in the following matters: *In re Flonase Antitrust Litigation, Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co. (re Doryx), Skelaxin (Metaxalone) Antitrust Litigation, Castro v. Sanofi Pasteur, Inc. (re Menactra), In re Photochromic Lens Antitrust Litigation, Madison Square Garden, L.P. v. NHL, In re Tricor Antitrust Litigation, Sullivan v. De Beers, W.B. David v. De Beers, and Compuware v. IBM*.

Mr. Demuth received his J.D. degree from American University Washington College of Law in 1999. Following law school, Mr. Demuth served as a law clerk to the United States Court of Appeals for the Second Circuit.

**Bernard C. Devieux**

Bernard Devieux is an associate at Grant & Eisenhofer, focusing on corporate governance and securities litigation on behalf of institutional investors. He is also part of a team handling residential mortgage-backed securities litigation in federal and state courts on behalf of several of the firm's clients.

Mr. Devieux received his J.D. and M.B.A. from Villanova in 2011. During law school, he worked as a summer associate for a nationally-recognized law firm in Philadelphia, PA, and interned with the Chief Mediator of the United States Court of Appeals for the Third Circuit's Appellate Mediation Program. He also interned in the general counsel's office of a Philadelphia-based software and technology company, where he assisted in handling general corporate law matters. During his third year of law school, Mr. Devieux was a member of Villanova's Civil Justice Clinic, where he represented low-income clients in child custody disputes and in administrative proceedings before the Social Security Administration. He is a 2008 graduate of the University of Delaware, with a B.S. in Finance.

Mr. Devieux volunteers as a mentor with Big Brothers Big Sisters of Delaware, and is a member of the Delaware State Bar Association and American Bar Association.

**Kimberly A. Evans**

Kimberly Evans is an associate at Grant & Eisenhofer, focusing her practice on corporate governance and complex securities litigation on behalf of institutional investor clients.

Prior to joining Grant & Eisenhofer, Ms. Evans worked as an associate at a well-known Philadelphia-based law firm, where she gained extensive experience in the practice areas of securities, antitrust, and consumer protection class action litigation. She also previously worked as a Paralegal in the Juvenile Division of the Philadelphia District Attorney's Office.

Ms. Evans is a member of the American Bar Association and has volunteered with the Wills For Heroes Program, an organization that provides free wills and advanced directives to police

officers, firefighters and other first responders. She also volunteers her time with local animal rescue groups in the greater-Philadelphia area.

Ms. Evans earned her J.D. from Temple University in 2007 and received a bachelor's degree in Chemistry and Criminal Justice from La Salle University in 2003.

**Robert D. Gerson**

Robert Gerson is an associate at Grant & Eisenhofer, focusing on mortgage-backed securities litigation and complex litigation issues.

Mr. Gerson is a graduate of New York Law School, where he was a member of the Moot Court Association. He participated in Fordham Law School's Kaufman Memorial Securities Law Moot Court Competition. During law school, he was an intern in the Office of the New York State Attorney General. Mr. Gerson received a B.A. in Government and Politics from the University of Maryland in 2006.

**David M. Haendler**

David Haendler is an associate at Grant & Eisenhofer, focusing on securities and corporate governance litigation. Mr. Haendler has experience in a variety of complex commercial cases, including matters involving corporate governance, mass torts and products liability.

Mr. Haendler graduated from the University of Chicago Law School in 2006 and received a Bachelor's degree in political science from Swarthmore College in 2003. Mr. Haendler served as the assistant legal counsel for the documentary film *Resurrect Dead: The Mystery of the Toynbee Tiles*, winner of the directing prize at the 2011 Sundance Film Festival. He has written a novel, *The Shattergrave Knights*, which was digitally published in June 2011.

**Jonathan M. Kass**

Jonathan Kass is an associate at Grant & Eisenhofer, focusing on commercial litigation and complex civil litigation issues. He has experience in antitrust and securities fraud.

Before joining Grant & Eisenhofer, Mr. Kass worked for a large international law firm in New York handling securities fraud and corporate governance disputes, as well as internal investigations concerning FCPA violations and counseling on antitrust matters.

Mr. Kass is a *magna cum laude* graduate of Fordham University School of Law. He received his bachelor's degree in government with a concentration in American institutions and public policy from Cornell University, achieving Distinction in all subjects.

**Jacob R. Kirkham**

Jacob Kirkham is an associate at Grant & Eisenhofer, focusing on securities, class action and false claims litigation. During law school, Mr. Kirkham interned at the Georgia Attorney General's Office and the United States Attorney's Office for the Northern District of Georgia. He was also a research assistant to Dean David Partlett for the publication of *Prosser, Wade, and Schwartz's Torts, 12th Edition*. He graduated Order of Barristers; was a Class of 2011 G. Conley

Ingram Scholar; recipient of the Dean's Public Service Award; Director-in-Chief of the Emory Law Mock Trial Society; a recipient of the Moffett Litigation Award and awarded first place for the William W. Daniel National Mock Trial Invitational.

Mr. Kirkham is a 2011 graduate of the Emory University School of Law and a 2008 graduate from Brigham Young University with a degree in corporate finance.

**Michael T. Manuel**

Michael Manuel is an associate at Grant & Eisenhofer, focusing on securities and corporate governance litigation. Mr. Manuel has experience in a variety of complex commercial cases, including matters involving contract disputes, securities, commercial litigation, corporate governance, mass torts and products liability cases.

Mr. Manuel graduated *cum laude* from Harvard Law School in 2002 and received a Bachelor's degree in mathematics from Duke University in 1999.

**Kyle J. McGee**

Kyle McGee is an associate at Grant & Eisenhofer, focusing on complex securities litigation on behalf of institutional investor clients and complex commercial litigation on behalf of consumers and advocacy organizations.

Mr. McGee was the principal associate in *In re Merck & Co., Inc. Vytorin/Zetia Securities Litigation* (D.N.J.), a major securities fraud action against pharmaceutical industry titan Merck & Co., Inc. The case, which was prosecuted with a related action, *In re Schering-Plough Corp. ENHANCE Securities Litigation* (D.N.J.), resulted in a record-setting recovery for investors totaling $688 million.

Mr. McGee also represented investors in *In re XTO Energy Shareholder Class Action Litigation* (Tarrant County, TX), an action arising out of Exxon Mobil Corp.'s $41 billion acquisition of XTO Energy, Inc., which resulted in substantial additional disclosures to shareholders concerning the merits, process, and financing of the proposed transaction.

Mr. McGee currently represents investors in various actions brought pursuant to the federal securities laws, as well as consumers in various actions brought pursuant to federal communications laws and state consumer protection laws.

Mr. McGee earned a research degree from the University of Edinburgh in Scotland as well as a J.D. from Villanova University in 2009, both with honors. Mr. McGee studied the history and philosophy of law at Edinburgh, and was honored as a Dean's Merit Scholar at Villanova Law. In 2005, he graduated from the University of Scranton with a B.A. in Philosophy as well as Media and Information Technology.

**Caitlin M. Moyna**

Caitlin M. Moyna is an associate at Grant & Eisenhofer where her practice includes litigating securities fraud and shareholder derivative claims on behalf of institutional investors. Ms. Moyna has over 9 years of broad complex commercial litigation experience.

Prior to joining Grant & Eisenhofer, Ms. Moyna was a litigation associate at Cravath, Swaine & Moore LLP and Ropes and Gray, LLP, and most recently, was an associate at boutique litigation firm specializing in representing plaintiffs in securities fraud and shareholder rights' actions.

Ms. Moyna is a *cum laude* graduate of Northwestern University School of Law where she was elected to the Order of the Coif. While at Northwestern, Ms. Moyna was on the Articles Board of the *Journal of Criminal Law and Criminology*, and she served as the legal writing tutor to the class of first year law students. Ms. Moyna received her bachelor's degree from Dartmouth College.

**Rebecca Musarra**

Rebecca Musarra is an associate at Grant & Eisenhofer, where she focuses his practice on complex antitrust litigation matters. Prior to joining G&E, Ms. Musarra worked as an appellate law clerk for the Supreme Court of the Virgin Islands in St. Thomas, Virgin Islands.

Ms. Musarra received her J.D. degree from American University Washington College of Law in 2009 and obtained a B.A. in international relations from the College of William and Mary in 2003. Following law school, Ms. Musarra served as a law clerk to the Superior Court of the Virgin Islands.

**Oderah Nwaeze**

Oderah Nwaeze is an associate at Grant & Eisenhofer, focusing on securities and False Claims Act litigation.

Previously, Mr. Nwaeze worked as a summer associate for an international law firm in New York City, as well as a legal intern with The Coca-Cola Company in Atlanta, Georgia.

Mr. Nwaeze received his J.D. from Emory University School of Law in 2011, where he was a member of the Emory Mock Trial Society, president of the Emory Law Student Alumni Association, and served on the Emory Law Honor Court. Mr. Nwaeze was also recognized for his oral advocacy skills and selected for the Order of Emory Advocates. In 2008, he received a Bachelor's degree in political science from Wake Forest University, where he was a Gordon Scholarship recipient.

**Catherine Ó Súilleabháin**

Catherine (Kate) Ó Súilleabháin is an associate at Grant & Eisenhofer, where her primary area of practice is consumer class action litigation. Prior to joining G&E, Ms. Ó Súilleabháin was an associate in the Chicago office of a large global law firm, where she practiced international commercial litigation and advised clients on product and medical-device regulation and recall. She has spoken on such topics as attorney-client privilege in international litigation and FDA regulation of medical devices.

Ms. Ó Súilleabháin represented an Albanian family in a successful asylum hearing and was recognized by Illinois Legal Aid Online as an Attorney of the Month (May 2009) for her work on the case.

Ms. Ó Súilleabháin was the first recipient of the Davies-Jackson Scholarship to St. John's College, the University of Cambridge. She graduated from the University of Cambridge (B.A. and M.A., English, 1992 and 1998, respectively), Loyola University of Chicago (B.A., English, 1990) and Georgetown University Law Center (J.D., 2007), where she was a Law Fellow and a member of the Barrister's Council.

Ms. Ó Súilleabháin is currently on the Executive Committee of the Alliance for Women of the Chicago Bar Association.

**Susan R. Schwaiger**

Susan Schwaiger is an associate at Grant & Eisenhofer. She practices in the area of antitrust, with experience in a wide variety of industries, and other areas of complex civil litigation.

Prior to joining Grant & Eisenhofer, Ms. Schwaiger was of counsel to several leading New York-based antitrust firms representing plaintiffs in class and individual actions. She has authored *The Submission of Written Instructions and Statutory Language to New York Criminal Juries*.

Ms. Schwaiger has played significant roles in a number of major antitrust cases including In re Microcrystalline Cellulose Antitrust Litigation; In re Plastics Additives Antitrust Litigation; and In re Lorazepam & Clorazepate Antitrust Litigation.  In addition, she has represented large corporate entities in individual actions in In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation; In re Chocolate Confectionary Antitrust Litigation; and CVS Pharmacy v. American Express Travel Related Services, et al. Ms. Schwaiger's experience also includes representation of Shannon Faulkner and Nancy Mellette in their successful litigation against The Citadel military academy in Charleston, South Carolina, where Shannon Faulkner became the first female cadet admitted to the all-male academy in August 1995.

Ms. Schwaiger graduated *cum laude* from Brooklyn Law School in 1992 with a J.D.  She obtained her M.A. from the University of Kentucky and a B.S. from the University of Tennessee.

**Elizabeth H. Shofner**

Elizabeth Shofner is an associate at Grant & Eisenhofer focusing on complex civil litigation, including corporate governance matters, false claims litigation, and consumer fraud.

Prior to joining Grant & Eisenhofer, Ms. Shofner was a litigator at Patterson Belknap Webb & Tyler LLP, where she focused on complex commercial litigation, including Medicaid and consumer fraud and mortgage-backed securities litigation.  She also has experience in intellectual property and appellate work.  She served for several years as a law clerk to the Honorable John M. Walker, Jr., of the Second Circuit Court of Appeals, during which time she was involved in hundreds of federal appeals involving all areas of law.

Ms. Shofner co-authored the New York section of *The 2012 50-State Survey of Privacy Law* (Media Law Resource Center; 2012), co-edited the *Task Force Report on Gender, Race, and Ethnic Bias in the Second Circuit* (1998), and co-authored the article *Similarity Ratings And Confusability Of Lipread Consonants Compared With Similarity Ratings Of Auditory And Orthographic Stimuli* (American Journal of Psychology; 1991).

Ms. Shofner received her J.D. *magna cum laude* from New York University School of Law, where she was elected to the Order of the Coif and served as an articles editor for the New York University Law Review. She also received an M.A. in cognitive psychology from Hunter College. She holds an undergraduate degree in English literature and psychology from Washington University in St. Louis.

**John Tangren**

John Tangren is an associate at Grant & Eisenhofer, where his primary area of practice is consumer class action litigation. Prior to joining G&E, Mr. Tangren was a class action litigation associate in the Chicago office of a national law firm and practiced complex commercial litigation as an associate in the Chicago office of a large global firm.

Mr. Tangren graduated from the University of Chicago (A.B., Philosophy and Music, 2000) and the University of Chicago Law School with honors (J.D. 2003) where he was Executive Editor of the University of Chicago Legal Forum. He was selected by Super Lawyers magazine as an Illinois "Rising Star" for 2011 and 2013.

**Justin K. Victor**

Justin Victor is an associate at Grant & Eisenhofer, focusing on the False Claims Act, class action litigation and antitrust.

Previously, Mr. Victor worked as a summer associate for an international law firm in Chicago, Illinois and London, England, as well as a Judicial Intern for the Honorable T. Jackson Bedford Jr., at Fulton County Superior Court in Atlanta, Georgia.

Mr. Victor received his J.D. from Emory University School of Law in 2010, where he was awarded the inaugural William C. O'Kelley Scholarship. Mr. Victor also served on the Executive Board for the Emory Mock Trial Society and graduated Order of the Barristers. He graduated from the University of Michigan with a B.A. in Political Science in 2007.

**Jennifer A. Williams**

Jennifer Williams is an associate at Grant & Eisenhofer. Ms. Williams attended Emory University School of Law and the Candler School of Theology in 2012 earning both her J.D. and M.D. in law and theological studies, respectively. In 2006, she also graduated magna cum laude with a B.A. in Religion from Centre College in Danville, Kentucky.

**Marisa N. DeMato**

Marisa DeMato is an attorney and a Client Relationship Manager at Grant & Eisenhofer where she works with the firm's institutional investor clients, regarding litigation related matters. Prior to joining Grant & Eisenhofer, Ms. DeMato was affiliated with a national plaintiffs' securities litigation firm where she practiced in the areas of securities litigation, shareholder derivative and consumer fraud litigation.

Ms. DeMato has lectured on topics pertaining to securities fraud litigation, fiduciary responsibility and corporate governance issues. Ms. DeMato has addressed the National

Conference on Public Employee Retirement Systems, the Florida Public Pension Trustees Association, The National Association of Police Officers, The Public Funds Summit, the National Coordinating Committee for Multiemployer Plans, the Southeastern Public Employees Retirement System Summit, the Texas Public Employees Retirement System, the New England Public Employees Retirement System Summit and the Massachusetts Contributory Retirement System, among others.

Ms. DeMato earned her B.A. in Political Science from Florida Atlantic University and received her J.D. from the University of Baltimore School of Law. While at the University of Baltimore School of Law, Ms. DeMato served as a legal intern for the Office of the Attorney General in Annapolis, Maryland, working directly with the Deputy Attorney General for the Maryland General Assembly. In the spring of 2006, Ms. DeMato was selected over 250,000 applicants to appear on the sixth season of The Apprentice, which aired on January 7, 2007 on NBC.

**Marc D. Weinberg**

Prior to joining G&E in 2006, Marc Weinberg gained a fourteen-year track record with two of the nation's leading securities litigation firms. He focuses on institutional services at Grant & Eisenhofer.

Mr. Weinberg earned his law degree at Widener University in 1992 after graduating from Pennsylvania State University. He is a member of the Philadelphia and Pennsylvania Bar Associations, and the Moot Court Honor Society.

**Joshua E. Alpert**

Joshua Alpert is a staff attorney at Grant & Eisenhofer, focusing on a wide range of securities litigation matters including complex antitrust litigation and bankruptcy. Mr. Alpert is a 2005 graduate of Brooklyn Law School, and a 1999 graduate of the State University of New York at Stony Brook where he received his bachelor in political science.

Prior to joining Grant & Eisenhofer, Mr. Alpert's experience was in antitrust, securities and derivative class action cases. He is a former member of the Association of Certified Anti-Money Laundering Specialists and was a certified anti-money laundering specialist.

**Katie L. Anderson**

Katie Anderson is a staff attorney who focuses on class action and securities litigation cases at Grant & Eisenhofer.

Ms. Anderson is a 1999 graduate of the University of Pittsburgh with a degree in political science and a 2002 graduate of Widener University School of Law. She was a law clerk in the Pennsylvania Office of Attorney General Bureau of Consumer Protection and was promoted in 2003 to the position of deputy attorney general. Before joining Grant & Eisenhofer, Ms. Anderson focused her practice on the area of antitrust, federal/state wage and hour litigation and gaming law.

**Simona L. Bonifacic**

Simona Bonifacic is a staff attorney at Grant & Eisenhofer, where her focus is on securities litigation. Ms. Bonifacic graduated in 1998 from Syracuse University College of Law. She is also a 1998 *magna cum laude* graduate of Maxwell School of Citizenship and Public Affairs where she obtained her M.A. in international relations. She further received a bachelor degree in 1994 from East Stroudsburg University in political science and philosophy.

Prior to joining Grant & Eisenhofer, Ms. Bonifacic worked as a legal consultant on multi-district court class actions, securities litigation, bankruptcy, immigration, commercial real estate, intellectual property, and contracts. She also has experience as an analyst in the banking sector. She is fluent in Romanian.

**Leanne P. Brown-Pasquarello**

Leanne Brown-Pasquarello is a staff attorney at Grant & Eisenhofer and has experience in complex class action securities litigation on behalf of institutional investors. Representative cases include In re Pfizer Inc. Securities Litigation, and *In re Refco Inc. Securities Litigation*.

Prior to joining Grant & Eisenhofer, her focus was on securities litigation, mass torts products liability pharmaceutical litigation, and nursing home litigation.

Ms. Brown-Pasquarello has co-authored numerous publications, including "Ex-Files: Ex-Corporate Employees May Be Contacted Ex Parte by the Plaintiff's Attorney: The Florida Supreme Court's Ruling in *H.R.A. Management, Inc. v. Schwartz*," published in the *Trial Advocacy Quarterly (1997)*. She also co-authored Jonathan L. Alpert's *Florida Handbooks and Forms (1996)*.

Ms. Brown-Pasquarello received her law degree from Widener University School of Law in 1993 and in 1990 she received her B.A. in political science from University of Delaware where she was a member of the *Phi Sigma Pi* National Honor Society and *Pi Sigma Alpha* National Political Science Honor Society.

**Tracy L. Campbell**

Tracy Campbell is a staff attorney at Grant & Eisenhofer, who focuses on complex securities fraud litigation in class action cases. She received her law degree from the University of Houston Law Center in 2003, where she completed an externship at the Methodist Health Care System. Before joining Grant & Eisenhofer, Ms. Campbell focused her practice on the area of health law. Upon graduating from law school, she worked at a mid-sized firm in Houston where she concentrated primarily on asbestos litigation. Subsequently, she worked for a small transactional health law firm in San Antonio, Texas.

Ms. Campbell received her B.S. in Business Administration with a Concentration in International Business Management from Goldey-Beacom College in 1997, where she graduated *magna cum laude*. Prior to entering law school, Ms. Campbell gained business experience as an analyst at JP Morgan. Upon relocating to Texas, she continued to pursue a career in the financial industry while obtaining her law degree. Ms. Campbell is a member of the Delaware Bar Association.

-36-

**James P.A. Cavanaugh**

James Cavanaugh is a staff attorney at Grant & Eisenhofer. His primary focus is on high profile securities fraud litigation and class actions. He has additional experience in products liability class actions and litigating toxic tort, patent infringement, bankruptcy, and asbestos related cases.

Prior to joining Grant & Eisenhofer, he was sole practitioner of a law practice with an emphasis on litigation, including workers' compensation, employment, civil rights and personal injury. Representative accomplishments include establishing case law precedent in *Dr. John Doe v. TRIS Mental Health Services* permitting the disabled, for the first time, to proceed anonymously in the New Jersey Superior Courts.

Mr. Cavanaugh was appointed to a specialized task force by the Chief Justice of the New Jersey Supreme Court to examine discrimination in the legal profession and in the courts and adopt recommendations. Mr. Cavanaugh also represented an *amicus curiae* institutional nonprofit corporation opposing discriminatory policies in *James Dale v. Boy Scouts of Americ*a case.

He is a graduate of George Washington University National Law Center where he earned his law degree, and Fordham University where he graduated, with honors, with a B.A. in history.

**Alice Y. Cho**

Alice Cho is a staff attorney at Grant & Eisenhofer, where her focus is on securities fraud class actions. She graduated from Brooklyn Law School in 2004 after receiving a B.A. from the University at Albany.

During law school, Ms. Cho interned as a law clerk for the Honorable Frederic Block, U.S. District Court, Eastern District of New York. She also worked with the New York City Human Rights Commission and the Asian American Legal Defense and Education Fund.

Ms. Cho currently serves as Executive Vice President of the Korean American Lawyers Association of Greater New York (KALAGNY).

**Stephen V. Cotter**

Stephen Cotter is a staff attorney at Grant & Eisenhofer, where he focuses on securities fraud and class action litigation.

Prior to joining Grant & Eisenhofer, Mr. Cotter worked as a policy analyst for the campaign of Bob Brady for Mayor. He also worked as real estate development counsel for the Philadelphia Housing Authority and as an associate in the offices of Eckert Seamans.

Mr. Cotter graduated from the University of Pittsburgh School of Law. He received a B.A. in political science and history from Millersville University of Pennsylvania.

**Kerry A. Dustin**

Kerry Dustin is a staff attorney at Grant & Eisenhofer, focusing on corporate securities litigation. Ms. Dustin received her law degree from Syracuse University College of Law where she was a

member of the Community Law Development Clinic and Corporate Law Society. She received her B.S. in business administration with a marketing concentration from LeMoyne College in 2000.

Prior to joining Grant & Eisenhofer, Ms. Dustin focused her practice on intellectual property and patent and employment law. Ms. Dustin served as a law clerk for Onondaga County Resource Recovery Agency (OCRRA). She also did an internship at the Ontario County Attorney's Office where she was involved in drafting labor contracts and research.

**Cheron D. Everett**

Cheron Everett focuses on securities and class action litigation as a staff attorney at Grant & Eisenhofer. Ms. Everett is a 2007 graduate of the Widener University School of Law and a 2001 *magna cum laude* graduate from Temple University with a degree in journalism and public relations. She was a recipient of the Chadwick Memorial Scholarship and a Fred G. Dibona Moot Court participant.

Prior to joining Grant & Eisenhofer, Ms. Everett's focus was on pharmaceutical and securities litigation as well as workmen's compensation.

**R. Alexander Gartman**

Alexander Gartman concentrates on securities litigation as a staff attorney at Grant & Eisenhofer. He graduated *cum laude* from Temple University School of Law in 2005. He served on the Student Bar Association Budget Committee, and the Curriculum Committee, working with faculty to revise first year curriculum.

Mr. Gartman received a B.B.A. in Finance in 1998 from The College of William and Mary, where he double majored in Economics.

**Lisa K. Grumbine**

Lisa Grumbine is a staff attorney at Grant & Eisenhofer, focusing on a wide range of securities litigation matters as well as employee benefits with emphasis on defined contribution plans. Ms. Grumbine is a 1997 graduate of Temple School of Law, and a 1990 *cum laude* graduate of University of Delaware where she received her bachelor in consumer economics.

Prior to joining Grant & Eisenhofer, her focus was on pharmaceutical products liability cases, pension and profit sharing plans, ERISA, and banking. She is an ABA National Employee Benefit Trust School graduate.

**C. Kirby Happer**

Kirby Happer is a staff attorney at Grant & Eisenhofer.

**Buneka Islam**

Buneka Islam is a staff attorney at Grant & Eisenhofer. Previously, Ms. Islam served as an intern in the Chambers of the Honorable Dolores K. Sloviter of the United States Court of

Appeals for the Third Circuit as well as in the Chambers of the Honorable Michele J. Fox of the New Jersey Superior Court in Camden, New Jersey. She was a legal intern in the Philadelphia Office of the District Attorney. She is a native speaker of Bengali.

Ms. Islam received her law degree in 2012 from Temple University School of Law where she was a staff member of Temple Political and Civil Rights Law Review. She also received a B.A. in Psychology from the University of Pennsylvania in 2006.

**Lawrence P. Kempner**

Lawrence Kempner is a staff attorney at Grant & Eisenhofer, focusing on complex securities, regulatory and corporate governance cases. Prior to joining Grant & Eisenhofer, Mr. Kempner was engaged in private practice with a concentration in civil litigation.

Mr. Kempner graduated from Lehigh University in 1988 with a B.S. in marketing. He received his J.D. from the George Washington University National Law Center in 1991.

**Edward M. Lilly**

Edward Lilly focuses on securities fraud and class action litigation as a staff attorney at Grant & Eisenhofer. He has additional experience in pharmaceutical intellectual property litigation, product liability litigation, and derivative class actions.

Mr. Lilly graduated in 1996 from Cornell Law School and served as editor for the *LII Bulletin-NY* and *Cornell Journal of Law & Public Policy*. He received his M.S. in social psychology in 1993 from Purdue University and graduated *magna cum laude* from DePauw University with a B.A. in economics.

Mr. Lilly served as a clerk for the Honorable Thomas J. McAvoy of the U.S. District Court in Binghamton, New York.

**Michael A. Morris**

Michael Morris is a staff attorney at Grant & Eisenhofer. He received his law degree from the University of Bridgeport Law School in 1980, and has been a member of the Connecticut Bar since 1980.

He was employed by the City of New Haven as Special Assistant Corporation Counsel where he represented and provided legal counsel for several city departments. He subsequently established his own law practice in New Haven which he maintained until 2000.

Mr. Morris served as Counsel to the Board of Directors for the Greater New Haven Transit District which involved federal and state legal matters in transportation, government contract and grant development, and presenting testimony to the Connecticut State Legislature.

Mr. Morris earned his M.B.A. from the University of Bridgeport. He also helped organize and became the first president of the University of Bridgeport Law School Alumni Association.

**Kevin M. Nadolny**

Kevin Nadolny is a staff attorney at Grant & Eisenhofer.  Mr. Nadolny has focused his career in securities litigation, antitrust, and mass tort cases, with a particular focus on e-discovery issues since 2004.

Mr. Nadolny is currently a member of the team litigating In re Pfizer Securities Litigation before the Honorable Judge Laura Swain in the Southern District of New York.  The team recently turned in a win in the Daubert Hearing clearing the way for a potential landmark settlement.

Mr. Nadolny has participated in assessing derivative actions in various state and federal courts including those arising out of instances of improper stock option backdating.

He is a 1998 graduate of the University of Minnesota, and a 2002 J.D. graduate of Temple Law. In 2003 he was granted an LL.M. degree in Transnational Law from Temple Law.

**Joseph P. Nearey**

Joseph Nearey focuses on complex securities litigation as a staff attorney at Grant & Eisenhofer. He received his law degree in 2001 from Temple University School of Law, where he was a member of the Temple International and Comparative Law Journal.  He attended the Temple University School of Law Semester in Japan and interned at a prominent Tokyo firm.  He served as a summer intern for the Honorable James R. Cavanaugh of the Superior Court of Pennsylvania.

Mr. Nearey graduated *cum laude* from Hamilton College in 1997 with dual B.A degrees in English Literature and Government.

**Matthew J. Rieder**

Matthew Rieder is a staff attorney at Grant & Eisenhofer. He earned his law degree from Villanova University School of Law in 1971.  He graduated from St. Joseph's University in 1968 where he received his B.A. in History.

**Raymond Schuenemann**

Raymond Schuenemann focuses on securities litigation as a staff attorney at Grant & Eisenhofer. He is a graduate of the Widener University School of Law and a member of the American Bar Association and the Pennsylvania Bar Association.  Prior to joining Grant & Eisenhofer, Mr. Schuenemann worked as an associate in labor law, nursing home law, sales and use tax law, and real estate law. He also worked as a consultant in the area of sales and use tax.

Mr. Schuenemann received a B.S. in Finance from West Chester University in 1999. He has experience as an investment accountant and internal auditor in the banking and finance sectors.

**Kimberly B. Schwarz**

Kimberly Schwarz is a staff attorney at Grant & Eisenhofer. She earned her law degree from Rutgers School of Law in 2010. She graduated with high honors from Rutgers University School of Business in 2002 where she received her B.S. in Business Management.

**Shannon T. Somma**

Shannon Somma is a staff attorney at Grant & Eisenhofer. Her focus is on securities fraud and class action litigation. She has additional experience in intellectual property, pharmaceutical, and environmental litigation.

Ms. Somma graduated in 1999 from the University of Delaware with a B.A. degree in psychology, and thereafter received her J.D. degree from Widener University School of Law in 2005.

**Selected Institutional Client Representations**

G&E has represented or is currently representing a number of institutional investors in major securities fraud actions, shareholder derivative suits, other breach-of-fiduciary-duty cases and related ancillary proceedings around the country. Some of our cases include:

**(A)** **In Securities Fraud Litigation:**

**(1)** **Cellstar**

In one of the earliest cases filed after the enactment of PSLRA, the State of Wisconsin Investment Board ("SWIB") was designated lead plaintiff and G&E was appointed lead counsel in Gluck v. CellStar Corp., 976 F.Supp. 542 (N.D.Tex. 1997). The cited opinion is widely considered the landmark on standards applicable to the lead plaintiff/lead counsel practice under PSLRA. (See, especially, In re Cendant Corp. Litig., 2001 WL 980469, at *40, *43 (3d Cir. Aug. 28, 2001), citing CellStar.) After the CellStar defendants' motion to dismiss failed and a round of discovery was completed, the parties negotiated a $14.6 million settlement, coupled with undertakings on CellStar's part for significant corporate governance changes as well. With SWIB's active lead in the case, the class recovery, gross before fees and expenses, was approximated to be 56% of the class' actual loss claims, about 4 times the historical 14% average gross recovery in securities fraud litigation. Because of the competitive process that SWIB had undertaken in the selection of counsel, resulting in a contingent fee percentage significantly less than the average 31% seen historically, the net recovery to the class after all claims were submitted came to almost 50% of actual losses, or almost 5 times the average net recovery.

**(2)** **DaimlerChrysler**

Florida State Board of Administration ("FSBA") was appointed lead plaintiff and G&E co-lead counsel in the PSLRA class action on behalf of shareholders of the former Chrysler Corporation who exchanged their shares for stock in DaimlerChrysler in Chrysler's 1998 business combination with Daimler-Benz AG which was represented at the time as a "merger of equals." Shortly before trial, the defendants agree to a $300 million cash settlement, among the largest securities class action settlements since the enactment of the PSLRA. In re DaimlerChrysler Securities Litigation, D. Del., C.A. No. 00-0993.

**(3)** **Oxford Health Plans**

Public Employees' Retirement Association of Colorado ("ColPERA") engaged G&E to represent it to seek the lead plaintiff designation in the numerous securities fraud actions that were consolidated into In re Oxford Health Plans, Inc., Securities Litig., S.D.N.Y., MDL Docket No. 1222 (CLB). The court ordered the appointment of ColPERA as a co-lead plaintiff and G&E as a co-lead counsel. G&E and its co-leads filed the Consolidated Amended Complaint. Memorandum opinions and orders were entered denying defendants' motions to dismiss (see 51 F.Supp. 2d 290 (May 28, 1999) (denying KPMG motion) and 187

F.R.D. 133 (June 8, 1999) (denying motion of Oxford and individual director defendants)). The case settled for $300 million, another settlement negotiated by G&E that is among the largest settlements since the enactment of the PSLRA.

**(4)**    **Dollar General**

The U.S. District Court for the Middle District of Tennessee ordered the appointment of Florida State Board of Administration ("FSBA") and the Teachers' Retirement System of Louisiana ("TRSL") as lead plaintiffs and G&E as co-lead counsel in a PSLRA and Rule 10b-5 case against the defendant company, its accountants, and individual insiders who allegedly issued false and misleading statements over an alleged 3-year Class Period and failed to disclose adverse facts about the company's financial results. Settlements were approved involving a cash payment of $162 million from the company and the individual defendants, an additional $10.5 million from Deloitte & Touche, LLP (Dollar General's accountants), and beneficial governance reforms for Dollar General. In re Dollar General Securities Litigation, M.D. Tenn., No. 3:01-0388, orders dated July 19, 2001 and September 29, 2003.

**(5)**    **Just For Feet**

G&E represented the State of Wisconsin Investment Board ("SWIB") in a federal securities class action against certain officers and directors of Just For Feet, Inc., and against Just For Feet's auditors, in the Northern District of Alabama. That action arose out of the defendants' manipulation of the company's accounting practices to materially misstate the company's financial results. Having been appointed co-lead plaintiff, SWIB and (G&E) as its counsel took primary responsibility for the case. (SWIB v. Ruttenberg, et al., N.D. Ala., CV 99-BU-3097-S and 99-BU-3129-S, 102 F. Supp. 2d 1280 (N.D. Ala. 2000)). SWIB obtained a policy limits settlement with the individual defendants' D&O carrier and an additional $7.4 million from Just For Feet's auditor, for a recovery totaling approximately $32 million.

**(6)**    **Waste Management**

G&E filed a non-class federal securities action against Waste Management, Inc., its former and current directors, and the company's accountants in the Northern District of Florida, on behalf of Lens Investment Management, LLC and Ram Trust Services, Inc. The complaint alleged that Waste Management had, over a five-year period, issued financial statements and other public statements that were materially false and misleading due to the defendants' fraudulent and improper accounting manipulations. G&E also filed non-class actions in Illinois state court, asserting similar claims on behalf of the Florida State Board of Administration ("FSBA") and the Teachers' Retirement System of Louisiana ("TRSL"). After G&E successfully defeated the defendants' motions to dismiss FSBA's complaint in state court, FSBA's cause of action was transferred to the Northern District of Florida. At the point where there were competing motions for summary judgment pending, G&E successfully negotiated a settlement pursuant to which each

plaintiff received several times what it would have received in the class action. Florida State Board of Administration, Ram Trust Services, Inc. and Lens Investment Management, LLC v. Waste Management, Inc., et al., N.D.Fla., No. 4:99CV66-WS, amended complaint filed June 21, 1999; and Teachers' Retirement System of Louisiana v. Waste Management, Inc., et al., Circuit Ct., Cook Co. [Ill.], No. 98 L 06034, complaint filed May 18, 1999.

(7)     **Total Renal Care**

In June 1999, the Louisiana State Employees' Retirement System ("LASERS") and Teachers' Retirement System of Louisiana ("TRSL") were appointed as Lead Plaintiff in a federal securities class action against Total Renal Care ("TRC") and certain of its officers and directors, pending in the U.S. District Court for the Central District of California. G&E was approved as Plaintiffs' Lead Counsel. Plaintiffs filed their Corrected Consolidated Amended Complaint against the defendants, alleging, inter alia, that the defendants manipulated TRC's financial statements so as to materially overstate TRC's revenues, income and assets and to artificially inflate TRC's stock price. G&E negotiated a settlement requiring TRC's payment of $25 million into a settlement fund for the class and the company's adoption of certain internal corporate governance policies and procedures designed to promote the future accountability of TRC's management to its stockholders. At the time of the settlement, this amount represented 33% of the value of the Company's shares. In re Total Renal Care Securities Litigation, C.D. Cal., Master File No. CV-99-01745 CBM.

(8)     **Safety-Kleen**

G&E was sole lead counsel for the plaintiffs in a federal securities class action and a series of related individual actions against former officers, directors, auditors and underwriters of Safety-Kleen Corporation, who are alleged to have made false and misleading statements in connection with the sale and issuance of Safety-Kleen bonds. In re Safety-Kleen Corp. Bondholders Litig., D.S.C., No. 3:00-CV-1145-17, consolidated complaint filed January 23, 2001. In March of 2005, after a jury had been selected for trial, the auditor defendant settled with the class and individual claimants for $48 million. The trial then proceeded against the director and officer defendants. After seven weeks of trial, the director defendants settled for $36 million, and the court entered judgment as a matter of law in favor of the class and against the company's CEO and CFO, awarding damages of $192 million.

(9)     **Styling Technology Corporation**

G&E represented funds managed by Franklin Advisers, Inc., Conseco Capital Management, Inc., Credit Suisse Asset Management, Pilgrim American Funds and Oppenheimer Funds, Inc. in a securities action brought in May 2001, asserting both federal (1933 Act) and state claims brought in the Superior Court of California. The suit alleged that certain former officers, as well as the independent auditors, of Styling Technology Corporation made false and

-44-

misleading statements in connection with the sale and issuance of Styling Technology bonds. Styling Technology filed for bankruptcy protection under Chapter 11 in August 1999. In October 2000, discovery of accounting irregularities and improperly recognized revenue forced the Company to restate its financial statements for the years 1997 and 1998. Plaintiffs, owning $66.5 million of the total $100 million in bonds sold in the offering, settled the case for a recovery representing approximately 46% of the losses suffered by the client funds that they manage. Franklin High Income Trust, et al. v. Richard R. Ross, et al., Cal. Super., San Mateo Co. [Calif.], Case No: 415057, complaint filed November 28, 2000.

**(10)** **Tyco**

G&E served as co-lead counsel representing co-lead plaintiffs Teachers' Retirement System of Louisiana and Louisiana State Employees' Retirement System in a securities class action against Tyco International Ltd. and PricewaterhouseCoopers LLP. The complaint alleged that the defendants, including Tyco International, Dennis Kozlowski and other former executives and directors of Tyco, and PricewaterhouseCoopers, made false and misleading public statements and omitted material information about Tyco's finances in violation of Sections 10(b), 14, 20A and 20(a) of the Securities Exchange Act of 1934. Tyco agreed to fund $2.975 billion in cash to settle these claims, representing the single largest payment from any corporate defendant in the history of securities class action litigation. PricewaterhouseCoopers also agreed to pay $225 million to settle these claims, resulting in a total settlement fund in excess of $3.2 billion.

**(11)** **Global Crossing**

Ohio Public Employees' Retirement System ("Ohio PERS") and the Ohio Teachers' Retirement System ("STRS") were appointed lead plaintiff and G&E was appointed sole lead counsel in a securities class action against Global Crossing, Ltd. and Asia Global Crossing, Ltd. In re Global Crossing, Ltd. Securities & "ERISA" Litig., MDL Docket No. 1472. In November 2004, the Court approved a partial settlement with the Company's former officers and directors, and former outside counsel, valued at approximately $245 million. In July 2005, the Court approved a $75 million settlement with the Citigroup-related defendants (Salomon Smith Barney and Jack Grubman). In October 2005, the Court approved a settlement with Arthur Anderson LLP and all Anderson-related defendants for $25 million. In October 2006, the Court approved a $99 million settlement with various financial institutions. In total, G&E recovered $448 million for investors in Global Crossing.

**(12)** **Telxon Corporation**

G&E filed a federal securities and common law action against Telxon Corporation, its former officers and directors and its accountants in the Northern District of Ohio on behalf of Wyser-Pratte Management Co., Inc., an investment management firm. Following mediation, G&E negotiated a settlement of all

-45-

claims. <u>Wyser-Pratte Management Co., Inc. v. Telxon Corp., et al.</u>, N.D. Ohio, Case No. 5:02CV1105.

**(13)** <u>**Hayes Lemmerz**</u>

G&E served as lead counsel to plaintiffs and class members who purchased or acquired over $1 billion in bonds issued by Hayes Lemmerz International, Inc. G&E negotiated a settlement worth $51 million. <u>Pacholder High Yield Fund, Inc. et al. v. Ranko Cucoz et al.</u>, E.D. Mich., C.A. No. 02-71778.

**(14)** <u>**Asia Pulp and Paper**</u>

On behalf of bondholders of various subsidiaries of Indonesian paper-making giant Asia Pulp and Paper ("APP"), G&E filed an action alleging that the bondholders were defrauded by APP's financial statements which were inflated by nearly $1 billion in fictitious sales. Defendants' motions to dismiss were denied. <u>Franklin High Income Trust, et al. v. APP Global Ltd., et al.</u>, N.Y. Sup. Ct., Trial Div., Index No. 02-602567. The matter was resolved through a confidential settlement.

**(15)** <u>**Alstom**</u>

Louisiana State Employees' Retirement System was appointed as co-lead plaintiff and G&E was appointed co-lead counsel in a class action against Alstom SA, a French corporation engaged in power generation, transmission and distribution in France. The suit alleges that Alstom and other defendants made false and misleading statements concerning the growth and financial performance of its transportation subsidiary. A settlement in the amount of $6.95 million is awaiting Court approval. <u>In re Alstom SA Sec. Litig.</u>, S.D.N.Y. 03-cv-6595.

**(16)** <u>**Parmalat**</u>

G&E is co-lead counsel in this securities class action arising out of a multi-billion dollar fraud at Parmalat, which the SEC has described as "one of the largest and most brazen corporate financial frauds in history." Settlements exceeding $90 million were reached. <u>In re Parmalat Sec. Litig.</u>, S.D.N.Y. 04-MDL-1653.

**(17)** <u>**Marsh & McLennan**</u>

G&E was co-lead counsel for the class of former Marsh & McLennan shareholders in this federal securities class action alleging that the company, its officers, directors, auditors, and underwriters participated in a fraudulent scheme involving, among other things, bid-rigging and secret agreements to steer business to certain insurance companies in exchange for "kick-back" commissions. After five years of litigation, G&E achieved a $400 million settlement on behalf of the class. <u>In re Marsh & McLennan Companies, Inc. Sec. Litig.</u>, S.D.N.Y. 04-cv-8144.

**(18)    Hollinger International**

G&E was co-lead counsel in this securities class action arising out of a company scandal at Hollinger International, Inc. which involves payment of millions of dollars to certain executives, including the company's former CEO, Lord Conrad Black, relating to sales of company assets.  G&E negotiated a settlement with Hollinger in the amount of $37.5 million.  Hollinger International Securities Litigation, N.D. Ill. 04-C-0834.

**(19)    General Motors**

G&E served as co-lead counsel in a securities class action against GM, arising from alleged false statements in GM's financial reports.  After about two and a half years of litigation, a settlement was reached with GM for $277 million, with GM's auditor, Deloitte & Touche contributing an additional $26 million.  The combined $303 million settlement ranked among the largest shareholder recoveries of 2008.  In re General Motors Corp. Sec. Litig., E.D. Mich., MDL No. 1749.

**(20)    Delphi**

Delphi is an automotive company that was spun off of General Motors.  The company failed as a stand-alone entity, but concealed its failure from investors.  G&E's client, one of the largest pension funds in the world, served as a lead plaintiff, and G&E served as co-lead counsel in this securities class action, which produced settlements totaling $325 million from Delphi, its auditor and its director and officers liability insurer.  In re Delphi Corporation Securities Derivative & ERISA Litigation, E.D. Mich., MDL No. 1725.

**(21)    Refco**

A mere two months after going public, Refco admitted that its financials were unreliable because the company had concealed that hundreds of millions of dollars of uncollectible receivables were owed to the company by an off-balance sheet entity owned by the company's CEO.  G&E served as a co-lead counsel and G&E's client, PIMCO, was a co-lead plaintiff.  The case resulted in recoveries totaling $422 million for investors in Refco's stock and bonds (including $140 million from the company's private equity sponsor, over $50 million from the underwriters, and $25 million from the auditor).  In re Refco, Inc. Securities Litigation, S.D.N.Y., No. 05 Civ. 8626.

**(22)    Sprint**

G&E represented lead plaintiff institutional investor Carlson Capital, L.P. in this class action suit against Sprint Corporation and its former CEO and directors for breach of fiduciary duty in the consolidation of two separate tracking stocks.  In December 2007, a $57.5 million settlement was approved.  In re Sprint Corporation Shareholder Litigation, D. Kan., No. 04 CV 01714.

**(B)**     **In Derivative and Other Corporate Litigation:**

    **(1)**     <u>Digex</u>

        This case resulted in a settlement of over $400 million, the largest reported settlement in the history of Delaware corporate litigation. G&E represented the lead plaintiff, TCW Technology Limited Partnership, in alleging that Digex, Inc.'s directors and majority stockholder (Intermedia, Inc.) breached their fiduciary duties in connection with WorldCom's proposed $6 billion acquisition of Intermedia. Among other issues, WorldCom was charged with attempting to usurp a corporate opportunity that belonged to Digex and improperly waiving on Digex's behalf the protections of Delaware's business combination statute. Following G&E's argument on a motion to preliminarily enjoin the merger, the Court issued an opinion declining to enjoin the transaction but acknowledging plaintiffs' likelihood of success on the merits. <u>In re Digex, Inc. Shareholders Litigation</u>, C.A. No. 18336, 2000 WL 1847679 (Del. Ch. Dec. 13, 2000). The case settled soon thereafter.

    **(2)**     **UnitedHealth Group**

        G&E represented the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Connecticut Retirement Plans and Trust Funds as lead plaintiffs in a derivative and class action suit in which G&E successfully challenged $1.2 billion in back-dated options granted to William McGuire, then-CEO of health care provider UnitedHealth Group. This was among the first – and most egregious – examples of options backdating. G&E's case produced a settlement of $922 million, the largest settlement in the history of derivative litigation in any jurisdiction. <u>In re UnitedHealth Group Inc. Shareholder Derivative Litig.</u>, C.A. No. 06-cv-1216 (D. Minn.)

    **(3)**     **AIG**

        In the largest settlement of derivative shareholder litigation in the history of the Delaware Chancery Court, G&E reached a $115 million settlement in a suit against former executives of AIG for breach of fiduciary duty. The case challenged hundreds of millions of dollars in commissions paid by AIG to C.V. Starr & Co., a privately held affiliate controlled by former AIG Chairman Maurice "Hank" Greenberg and other AIG directors. The suit alleged that AIG could have done the work for which it paid Starr, and that the commissions were simply a mechanism for Greenberg and other Starr directors to line their pockets. <u>Teachers' Retirement System of Louisiana v. Greenberg, et al.</u>, C. A. No. 20106-VCS (Del. Ch.).

    **(4)**     **Genentech**

        When Swiss healthcare company Roche offered to buy out biotech leader Genentech Inc. for $43.7 billion, or $89 per share, G&E filed a derivative claim on behalf of institutional investors opposed to the buyout. With the pressure of the pending litigation, G&E was able to reach a settlement that provided for

Roche to pay $95 per share, representing an increase of approximately $3 billion for minority shareholders. <u>In re Genentech, Inc. Shareholders Litig.</u>, C.A. No. 3911-VCS (Del. Ch.).

**(5)** <u>**Willamette**</u>

In January 2002, at the request of Wyser-Pratte Management Co., Inc. and Franklin Mutual Advisors, G&E filed a shareholder derivative action in Oregon state court claiming that the board of Willamette Industries, Inc. breached its fiduciary duties by attempting to cause Willamette to acquire the asbestos-ridden building products division of Georgia-Pacific Company as part of a scorched-earth effort to defeat a hostile takeover of Willamette by its chief competitor, Weyerhaeuser Company. G&E obtained an expedited hearing on its motion for a preliminary injunction and obtained an agreement from Willamette at the hearing not to consummate any deal with Georgia-Pacific without providing prior notice to G&E. Almost immediately thereafter, and after years of fighting against Weyerhaeuser's take-over attempts, the Willamette board relented and agreed to sell the company to Weyerhaeuser. <u>Wyser-Pratte Management Co., Inc. & Franklin Mutual Advisors v. Swindells, et al.</u>, No. 0201-0085 (Ore. Cir. Ct.).

**(6)** <u>**Medco Research**</u>

In January 2000, G&E filed a shareholder derivative action on behalf of State of Wisconsin Investment Board against the directors of Medco Research, Inc. in Delaware Chancery Court. The suit alleged breach of fiduciary duty in connection with the directors' approval of a proposed merger between Medco and King Pharmaceuticals, Inc. G&E was successful in obtaining a preliminary injunction requiring Medco to make supplemental and corrective disclosures. Because of G&E's efforts, the consideration to Medco's stockholders increased by $4.08 per share, or $48,061,755 on a class-wide basis. <u>State of Wisconsin Investment Board v. Bartlett, et al.</u>, C.A. No. 17727, 2000 WL 193115 (Del. Ch. Feb. 9, 2000).

**(7)** <u>**Occidental Petroleum**</u>

G&E represented Teachers' Retirement System of Louisiana and served as co-counsel in a shareholders' derivative suit against the directors of Occidental Petroleum Corporation, challenging as corporate waste the company's excessive compensation arrangements with its top executives. Filed in California state court, the case settled when the company agreed to adopt CalPERS's model principles of corporate governance and undertook to reconstitute its key committees so as to meet the tests of independence under those principles. <u>Teachers' Retirement System of Louisiana v. Irani et al.</u>, No. BC1850009 (Cal. Super.).

**(8)** <u>**Staples, Inc.**</u>

On behalf of Teachers' Retirement System of Louisiana, G&E challenged Staples, Inc.'s proposed "recapitalization" plan to unwind a tracking stock, Staples.com,

which it created in 1998. G&E obtained a preliminary injunction against the deal and the deal terms were ultimately altered resulting in a $15-$20 million gain for shareholders. Additional disclosures were also required so that shareholders voted on the challenged transaction based on a new proxy statement with substantial additional disclosures. In re Staples, Inc. Shareholders Litigation, C.A. No. 18784, 2001 WL 640377 (Del. Ch. June 5, 2001).

**(9)    SFX/Clear Channel Merger**

G&E filed a class action on behalf of Franklin Advisers, Inc. and other stockholders of SFX, challenging the merger between SFX and Clear Channel. While the SFX charter required that in any acquisition of SFX all classes of common stockholders be treated equally, the merger, as planned, provided for approximately $68 million more in consideration to the two Class B stockholders (who happened to be the senior executives of SFX) than to the public stockholders. The merger was structured so that stockholders who voted for the merger also had to vote to amend the Charter to remove the non-discrimination provisions as a condition to the merger. G&E negotiated a settlement whereby $34.5 million more was paid to the public stockholders upon closing of the merger. This was more than half the damages alleged in the Complaint. Franklin Advisers, Inc., et al. v. Sillerman, et al., C.A. No. 17878 (Del. Ch.).

**(10)    Lone Star Steakhouse & Saloon**

G&E filed a derivative lawsuit on behalf of CalPERS against Lone Star's former CEO, Jamie Coulter, and six other Lone Star directors. The suit alleged that the defendants violated their fiduciary duties in connection with their approval of the company's acquisition of CEI, one of Lone Star's service providers, from Coulter, as well as their approvals of certain employment and compensation arrangements and option repricing programs. Before filing the suit, G&E had assisted in CalPERS in filing a demand for books and records pursuant to Section 220 of the Delaware General Corporation Law. The company's response to that demand revealed the absence of any documentation that the board ever scrutinized transactions between Lone Star and CEI, that the board negotiated the purchase price for CEI, or that the board analyzed or discussed the repricing programs. In August 2005, the Court approved a settlement negotiated by G&E whereby Lone Star agreed to a repricing of options granted to certain of its officers and directors, payments from certain of the officers and directors related to option grants, and a $3 million payment from Lone Star's director and officer insurance policy. Lone Star further acknowledged that the lawsuit was one of the significant factors considered in its adoption of certain corporate governance reforms. California Public Employees' Retirement System v. Coulter, et al., C.A. No. 19191 (Del. Ch.).

**(11)    Siebel**

The issue of excessive executive compensation has been of significant concern for investors, yet their concerns have remained largely unaddressed due to the wide

discretion afforded corporate boards in establishing management's compensation. G&E effected a sea change in the compensation policies of Siebel Systems, a leading Silicon Valley-based software developer long considered to be an egregious example of executive compensation run amok, and caused Thomas Siebel, the company's founder and CEO, to cancel 26 million options with a potential value of $54 million. Since the company's founding in 1996, Siebel Systems had paid Mr. Siebel nearly $1 billion in compensation, largely in the form of lavish stock options that violated the shareholder-approved stock option plan. In addition, the company had paid its directors millions of dollars for their service on the board, also in the form of stock options, at levels exponentially higher than that paid to directors on the boards of similar companies. G&E, on behalf of Teachers' Retirement System of Louisiana, commenced a derivative action challenging the company's compensation practices in September of 2002 even though a prior, similar lawsuit had been dismissed. Following a hard-fought and acrimonious litigation, G&E successfully negotiated a settlement that, in addition to the options cancellation, included numerous corporate governance reforms. The company agreed to, inter alia, restructure its compensation committee, disclose more information regarding its compensation policies and decisions, cause its outside auditor to audit its option plans as part of the company's annual audit, and limit the compensation that can be paid to directors. The Siebel Systems settlement generated considerable favorable press in the industry, as investors and compensation experts anticipated that the reforms adopted by Siebel Systems could affect how other companies deal with compensation issues. Teachers' Retirement System of Louisiana v. Thomas M. Siebel, et al., C. A. No. 425796 (Cal. Super.).

**(12)** **HealthSouth Corporation**

G&E filed a derivative and class action lawsuit on behalf of Teachers' Retirement System of Louisiana against HealthSouth Corporation, its auditors, certain individual defendants, and certain third parties seeking, inter alia, an order forcing the HealthSouth board of directors to hold an annual shareholder meeting for the purpose of electing directors, as no such meeting had been held for over thirteen months. Following a trial, G&E negotiated a settlement of part of its claims, pursuant to which five of the defendant directors who were alleged to have engaged in improper self-dealing with the company agreed to resign and be replaced by directors selected by a committee comprised in part by institutional investors of HealthSouth. Teachers' Retirement System of Louisiana v. Scrushy, Del. Ch., C.A. No. 20529 (March 2, 2004).

**(13)** **NYSE/Archipelago**

G&E served as co-lead counsel in a class action in New York state court, brought on behalf of a class of seat holders of the New York Stock Exchange ("NYSE") challenging the proposed merger between the NYSE and Archipelago Holdings, LLC. The complaint alleged that the terms of the proposed merger were unfair to the NYSE seat holders, and that by approving the proposed merger, the NYSE board of directors had violated their fiduciary duties of care, loyalty and candor,

-51-

because the transaction was the result of a process that was tainted by conflicts of interest and the directors failed adequately to inform themselves of the relevant facts. The court denied the defendants' motion to dismiss, and after expedited discovery, including over 30 depositions in a five week period, a preliminary injunction evidentiary hearing was held, in which plaintiffs sought to postpone the vote on the merger until a new, current fairness opinion was obtained from an independent financial advisor. On the second day of the hearing, the defendants agreed to the relief being sought, namely that they would obtain a new, current fairness opinion from an independent financial advisor. In re New York Stock Exchange/Archipelago Merger Litig., No. 601646/05 (Sup. Ct. N.Y. Co.)

**(14)** **Caremark / CVS**

G&E represented institutional shareholders in this derivative litigation challenging the conduct of the board of directors of Caremark Rx Inc. in connection with the negotiation and execution of a merger agreement with CVS, Inc., as well as that board's decision to reject a competing proposal from a different suitor. Ultimately, through the litigation, G&E was able to force Caremark's board not only to provide substantial additional disclosures to the public shareholders, but also to renegotiate the terms of the merger agreement with CVS to provide Caremark shareholders with an additional $3.19 billion in cash consideration and to ensure Caremark's shareholders had statutory appraisal rights in the deal. Louisiana Municipal Police Employees' Retirement System, et al. v. Crawford, et al., C.A. No. 2635-N (Del. Ch.).

**(15)** **UnitedHealth Group**

G&E represented the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Connecticut Retirement Plans and Trust Funds as lead plaintiffs in a derivative and class action suit in which G&E successfully challenged $1.2 billion in back-dated options granted to William McGuire, then-CEO of health care provider UnitedHealth Group. This was among the first – and most egregious – examples of options backdating. G&E's case produced a settlement of $922 million, the largest settlement in the history of derivative litigation in any jurisdiction. In re UnitedHealth Group Inc. Shareholder Derivative Litig., C.A. No. 06-cv-1216 (D. Minn.)

**(16)** **AIG**

In the largest settlement of derivative shareholder litigation in the history of the Delaware Chancery Court, G&E reached a $115 million settlement in a suit against former executives of AIG for breach of fiduciary duty. The case challenged hundreds of millions of dollars in commissions paid by AIG to C.V. Starr & Co., a privately held affiliate controlled by former AIG Chairman Maurice "Hank" Greenberg and other AIG directors. The suit alleged that AIG could have done the work for which it paid Starr, and that the commissions were simply a mechanism for Greenberg and other Starr directors to line their pockets.

<u>Teachers' Retirement System of Louisiana v. Greenberg, et al.</u>, C. A. No. 20106-VCS (Del. Ch.).

**(17)  Del Monte Foods**

G&E served as lead counsel in shareholder litigation in which the Firm obtained an $89.4 million settlement against Del Monte Foods Co. and Barclays Capital. On February 14, 2011, the Delaware Chancery Court issued a ground-breaking order enjoining not only the shareholder vote on the merger, but the merger agreement's termination fee and other mechanisms designed to deter competing bids.  As a result of plaintiff's efforts, the Board was forced to conduct a further shopping process for the company.  Moreover, the opinion issued in connection with the injunction has resulted in a complete change on Wall Street regarding investment banker conflicts of interests and company retention of investment bankers in such circumstances.  <u>In re Del Monte Shareholder Litigation</u>, C.A. No. 6027-VCL (Del. Ch).

**(18)  Genentech**

When Swiss healthcare company Roche offered to buy out biotech leader Genentech Inc. for $43.7 billion, or $89 per share, G&E filed a derivative claim on behalf of institutional investors opposed to the buyout.  With the pressure of the pending litigation, G&E was able to reach a settlement that provided for Roche to pay $95 per share, representing an increase of approximately $3 billion for minority shareholders.  <u>In re Genentech, Inc. Shareholders Litig.</u>, C.A. No. 3911-VCS (Del. Ch.).

**(19)  Willamette**

In January 2002, at the request of Wyser-Pratte Management Co., Inc. and Franklin Mutual Advisors, G&E filed a shareholder derivative action in Oregon state court claiming that the board of Willamette Industries, Inc. breached its fiduciary duties by attempting to cause Willamette to acquire the asbestos-ridden building products division of Georgia-Pacific Company as part of a scorched-earth effort to defeat a hostile takeover of Willamette by its chief competitor, Weyerhaeuser Company.  G&E obtained an expedited hearing on its motion for a preliminary injunction and obtained an agreement from Willamette at the hearing not to consummate any deal with Georgia-Pacific without providing prior notice to G&E.  Almost immediately thereafter, and after years of fighting against Weyerhaeuser's take-over attempts, the Willamette board relented and agreed to sell the company to Weyerhaeuser.  <u>Wyser-Pratte Management Co., Inc. & Franklin Mutual Advisors v. Swindells, et al.</u>, No. 0201-0085 (Ore. Cir. Ct.).

**(20)  Medco Research**

In January 2000, G&E filed a shareholder derivative action on behalf of State of Wisconsin Investment Board against the directors of Medco Research, Inc. in Delaware Chancery Court.  The suit alleged breach of fiduciary duty in connection with the directors' approval of a proposed merger between Medco and

King Pharmaceuticals, Inc. G&E was successful in obtaining a preliminary injunction requiring Medco to make supplemental and corrective disclosures. Because of G&E's efforts, the consideration to Medco's stockholders increased by $4.08 per share, or $48,061,755 on a class-wide basis. State of Wisconsin Investment Board v. Bartlett, et al., C.A. No. 17727, 2000 WL 193115 (Del. Ch. Feb. 9, 2000).

**(21) Occidental Petroleum**

G&E represented Teachers' Retirement System of Louisiana and served as co-counsel in a shareholders' derivative suit against the directors of Occidental Petroleum Corporation, challenging as corporate waste the company's excessive compensation arrangements with its top executives. Filed in California state court, the case settled when the company agreed to adopt CalPERS's model principles of corporate governance and undertook to reconstitute its key committees so as to meet the tests of independence under those principles. Teachers' Retirement System of Louisiana v. Irani et al., No. BC1850009 (Cal. Super.).

**(22) Staples, Inc.**

On behalf of Teachers' Retirement System of Louisiana, G&E challenged Staples, Inc.'s proposed "recapitalization" plan to unwind a tracking stock, Staples.com, which it created in 1998. G&E obtained a preliminary injunction against the deal and the deal terms were ultimately altered resulting in a $15-$20 million gain for shareholders. Additional disclosures were also required so that shareholders voted on the challenged transaction based on a new proxy statement with substantial additional disclosures. In re Staples, Inc. Shareholders Litigation, C.A. No. 18784, 2001 WL 640377 (Del. Ch. June 5, 2001).

**(23) SFX/Clear Channel Merger**

G&E filed a class action on behalf of Franklin Advisers, Inc. and other stockholders of SFX, challenging the merger between SFX and Clear Channel. While the SFX charter required that in any acquisition of SFX all classes of common stockholders be treated equally, the merger, as planned, provided for approximately $68 million more in consideration to the two Class B stockholders (who happened to be the senior executives of SFX) than to the public stockholders. The merger was structured so that stockholders who voted for the merger also had to vote to amend the Charter to remove the non-discrimination provisions as a condition to the merger. G&E negotiated a settlement whereby $34.5 million more was paid to the public stockholders upon closing of the merger. This was more than half the damages alleged in the Complaint. Franklin Advisers, Inc., et al. v. Sillerman, et al., C.A. No. 17878 (Del. Ch.).

**(24) Lone Star Steakhouse & Saloon**

G&E filed a derivative lawsuit on behalf of CalPERS against Lone Star's former CEO, Jamie Coulter, and six other Lone Star directors. The suit alleged that the

defendants violated their fiduciary duties in connection with their approval of the company's acquisition of CEI, one of Lone Star's service providers, from Coulter, as well as their approvals of certain employment and compensation arrangements and option repricing programs. Before filing the suit, G&E had assisted in CalPERS in filing a demand for books and records pursuant to Section 220 of the Delaware General Corporation Law. The company's response to that demand revealed the absence of any documentation that the board ever scrutinized transactions between Lone Star and CEI, that the board negotiated the purchase price for CEI, or that the board analyzed or discussed the repricing programs. In August 2005, the Court approved a settlement negotiated by G&E whereby Lone Star agreed to a repricing of options granted to certain of its officers and directors, payments from certain of the officers and directors related to option grants, and a $3 million payment from Lone Star's director and officer insurance policy. Lone Star further acknowledged that the lawsuit was one of the significant factors considered in its adoption of certain corporate governance reforms. <u>California Public Employees' Retirement System v. Coulter, et al.</u>, C.A. No. 19191 (Del. Ch.).

**(25)** <u>**Siebel**</u>

The issue of excessive executive compensation has been of significant concern for investors, yet their concerns have remained largely unaddressed due to the wide discretion afforded corporate boards in establishing management's compensation. G&E effected a sea change in the compensation policies of Siebel Systems, a leading Silicon Valley-based software developer long considered to be an egregious example of executive compensation run amok, and caused Thomas Siebel, the company's founder and CEO, to cancel 26 million options with a potential value of $54 million. Since the company's founding in 1996, Siebel Systems had paid Mr. Siebel nearly $1 billion in compensation, largely in the form of lavish stock options that violated the shareholder-approved stock option plan. In addition, the company had paid its directors millions of dollars for their service on the board, also in the form of stock options, at levels exponentially higher than that paid to directors on the boards of similar companies. G&E, on behalf of Teachers' Retirement System of Louisiana, commenced a derivative action challenging the company's compensation practices in September of 2002 even though a prior, similar lawsuit had been dismissed. Following a hard-fought and acrimonious litigation, G&E successfully negotiated a settlement that, in addition to the options cancellation, included numerous corporate governance reforms. The company agreed to, inter alia, restructure its compensation committee, disclose more information regarding its compensation policies and decisions, cause its outside auditor to audit its option plans as part of the company's annual audit, and limit the compensation that can be paid to directors. The Siebel Systems settlement generated considerable favorable press in the industry, as investors and compensation experts anticipated that the reforms adopted by Siebel Systems could affect how other companies deal with compensation issues. <u>Teachers' Retirement System of Louisiana v. Thomas M. Siebel, et al.</u>, C. A. No. 425796 (Cal. Super.).

**(26)**   **HealthSouth Corporation**

G&E filed a derivative and class action lawsuit on behalf of Teachers' Retirement System of Louisiana against HealthSouth Corporation, its auditors, certain individual defendants, and certain third parties seeking, inter alia, an order forcing the HealthSouth board of directors to hold an annual shareholder meeting for the purpose of electing directors, as no such meeting had been held for over thirteen months. Following a trial, G&E negotiated a settlement of part of its claims, pursuant to which five of the defendant directors who were alleged to have engaged in improper self-dealing with the company agreed to resign and be replaced by directors selected by a committee comprised in part by institutional investors of HealthSouth. Teachers' Retirement System of Louisiana v. Scrushy, Del. Ch., C.A. No. 20529 (March 2, 2004).

**(27)**   **NYSE/Archipelago**

G&E served as co-lead counsel in a class action in New York state court, brought on behalf of a class of seat holders of the New York Stock Exchange ("NYSE") challenging the proposed merger between the NYSE and Archipelago Holdings, LLC. The complaint alleged that the terms of the proposed merger were unfair to the NYSE seat holders, and that by approving the proposed merger, the NYSE board of directors had violated their fiduciary duties of care, loyalty and candor, because the transaction was the result of a process that was tainted by conflicts of interest and the directors failed adequately to inform themselves of the relevant facts. The court denied the defendants' motion to dismiss, and after expedited discovery, including over 30 depositions in a five week period, a preliminary injunction evidentiary hearing was held, in which plaintiffs sought to postpone the vote on the merger until a new, current fairness opinion was obtained from an independent financial advisor. On the second day of the hearing, the defendants agreed to the relief being sought, namely that they would obtain a new, current fairness opinion from an independent financial advisor. In re New York Stock Exchange/Archipelago Merger Litig., No. 601646/05 (Sup. Ct. N.Y. Co.)

**(28)**   **Caremark / CVS**

G&E represented institutional shareholders in this derivative litigation challenging the conduct of the board of directors of Caremark Rx Inc. in connection with the negotiation and execution of a merger agreement with CVS, Inc., as well as that board's decision to reject a competing proposal from a different suitor. Ultimately, through the litigation, G&E was able to force Caremark's board not only to provide substantial additional disclosures to the public shareholders, but also to renegotiate the terms of the merger agreement with CVS to provide Caremark shareholders with an additional $3.19 billion in cash consideration and to ensure Caremark's shareholders had statutory appraisal rights in the deal. Louisiana Municipal Police Employees' Retirement System, et al. v. Crawford, et al., C.A. No. 2635-N (Del. Ch.).

**(C)**     **In Securities Class Action Opt-Out Litigation**

    **(1)**     **AOL Time Warner, Inc.**

    G&E filed an opt-out action against AOL Time Warner, its officers and directors, auditors, investment bankers and business partners. The case challenged certain transactions entered by the company to improperly boost AOL Time Warner's financials. G&E was able to recover for its clients more than 6 times the amount that they would have received in the class case.

    **(2)**     **BankAmerica Corp.**

    G&E filed an individual action seeking to recover damages caused by the defendants' failure to disclose material information in connection with the September 30, 1998 merger of NationsBank Corporation and BankAmerica Corporation. G&E was preparing the case for trial when it achieved a settlement whereby the firm's client received more than 5 times what it would have received in the related class action. Those proceeds were also received approximately one year earlier than the proceeds from the class action settlement.

    **(3)**     **Bristol-Myers Squibb**

    G&E filed an opt-out action against Bristol-Myers Squibb, certain of its officers and directors, its auditor, and Imclone, Inc., alleging that Bristol-Myers had falsified billions of dollars of revenue as part of a scheme of earnings management. While the federal class action was dismissed and eventually settled for only 3 cents on the dollar, G&E's action resulted in a total settlement representing approximately 10 times what the firm's clients likely would have received from the class action.

    **(4)**     **Qwest Communications**

    G&E filed an individual action against Qwest, its accountant (Arthur Anderson LLP), Solomon Smith Barney, and current and former officers and directors of those companies. The case alleged that Qwest used "swap deals" to book fake revenue and defraud investors. G&E was able to recover for its clients more than 10 times what they would have recovered had they remained members of the class.

    **(5)**     **WorldCom**

    G&E filed an opt-out action against former senior officers and directors of WorldCom, including former CEO Bernard Ebbers, and Arthur Andersen LLP (WorldCom's former auditor), among others. The case stemmed from the widely-publicized WorldCom securities fraud scandal that involved false and misleading statements made by the defendants concerning WorldCom's financials, prospects and business operations. G&E recovered for its clients more than 6 times what they would have received from the class action.

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

THURMAN ROSS, by and on behalf of
himself and all others similarly situated,

Plaintiff,

v.

CAREER EDUCATION CORPORATION,
GARY E. McCULLOUGH and MICHAEL J.
GRAHAM,

Defendants.

No. 12-CV-00276
Hon. John W. Darrah

**DECLARATION OF JEANNE C. FINEGAN, APR,**
**CONCERNING PROPOSED POSTCARD NOTIFICATION**

I, JEANNE C. FINEGAN, APR declare as follows:

## INTRODUCTION

1.      I am a President of HF Media LLC., ("HF Media"), a Division of Heffler
Claims Group.  This Declaration is based upon my personal knowledge, as well as on
information provided to me by my associates, including information reasonably relied
upon in the fields of advertising, media, and communications.

## QUALIFICATIONS

2.      I have served as an expert, directly responsible for the design and
implementation of hundreds class action notice programs, some of which are the largest
and most complex programs ever filed in both the United States and in Canada.

3.      I have more than 25 years of communications and advertising experience
and I am accredited in Public Relations (APR) by the Universal Accreditation Board, a
program administered by the Public Relations Society of America. Further, I have
provided testimony before Congress on issues of notice. Also, I have lectured, published,

1

and been cited extensively on various aspects of legal noticing, product recall and crisis communications, and have served the Consumer Product Safety Commission (CPSC) as an expert to determine ways in which the Commission can increase the effectiveness of its product recall campaigns.

4.    I have designed, implemented, or consulted on many of the largest and highest profile national and international legal notice communication programs for a wide range of class actions and regulatory and consumer matters that include securities, product liability, construction defect, antitrust, asbestos, medical pharmaceutical, human and civil rights, telecommunications, media, environmental, banking, insurance, and bankruptcy. Those cases include, but are not limited to: *In Re Nortel I & II Securities Litigation,* Civil Action No. 01-CV-1855 (RMB), Master File No. 05 MD 1659 (LAP) (S.D.N.Y. 2006), *SEC v. Vivendi Universal, S.A., et al.,* Case No. 03-CV-10195-PKC (S.D.N.Y. 2003); *In re: Canadian Air Cargo Shipping Class Actions* (Ontario Superior Court of Justice, Court File No. 50389CP, Supreme Court of British Columbia, Quebec Superior Court); *DeHoyos v. Allstate Insurance Company*, Civil Action No SA-01-CA-1010-FB (W.D. Tex. 2006); *In re: John's Manville (Statutory Direct Action Settlement, Common Law Direct Action and Hawaii Settlement*), Index No 82-11656 (BRL) (Bankr. S.D.N.Y. 2004); *Deke, et al. v. Cardservice International*, Case No. BC 271679 (Los Angeles County Sup. Ct., Cal. 2004); *Sager v. Inamed Corp. and McGhan (Medical Breast Implant Litigation)*, Case No. 01043771 (Santa Barbara County Sup. Ct., Cal. 2004); *Wilson v. Massachusetts Mutual Life Insurance Company*, No. D-101-CV 98-02814 (1st Jud. Dist. Ct., Santa Fe County, N.M.); *In re: Florida Microsoft Antitrust Litigation*, Index No. 99-27340 (11th Jud. Dist. Ct. of Miami, Dade County, Fla.); *In re: Montana Microsoft Antitrust Litigation,* No. DCV 2000 219 (1st Jud. Dist. Ct., Lewis & Clark County, Mont.); *In re: MCI Non-Subscriber Ratepayers*, MDL No. 1275 (S.D. Ill.); *Sparks v. AT&T Corporation*, No. 96-LM-983 (3d Jud. Cir., Madison County, Ill.); *Pigford v. Glickman*, No. CA 97-19788 (PLF) (D.D.C.); *In re: SmithKline Beecham Clinical Billing*, No. CV 97-L-1230 (3d Jud. Dist., Madison County, Ill.); *Schmidt v. Adidas Salomon A.G.*, No. OCN-L-1248-01 (N.J. Super. Ct.); *MacGregor v. Schering Plough Corp.*, No. EC248041 (Los Angeles County Sup. Ct., Cal.); *In re: Louisiana-Pacific Inner Seal Siding*, Nos. 879-JE and 1543JE (D. Or.); *Foster v. ABTco Siding*

*Litigation*, No. 95-151-M (Cir. Ct. of Choctaw County, Ala.); *In re: Johns-Manville Phenolic Foam*, No. CV 96-10069 (D. Mass.); *In re: James Hardie Roofing*, No. CV 00-2-17945-65SEA (King County Super. Ct., Wash.); *Claybrook v. Sunbeam Corporation*, No. CV-98-C-1546-W (UWC) (N.D. Ala.); *In re: American Cyanamid*, No. CV-97-0581-BH-M (S.D. Ala.); *Bristow v. Fleetwood Enterprises*, No. Civ 00-0082-S-ELJ (D. Idaho); *Spencer v. Shell Oil Co.*, No. CV 94-074 (Harris County Dist. Ct., Tex.); and *In re: StarLink Corn Products*, No. 01 C 1181 (N.D. Ill.).

     5.     Additionally, I have published extensively on various aspects of legal noticing. Included below is a sample list of publications and articles:

     (a)     Author, *'Being 'Media-Relevant' — What It Means And Why It Matters* - Law360.com, New York (September 11, 2013, 2:50 PM ET).

     (b)     Co-Author, with Hon. Dickran Tevrizian, *"Expert Opinion: It's More Than Just a Report...Why Qualified Legal Experts Are Needed to Navigate the Changing Media Landscape,"* BNA Class Action Litigation Report, 12 CLASS 464, 5/27/11.

     (c)     Co-Author, with Hon. Dickran Tevrizian, "*Your Insight: It's More Than Just a Report...Why Qualified Legal Experts Are Needed to Navigate the Changing Media Landscape,* TXLR, Vol. 26, No. 21, 5/26/2011.

     (d)     Author, *Five Key Considerations for a Successful International Notice Program*, BNA Class Action Litigation Report, 4/9/10 Vol. 11, No. 7 p. 343.

     (e)     Quoted: *Technology Trends Pose Novel Notification Issues for Class Litigators*, BNA Electronic Commerce and Law Report, 15, ECLR 109, 1/27/10.

     (f)     Author, *Legal Notice: R U ready 2 adapt?* BNA Class Action Litigation Report, Vol. 10, No. 14, 7/24/2009, pp. 702-703.

     (g)     Author, *On Demand Media Could Change the Future of Best Practicable Notice*, BNA Class Action Litigation Report, Vol. 9, No. 7, 4/11/2008, pp. 307-310.

(h)    Quoted in, *Warranty Conference: Globalization of Warranty and Legal Aspects of Extended Warranty*, Warranty Week, February 28, 2007, available at www.warrantyweek.com/archive/ww20070228.html.

(i)    Co-Author, *Approaches to Notice in State Court Class Actions*, For The Defense, Vol. 45, No. 11, November, 2003.

(j)    Author, *The Web Offers Near, Real-Time Cost Efficient Notice*, American Bankruptcy Institute Journal, Vol. XXII, No. 5, 2003.

(k)    Author, *Determining Adequate Notice in Rule 23 Actions*, For The Defense, Vol. 44, No. 9, September, 2002.

(l)    Author, *What are the best practicable methods to give notice?* Georgetown University Law Center Mass Tort Litigation Institute, CLE White Paper: Dispelling the communications myth -- A notice disseminated is a notice communicated, November 1, 2001.

6.    In addition, I have lectured or presented extensively on various aspects of legal noticing:

a.    CLE Featured Speaker, "The Impact of Social Media on Class Action Notice." Consumer Attorneys of San Diego Class Action Symposium, San Diego, California, September 2012.

b.    International 8th Annual Class Actions Conference, Faculty Panelist, How Social Media and Networking has Changed Class Actions Nationwide, Los Angeles, California May 2012.

c.    CLE International, Faculty Panelist, Building a Workable Settlement Structure, CLE International, San Francisco, California May, 2011.

d.    Consumer Attorneys of San Diego (CASD), Faculty    Panelist, "21st Century Class Notice and Outreach," 2nd Annual Class Action Symposium CASD Symposium, San Diego, California, October 2010.

4

      e.      Consumer Attorneys of San Diego (CASD), Faculty Panelist, "The Future of Notice," 2nd Annual Class Action Symposium CASD Symposium, San Diego, California, October 2009.

      f.      American Bar Association, Speaker, 2008 Annual Meeting, "Practical Advice for Class Action Settlements: The Future of Notice In the United States and Internationally – Meeting the Best Practicable Standard."

      g.      American Bar Association, Section of Business Law Business and Corporate Litigation Committee – Class and Derivative Actions Subcommittee, New York, NY, August 2008.

      h.      Faculty Panelist, Women Lawyers Association of Los Angeles (WLALA) CLE Presentation, "The Anatomy of a Class Action." Los Angeles, CA, February 2008.

## OVERVIEW

This declaration is submitted to provide the Court with background concerning the use of postcards as an effective form of direct outreach to identifiable class members.

## POSTCARD NOTICE

As noted below, numerous courts have recognized that postcard notice has provided an appropriate means of communicating with class members.

- *In re General Electric Co. Securities Litigation*, No 09-C-1951 (S.D.N.Y. 2013)
- *In re Bally Total Fitness Securities Litigation*, No. 04-C-3530 (N.D. Ill. 2010)
- *In re AT&T Mobility Wireless Data Services Sales Tax Litigation*, 789 F. Supp. 2d 935 (N.D. Ill. 2011)
- *Malta v. Federal Home Loan Mortgage Corporation, et al.*, No. 10-CV-1290 BEN (NLS), 2013 WL 444619 (S.D. Cal. Feb. 5, 2013)
- *In re Checking Account Overdraft Litigation*, 275 F.R.D. 654 (S.D. Fla. 2011)
- *In re Checking Account Overdraft Litigation*, No. 09-MD-02036-JLK, 2012 WL 4174502 (S.D. Fla. Sept. 19, 2012)

- *In re Antibiotic Antitrust Actions*, 333 F.Supp. 291,293 (S.D.N.Y. 1971)
- *In re Countrywide Financial Corp. Customer Data Security Breach Litigation*, 2009 U.S. Dist. LEXIS 119870 (W.D. Ky. 2009)

## RESEARCH CONCERNING POSTCARD USE AND EFFECTIVENESS

Postcards are noted for effectively capturing attention and presenting important content. Studies by the U.S. Postal Service ("USPS") and the Direct Marketing Association[1] provide research reporting that consumers are more likely to read short, engaging materials in contrast to longer forms of communication. In this analysis the USPS Household Diary[2] reports and compares how consumers treat and interact with various types of mail and provides behavioral trends concerning mail treatment over time. In 2011, the report below finds that 78% of U.S. Households either read or scan advertising sent to their household.



*Source: HDS Recruitment Sample FY 1987, 2009, 2010 and 2011. Figure 5.3*
*Note: Percentages do not include those who did not provide a response.*

While research confirms that a majority of consumers are looking at their mail, of particular relevance in the USPS Study is the more granular examination of mail by shape

---

[1] Direct Marketing Association Statistical Fact Book ("DMA") 2009, p. 39 Usefulness of direct mail piece and shape, postcards. Also see page 42, (DMA 2009) Standard Mail (A) Response to Advertising by Shape – Reporting USPS 2008 Study.
[2] USPS Household Diary Study 2011, p 149, table A3-31 and A3-32 and A3-34.

and type including, among others, letters, larger than letter size and postcards. It finds that postcards exceed any other form of direct mail in the *"found useful"* and *"read by a member of the household"* category.

While information specific to legal notices is not measured, general assumptions can be made through this report of consumer attitudes and treatment of advertising mail.

## CONCLUSION

7.    I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 22nd, 2013, in Tigard, Oregon.

JEANNE C. FINEGAN

7